**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

The Woodlands Pride, Inc.; Abilene Pride
Alliance; Extragrams, LLC; 360 Queen
Entertainment LLC; Brigitte Bandit,

      Plaintiffs,

v.

Angela Colmenero, in an official capacity as
Interim Attorney General of Texas; The
Woodlands Township; Montgomery County,
Texas; Brett Ligon, in an official capacity as
District Attorney of Montgomery County;
City of Abilene, Texas; Taylor County,
Texas; James Hicks, in an official capacity as
District Attorney of Taylor County; Delia
Garza, in an official capacity as County
Attorney of Travis County; Joe D. Gonzalez,
in an official capacity as District Attorney of
Bexar County,

      Defendants.

Civil Action No.

**ORIGINAL COMPLAINT**

1.     Senate Bill 12 ("SB 12" or "Drag Ban") unconstitutionally singles out drag

performances as a disfavored form of expression. In its zeal to target drag, the Legislature also

passed a bill so yawning in scope that it criminalizes and restricts an enormous swath of

constitutionally protected activity, including theater, ballet, comedy, and even cheerleading. By

enacting this law, the State has threatened the livelihood and free expression of many Texans, including drag performers across our state. The First and Fourteenth Amendments prohibit such strident attempts to regulate and ban free expression, and SB 12 should be declared unconstitutional and enjoined.

2.      Plaintiffs The Woodlands Pride, Inc.; Abilene Pride Alliance; Extragrams, LLC; 360 Queen Entertainment LLC; and Brigitte Bandit (collectively, "Plaintiffs") bring this action to enjoin the enforcement of SB 12.[1] Defendants are sued because they are statutorily tasked with enforcing this unconstitutional law and include Angela Colmenero, in an official capacity as Interim Attorney General of Texas; The Woodlands Township; Montgomery County, Texas; Brett Ligon, in an official capacity as District Attorney of Montgomery County; City of Abilene, Texas; Taylor County, Texas; James Hicks, in an official capacity as District Attorney of Taylor County; Delia Garza, in an official capacity as County Attorney of Travis County; and Joe D. Gonzalez, in an official capacity as District Attorney of Bexar County (collectively, "Defendants").

3.      The Drag Ban creates a new category of criminal offense and civil penalties that violate Plaintiffs' First Amendment rights because the law discriminates against the content and viewpoints of performances and imposes prior restraints on free expression. The Drag Ban is sweepingly overbroad and vague and fails to give adequate notice of what it proscribes. Guardrails that are common among other criminal laws—such as a *mens rea* element—are utterly lacking from SB 12. The Drag Ban impermissibly gives police, prosecutors, municipalities, counties, and the Texas Attorney General unbridled discretion to censor

---

[1]      S.B. 12, 88th Leg. (2023) is codified as proposed Tex. Health & Safety Code § 769.002; Tex. Local Gov. Code § 243.0031; Tex. Penal Code § 43.28.

expressive activity by cancelling events and imposing criminal penalties of up to a year in jail or fines of up to $10,000. Such harsh punishments based on vague restrictions on expressive activities chill free speech and present this Court with clear violations of the First and Fourteenth Amendments.

4.       Plaintiffs have already suffered concrete harms due to the passage of SB 12, including the financial loss of business, threats to their personal safety, and having to change or censor their own free expression. Plaintiffs' imminent plans and performances have already been chilled by SB 12, and they will continue to suffer irreparable harm if the Drag Ban goes into effect on September 1, since Plaintiffs will lose their livelihood and right to free expression or face harsh criminal and civil sanctions. Plaintiffs urge this Court to enjoin SB 12's enforcement to prevent irreparable harm and ensure that no performer in our state is thrown in jail simply for engaging in constitutionally protected expression.

## I.       Jurisdiction and Venue

5.       This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action raises federal questions and seeks to vindicate civil rights protected by the First and Fourteenth Amendments to the U.S. Constitution, pursuant to 42 U.S.C. § 1983.

6.       The Court has personal jurisdiction over Defendants because they are residents and officials in the State of Texas.

7.       Venue in this district is proper under 28 U.S.C. § 1391(b) because multiple Defendants reside in this district and because all Defendants are residents of the State in which this district is located.

8.       This Court has jurisdiction to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Fed. R. Civ. P. 65.

9.     This Court has authority to award costs and attorney's fees under 42 U.S.C. § 1988.

## II.     Parties

10.     **Plaintiff The Woodlands Pride, Inc. ("The Woodlands Pride")** is a nonprofit organization whose mission is to connect, celebrate, educate, and foster relationships in the LGBTQIA+[2] community while promoting equality, unity, and love in The Woodlands and beyond. The Woodlands Pride is headquartered in The Woodlands Township in Montgomery County, Texas. The Woodlands Pride has already been negatively impacted by the Drag Ban and will continue to be irreparably harmed if it is not enjoined. The Woodlands Pride asserts claims against Defendants Angela Colmenero, in an official capacity as Interim Attorney General of Texas; The Woodlands Township; Montgomery County, Texas; and Brett Ligon, in an official capacity as District Attorney of Montgomery County.

11.     **Plaintiff Abilene Pride Alliance** is a nonprofit organization committed to developing an environment of diversity, equity, and inclusion for the LGBTQIA+ community through advocacy, programs, and education in Abilene. Abilene Pride Alliance is headquartered in the City of Abilene in Taylor County, Texas. Abilene Pride Alliance has already been negatively impacted by the Drag Ban and will continue to be irreparably harmed if it takes effect. Abilene Pride Alliance asserts claims against Defendants Angela Colmenero, in an official capacity as Interim Attorney General of Texas; the City of Abilene, Texas; Taylor County, Texas; and James Hicks, in an official capacity as District Attorney of Taylor County.

---

[2]     LGBTQIA+ refers to people who are lesbian, gay, bisexual, transgender, queer or questioning, intersex, asexual, or another sexual orientation or gender identity beyond the heterosexual and cisgender majority. *See, e.g.*, *LGBTQIA+ 101*, GENDER+ SEXUALITY RESOURCE CENTER, https://www.gsrc.princeton.edu/lgbtqia-101. Other terms throughout this lawsuit with the same meaning include LGBTQIA+, LGBTQ+, and LGBT+.

12.     **Plaintiff Extragrams, LLC ("Extragrams")** is a drag production and entertainment company headquartered in Travis County, Texas. Extragrams coordinates and hosts drag events and has already been negatively impacted by the Drag Ban. Extragrams will continue to be irreparably harmed unless the Drag Ban is enjoined and asserts claims against Defendants Angela Colmenero, in an official capacity as Interim Attorney General of Texas, and Delia Garza, in an official capacity as County Attorney of Travis County.

13.     **Plaintiff 360 Queen Entertainment, LLC ("360 Queen Entertainment")** is a drag production and entertainment company headquartered in Bexar County, Texas. 360 Queen Entertainment has already suffered negative impacts from the Drag Ban and will continue to be irreparably harmed if it takes effect. 360 Queen Entertainment asserts claims against Defendants Angela Colmenero, in an official capacity as Interim Attorney General of Texas, and Joe D. Gonzalez, in an official capacity as District Attorney of Bexar County.

14.     **Plaintiff Brigitte Bandit** is a drag artist and performer who resides in Travis County, Texas.[3] Brigitte Bandit performs, hosts, and produces drag events. She has already been negatively impacted by the Drag Ban and will continue to be irreparably harmed unless it is enjoined. Brigitte Bandit asserts claims against Defendants Angela Colmenero, in an official capacity as Interim Attorney General of Texas, and Delia Garza, in an official capacity as County Attorney of Travis County.

15.     **Defendant Angela Colmenero** is the Interim Attorney General of the State of Texas and sued in an official capacity because she is statutorily tasked with enforcing SB 12.

---

[3]     For reasons of personal safety and privacy, Plaintiff Brigitte Bandit is proceeding under a pseudonym, subject to approval from this Court and a forthcoming motion to proceed under a pseudonym.

Angela Colmenero may be served with process at the Office of the Attorney General, 300 West 15th Street, Austin, Texas 78701.

16.     **Defendant The Woodlands Township** is a special district and municipality primarily located in Montgomery County, Texas. The Woodlands Township is sued because it is statutorily tasked with enforcing SB 12 and may be served with process at 2801 Technology Forest Blvd., The Woodlands, Texas 77381.

17.     **Defendant Montgomery County** is a county in the State of Texas. Montgomery County is sued because it is statutorily tasked with enforcing SB 12 and may be served with process at 501 North Thompson, Suite 300, Conroe, Texas 77301.

18.     **Defendant Brett Ligon** is sued in an official capacity as District Attorney of Montgomery County because he is statutorily tasked with enforcing SB 12. He is responsible for prosecuting Class A misdemeanors in Montgomery County and may be served with process at 207 W. Phillips, 2nd Floor, Conroe, Texas 77301.

19.     **Defendant City of Abilene** is a municipality in Taylor County, Texas. The City of Abilene is sued because it is statutorily tasked with enforcing SB 12 and may be served with process at 555 Walnut Street, Abilene, Texas 79601.

20.     **Defendant Taylor County** is a county in the State of Texas. Taylor County is sued because it is statutorily tasked with enforcing SB 12 and can be served with process at 400 Oak Street, Suite 300, Abilene, Texas 79602.

21.     **Defendant James Hicks** is sued in an official capacity as District Attorney of Taylor County because he is statutorily tasked with enforcing SB 12. He is responsible for prosecuting Class A misdemeanors in Taylor County and may be served with process at 300 Oak Street, Suite 300, Abilene, Texas 79602.

22.      **Defendant Delia Garza** is sued in an official capacity as County Attorney of Travis County because she is statutorily tasked with enforcing SB 12. She is responsible for prosecuting Class A misdemeanors in Travis County and may be served with process at 314 West 11th Street, Room 300, Austin, Texas 78701.

23.      **Defendant Joe D. Gonzalez** is sued in an official capacity as District Attorney of Bexar County because he is statutorily tasked with enforcing SB 12. He is responsible for prosecuting Class A misdemeanors in Bexar County and may be served with process at 101 W. Nueva, Paul Elizondo Tower 4th Floor, San Antonio, Texas 78205.

**III.**    **Factual Background**

**A.  The Drag Ban Impacts a Broad Range of Expressive Activity**

24.      The Drag Ban was signed by Governor Abbott on June 18, 2023, and is scheduled to take effect on September 1, 2023.

25.      The Drag Ban purports to ban "sexually oriented performances" through at least three mechanisms: (1) criminalizing many such performances; (2) creating civil penalties for commercial entities that host such performances; and (3) mandating that counties and municipalities ban many "sexually oriented performances," and granting them unbridled authority to regulate others.

26.      Each aspect of SB 12—the capacious definition of "sexually oriented performances" and the methods of enforcement— contributes to the law's impermissible threat to Plaintiffs' constitutional rights.

**1. SB 12's Definition of "Sexually Oriented Performance"**

27.      The Drag Ban defines a "sexually oriented performance" as a "visual performance" that (A) features (i) a performer who is nude or (ii) a performer who engages in

"sexual conduct"; and (B) appeals to the prurient interest in sex.[4] These are collection of undefined or capaciously defined terms that target and sweep in vast amounts of protected expression.

### a.       Definition of "Visual Performance"

28.       "Visual performance" is not defined in SB 12 or elsewhere in Texas law. This means that the Drag Ban could apply broadly to a number of different art forms—such as theater, dance, musicals, synchronized swimming, sports competitions, as well as other visual media like painting, sculpture, television, movies, and websites.

### b.       Definition of "Nude"

29.       SB 12 borrows a definition of "nude" from the Texas Penal Code and from the Business and Commerce Code,[5] which includes anyone who is "entirely unclothed" or "clothed in a manner that leaves uncovered or visible through less than fully opaque clothing *any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks*."[6] This means that any performer who is showing a small part of their skin—even momentarily or accidentally—could potentially be subject to harsh penalties.

30.       The Drag Ban goes far beyond the definition of "indecent exposure" in the Penal Code that requires an "intent to arouse or gratify the sexual desire of any person" before a criminal offense (and Class B misdemeanor) can be established.[7] Such a sweeping definition of nudity could turn any type of wardrobe malfunction on stage into a year in jail and/or a fine.

---

[4]       S.B. 12 § 3 (proposed Tex. Penal Code § 43.28(a)(2)).
[5]       S.B. 12 § 3 (proposed Tex. Penal Code § 43.28(a)(2)(A)(1)).
[6]       Tex. Bus. & Commerce Code § 102.051 (emphasis added).
[7]       *See* Tex. Penal Code § 21.08.

8

### c.      Definition of "Sexual Conduct"

31.     SB 12's definition of "sexual conduct" is also vague, overbroad, and goes far beyond the types of sexual conduct already prohibited under Texas law. There are five categories of "sexual conduct" under SB 12 that individually and in combination will lead to the criminalization of innocent and ordinary conduct.

32.     First, SB 12 defines "sexual conduct" to include "the exhibition *or representation*, actual *or simulated*, of sexual acts, *including* vaginal sex, anal sex, and masturbation."[8] The word "including" shows that this section is not limited to vaginal sex, anal sex, or masturbation, but extends beyond those things to undefined acts that can later be alleged to be sexual in nature.[9] The words "representation" and "simulated" are not defined, so any type of art or performance that "represent[s]" or "simulate[s]" sexual activity could fall within this category. There is nothing in SB 12 that would limit this definition to exclude kissing or hugging, so even those very PG activities could be considered "sexual conduct" under this law. Moreover, any type of visual performance that depicts or alludes to sexual activity—including underneath a blanket or behind a screen—could fall within the ambit of this sweeping prohibition.

33.     Second, SB 12's definition of "sexual conduct" includes the "exhibition or *representation*, actual *or simulated*, of male or female genitals in a lewd state, *including* a state of sexual stimulation or arousal."[10] As with the definition above, these terms are undefined and open-ended, so that any visual representation of genitals in a performance, even a cartoon or someone putting a condom over a banana, could fall within this category. Even the display of an

---

[8]      S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(A)).
[9]      *See* Tex. Gov't Code § 311.005(13) ("'Includes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded.").
[10]     S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(B)).

art piece like Michelangelo's *David* could potentially be considered "lewd" and be impacted by this law.

34.     Third, SB 12 defines "sexual conduct" to include "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals."[11] This would potentially bar a comedian from using a dildo, vibrator, or bottle of lubricant as a prop on stage, even if being displayed for non-sexual purposes.

35.     Fourth, SB 12 defines "sexual conduct" to include "actual contact or *simulated contact* occurring between one person and the buttocks, breast, or any part of the genitals of another person."[12] This provision is written so broadly that it could prohibit a performer from even giving a friendly front-facing hug to another person on stage. It would severely limit most types of dancing, where performers often touch or simulate touching one other. It would also bar most professional sports where athletes might slap each other's butts as a form of encouragement or comradery. In addition, even accidentally brushing up against another person's backside or breast could potentially subject a performer to steep penalties.

36.     Fifth, SB 12 defines "sexual conduct" to include "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics."[13] This provision directly targets drag performers—who often use accessories or prosthetics to exaggerate male or female characteristics—even though none of these terms are defined by SB 12 or elsewhere in Texas law. It is unclear whether a "sexual gesticulation" could include a hug, a wink, or a dance. The law does not explain what it means to use "accessories or prosthetics." Performers who wear makeup, wigs, or high heels could be accused of using

---

[11]     S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(C)).
[12]     S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(D)).
[13]     S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(E)).

"accessories" and performers who wear prosthetic breasts or padding, which are common in drag shows, could also be accused of wearing "prosthetics that exaggerate male or female sexual characteristics." This language is so broad and vague that it could also impact anyone wearing makeup or a wig who is accused of engaging in any "sexual gesticulation" such as licking their lips, sticking out their tongue, or making a facial expression that is interpreted as suggestive, and anyone who wears a bra or padded bra could be accused of "exaggerat[ing] . . . female sexual characteristics."

### 2. The Drag Ban's Lack of Definition of "Prurient Interest in Sex" and Lack of *Mens Rea*

37.     Any performer who is "nude" or "engages in sexual conduct" during a visual performance violates the Drag Ban if their conduct "appeals to the prurient interest in sex."[14] "[P]rurient interest" is undefined under Texas law. Without a clear definition of this standard, SB 12 will lead to arbitrary and discriminatory enforcement by police, prosecutors, local governments, and the Attorney General, which will lead to censorship and a chilling effect on the types of performances mentioned above. Without any definition of "prurient interest," it is also impossible for an artist to know whether a visual performance might "appeal[] to the prurient interest in sex."

38.     The Drag Ban adds to this infirmity by failing to articulate any explicit *mens rea* requirement. Criminal laws must generally state the mental culpability required for a defendant to be found guilty of an offense.[15] Without any specified *mens rea*, the Drag Ban threatens to

---

[14]     S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(2)(A)(B)).
[15]     *Mens rea* has long been a basic principle of American criminal law and the common law tradition generally. *Rehaif v. United States*, 139 S. Ct.  2191, 2196 (2019) (quoting 4  WILLIAM BLACKSTONE, COMMENTARIES *21  ("An unwarrantable act without a vicious will is no crime at all.")).

11

criminalize anyone who the State determines to have engaged in a "sexually oriented performance"—even if that individual does not know they are engaging in such a performance or intend for their performance to be sexually oriented in any way. The Drag Ban will thereby lead to the punishment of performers based on the predilections of government officials.

### 3. SB 12's Enforcement Mechanisms

39.     The Drag Ban contains three separate enforcement mechanisms for the Attorney General, local municipalities and counties, and prosecutors across the state.

40.     First, SB 12 amends the Texas Health and Safety Code to prohibit anyone who "controls the premises of a commercial enterprise" from "allow[ing] a sexually oriented performance to be presented on the premises in the presence of an individual younger than 18 years of age."[16] As with other provisions of this law, the Drag Ban does not define what it means to "control[]" the premises of a commercial enterprise;[17] anyone who owns, rents, or temporarily uses a space might be liable. Likewise, the Drag Ban does not clarify what it means to "allow" a performance to be presented. It is unclear whether someone who controls the premises needs to formally approve of a performance and grant permission for it to continue or whether that person or business could be held strictly liable for simply failing to stop a performance. It is also unclear whether someone who controls the premises could be held strictly liable for knowing the age of every person in the audience. This provision also fails to define what it means for a performance to be "on the premises in the presence of an individual younger than 18 years of age." It does not articulate whether liability is triggered if a minor only briefly sees a performance through a

---

[16]     S.B. 12 § 1 (proposed Tex. Health & Safety Code § 769.002).
[17]     The law also does not define what "commercial enterprise" means, so anyone who controls a place where commercial activity occurs (even giving a drag performer a tip) could potentially be subject to the threat of enforcement by the Attorney General.

window or fence, or whether "in the presence of" can be interpreted to mean a show is happening and a minor is somewhere nearby in the same building.

41.     The Drag Ban borrows the definition of "premises" from the Texas Penal Code § 46.03, which states that "'Premises' means a building or a portion of a building." This expansive definition imposes sweeping liability on anyone who might own or rent out large buildings—such as a mall or strip mall—where individual performances might occur. Because many property owners are not present for shows and performances in their buildings, those owners will preemptively deter performances on their properties, thereby having a chilling effect on free expression throughout the state.

42.     The penalty for violating this section of the Drag Ban is steep—a $10,000 fine "for each violation."[18] Because SB 12 is overbroad and vague, some performers could be accused of violating the law multiple times in a single performance. These fines would accumulate quickly and be financially devastating for people and businesses across the state who control the premises where performances occur. This section of the Drag Ban also explicitly authorizes the Attorney General to bring actions to recover these penalties, seek temporary and permanent injunctions, and recover attorney's fees, "investigative costs," and other expenses against businesses and anyone who controls the premises for any "sexually oriented performance."[19]

43.     Second, the Drag Ban amends the Local Government Code to prohibit municipalities and counties from "authoriz[ing]" a "sexually oriented performance" on public property or in the presence of anyone under the age of 18.[20] This total prohibition on any

---

[18]     S.B. 12 § 1 (proposed Tex. Health & Safety Code § 769.002(b)).
[19]     S.B. 12 § 1 (proposed Tex. Health & Safety Code §§ 769.002(b)-(f)).
[20]     S.B. 12 § 2 (proposed Tex. Local Gov. Code § 243.0031(c)).

"sexually oriented performance" completely bars municipalities and counties from allowing any performance that could broadly be considered "sexually oriented" under this law. The other provision of this section, which allows municipalities and counties to "regulate sexually oriented performances as the municipality or county considers necessary to promote the public health, safety, or welfare" is also undefined and sweepingly broad.[21] The Drag Ban does not explain what it means to "regulate" a "sexually oriented performance" or where that might occur. This gives municipalities and counties across Texas seemingly unfettered discretion to impose fines, fees, rules, and regulations on any "sexually oriented performance," even if held on private property and for an audience comprised entirely of adults.

44.     The third enforcement mechanism of the Drag Ban amends the Penal Code to create a new category of criminal offense "if, regardless of whether compensation for the performance is expected or received, the person engages in a sexually oriented performance: (1) on public property at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child; or (2) in the presence of an individual younger than 18 years of age."[22] In addition to criminalizing vast amounts of expression that the State cannot limit to only those above the age of 18, this provision potentially holds performers criminally liable for performing in places where they understand all patrons to be over the age of 18, such as bars or night clubs, but where younger people may have entered using fake identification. Compounded by the lack of *mens rea*, this section of the law seemingly holds performers liable for knowing the age of every person in the audience of every venue where they perform. Individuals found guilty of this new Class A misdemeanor face up to a year in jail and a fine of up to $4,000.[23]

---

[21]     S.B. 12 § 2 (proposed Tex. Local Gov. Code § 243.0031(b)).
[22]     S.B. 12 § 3 (proposed Tex. Penal Code § 43.28(b)).
[23]     *See* Tex. Penal Code § 12.21.

**B. SB 12 Is Intended to Target Drag Performances**

45.    Although the Drag Ban is so broad and vague that it impacts many types of visual performances, SB 12 was intended to discriminate against drag performances from its inception to final passage. As declared by Governor Abbott after he signed SB 12 into law: "Texas Governor Signs Law Banning Drag Performances in Public. That's Right."[24]

### 1. The Text of the Law Impacts Drag Performances

46.    SB 12 prohibits "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics" on any public property and on any "premises in the presence of an individual younger than 18 years of age," if such an exhibition "appeals to the prurient interest in sex."[25] This language is aimed at targeting drag, since "accessories or prosthetics that exaggerate male or female characteristics" are commonly part of drag performances, which typically challenge gender stereotypes and involve various "accessories" and "prosthetics" such as wigs, makeup, high heels, earrings, padding, bodysuits, and prosthetic breasts.

47.    Other vague and undefined provisions of SB 12 also impact drag shows, including the prohibition on any "representation, actual or simulated, of sexual acts,"[26] which could be so broadly construed to even include licking someone's lips, winking, or dancing. And the provision prohibiting "simulated contact occurring between one person and the buttocks, breast,

---

[24]    Greg Abbott (@GregAbbott_TX), TWITTER (June 24, 2023, 11:03 PM), https://twitter.com/gregabbott_tx/status/1672817859729162240?s=12&t=PdsS2XI_vKHecU3T2VPeyw.

[25]    S.B. 12 §§ 1-3 (proposed Tex. Health & Safety Code § 769.002; Tex. Local Gov. Code § 243.0031; Tex. Penal Code § 43.28).

[26]    S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(A)).

or any part of the genitals of another person"[27] likewise prohibits artists from even pretending to sit on someone's lap or dancing closely with another performer.

48.     Taken together, these vague and broad terms cause the Drag Ban to have a chilling effect on drag performances across the state and will lead to arbitrary and discriminatory enforcement. Any drag artist could be impacted by the Drag Ban's sweep, particularly in light of the legislative history showing a clear legislative intent to target drag performers.

### 2.   The Legislative History Evinces an Intent to Target Drag

49.     When SB 12 was introduced in the Texas Senate, its author, Senator Bryan Hughes, made clear that the bill was intended to target drag. The Statement of Intent in the Senate Bill Analysis noted a concern about a "recent cultural trend" of "drag shows . . . performed in venues generally accessible to the public, including children."[28] When Senator Hughes introduced both SB 12 and another bill targeting "Drag Story Hours" in public libraries, SB 1601, he indicated that he considered *all* drag performances to be "sexually explicit" and worthy of censorship—even if those drag shows were tailored to audiences of all ages. Senator Hughes stated: "Children should not be exposed to sexually explicit performances *like drag shows*. I presented SB 12 and SB 1601 today to the State Affairs Committee to protect kids from these shows."[29]

50.     Other Texas lawmakers also made clear that this law is designed to target drag artists in Texas. Lieutenant Governor Dan Patrick informally titled the bill "Banning Children's

---

[27]     S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(D)).
[28]     S.B. 12 Bill Analysis, Author's/Sponsor's Statement of Intent, 88th Leg., R.S. (2023), *available at* https://capitol.texas.gov/tlodocs/88R/analysis/pdf/SB00012I.pdf#navpanes=0.
[29]     Bryan Hughes, Facebook, (Mar. 23, 2023, 5:48 PM), https://www.facebook.com/BryanHughesTX/posts/pfbid0LBAWQr7km6fSGGtZrr8nbL8J5xKS BxLhocbMh1mfcVfRVepjGMj5euq26Fy7ECHbl (emphasis added).

Exposure to Drag Shows" and explained, "I named SB 12 to be one of my top priorities this session because someone must push back against the radical left's disgusting drag performances which harm Texas children."[30] Representative Matt Shaheen, the sponsor of SB 12 in the House, made a similar statement: "Working with @SenBryanHughes, I passed legislation in the TX House protecting children from explicit, hyper-sexualized drag performances in Texas. #SB12."[31] Representative Caroline Harris, a joint sponsor of SB 12, stated: "Drag shows and sexually explicit performances have no business being around children. I am proud to joint author SB 12, which bans these performances and protects a child's innocence."[32] Representative Carrie Isaac, another joint sponsor, declared: "Today we passed SB 12 to protect our children from being groomed by restricting sexually oriented performances also know [sic] as "drag shows" in the presence of children."[33]

51.     The State of Texas's targeting of drag is also based on historic levels of animus this legislative session towards LGBTQIA+ Texans, since drag shows are closely connected and associated with the LGBTQIA+ community.

---

[30]     *Statement On The Adoption Of Conference Committee Report For Senate Bill 12, Banning Children's Exposure To Drag Shows*, LIEUTENANT GOVERNOR OF TEX. DAN PATRICK (May 28, 2023), https://www.ltgov.texas.gov/2023/05/28/statement-on-the-adoption-of-conference-committee-report-for-senate-bill-12-banning-childrens-exposure-to-drag-shows/.

[31]     Matt Shaheen (@MattShaheen), TWITTER, (June 8, 2023, 7:48 AM), https://twitter.com/MattShaheen/status/1666789387005222912.

[32]     Caroline Harris (@CarolineForTX), TWITTER, (May 22, 2023, 4:09 PM), https://twitter.com/carolinefortx/status/1660754742639837184?s=12&t=PdsS2XI_vKHecU3T2VPeyw.

[33]     Carrie Isaac (@CarrieIsaac), TWITTER, (May 19, 2023, 11:11 PM) https://twitter.com/carrieisaac/status/1659773848676450304?s=12&t=PdsS2XI_vKHecU3T2VPeyw.

52.     This year, the Texas Legislature introduced approximately 145 bills seeking to curtail LGBTQIA+ rights,[34] and enacted laws seeking to ban books with LGBTQIA+ characters, prohibit evidence-based health care for transgender youth, and bar transgender student athletes from playing sports in accordance with their gender identity in public universities.[35] The Drag Ban adds to this animus towards LGBTQIA+ Texans by seeking to stigmatize and criminalize an art form historically and currently associated with the LGBTQIA+ community as a source of pride, joy, creativity, and economic empowerment.

## C. Drag Artistry Has a Vibrant History in Texas and Is Inherently Expressive

53.     Drag is a form of artistic and creative expression that is well-recognized and deeply rooted. Drag shows typically involve the exaggeration of feminine or masculine characteristics and the challenging of gender stereotypes. While drag is most often associated with the LGBTQIA+ community, this art form is performed and enjoyed by people of every race, religion, gender, gender identity, and sexual orientation. Many heterosexual and cisgender Texans perform drag and enjoy drag performances, including at Plaintiffs' events from Austin to Abilene, and the Woodlands to San Antonio. Churches and houses of worship across Texas also host drag performances, including for families and children.[36]

---

[34]     Legislative Bill Tracker 2023, EQUALITY TEXAS (last accessed July 20, 2023), https://www.equalitytexas.org/legislature/legislative-bill-tracker-2023/.

[35]     *See* Tex. H.B. 900, 88th Leg., R.S. (2023); S.B. 14, 88th Leg., R.S. (2023); S.B. 15, 88th Leg., R.S. (2023).

[36]     Several Christian houses of worship have made headlines in Texas for hosting drag events. *See* Clair Goodman, *LGBTQ-Friendly Katy church sees massive growth despite online hate over its drag shows*, HOUSTON CHRONICLE (Aug. 29, 2022, 12:32pm), https://www.houstonchronicle.com/neighborhood/katy/article/church-lgbtq-drag-shows-17395546.php (discussing how the First Christian Church Katy hosts family-friendly drag bingo night); Cameron Abrams, *New Braunfels Church to host 'Family-Friendly' Drag Show*, THE TEXAN, (Apr. 26, 2023), https://thetexan.news/new-braunfels-church-to-host-family-friendly-drag-show/ (discussing how the New Braunfels Church hosted a family-friendly drag show).

54.     As with any art form, there is nothing inherently sexual or obscene about drag. Drag can be performed for any age level and in any venue, since drag artists tailor their performances to their audience.

55.     While drag's challenging of gender stereotypes may make some people feel uncomfortable, that is often the purpose of the art itself and inherent in many forms of expression, from books to movies to music to theater.

56.     Drag as an art form is inherently expressive and there is no set standard for drag performances. There are drag queens, drag kings, and drag artists who do not identify within the gender binary. Drag performances typically include numerous accessories and prosthetics, including wigs, makeup, high heels, pantyhose, nail extensions, false eyelashes, body suits, hip pads, butt pads, breast plates, and silicone breasts.

57.     Drag as an art form has roots that date back millennia, with performers cross-dressing on stage since the days of ancient Greece, Egypt, China, and India.[37] The origins of drag are also intertwined with English theater and the Christian church, since the Church of England required all roles in theater to be played by men during the Shakespearean Era.[38]

---

[37]     *See, e.g.*, Ben Rimalower, *From Ancient Greece to Angry Inch, Take a Look at the History of Drag in Theatre*, PLAYBILL (Aug. 15, 2015), https://playbill.com/article/from-ancient-greece-to-angry-inch-take-a-look-at-the-history-of-drag-in-theatre-com-357650; Frances Anderton, *A history of drag, from Caligula to RuPaul*, KCRW (Oct. 15, 2019), https://www.kcrw.com/culture/shows/design-and-architecture/building-housing-affordably-drag-through-the-ages/a-history-of-drag-from-caligula-to-rupaul; Sayantan Datta, *India's drag scene is nothing like America's. Here's how it's different & why*, LGBTQ NATION (June 22, 2022), https://www.lgbtqnation.com/2022/06/indias-drag-scene-nothing-like-americas-heres-different/.
[38]     Emily Martin, *From police raids to pop culture: the early history of modern drag*, NAT. GEOGRAPHIC (June 2, 2023), https://www.nationalgeographic.com/history/article/drag-queen-drag-balls-early-history-pop-culture.

58.     The term "drag" became established as referring to cross-dressing during the Victorian Era of the 1860s.[39] By the end of the nineteenth century, drag performances had already gained a foothold in the United States, especially among Black and Latinx performers.[40] As drag became a way for LGBTQIA+ people to express themselves and challenge gender stereotypes—often underground but sometimes more overtly—the art form also grew in popularity with audiences of all races, backgrounds, and ages, especially during the Vaudeville Era and the advent of silent films, when "female impersonators" were some of the most renowned and highest-paid actors in the world.[41]

59.     As this art form took off on the global stage, drag also took hold here in Texas. In 1890, the "Great Female Impersonator"—"Prof. Stewart"—was the star performer of the Texas State Fair, performing for audiences of students and young people from across the state.[42] In 1906, drag performers headlined shows in San Antonio, where the artist Gilbert Sarony was heralded by the *San Antonio Gazette* as "one of the greatest female impersonators" in the United States.[43] Corpus Christi boasted popular drag venues in the 1930s,[44] and a bar in Houston was

---

[39]     *Id.*

[40]     *Id*.

[41]     *See Famous and Not Forgotten: Vaudevillian Julian Eltinge*, MONTANA PRESS (Nov. 18, 2021), https://www.montanapress.net/post/famous-and-not-forgotten-vaudevillian-julian-eltinge (discussing the life and rise to fame of Julian Eltinge, a popular drag queen during the early 1900s).

[42]     Lauren McGaughy, *A brief history of drag queens in Texas*, DALLAS MORNING NEWS (Oct. 28, 2022, 5:06 AM), https://www.dallasnews.com/news/politics/2022/10/28/a-brief-history-of-drag-queens-in-texas/.

[43]     *San Antonio Drag*, HOUSTON LGBT HISTORY (last accessed July 20, 2023), https://www.houstonlgbthistory.org/san-antonio-drag.html.

[44]     *Wagon Wheel Night Club,* HOUSTON LGBT HISTORY (last accessed July 20, 2023), https://www.houstonlgbthistory.org/wagonwheel.html.

accused of hosting shows "specializ[ing] in female impersonators who sing lewd songs and do obscene dances" in 1938.[45]

60.       As drag shows continued to grow and thrive in Texas, they were also closely associated with same-sex relations, which were criminalized and heavily policed. Drag shows in the LGBTQIA+ community were often forced underground and occasionally raided by police, who relied heavily on local cross-dressing bans to surveil, target, and arrest drag performers and LGBTQIA+ Texans.[46] Local ordinances that prohibited performers from wearing clothes attributed to other genders were categorically repealed or struck down by federal courts by the early 1980s.[47]

61.       During the AIDS epidemic, drag performers played a pivotal role in raising money for the LGBTQIA+ community.[48] According to the *Dallas Voice*, "[t]here isn't a granite wall where the drag queens' names are etched, but . . . so great was their contribution in the fight against the epidemic."[49]

---

[45]    *Id.*

[46]    *See* Todd Camp, *Fort Worth LGBT Community*, TEX. STATE HISTORICAL ASS'N (May 12, 2021), https://www.tshaonline.org/handbook/entries/fort-worth-lgbt-community (describing how, in 1973, seven drag performers were arrested and charged in Fort Worth under a city ordinance that made it illegal for anyone to wear clothing "in a dress not belonging to his or her sex"); Brandon Wolf, *Celebrating the Victory over Houston's Cross-dressing Ordinance*, OUTSMART (Aug. 1, 2015), https://www.outsmartmagazine.com/2015/08/celebrating-the-victory-over-houstons-cross-dressing-ordinance/ (describing how, in 1967, 25 women were arrested by the Houston Police for wearing jeans and congregating at a lesbian bar).

[47]    *See* Brandon Wolf, *Celebrating the Victory over Houston's Cross-dressing Ordinance*, OUTSMART (Aug. 1, 2015), https://www.outsmartmagazine.com/2015/08/celebrating-the-victory-over-houstons-cross-dressing-ordinance/ (describing the repeal of Houston's cross-dressing ordinance); *see also Doe v. McConn*, 489 F. Supp. 76, 80 (S.D. Tex. 1980) (declaring Houston's cross-dressing ordinance unconstitutional as applied to the plaintiffs in the case).

[48]    Steve Ramos and David Taffet, *Drag queens pulled us through, one dollar at a time*, DALLAS VOICE (April 25, 2014), https://dallasvoice.com/drag-queens-pulled-through-dollar-time/.

[49]    *Id.*

62.     Still today, drag performances serve as a refuge, a source of entertainment, and an engine of economic empowerment for artists, performers, businesses, nonprofits, and Texas's LGBTQIA+ community. As explained by Verniss McFarland III, founder of the Mahogany Project, a Houston nonprofit that provides resources and support to the Black Trans community: "Drag is how we've buried our dead, and how we've raised money for our community and programs. It has funded people after their houses have been burned down or broken into. It's how we provide Christmas and holiday support. Drag provides sustainable life to all of our community."[50]

63.     There has unfortunately been a recent increase in harassment and threats of violence against drag artists and audiences that will likely worsen if SB 12 goes into effect. In 2022, there were 141 reported incidents of anti-LGBTQIA+ protests and threats targeting specific drag events nationwide.[51] Texas had the most reported incidents of any state—double the amount of the second highest state.[52]

---

[50]     Robert Downen, *How Texas activists turned drag events into fodder for outrage*, TEX. TRIBUNE (Feb. 24, 2023, 5:00 AM), https://www.texastribune.org/2023/02/24/texas-drag-protests-children/.

[51]     *Updated GLAAD Report: Drag events faced at least 141 protests and significant threats in 2022*, GLAAD (Nov. 21, 2022), https://glaad.org/glaad-report-drag-events-faced-least-125-protests-and-significant-threats-2022/. The data from this report did not include the anti-LGBTQIA+ mass shooting at a gay night club in Colorado Springs, Colorado, on November 19, 2022. The gunman opened fire during a drag queen's birthday celebration, killed five people, and wounded 17 others. *See* Colleen Slevin, *Colorado gay club shooting suspect charged with hate crimes*, ASSOCIATED PRESS (Dec. 6, 2022), https://apnews.com/article/crime-shootings-colorado-hate-crimes-springs-b9be567920a55986c57af59535ac9f61.

[52]     *Updated GLAAD Report: Drag events faced at least 141 protests and significant threats in 2022*, GLAAD (Nov. 21, 2022), https://glaad.org/glaad-report-drag-events-faced-least-125-protests-and-significant-threats-2022/.

64.     Drag events in every corner of Texas have been targeted by extremist groups, who are often armed and convey messages of violence.[53] In January 2023, a Dallas drag show was targeted by anti-LGBTQIA+ protestors, including self-proclaimed neo-fascists.[54] One of the protestors yelled at an LGBTQIA+ supporter: "Most of us want to kill all of you."[55] In Pflugerville, in late 2022, a "group of neo-Nazis toting swastikas and transphobic signs gathered near a restaurant hosting a drag brunch . . . just days after the state GOP tweeted an 'alert' about the event."[56] Members of an FBI-designated extremist militia protested a Fort Worth-area drag show, where some shouted homophobic slurs and one carried a baseball bat wrapped in barbed wire.[57] And in Grand Prairie and San Antonio, protestors—including neofascists, neo-Nazis, and militia members—targeted two Christmas-themed drag shows.[58]

65.     These threats of violence against Texas drag shows and performers coincide with a rise in anti-LGBTQIA+ hate crimes across the state. According to Texas Department of Public Safety data, "hate crimes in Texas increased by 6.4 percent from 2021 to 2022, marking the sixth

[53]     Trent Brown, *Texas drag shows become a right-wing target amid rising extremism*, TEX. TRIBUNE (Dec. 9, 2022, 5:00 AM), https://www.texastribune.org/2022/12/09/texas-drag-shows-all-ages-family-friendly/.

[54]     Robert Downen, *How Texas activists turned drag events into fodder for outrage*, TEX. TRIBUNE (Feb. 24, 2023, 5:00 AM), https://www.texastribune.org/2023/02/24/texas-drag-protests-children/.

[55]     *Id.*

[56]     Tess Owen, *Neo-Nazis Protested Near Drag Brunch After Texas GOP Tweeted 'Alert'*, VICE NEWS (Sep. 19, 2022, 11:44 AM),  https://www.vice.com/en/article/wxnzpw/neo-nazis-drag-brunch-texas-gop.

[57]     Robert Downen, *How Texas activists turned drag events into fodder for outrage*, TEX. TRIBUNE (Feb. 24, 2023, 5:00 AM), https://www.texastribune.org/2023/02/24/texas-drag-protests-children/.

[58]     Steven Monacelli, *The War on Christmas Drag Shows*, TEX. OBSERVER (Dec. 21, 2022, 10:24 AM), https://www.texasobserver.org/christmas-drag-protest-san-antonio-grand-prairie-texas/.

year in a row the state has seen an increase in hate crimes—and setting a new record."[59]And of that record-breaking total, anti-LGBTQIA+ hate crimes were the most numerous and "occurred at the highest rate of any group, 4.7 times the rate of all hate crimes in the state."[60]

66.     SB 12 will only stoke these flames and threats of violence currently raging against the LGBTQIA+ community in Texas.

### D. The Drag Ban Has Already Negatively Impacted Plaintiffs and Will Cause Further Harm if Permitted to Take Effect

#### 1. The Woodlands Pride

67.     The Woodlands Pride is a non-profit LGBTQIA+ organization that hosts an annual Pride Festival and also participates in other fundraisers, summits, and community events.

68.     Like many LGBTQIA+-centered organizations, it has faced escalating animosity and bigotry in recent months. Protestors targeted its 2022 Pride Festival—at least one was openly carrying a firearm and some held signs with anti-LGBTQIA+ messages like "Stop Being Gay" and "Recriminalize Same-Sex Marriage." In July of 2023, just weeks after Governor Abbott signed SB 12 into law, The Woodlands Pride marched in the South Montgomery County Fourth of July parade, with some of its members holding hands, waiving pride flags, and wearing tutus. Following that event, anti-LGBTQIA+ activists have attended The Woodlands Township board meetings to complain about the group's inclusion in the parade, which was sponsored by the Township. The activists have used their public comments to accuse The Woodlands Pride members of being "groomers and pedophiles."

---

[59]     Steven Monacelli, *Texas Sets New Hate Crimes Record, DPS Data Show*, TEX. OBSERVER (June 27, 2023, 8:57 AM), https://www.texasobserver.org/texas-sets-new-hate-crimes-record-dps-data-show/.

[60]     *Id.*

69.     The Woodlands Pride hosts one of Texas' largest free Pride Festivals. It has held

an annual Pride Festival every year since it was founded in 2018, except for 2020. All its

previous Pride Festivals have been open to all ages, have prominently featured drag performers

or drag queen emcees, and have been held on public property owned by The Woodlands

Township.

70.     The drag performers and emcees at past Woodlands Pride Festivals have used

numerous accessories or prosthetics—like wigs, makeup, high heels, earrings, and padded bras—

that exaggerate male or female sexual characteristics. They have also performed dances that

contained gestures or gesticulations that could arguably be interpreted as "sexual" by others,

although Woodlands Pride does not view them as such.

71.     The Woodlands Pride's annual Pride Festivals are the organization's largest

events and primary fundraisers. The 2022 Pride Festival generated almost $100,000 in revenue.

The Woodlands Pride's 2023 Festival is scheduled for October 21, 2023, at Town Green Park,

which is owned by The Woodlands Township. The Woodlands Pride has preliminarily reserved

the date at Town Green Park but has not yet been granted full authorization or a permit for the

event by The Woodlands Township.

72.     If SB 12 takes effect, it would significantly disrupt The Woodlands Pride and its

annual Festival. Although the drag performances at the Woodlands Pride Festivals are not

obscene or sexually oriented in the organization's view, they could arguably be considered

"prurient" or "sexually oriented" by people protesting against them and those in charge of

enforcing the vague and overbroad Drag Ban.

73.      The Woodlands Pride fears that its permit for the use of the park may not be

approved by the Woodlands Township unless Woodlands Pride guarantees that no drag

performances would occur at the Festival because of its Festival's well-known and popular practice of featuring drag performers. But by censoring its popular drag performances, The Woodlands Pride Festival would risk a decline in attendees and advertising revenue and would lose an integral aspect of its character and artistic vision.

74.     Because SB 12 also grants specific enforcement power to Montgomery County to restrict and regulate any "sexually oriented performance," The Woodlands Pride worries that the County will restrict or stop its drag performances if the Drag Ban takes effect.

75.     The Woodlands Pride also fears that, if this year's Festival incorporates drag, the organization and its performers may incur SB 12's harsh civil or criminal penalties. If someone accuses The Woodlands Pride of hosting a "sexually oriented performance," The Woodlands Township may refuse to authorize such a performance with no due process or recourse for The Woodlands Pride prescribed by the law. Because The Woodlands Pride could also be accused of aiding and abetting such performances, it fears exposing itself, its volunteers, and its performers to criminal liability if SB 12 is not enjoined.

76.     Because of the uncertainty caused by the impending enforcement of the Drag Ban, The Woodlands Pride has already expended considerable resources planning two alternative Pride Festivals for this October—one that features drag performers and one that does not. One of its board members, who has traditionally emceed the Festival in drag, has already decided to forego their drag performances this year, for fear of being subjected to a fine or jail time. If The Woodlands Pride Festival is denied a permit or is forced to cancel its traditional—and extremely popular—drag performances, the organization would suffer irreparable harm to its First Amendment rights and its image and standing in the community. The Festival would also likely

26

attract fewer visitors and less revenue since drag performances are one of the primary draws and causes for celebration each year.

77.     The Woodlands Pride is also planning another event that will feature drag performances. In February 2024, it plans to host a fundraiser in a car dealership, which it will rent from a private owner and which the Woodlands Pride will "control" for the purposes of the event. But if SB 12 is not enjoined, The Woodlands Pride fears that it must either cancel the planned drag performances at the fundraiser or take burdensome action, such as strictly age-limiting the event, to comply with the law and avoid incurring its civil penalties. Any such course of action would not only limit the organization's fundraising potential but also fundamentally alter its character as a family friendly group that celebrates drag artistry.

78.     The Woodlands Pride brings this action for injunctive and declaratory relief against Defendants Angela Colmenero, in an official capacity as Interim Attorney General of Texas; The Woodlands Township; Montgomery County, Texas; and Brett Ligon, in an official capacity as District Attorney of Montgomery County so that it can continue hosting drag performances at its Pride Festival this October and at other future events without fear of civil or criminal penalties.

### 2.  Abilene Pride Alliance

79.     The Abilene Pride Alliance is a non-profit organization focused on supporting Abilene's LGBTQIA+ community, based in Taylor County, Texas.

80.     The Abilene Pride Alliance hosts social support groups and free events in Abilene, with the goal of fostering a strong community. For example, the Abilene Pride Alliance currently hosts monthly social support meetings for transgender and nonbinary people, holds free

game nights multiple times a month, and sponsors a free support group facilitated by a therapist. Last year, it also hosted its first pride festival and parade.

81.     The Abilene Pride Alliance and its community events have been victims of the recent uptick of anti-drag and anti-LGBTQIA+ rhetoric in Texas. In June and July of 2022, the Abilene Pride Alliance partnered with a local Abilene coffee shop to host a drag brunch fundraiser. After these events, the coffee shop was targeted by protestors, who sent harassing and threatening phone calls and emails to the coffee shop and even entered the shop to scream at its employees. The Abilene Pride Alliance was forced to cancel its future planned drag brunches for the safety of its drag performers, fundraiser patrons, and the coffee house staff.

82.     In September 2022, the Abilene Pride Alliance held Abilene's first full-scale Pride event, which included a parade and a festival at Grover Nelson Park with over 1,800 attendees. The parade, through the streets of downtown Abilene, featured a drag artist float, and the festival included an all-ages drag show. The event was also targeted by protesters, who held anti-LGBTQIA+ signs during the parade and yelled at and intimidated attendees entering the festival.

83.     The Abilene Pride Alliance is currently planning its annual Pride event on September 30, 2023, which will feature a parade through Abilene's public downtown streets and a festival at the Expo Center of Taylor County. The Expo Center of Taylor County is operated by a non-profit organization who rents the facility from Taylor County. The City of Abilene has issued a permit for the parade.

84.     If SB 12 takes effect, it could end or severely hinder the Abilene Pride Alliance's 2023 pride event and other drag-related fundraisers.

85.     The drag performers at past Abilene Pride Alliance events have used accessories and prosthetics that "that exaggerate male or female sexual characteristics" like wigs, makeup, dresses, and jewelry. The performers have also danced and moved in ways that could arguably be considered "sexual gesticulations" under the Drag Ban's vague and undefined provisions. The Abilene Pride Alliance considers all of the drag performances at its events to be family friendly and does not view them as "sexually oriented" or explicit in any way. But under the Drag Ban's vague and broad provisions, some people could arguably view these performances as "sexually oriented" or "appealing to the prurient interest in sex."

86.     The Abilene Pride Alliance fears that, if SB 12 takes effect, its permit for the use of Abilene's city streets may be revoked—with no established due process or recourse—by the City of Abilene because of the Abilene Pride Alliance's well-known and common tradition of including drag performers in its events.

87.     Because SB 12 also grants specific enforcement power to Taylor County to restrict and regulate any "sexually oriented performance," the Abilene Pride Alliance worries that the County will restrict or stop its drag performances if the Drag Ban takes effect, particularly at its planned pride festival on county property.

88.     The Abilene Pride Alliance also fears that, if its 2023 pride event, or any of its upcoming fundraisers, incorporate drag, the organization and its performers may incur SB 12's harsh civil or criminal penalties. For example, if, like they have in the past, the Abilene Pride Alliance rents or is donated the use of a private event space or coffee shop to host a fundraiser featuring a drag performance, it could be said to "control[] the premises of a commercial enterprise" and could be targeted by the Texas Attorney General under the Drag Ban's civil

enforcement provisions. As a result, it could be liable for a $10,000 penalty, plus fees, for each alleged violation of SB 12.

89.     Further, if someone accuses a drag performer employed by the Abilene Pride Alliance of giving a "sexually oriented performance," the performer would be exposed to criminal penalties and members of the Abilene Pride Alliance could be charged with aiding and abetting that performance. Therefore, the Abilene Pride Alliance fears exposing itself, its volunteers, and its performers to criminal liability if SB 12 is not enjoined.

90.     The Abilene Pride Alliance brings this action for injunctive and declaratory relief against Defendants Angela Colmenero, in an official capacity as Interim Attorney General of Texas; City of Abilene, Texas; Taylor County, Texas; and James Hicks, in an official capacity as District Attorney of Taylor County, so that it can continue hosting drag performances at its Pride event this September and at other future events without fear of civil or criminal penalties.

### 3.  Extragrams

91.      Extragrams is a drag entertainment and delivery service based in Austin, Texas. Extragrams operates by connecting drag performers, working as independent contractors, with customers seeking entertainment for birthday parties, corporate events, festivals, fundraisers, weddings, university orientations, bachelorette parties, and more. Extragrams has successfully coordinated approximately 1,000 drag performances, many of which occurred in public spaces and were open to all ages, with children and families often in attendance.

92.     Extragrams retains a level of control over its drag performers and commonly approves its performers' costumes, songs, and routines.

93.     Extragrams' drag performers, like many drag artists, wear accessories or prosthetics that "exaggerate male or female sexual characteristics," such as wigs, makeup, high

heels, dresses, body padding, pantyhose, false eyelashes, fake fingernails, waist cinchers and corsets, push-up bras, and breast plates. Extragrams drag performers also shimmy and shake their hips during performances, which could arguably be interpreted as "sexual gesticulations" under the Drag Ban's vague and broad provisions.

94.     Extragrams also fears that SB 12 could lead their performers to be accused of "representation [of] . . . simulated . . .sexual acts," or "simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person," although Extragrams would disagree with such a description of its performers' routines.

95.     Extragrams fears that, because of SB 12's vagueness and uncertainty, it will not be able to correctly advise Extragrams' drag performers about how to comply with the law, leaving them vulnerable to harsh criminal penalties if they are accused of giving a "sexually oriented performance." As a result, Extragrams also fears that it could be charged with aiding and abetting a prohibited performance.

96.     This fear is intensified by the Drag Ban's lack of a *mens rea* requirement. It is not Extragrams' business practice to inquire if minors will be present at the events its drag performers attend, and it would be impossible to know for sure whether a minor may be present, even if it asked. But Extragrams and its performers could be accused of being strictly liable for a performance in front of a minor even if they do not intentionally or knowingly host such a performance.

97.     Extragrams also worries that private venues—such as hotels, restaurants, wedding venues, ballrooms, and corporate offices—which typically host Extragrams drag performers, will no longer book or allow drag performances on their premises, for fear of incurring SB 12's civil penalties and Texas Attorney General enforcement action, and that Extragrams itself could be

targeted for investigation and enforcement if it is considered to "control" its shows and the spaces that its performers utilize. This will have a direct, negative impact on Extragrams' revenue and impair Extragram's ability to facilitate drag performances.

98.     Extragrams also fears that municipalities will no longer authorize or grant permits for events featuring its drag performers on public property—such as parades and music festivals—after SB 12 takes effect. This, too, will reduce Extragrams' revenue and impair Extragram's ability to facilitate drag performances.

99.     Finally, because SB 12 has been promoted by prominent lawmakers as a "drag ban," Extragrams fears that its enforcement will further stigmatize the art of drag, which will put Extragrams' drag performers at an increased risk of threats and harassment and could reduce the number of drag performers and customers willing to do business with Extragrams.

100.    Extragrams' drag performers have already faced increased harassment and threats as SB 12 made its way through the legislature. For example, in March of 2023, one of Extragrams' regular drag performers performed at a show for children, which sparked a social media outage among anti-drag activists. Some of these protesters targeted and followed the performer to an event and vandalized and nearly destroyed the performer's car, which was parked outside. Additionally, two Extragrams performers had their personal information disclosed online by anti-drag activists, which put their personal safety at risk.

101.    Due to events like these, Extragrams has had to take costly security measures. Extragrams now sends employees to accompany its drag performers at each of their events. Extragrams now also turns down business opportunities that may be unsafe for performers in this hostile climate, including performances in less populated areas, especially at night.

102.     Extragrams has already lost business as a result of SB 12 and the surrounding anti-drag sentiment, harassment, and threats. For example, Extragrams has provided performers for the University of Texas at Austin's freshman orientation for the past two years and had already agreed to provide performers for this year's orientation. However, the day of its first scheduled performance this year—which was also the day after SB 12 was sent to the Governor for signature—the University retracted its purchase order for the event.

103.     Extragrams fears that if the Drag Ban takes effect, it will subject Extragrams' performers to criminal liability for performing in public or in places where people under the age of 18 may be present, and that Extragrams itself could be subject to liability for aiding and abetting. Extragrams' First Amendment right to expressive activity and business reputation will also be irreparably harmed if SB 12 goes into effect and its drag performances are banned or criminalized.

104.     Extragrams brings this action for injunctive and declaratory relief against Defendants Angela Colmenero, in an official capacity as Interim Attorney General of Texas, and Delia Garza, in an official capacity as County Attorney of Travis County, so that it can continue its free expression and business activities without fear of civil or criminal penalties.

### 4.  360 Queen Entertainment

105.     360 Queen Entertainment is a gay and Latinx-owned drag production company founded in 2022 to provide joy, hope, and celebration through drag performances in Bexar County, Texas. 360 Queen Entertainment brings globally renowned drag stars to San Antonio and hosts commercial drag shows on the back patio of a family-owned restaurant, which provides the space at an agreed-upon cost.

106.     Because of protests and threats of violence against drag venues and performers, 360 Queen Entertainment generally limits ticket sales to guests ages 18 and up, but they do not believe that drag is inappropriate for children or inherently sexual and want to have the choice of whether to allow guests younger than 18 at their shows in the future. Further, on occasion, 360 Queen Entertainment has welcomed parents who individually requested to bring their teenagers to shows. One mom asked if she and her teenage daughter could watch the show because her daughter's eyes filled with tears of joy at the idea of being able to watch one of her favorite drag performers from *RuPaul's Drag Race* in real life.

107.     Even when it attempts to limit ticket sales to those over the age of 18, the business cannot guarantee that its drag shows will not be presented on the premises in the presence of an individual younger than 18 years of age. 360 Queen Entertainment hosts its drag shows on the back patio of a restaurant, adjacent to the main dining room where families and kids sit inside and walk around. The drag shows are partially visible from the parking lot and from windows inside the restaurant.

108.     In April 2023, as SB 12 was making its way through the Legislature, someone called the police on 360 Queen Entertainment and accused them of engaging in "illegal" activity by hosting a drag show at a restaurant where families and kids were present. The person complained that "what you're doing here is illegal," "there are children around," "it's inappropriate," and "it's perverted." When someone explained that hosting a drag show was not illegal, the person complaining said, "well, one day it's going to be."

109.     360 Queen Entertainment has already had to significantly change its business operations in response to the Drag Ban. On July 1, 2023, they held their monthly drag show half an hour later to try to give more time for families and kids to clear out of the restaurant before

drag artists were present on the premises, but it was still impossible to clear everyone out of the dining room before the show began.

110.     360 Queen Entertainment is planning on hosting a show on August 25, 2023, which has been significantly modified to start after the restaurant closes at 9 pm. To accommodate this change, the restaurant will have to shut down two hours early and lose out on business and revenue in the dining room while maintaining the same level of staffing to serve customers at the drag show on the back patio. Even while shutting down the restaurant at 9 pm, 360 Queen Entertainment cannot guarantee that every family and child will leave the establishment, since some people choose to linger and finish eating even after the restaurant stops serving.

111.     Even though the Drag Ban does not take effect until September 1, 360 Queen Entertainment is trying to prepare for the law's enactment and see if it is possible to reduce the chance of someone younger than 18 being on the premises during their performances. They are taking these steps despite their conviction that their show in no way exposes children to ill-intended or sexual content. 360 Queen Entertainment believes that having to take these measures unnecessarily forces their shows and performers into the shadows, hidden late at night from anyone under the age of 18.

112.     Because 360 Queen Entertainment is unable to guarantee that no one under the age of 18 is present on the premises of the establishment where shows are currently held, the business has made the devastating decision to cancel all shows after September 1 for fear of prosecution or penalties under SB 12.

113.    Although 360 Queen Entertainment's drag shows are not obscene or sexually oriented in their view, they reasonably fear that they could be considered "prurient" or "sexually oriented" by some people under the vague and open-ended definitions of the Drag Ban.

114.    The drag entertainers at 360 Queen Entertainment's events use a variety of accessories and prosthetics like wigs, makeup, high heels, bodysuits, butt pads, hip pads, and prosthetic breasts. They also sometimes perform gestures or gesticulations that could arguably be interpreted as "sexual" by others, such as twerking, dancing, sitting on people's laps, or flirting with customers. 360 Queen Entertainment also fears that SB 12 could lead their performers to be accused of "representation [of] . . . simulated . . .sexual acts," or "simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person," although 360 Queen Entertainment would disagree with such a description of its performers' routines.

115.    360 Queen Entertainment does not want to stop hosting performances due to the Drag Ban after September 1, which will effectively end their business, but it has made the difficult choice to do so because it does not want to expose itself, its performers, or the establishment where the event is held to the harsh civil and criminal penalties that SB 12 threatens to impose.

116.    SB 12 has also disrupted 360 Queen Entertainment's business growth plan, which aims to expand to other restaurant venues that would be restricted by the Drag Ban. 360 Queen Entertainment believes that growth is part of the entrepreneurial spirit that every business owner should have the freedom to pursue. SB 12 constrains and limits 360 Queen Entertainment's ability to reach and connect with new audiences and to empower performers to earn an income using their craft and artistry.

117.     360 Queen Entertainment brings this action for injunctive and declaratory relief against Defendants Angela Colmenero, in an official capacity as Interim Attorney General of Texas, and Joe D. Gonzalez, in an official capacity as District Attorney of Bexar County, so that it can continue hosting drag performances without fear of civil or criminal penalties.

### 5.  Brigitte Bandit

118.     Brigitte Bandit is a non-binary drag artist who was assigned the sex of female at birth. She uses she/they pronouns and lives in Travis County, Texas. Brigitte performs, produces, and hosts drag shows and has worked as a drag artist for the past five years.

119.     Starting during the COVID-19 pandemic, Brigitte started impersonating Dolly Parton as a drag persona. As part of her artistic expression, Brigitte uses a prosthetic breast plate to give her a larger chest and help exaggerate her female sexual characteristics. Brigitte also uses various accessories like wigs, eyelash extensions, makeup, rhinestones, cowboy boots, high heels, and clothing to complete her "Dolly look" and also to impersonate other female stars like Amy Winehouse, Cher, Britney Spears, Lady Gaga, Cyndi Lauper, and Shania Twain.

120.     Although Brigitte performs some shows in bars for adults ages 18 or 21 and up, she also performs, hosts, and produces drag shows in public and in the presence of people under the age of 18. For the last three years, Brigitte has held Drag Story Time events that help encourage a love of reading among young children. These events are wholesome and family friendly and take place at schools, coffee shops, libraries, and public parks. Although these events are not obscene or sexual, Brigitte recently had her personal information released online in June 2023 and was accused of performing "sexually explicit drag shows in front of children" and being "a well-known advocate for child sexualization." Even though these accusations were

false, they led to Brigitte receiving hateful messages online and being much more concerned about her personal safety and physical security.

121.    Brigitte has noticed a significant increase in protests and threats of violence against her artistry and fellow drag performers in the past year to year-and-a-half. Brigitte spoke out and testified against the Drag Ban because she knew that it would harm her ability to engage in art and earn a living. Performing drag is Brigitte's full-time job and also her creative passion. She modifies and tailors her performances for the audience and age range that she is performing for, and she does not believe that drag should be banned, driven into the shadows, or limited only to audiences age 18 and up.

122.    Brigitte has already been negatively impacted by SB 12 even though it is not scheduled to take effect until September 1. She was removed from a paid speaking engagement in June 2023 because her biography mentioned that she is a drag queen. She also has had several events and gigs get cancelled this summer, including performance series that would have extended past September 1. She has other gigs in public spaces where people under the age of 18 may be present scheduled for after September 1, but she will lose performance opportunities and revenue if the Drag Ban takes effect.

123.    SB 12 will be devastating for Brigitte as an artist and a lifelong Texan. Much of her business comes from restaurants where she performs drag shows and brunches. Although some of her shows are geared towards adults, she cannot control who comes into the spaces where she performs and does not know the age of every person in the audience. Even when Brigitte hosts or produces drag events and has some control over the premises of a commercial establishment, she still cannot guarantee that every person in the audience will be over the age of 18.

124.     If allowed to take effect, the Drag Ban will have a chilling effect on Brigitte's business and artistry. Brigitte worries that every gesture or "gesticulation" she makes could arguably be interpreted as "sexual" and as appealing "to the prurient interest in sex." Brigitte also fears that SB 12 could lead someone to accuse her of "representation [of] . . . simulated . . .sexual acts," or "simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person," although she would not characterize her performances this way. Brigitte cannot control how her audience will perceive her shows, but she understands that there is a target on her back from hatred and threats that she has already received and that some people want to see her thrown in jail or fined simply for existing and practicing her art.

125.     Brigitte brings this action for declaratory and injunctive relief against Defendants Angela Colmenero, in an official capacity as Interim Attorney General of Texas, and Delia Garza, in an official capacity as County Attorney of Travis County, to enjoin them from enforcing SB 12 against her, suppressing her free speech and expression, and irreparably harming her business, reputation, and public persona.

### IV.     Causes of Action

126.     For each Count, all of the foregoing allegations are repeated and realleged as though fully set forth therein.

### Count One: Content and Viewpoint Discrimination in Violation of the First Amendment, 42 U.S.C. § 1983

127.     SB 12 regulates and criminalizes performances, including drag performances, that are inherently expressive and shielded by the First Amendment. Each element of the law's definition of "sexually oriented performances" is content-based and triggers heightened scrutiny. The Drag Ban also constitutes viewpoint discrimination. For instance, the Drag Ban's prohibition on "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male

or female sexual characteristics" is viewpoint-based since it prohibits expressive activity that "exaggerate[s] male or female sexual characteristics" while permitting the same "gesticulations" for performers who already have those characteristics and need not "exaggerate" them. This is "particularly pernicious" under the First Amendment since the Drag Ban imposes the government's viewpoint of what kind of "male or female sexual characteristics" are appropriate in performances and threatens Plaintiffs with criminal and civil penalties if they do not comply. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 430 (1992). Both viewpoint and content-based discrimination is "presumptively invalid" and triggers heightened scrutiny under the First Amendment. *United States v. Stevens*, 559 U.S. 460, 468 (2010).

128.   Because SB 12 triggers heightened scrutiny, the burden is on Defendants to show that the law "furthers a compelling governmental interest and is narrowly tailored to that end." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015). There is no compelling governmental interest that justifies prohibiting such huge swaths of constitutionally protected expression barred by SB 12. Even if there were, this law is not narrowly tailored to those ends. SB 12 is not "actually necessary" to achieve any compelling state interest and is therefore unconstitutional. *See United States v. Alvarez*, 567 U.S. 709, 725 (2012).

**Count Two: Overbreadth in Violation of the First Amendment, 42 U.S.C. § 1983**

129.   SB 12 is also unconstitutionally overbroad in that it "prohibits a substantial amount of protected speech" relative to its "plainly legitimate sweep." *United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023).

130.   The broad and undefined provisions of SB 12 are "substantially disproportionate to the statute's lawful sweep." *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 14 (1988). Because the Drag Ban "applies to common depictions of ordinary and lawful activities" and "create[s] a criminal prohibition of alarming breadth," it is unconstitutionally

40

overbroad on its face and violates the First Amendment. *United States v. Stevens*, 559 U.S. 460, 473–74 (2010). The lack of *mens rea* in the Drag Ban also worsens the law's unconstitutional overbreadth. *Cf. Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 221 (5th Cir. 2023) (explaining that the Act's scope is confined to representations made by companies with the "specific intention" of misleading consumers and thus not overbroad).

### Count Three: Vagueness in Violation of the First and Fourteenth Amendments, 42 U.S.C. § 1983

131.    SB 12 is also unconstitutionally vague because it "leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Giaccio v. State of Pennsylvania*, 382 U.S. 399, 402–03 (1966). A litany of key terms in the Drag Ban are so vague and open-ended that the law fails to give notice of what conduct is prohibited and encourages arbitrary and discriminatory enforcement. *United States v. Ross*, 948 F.3d 243, 246 (5th Cir. 2020).

132.    A more stringent vagueness test applies where a law "interferes with the right of free speech," especially where it contains criminal penalties. *Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982). Here, the criminalization of performance and art—combined with a lack of *mens rea*—"chill[s] constitutionally protected conduct" and violates the First and Fourteenth Amendments. *See Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008).

### Count Four: Prior Restraint on Speech in Violation of the First Amendment, 42 U.S.C. § 1983

133.    By requiring municipalities and counties to prohibit all "sexually oriented performances" on public property or in the presence of an individual younger than 18 years of

age—and allowing municipalities and counties to "regulate" all other such performances[61]—the Drag Ban is a prior restraint on free expression. This prior restraint bears a "heavy presumption of unconstitutionality." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990).

134.    SB 12 does not have "narrowly drawn, reasonable and definite standards" but instead gives local and state officials "unbridled discretion" to "encourag[e] some views and discourag[e] others through the arbitrary application" of the law. *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992). The Drag Ban is a content and viewpoint-based prior restraint that lacks constitutionally required safeguards and violates the First Amendment. *See N.W. Enters. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir. 2003).

## V.    Prayer for Relief

Plaintiffs respectfully ask this Court to:

135.    Exercise its jurisdiction over this matter;

136.    Enter a preliminary injunction and permanent injunction to stop Defendants[62] from enforcing SB 12;

137.    Declare that SB 12 is facially unconstitutional, void, and of no effect;

138.    In the alternative, declare that SB 12 is unconstitutional, void, and of no effect as applied to Plaintiffs;

139.    Award reasonable costs and attorneys' fees under 42 U.S.C. § 1988(b), and any other applicable statute or regulation; and

140.    Grant such further relief as the Court may deem proper.

---

[61]    S.B. 12 § 2 (proposed Tex. Local Gov. Code § 243.0031(b)).
[62]    "Defendants" includes their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the injunction.

Respectfully submitted,

*/s/Brian Klosterboer*

Brian Klosterboer, *attorney-in-charge*
TX Bar No. 24107833, SDTX No. 3314357
Chloe Kempf
TX Bar No. 24127325, SDTX No. 3852674
Thomas Buser-Clancy
TX Bar No. 24078344, SDTX No. 1671940
Edgar Saldivar
TX Bar No. 24038188, SDTX No. 618958
Adriana Pinon
TX Bar No. 24089768, SDTX No. 1829959
ACLU Foundation of Texas, Inc.
P.O. Box 8306
Houston, TX 77288
Tel. (713) 942-8146
Fax. (713) 942-8966
bklosterboer@aclutx.org
ckempf@aclutx.org
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
apinon@aclutx.org