# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| The Woodlands Pride, Inc.; Abilene Pride Alliance; Extragrams, LLC; 360 Queen Entertainment LLC; Brigitte Bandit,<br><br>    *Plaintiffs,*<br><br>*v.*<br><br>Angela Colmenero, in an official capacity as Interim Attorney General of Texas; The Woodlands Township; Montgomery County, Texas; Brett Ligon, in an official capacity as District Attorney of Montgomery County; City of Abilene, Texas; Taylor County, Texas; James Hicks, in an official capacity as District Attorney of Taylor County; Delia Garza, in an official capacity as County Attorney of Travis County; Joe D. Gonzalez, in an official capacity as District Attorney of Bexar County,<br><br>    *Defendants.* | Civil Action No. 4:23-cv-02847 |

# PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................2

FACTUAL BACKGROUND ....................................................7

I.    The Drag Ban ............................................................7

    A.  Definition of Sexually Oriented Performance ...........8

    B.  Enforcement Mechanisms ........................................9

II.   Legislative History of the Drag Ban .......................11

III.  Drag Performances ...................................................13

IV.  Plaintiffs ...................................................................15

    A.  The Woodlands Pride ............................................15

    B.  Abilene Pride Alliance ..........................................19

    C.  Extragrams ............................................................22

    D.  360 Queen Entertainment.....................................25

    E.  Brigitte Bandit ......................................................28

ARGUMENT .......................................................................31

I.    Plaintiffs Have Standing to Challenge SB 12 ..........32

II.   Plaintiffs Are Substantially Likely to Prevail on the Merits......................34

    A.  The Drag Ban Impermissibly Discriminates Based on Content and Viewpoint ......................................................34

        1.  SB 12 Is Content Based ...................................35

        2.  SB 12 Is Also Viewpoint Based ........................36

        3.  SB 12 Fails Strict Scrutiny ...............................37

    B.  The Drag Ban Is Overbroad in Violation of the First Amendment ..........40

    C.  The Drag Ban Is Unconstitutionally Vague ............45

    D.  The Drag Ban Is an Impermissible Prior Restraint on Speech .................49

III.  Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief............50

IV.    The Balance of the Equities and Public Interest Weigh in Favor of
Granting Injunctive Relief ........................................................................53

V.    No Bond Should Be Required....................................................................54

CONCLUSION ..........................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ass'n of Club Execs. of Dallas, Inc. v. City of Dallas, Tex.*,
    604 F. Supp. 3d 414 (N.D. Tex. 2022) ...............................35

*Carey v. Population Services, Intern.*,
    431 U.S. 678 (1977)...............................................35

*Cath. Leadership Coal. of Texas v. Reisman*,
    764 F.3d 409 (5th Cir. 2014) ....................................49

*City of Austin, Tex. v. Reagan Nat'l Advert. of Austin, LLC*,
    142 S. Ct. 1464 (2022)...........................................34

*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984)..............................................36

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.,
    Tennessee*,
    274 F.3d 377 (6th Cir. 2001) ....................................43

*Edwards v. South Carolina*,
    372 U.S. 229 (1963)..............................................45

*Elrod v. Burns*,
    427 U.S. 347 (1976)..............................................50

*Forsyth Cty., Ga. v. Nationalist Movement*,
    505 U.S. 123 (1992)..............................................49

*Friends of Georges, Inc. v. Mulroy*,
    No. 223CV02163TLPTMP, 2023 WL 3790583 (W.D. Tenn. June 2, 2023).....3,
    36, 37, 39

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990)..............................................49

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*,
  415 U.S. 423 (1974)...................................................................31

*HM Fla.-ORL, LLC v. Griffin*,
  No. 6:23-CV-950-GAP-LHP, 2023 WL 4157542 (M.D. Fla. June 23, 2023).....3

*Hoffman Estates v. Flipside*,
  455 U.S. 489 (1982)...................................................................45

*Imperial Sovereign Ct. of Montana v. Knudsen*,
  No. CV 23-50-BU-BMM, 2023 WL 4847007 (D. Mont. July 28, 2023) ...........4

*Jacobellis v. State of Ohio*,
  378 U.S. 184 (1964)...................................................................39

*Johnson v. United States*,
  576 U.S. 591 (2015)...............................................................46, 48

*Kaepa, Inc. v. Achilles Corp.*,
  76 F.3d 624 (5th Cir. 1996) ......................................................54

*Kolender v. Lawson*,
  461 U.S. 352 (1983)...................................................................45

*Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1988)...................................................................49

*Local 8027, AFT-N.H., AFL-CIO v. Edelblut*,
  No. 21-CV-1077-PB, 2023 WL 171392 (D.N.H. Jan. 12, 2023) ......................47

*Lujan v. Def's. of Wildlife*,
  504 U.S. 555 (1992)...................................................................32

*Miller v. California*,
  413 U.S. 15 (1973).............................................................43, 44, 47

*N.H. Right to Life PAC v. Gardner*,
  99 F.3d 8 (1st Cir. 1996).............................................................33

*N.W. Enters. v. City of Houston*,
  352 F.3d 162 (5th Cir. 2003) ......................................................49

*Nat'l Press Photographers Ass'n v. McCraw*,
  594 F. Supp. 3d 789 (W.D. Tex. 2022) ............................................................45

*Opulent Life Church v. City of Holly Springs, Miss.*,
  697 F.3d 279 (5th Cir. 2012) ...............................................32, 50, 53

*Ostrewich v. Tatum*,
  72 F.4th 94 (5th Cir. 2023) ...............................................................32

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992)............................................................................37

*Reed v. Gilbert*,
  576 U.S. 155 (2015)....................................................................34, 37

*Reno v. ACLU*,
  521 U.S. 844 (1997)......................................................35, 38, 44, 47

*Roark & Hardee LP v. City of Austin*,
  522 F.3d 533 (5th Cir. 2008) ...........................................................45

*Roman Catholic Diocese v. Cuomo*,
  141 S. Ct. 63 (2020)..........................................................................50

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
  515 U.S. 819 (1995)...........................................................................37

*S. Utah Drag Stars v. City of St. George*,
  No. 4:23-CV-00044-DN-PK, 2023 WL 4053395 (D. Utah June 16, 2023) ..4, 34

*Sable Communications of Cal., Inc. v. F.C.C.*,
  492 U.S. 115 (1989)...........................................................................35

*Smith v. People of the State of California*,
  361 U.S. 147 (1959)...........................................................................44

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)...........................................................................34

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) .....................................................32, 33

*Spence v. State of Wash.*,
    418 U.S. 405 (1974)................................................................34

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)................................................................33

*Tex. v. Johnson*,
    491 U.S. 397 (1989)................................................................34

*Texas Ent. Ass'n, Inc. v. Hegar*,
    10 F.4th 495 (5th Cir. 2021), *cert. denied,* 142 S. Ct. 2852 (2022) ..................35

*Triplett Grille, Inc. v. City of Akron*,
    40 F.3d 129 (6th Cir. 1994) ................................................44

*United States v. Cook*,
    970 F.3d 866 (7th Cir. 2020) ................................................47

*United States v. Gaudreau*,
    860 F.2d 357 (10th Cir. 1988) ................................................45

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000)................................................................38

*United States v. Stevens*,
    559 U.S. 460 (2010)................................................40, 44

*Virginia v. Hicks*,
    539 U.S. 113 (2003)................................................................40

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)................................................36, 39

**STATUTES**

Tex. Bus. & Com. Code § 102.051................................................8, 41

Tex. Penal Code § 12.21 ................................................11

Tex. Penal Code § 43.22 ................................................38

Tex. Penal Code § 43.23 ................................................38

Tex. Penal Code § 43.24 ................................................38

Tex. Penal Code § 43.25 ..................................................................38

Tex. Penal Code § 43.251 ................................................................38

Plaintiffs The Woodlands Pride, Inc.; Abilene Pride Alliance; Extragrams, LLC; 360 Queen Entertainment LLC; and Brigitte Bandit (collectively, "Plaintiffs") bring this Motion for a Temporary Restraining Order and Preliminary Injunction to enjoin the enforcement of SB 12 before it goes into effect on September 1, 2023.[1] Defendants are statutorily tasked with enforcing this unconstitutional law and include Angela Colmenero, in an official capacity as Interim Attorney General of Texas; The Woodlands Township; Montgomery County, Texas; Brett Ligon, in an official capacity as District Attorney of Montgomery County; City of Abilene, Texas; Taylor County, Texas; James Hicks, in an official capacity as District Attorney of Taylor County; Delia Garza, in an official capacity as County Attorney of Travis County; and Joe D. Gonzalez, in an official capacity as District Attorney of Bexar County (collectively, "Defendants").[2] Plaintiffs notified Defendants of their intent to file this motion on August 3, 2023, and again on August 8, 2023, and asked for their position on the requested relief. Defendant Angela Colmenero is opposed to the requested relief and the other Defendants either did not respond or were unable to determine their position before the time of filing.

---

[1]     S.B. 12, 88th Leg. (2023) is codified as proposed Tex. Health & Safety Code § 769.002; Tex. Local Gov. Code § 243.0031; Tex. Penal Code § 43.28 and is attached to this motion as Exhibit 1.

[2]     For purposes of this Motion, "Defendants" includes Defendants' officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the injunction.

## INTRODUCTION

It is a hallmark of our constitutional democracy that governments may not censor speech simply because it is disfavored or it makes some members of the public uncomfortable. But that is exactly what Senate Bill 12 ("SB 12" or the "Drag Ban") threatens to do with respect to drag performances. And because SB 12 is alarmingly vague and open-ended, it will also chill huge swaths of other constitutionally protected activities across our state, from ballet to comedy, cheerleading to football. Unless blocked by this Court, SB 12 will violate the First and Fourteenth Amendment rights of Plaintiffs and countless other Texans and cause irreparable harm when it takes effect on September 1, 2023.

In passing this law, the Texas Legislature singled out drag performances as a disfavored form of expression. The day SB 12 was signed, Governor Abbott declared "Texas Governor Signs Law Banning Drag Performances in Public. That's Right."[3] Drag performances are inherently expressive and often involve the exaggeration of male or female characteristics and the challenging of gender stereotypes. There is nothing inherently sexual or obscene about drag, and the First Amendment prohibits the kind of government censorship and oppression advanced by SB 12.

---

[3]     Greg Abbott (@GregAbbott_TX), TWITTER (June 24, 2023, 11:03 PM), https://twitter.com/gregabbott_tx/status/1672817859729162240?s=12&t=PdsS2XI_vKHecU3T2VPeyw.

While aiming to criminalize, chill, and censor drag performances, SB 12 is sweepingly overbroad and vague. The statute's key terms are undefined and fail to give adequate notice of what the law proscribes. Steep criminal and civil penalties—including up to a year in jail and fines of up to $10,000 per violation—threaten to chill entire genres of expressive activity in our state. Combined with a complete lack of any *mens rea* requirement, SB 12 seemingly imposes strict liability on performers of all types, including actors, dancers, comedians, singers, gymnasts, wrestlers, and more. Performers have no way of knowing the age of every person in their audience or whether their expressive activity might be found to "appeal[] to the prurient interest in sex," but SB 12 threatens to punish them for a wide universe of ordinary and innocent conduct. The Drag Ban thereby diminishes the free expression of all Texans and severely restricts access to cherished works of art, from Shakespeare's plays to Broadway musicals to Michelangelo's *David*.

Similar efforts to censor or restrict drag performances in other states have recently and resoundingly been blocked by federal courts. *See, e.g., Friends of Georges, Inc. v. Mulroy*, No. 223CV02163TLPTMP, 2023 WL 3790583, at *29 (W.D. Tenn. June 2, 2023) (finding Tennessee's restrictions on drag performances under the label of "adult cabaret entertainment" to constitute impermissible viewpoint discrimination and be unconstitutionally vague and substantially overbroad); *HM Fla.-ORL, LLC v. Griffin*, No. 6:23-CV-950-GAP-LHP, 2023 WL

4157542, at *9 (M.D. Fla. June 23, 2023) (holding that Florida's law targeting drag performances under the guise of "adult live performances" likely violates the First Amendment and is vague and overbroad); *S. Utah Drag Stars v. City of St. George*, No. 4:23-CV-00044-DN-PK, 2023 WL 4053395, at *27 (D. Utah June 16, 2023) (finding a local government's cancellation of a drag performance to likely violate the First Amendment); *Imperial Sovereign Ct. of Montana v. Knudsen*, No. CV 23-50-BU-BMM, 2023 WL 4847007, at *7 (D. Mont. July 28, 2023) (granting a temporary restraining order to stop a state law prohibiting public drag performances under the label of "sexually oriented shows").

Plaintiffs in this case have already been concretely and negatively impacted by SB 12 and meet every element necessary for this Court to grant injunctive relief.

*First*, Plaintiffs are substantially likely to succeed on the merits of their claims under the First and Fourteenth Amendments. The Drag Ban discriminates against the content and views of performances and fails to meet heightened scrutiny. It does not further a compelling governmental interest, particularly where presenting obscene material to minors is already proscribed by Texas law. SB 12's sweeping prohibition on free expression is not narrowly tailored, and the law fails to survive even intermediate scrutiny.

Plaintiffs are also substantially likely to succeed in showing that the Drag Ban is unconstitutionally overbroad and vague. The law impacts far more protected

speech than any plainly legitimate sweep, and its terms are so undefined and open-ended that SB 12 fails to give notice of what conduct it proscribes and will lead to arbitrary and discriminatory enforcement. The Drag Ban also imposes an unconstitutional prior restraint on speech by requiring municipalities and counties to prohibit performances on public property or in the presence of someone under the age of 18 based on the content of those performances, while also giving municipalities and counties seemingly limitless discretion to regulate all such performances, even in private and solely among adults. Individually and collectively, SB 12's prohibitions facially violate Plaintiffs' First and Fourteenth Amendment rights.

*Second*, Plaintiffs will continue to suffer irreparable harm if the Drag Ban is not enjoined. Plaintiffs have already suffered concrete injuries due to the passage of SB 12, including having to change or censor their own free expression, the financial loss of business, and increased threats to their personal safety. Both The Woodlands Pride and Abilene Pride Alliance are hosting local Pride festivals this September and October that feature drag performers and are directly impacted by this law. *See* Declaration of Jason Rocha, President of The Woodlands Pride, attached as Exhibit 2 ("Rocha Decl.") ¶¶ 4–17; Declaration of Gavyn Hardegree, President of Abilene Pride Alliance, attached as Exhibit 3 ("Hardegree Decl.") ¶¶ 8–17. They intend to engage in conduct arguably proscribed by SB 12 and reasonably fear that

themselves, their drag artists, and their attendees could be subject to civil and criminal penalties if the law is not enjoined. Rocha Decl. ¶¶ 8–14; Hardegree Decl. ¶¶ 9–15. Plaintiffs Extragrams and Brigitte Bandit also intend to continue engaging in conduct arguably proscribed by the Drag Ban shortly after September 1 and reasonably fear steep penalties and prosecution under this new law. *See* Declaration of Kerry Lynn Sieff, Founder of Extragrams, attached as Exhibit 4 ("Sieff Decl.") ¶¶ 11–25; Declaration of Brigitte Bandit, attached as Exhibit 6 ("Bandit Decl.") ¶¶ 19–28.[4] Plaintiff 360 Queen Entertainment has made the difficult decision to shut down its popular drag performances after September 1 because it cannot determine how to comply with this vague and overbroad law at its current venue. Declaration of Richard Montez Jr., Co-Owner of 360 Queen Entertainment, attached as Exhibit 5 ("Montez Decl.") ¶¶ 19–25. If not blocked by this Court, SB 12 will drive 360 Queen Entertainment out of business and completely chill its free expression. *Id.* at ¶ 25.

*Third*, because of these harms, the balance of equities tips sharply in Plaintiffs' favor. Plaintiffs seek to vindicate their First and Fourteenth Amendment rights and maintain the status quo. Any interest that Defendants allege is necessary to protect

---

[4]     For reasons of personal safety and privacy, Plaintiff Brigitte Bandit is proceeding under a pseudonym, subject to approval from this Court and a forthcoming motion to proceed under a pseudonym.

children from obscenity is already shielded by Texas law, and SB 12 does not further any legitimate governmental purpose.

*Fourth*, the public interest is served by upholding Plaintiffs' constitutional rights and by enjoining an unconstitutional law. Because injunctive relief serves the public interest and Defendants cannot show any harm from SB 12 being blocked, Plaintiffs ask this Court to preliminarily enjoin this law to prevent irreparable harm, or, in the alternative, to issue a temporary restraining order to preserve the status quo and block the Drag Ban's enforcement until the Court can rule upon Plaintiffs' Motion for a Preliminary Injunction.

## FACTUAL BACKGROUND

### I. The Drag Ban

The Drag Ban was signed by Governor Abbott on June 18, 2023, and is scheduled to take effect on September 1, 2023.

The Drag Ban purports to ban "sexually oriented performances" through at least three mechanisms: (1) criminalizing many such performances; (2) creating civil penalties for commercial entities that host such performances; and (3) mandating that counties and municipalities ban many "sexually oriented performances," and granting them authority to regulate other such performances.[5]

---

[5]    S.B. 12 §§ 1–3 (proposed Tex. Health & Safety Code § 769.002; Tex. Local Gov. Code § 243.0031; Tex. Penal Code § 43.28).

## A. Definition of Sexually Oriented Performance

The Drag Ban defines a "sexually oriented performance" as a "visual performance" that (A) features (i) a performer who is nude or (ii) a performer who engages in "sexual conduct"; and (B) appeals to the prurient interest in sex.[6] "Visual performance" is not defined in SB 12 or elsewhere in Texas law.

SB 12 borrows a definition of "nude" from the Texas Penal Code and from the Business and Commerce Code,[7] which includes anyone who is "entirely unclothed" or "clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks."[8]

SB 12 establishes five categories of "sexual conduct." *First*, SB 12 defines "sexual conduct" to include "the exhibition or representation, actual or simulated, of sexual acts, including vaginal sex, anal sex, and masturbation."[9] *Second*, SB 12's definition of "sexual conduct" includes the "exhibition or representation, actual or simulated, of male or female genitals in a lewd state, including a state of sexual stimulation or arousal."[10] *Third*, "sexual conduct" also includes "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male

---

[6]     S.B. 12 § 3 (proposed Tex. Penal Code § 43.28(a)(2)).

[7]     *Id.* (proposed Tex. Penal Code § 43.28(a)(2)(A)(1)).

[8]     Tex. Bus. & Com. Code § 102.051.

[9]     S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(A)).

[10]     *Id.* (proposed Tex. Penal Code § 43.28 (a)(1)(B)).

or female genitals."[11] *Fourth*, SB 12 defines "sexual conduct" to include "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person."[12] *Fifth*, the definition includes "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics."[13]

Any performer who is "nude" or "engages in sexual conduct" during a visual performance engages in a "sexually oriented performance" if their conduct "appeals to the prurient interest in sex."[14]"[P]rurient interest" is undefined under Texas law.

## B. Enforcement Mechanisms

The Drag Ban contains three separate enforcement mechanisms for the Attorney General, local municipalities and counties, and prosecutors across the state.

*First*, SB 12 amends the Texas Health and Safety Code to prohibit anyone who "controls the premises of a commercial enterprise" from "allow[ing] a sexually oriented performance to be presented on the premises in the presence of an individual younger than 18 years of age."[15] The law does not specify that the individual must have knowledge that the minor is present or have allowed the minor to be present, nor does it define "commercial enterprise," what it means to "control" the premises,

---

[11]     S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(C)).
[12]     *Id.* (proposed Tex. Penal Code § 43.28 (a)(1)(D)).
[13]     *Id.* (proposed Tex. Penal Code § 43.28 (a)(1)(E)).
[14]     *Id.* (proposed Tex. Penal Code § 43.28 (a)(2)(A)(B)).
[15]     S.B. 12 § 1 (proposed Tex. Health & Safety Code § 769.002).

or what it means for a performance to be presented "on the premises in the presence of an individual younger than 18."[16] The penalty for violating this section of the Drag Ban is a $10,000 fine "for each violation."[17] The Attorney General is tasked with bringing actions to recover these penalties, seeking temporary and permanent injunctions, and recovering attorney's fees, "investigative costs," and other expenses against businesses and anyone who violates this section.[18]

*Second*, the Drag Ban amends the Local Government Code to prohibit municipalities and counties from "authoriz[ing]" a "sexually oriented performance" on public property or in the presence of anyone under the age of 18.[19] It also allows municipalities and counties to "regulate sexually oriented performances as the municipality or county considers necessary to promote the public health, safety, or welfare," with no set standards or procedures for such regulations.[20]

*Third*, the Drag Ban amends the Penal Code to create a new category of criminal offense "if, regardless of whether compensation for the performance is expected or received, the person engages in a sexually oriented performance: (1) on public property at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child; or (2) in the presence of an individual younger

---

[16]    S.B. 12 § 1 (proposed Tex. Health & Safety Code § 769.002(b)).
[17]    *Id.*
[18]    *Id.* (proposed Tex. Health & Safety Code §§ 769.002(b)-(f)).
[19]    S.B. 12 § 2 (proposed Tex. Loc. Gov't Code § 243.0031(c)).
[20]    *Id.* (proposed Tex. Loc. Gov't Code § 243.0031(b)).

than 18 years of age."[21] The law does not contain any *mens rea* requirement and this criminal offense is a Class A misdemeanor with penalties of up to a year in jail and a fine of up to $4,000.[22]

## II.    Legislative History of the Drag Ban

When SB 12 was introduced in the Texas Senate, its author, Senator Bryan Hughes, made clear that the bill was intended to target drag. The bill's statement of intent noted a concern about a "recent cultural trend" of "drag shows . . . performed in venues generally accessible to the public, including children."[23] When Senator Hughes introduced both SB 12 and another bill targeting "Drag Story Hours" in public libraries, he stated: "Children should not be exposed to sexually explicit performances *like drag shows*. I presented SB 12 and SB 1601 today to the State Affairs Committee to protect kids from these shows."[24]

Lieutenant Governor Dan Patrick titled the bill "Banning Children's Exposure to Drag Shows" and explained, "I named SB 12 to be one of my top priorities this session because someone must push back against the radical left's disgusting drag

---

[21]    S.B. 12 § 3 (proposed Tex. Penal Code § 43.28(b)).

[22]    *See* Tex. Penal Code § 12.21.

[23]    S.B. 12 Bill Analysis, Author's/Sponsor's Statement of Intent, 88th Leg., R.S. (2023),                                available                                at https://capitol.texas.gov/tlodocs/88R/analysis/pdf/SB00012I.pdf#navpanes=0.

[24]    Bryan    Hughes,    FACEBOOK,    (Mar.    23,    2023,    5:48    PM), https://www.facebook.com/BryanHughesTX/posts/pfbid0LBAWQr7km6fSGGtZrr8nbL8J5xKSBxLhocbMh1mfcVfRVepjGMj5euq26Fy7ECHbl (emphasis added).

performances which harm Texas children."[25] Representative Matt Shaheen, the sponsor of SB 12 in the House, made a similar statement: "Working with @SenBryanHughes, I passed legislation in the TX House protecting children from explicit, hyper-sexualized drag performances in Texas. #SB12."[26] Representative Caroline Harris, a joint sponsor of SB 12, stated: "Drag shows and sexually explicit performances have no business being around children. I am proud to joint author SB 12, which bans these performances and protects a child's innocence."[27] Representative Carrie Isaac, another joint sponsor, declared: "Today we passed SB 12 to protect our children from being groomed by restricting sexually oriented performances also know [sic] as "drag shows" in the presence of children."[28]

---

[25]    *Statement On The Adoption Of Conference Committee Report For Senate Bill 12, Banning Children's Exposure To Drag Shows*, LIEUTENANT GOVERNOR OF TEX. DAN PATRICK (May 28, 2023), https://www.ltgov.texas.gov/2023/05/28/statement-on-the-adoption-of-conference-committee-report-for-senate-bill-12-banning-childrens-exposure-to-drag-shows/.

[26]    Matt Shaheen (@MattShaheen), TWITTER, (June 8, 2023, 7:48 AM), https://twitter.com/MattShaheen/status/1666789387005222912.

[27]    Caroline Harris (@CarolineForTX), TWITTER, (May 22, 2023, 4:09 PM), https://twitter.com/carolinefortx/status/1660754742639837184?s=12&t=PdsS2XI_vKHecU3T2VPeyw.

[28]    Carrie Isaac (@CarrieIsaac), TWITTER, (May 19, 2023, 11:11 PM) https://twitter.com/carrieisaac/status/1659773848676450304?s=12&t=PdsS2XI_vKHecU3T2VPeyw.

When Governor Abbott signed SB 12 into law, he declared: "Texas Governor Signs Law Banning Drag Performances in Public. That's Right."[29]

## III.  Drag Performances

Drag is a form of artistic and creative expression that is well-recognized and deeply rooted.[30] Drag shows typically involve the exaggeration of feminine or masculine characteristics and the challenging of gender stereotypes.[31] While drag is most often associated with the LGBTQIA+ community,[32] this art form is performed and enjoyed by people of every race, religion, gender, gender identity, and sexual orientation.[33] Countless Texans who are not part of the LGBTQIA+ community

---

[29]  Greg Abbott (@GregAbbott_TX), TWITTER (June 24, 2023, 11:03 PM), https://twitter.com/gregabbott_tx/status/1672817859729162240?s=12&t=PdsS2XI_vKHecU3T2VPeyw.

[30]  *See, e.g.*, Ben Rimalower, *From Ancient Greece to Angry Inch, Take a Look at the History of Drag in Theatre*, PLAYBILL (Aug. 15, 2015), https://playbill.com/article/from-ancient-greece-to-angry-inch-take-a-look-at-the-history-of-drag-in-theatre-com-357650

[31]  Caitlin Greaf, *Drag queens and gender identity*, 25 JOURNAL OF GENDER STUDIES 1, 1-2(2015).

[32]  LGBTQIA+ refers to people who are lesbian, gay, bisexual, transgender, queer or questioning, intersex, asexual, or another sexual orientation or gender identity beyond the heterosexual and cisgender majority. *See, e.g.*, *LGBTQIA+ 101*, GENDER+ SEXUALITY RESOURCE CENTER, https://www.gsrc.princeton.edu/lgbtqia-101.

[33]  Greaf, *supra* note 31, at 2-3.

enjoy drag shows, including at Plaintiffs' events from Austin to Abilene, and The Woodlands to San Antonio.[34]

Drag can be performed for any age level and in any venue, since drag artists commonly tailor their performances to their audiences. *See, e.g.,* Bandit Decl. ¶ 25. Drag performances typically include numerous accessories and prosthetics, such as wigs, makeup, high heels, pantyhose, nail extensions, false eyelashes, body suits, hip pads, butt pads, breast plates, and silicone breasts. *See*, *e.g.,* Bandit Decl. ¶ 11; Sieff Decl. ¶¶ 5, 13.

Despite drag's ubiquity in mainstream culture, it is not beloved by everyone. Some people oppose this artistic genre and have spurred an increase in threats of violence against drag performers and their audiences. In 2022, there were 141 reported incidents of anti-LGBTQIA+ protests and threats targeting specific drag events nationwide.[35] Texas had the most reported incidents of any state—double the amount of the second highest state.[36] Drag events in every corner of Texas have been targeted by extremist groups, who are often armed and convey messages of

---

[34]    *See, e.g.,* Cameron Abrams, *New Braunfels Church to Host 'Family-Friendly' Drag Show*, THE TEXAN, 2023, https://thetexan.news/new-braunfels-church-to-host-family-friendly-drag-show/ (discussing recurrent drag shows hosted by the New Braunfels Church).
[35]    *Updated GLAAD Report: Drag events faced at least 141 protests and significant threats in 2022*, GLAAD (Nov. 21, 2022), https://glaad.org/glaad-report-drag-events-faced-least-125-protests-and-significant-threats-2022/.
[36]    *Id.*

violence.[37] These threats of violence against drag shows and performers coincide with a rise in anti-LGBTQIA+ hate crimes across the state. According to an analysis of Texas Department of Public Safety data, "hate crimes in Texas increased by 6.4 percent from 2021 to 2022, marking the sixth year in a row the state has seen an increase in hate crimes—and setting a new record."[38] And of that record-breaking total, anti-LGBTQIA+ hate crimes were the most numerous and "occurred at the highest rate of any group, 4.7 times the rate of all hate crimes in the state."[39] SB 12 threatens to stoke these flames and threats of violence by advancing anti-drag animus against Plaintiffs and others throughout the state.

## IV.    Plaintiffs

### A. The Woodlands Pride

The Woodlands Pride is a non-profit LGBTQIA+ organization in Montgomery County, Texas, that hosts an annual Pride Festival and also participates in other fundraisers, summits, and community events. Rocha Decl. ¶¶ 3, 18, 24. Its mission is to connect, celebrate, educate, and foster relationships in the LGBTQIA+

---

[37]    Trent Brown, *Texas drag shows become a right-wing target amid rising extremism*, TEX. TRIBUNE (Dec. 9, 2022, 5:00 AM), https://www.texastribune.org/2022/12/09/texas-drag-shows-all-ages-family-friendly/.

[38]    Steven Monacelli, *Texas Sets New Hate Crimes Record, DPS Data Show*, TEX. OBSERVER (June 27, 2023, 8:57 AM), https://www.texasobserver.org/texas-sets-new-hate-crimes-record-dps-data-show/.

[39]    *Id.*

community while promoting equality, unity, and love in The Woodlands and beyond. *Id.* at ¶ 3. The Woodlands Pride hosts one of Texas' largest free Pride Festivals. *Id.* at ¶ 4. It has held an annual Pride Festival every year since it was founded in 2018, except for 2020. *Id.* All its previous Pride Festivals have been open to all ages, have prominently featured drag performers or drag queen emcees, and have been held on public property owned by The Woodlands Township. *Id.* at ¶¶ 4, 5, 16.

The Woodlands Pride's 2023 Festival—which will welcome families and people of all ages—is scheduled for October 21, 2023, at Town Green Park, which is owned by The Woodlands Township. *Id.* at ¶ 17. If SB 12 takes effect, it would significantly disrupt The Woodlands Pride and its annual Festival because it could criminalize or ban many common aspects of its festival and performances. *Id.* at ¶ 8.

Numerous aspects of The Woodlands Pride Festivals' drag performances arguably fall within SB 12's ambit. The drag performers and emcees at The Woodlands Pride Festivals use accessories or prosthetics—like wigs, makeup, high heels, panty hose, earrings, and padded bras—that "exaggerate male or female sexual characteristics." *Id.* at ¶ 9. They also perform dance routines that contain gestures or gesticulations that could be interpreted as "sexual" or "represent[ing] . . . simulated . . . sexual acts" by government officials. *Id.* Additionally, The Woodlands Pride's drag performers may sometimes pretend to, or actually, touch

each other's butts or hips in a dance routine, in what could be characterized as "actual

. . . or simulated contact occurring between one person and the buttocks . . . of

another person." *Id.* at ¶ 10. At past Festivals, some performers and attendees have

worn speedos and bikinis, which could be considered by government officials to be

"the exhibition or representation, actual or simulated, of male or female genitals in

a lewd state." *Id.* at ¶ 11. Sexual health vendors at past Festivals have also distributed

free condoms and sexual lubricant to attendees, which could be considered "the

exhibition of a device designed and marketed as useful primarily for the sexual

stimulation of male or female genitals." *Id.* at ¶ 12. Finally, although the drag

performances at The Woodlands Pride Festivals are not obscene or sexually oriented

in the organization's view, they could be considered "prurient" or "sexually

oriented" by the public and government officials under SB 12's vague and broad

provisions, especially considering that SB 12 has been touted as banning drag shows.

*Id.* at ¶ 13.

If SB 12 is not enjoined, The Woodlands Pride fears that its permit for the use

of the park may not be approved by The Woodlands Township unless The

Woodlands Pride guarantees that no drag performances would occur at the Festival.

*Id.* at ¶ 23. If The Woodlands Pride Festival is denied a permit or is forced to cancel

its traditional—and extremely popular—drag performances, the organization would

suffer irreparable harm to its First Amendment rights and its image and standing in

the community. *Id.* at ¶ 26. The Festival would also likely attract fewer visitors and less revenue since drag performances are one of the primary draws and causes for celebration each year. *Id.* at ¶ 28. Because SB 12 also grants specific enforcement power to Montgomery County to restrict and regulate any "sexually oriented performance," The Woodlands Pride worries that the County will restrict or stop future drag performances if the Drag Ban takes effect. *Id.* at ¶ 24.

The Woodlands Pride also fears that, if this year's Festival incorporates drag, the organization and its performers may incur SB 12's harsh civil or criminal penalties. Because of the uncertainty caused by the impending enforcement of the Drag Ban, The Woodlands Pride has already expended considerable resources planning two alternative Pride Festivals for this October—one that features drag performers and one that does not. *Id.* at ¶ 21. One of its board members, who has traditionally emceed the Festival in drag, has already decided to forego their drag performances this year, for fear of being subjected to a fine or jail time. *Id.* The enforcement of SB 12 will also hinder other The Woodlands Pride events, including a gala that will feature drag performances in February 2024. *Id.* at ¶ 25. At this gala, The Woodlands Pride plans to rent and therefore temporarily "control" a premises— a local car dealership—and could therefore incur SB 12's steep civil fines and face other Attorney General enforcement action. *Id.*

Censoring its drag shows would silence The Woodlands Pride's organizational viewpoint and directly contravene its mission of promoting equality for, and celebrating, the LGBTQIA+ community. *Id.* at ¶ 27.

## B. Abilene Pride Alliance

The Abilene Pride Alliance is a non-profit organization focused on supporting Abilene's LGBTQIA+ community, based in Taylor County, Texas. Hardegree Decl. ¶¶ 3, 20. The Abilene Pride Alliance hosts social support groups and free events in Abilene, with the goal of fostering a strong community. *Id.* at ¶ 4. Its mission is to develop an environment of diversity, equity, and inclusion for the LGBTQIA+ community through advocacy, programs, and education in Abilene. *Id.* at ¶ 3.

In September 2022, the Abilene Pride Alliance held Abilene's first full-scale Pride event, which included a parade and a festival at Grover Nelson Park with over 1,800 attendees. *Id.* at ¶ 5. The parade, through the streets of downtown Abilene, featured a drag artist float and the festival included an all-ages drag show. *Id.* The Abilene Pride Alliance is currently planning this year's Pride event to be held on September 30, 2023, which will feature drag performers during a parade through Abilene's public downtown streets and a festival at the Expo Center of Taylor County. *Id.* at ¶ 16. The Expo Center of Taylor County is operated by a non-profit organization who rents the facility from Taylor County. *Id.*

If SB 12 takes effect, it could end or severely hinder the Abilene Pride Alliance's 2023 pride event and other drag-related fundraisers, and Abilene Pride Alliance does not know how to comply with its broad and vague prohibitions. *Id.* at ¶ 9. The drag performers at past Abilene Pride Alliance events have used accessories and prosthetics "that exaggerate male or female sexual characteristics" like wigs, makeup, dresses, and jewelry. *Id.* at ¶ 10. The performers have also danced and moved in ways that could be considered "sexual gesticulations" under the Drag Ban's vague and undefined provisions. *Id.* Its drag performers sometimes give front-facing hugs and hip-bumps to audience members or even sit in their laps, which may be construed by government officials as a type of "actual . . . or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person." *Id.* at ¶ 11. The organization also employs "drag kings" who use devices called "packers," to give the appearance of a masculine "bulge," which could be found by government officials to be an "exhibition or representation, actual or simulated, of male or female genitals in a lewd state." *Id.* at ¶ 12. At its 2022 Pride event, vendors distributed free condoms and sexual lubricant, which could be deemed to be "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals." *Id.* at ¶ 13. Finally, although the drag performances at Abilene Pride Alliance events are not obscene or sexually oriented in the organization's view, they could be considered as "appealing to the

prurient interest in sex" or "sexually oriented" by government officials under SB 12's vague and broad provisions, especially considering that some lawmakers describe SB 12 as a "drag ban." *Id.* at ¶ 9.

The Abilene Pride Alliance fears that, if SB 12 takes effect, its permit for the use of Abilene's city streets may be revoked by the City of Abilene because of the Abilene Pride Alliance's well-known and common tradition of including drag performers in its events. *Id.* at ¶ 19. Because SB 12 also grants specific enforcement power to Taylor County to restrict and regulate any "sexually oriented performance," the Abilene Pride Alliance worries that the County will restrict or stop its drag performances if the Drag Ban takes effect, particularly at its planned pride festival on county property. *Id.* at ¶ 20.

The Abilene Pride Alliance also fears that, if its 2023 pride event, or any of its upcoming fundraisers, incorporate drag, the organization and its performers may incur SB 12's harsh civil or criminal penalties. If SB 12 is not enjoined, its enforcement and chilling effect will force the Abilene Pride Alliance to cease or limit its planned drag performances, which will cause the organization irreparable harm. *Id.* at ¶ 21. Censoring its drag performances would amount to an abandonment of the fundamental mission and viewpoint of its organization and would limit its fundraising potential. *Id.*

## C. Extragrams

Extragrams is a drag entertainment and delivery service based in Austin, Texas. Sieff Decl. ¶ 3. Extragrams operates by connecting drag performers, who work as independent contractors, with customers seeking entertainment for birthday parties, corporate events, festivals, fundraisers, weddings, university orientations, bachelorette parties, and more. *Id.* at ¶ 4. Extragrams has successfully coordinated approximately 1,000 drag performances, many of which occurred in public spaces and were open to all ages, with children and families often in attendance. *Id.* at ¶¶ 4-5.

Extragrams reasonably fears that many common aspects of its drag performances may be implicated by SB 12's broad sweep. Extragrams' drag performers wear clothing and accessories that "exaggerate male or female sexual characteristics," such as wigs, makeup, high heels, dresses, body padding, pantyhose, false eyelashes, fake fingernails, waist cinchers and corsets, push-up bras, breast plates, and crotch packers, which simulate or enhance a pubic "bulge." *Id.* at ¶ 13. Extragrams' drag performers also shimmy, shake and thrust their hips and butts, touch their own bodies, do the splits, and blow kisses during some of their performances, which could be interpreted by government officials as "sexual gesticulations" or "representation[s] [of] . . . simulated . . . sexual acts" under the Drag Ban's vague and broad provisions. *Id.* at ¶ 14. Its performers also dance with

or hug other performers or audience members, or sit in audience member's laps, which sometimes results in a performer briefly touching or brushing up against another person's chest, butt, or lap. *Id.* at ¶ 15. These actions could constitute "actual . . . or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person." *Id.* Extragrams' "drag kings" often wear prosthetic bulges, or "packers," which could be construed by government officials as "the exhibition or representation, actual or simulated, of male or female genitals in a lewd state." *Id.* at ¶ 16. Because the term "nude" is so broadly defined by SB 12, Extragrams fears that one of its performers could be accused of being "nude" simply by revealing any portion of a breast or buttocks or having a momentary and accidental wardrobe malfunction. *Id.* at ¶ 18. Finally, Extragrams reasonably fears that aspects of their performances could be accused by government officials of "appeal[ing] to the prurient interest in sex," especially because the term is undefined, and because lawmakers have recently accused drag performances of being "sexually explicit" and a way to "sexualize children." *Id.* at ¶ 17.

Extragrams fears that, because of SB 12's vagueness and uncertainty, it will not be able to correctly advise Extragrams' drag performers about how to comply with the law, leaving them vulnerable to harsh criminal penalties if they are accused of giving a "sexually oriented performance." *Id.* at ¶ 19. As a result, Extragrams also fears that it could be charged with aiding and abetting a prohibited performance and

could be held strictly liable for a performance in front of a minor even if Extragrams did not intentionally or knowingly facilitate such a performance. *Id.*

Extragrams also worries that private venues—such as hotels, restaurants, wedding venues, ballrooms, and corporate offices—which typically host Extragrams' drag performers, will no longer book or allow drag performances on their premises, for fear of incurring SB 12's civil penalties and Texas Attorney General enforcement action. *Id.* at ¶ 21. It also fears that Extragrams itself could be targeted for investigation and enforcement if it is considered to "control" its shows and the spaces that its performers utilize. *Id.* Extragrams also fears that municipalities will no longer authorize or grant permits for events featuring its drag performers on public property—such as parades and music festivals—after SB 12 takes effect. *Id.* at ¶ 22.

Extragrams has already lost business as a result of SB 12 and the surrounding anti-drag sentiment, harassment, and threats. *Id.* at ¶ 23. Extragrams fears that if the Drag Ban takes effect and its drag performances are banned, criminalized, or limited, its First Amendment right to expressive activity and its business reputation will be further harmed. *Id.* at ¶ ¶ 22, 25.

Extragrams intends to continue providing drag performers and facilitating drag performances for its customers in Texas in the future, and has multiple public

performances scheduled for September of this year. *Id.* at ¶ 25. These performances are at imminent risk of being canceled if SB 12 goes into effect. *Id.*

**D. 360 Queen Entertainment**

360 Queen Entertainment is a gay and Latinx-owned drag production company founded in 2022 to provide joy, hope, and celebration through drag performances in Bexar County, Texas. Montez Decl. ¶ 4. 360 Queen Entertainment brings globally renowned drag stars to San Antonio and hosts commercial drag shows on the back patio of a family-owned restaurant, which provides the space at an agreed-upon cost. *Id.* at ¶¶ 6–8. It has hosted drag shows at the restaurant every month since July 2022. *Id.* at ¶ 7.

Because of protests and threats of violence against drag venues and performers, 360 Queen Entertainment generally limits ticket sales to guests ages 18 and up, but it does not believe that drag is inappropriate for children or inherently sexual. *Id.* at ¶ 12. On occasion, it has welcomed parents who individually requested to bring their teenagers to shows. *Id.* at ¶ 13. It would like to have the option to allow audience members who are under 18 in the future on a case-by-case basis, but SB 12 threatens to destroy that choice. *Id.*

Even when 360 Queen Entertainment attempts to limit ticket sales to those over the age of 18, it cannot guarantee that its drag shows will not be presented "on the premises in the presence of an individual younger than 18 years of age," as

required by SB 12. *Id.* at ¶ 14. 360 Queen Entertainment hosts its drag shows on the back patio of a restaurant, adjacent to the main dining room where families and kids sit inside and walk around. *Id.* The drag shows are partially visible from the parking lot and also through windows inside the restaurant. *Id.*

360 Queen Entertainment has already had to significantly change its business operations in response to the Drag Ban. *Id.* at ¶ 16. On July 1, 2023, it held its monthly drag show half an hour later to try to give more time for families and kids to clear out of the restaurant before drag artists were present on the premises, but it was still impossible to clear everyone out of the dining room before the show began. *Id.* It also plans to start its upcoming August 25 show after the restaurant closes at 9 pm. *Id.* at ¶ 17. To accommodate this change, the restaurant will have to shut down two hours early and lose out on business and revenue in the dining room while maintaining the same level of staffing to serve customers at the drag show on the back patio. *Id.* But even while shutting down the restaurant at 9 pm, 360 Queen Entertainment cannot guarantee that every family and child will leave the establishment. *Id.*

Because 360 Queen Entertainment is unable to guarantee that no one under the age of 18 is present on the premises where its shows are currently held, the business has made the devastating decision to cancel all shows after September 1 because of SB 12. *Id.* at ¶¶ 19–20. It was planning to hold a drag show dinner on

either September 9 or September 23, but has not been able to schedule this show for fear of the Drag Ban's civil and criminal penalties. *Id.* at ¶ 20.

360 Queen Entertainment fears that its shows will be targeted for enforcement by SB 12 because the Legislature and Governor Abbott proclaimed that this law targets and criminalizes drag shows anywhere that people under the age of 18 might be present. *Id.* at ¶ 21. It reasonably fears that its shows could be considered by government officials to "appeal[] to the prurient interest in sex," especially since this term is vague and undefined. *Id.* Further, the drag entertainers at 360 Queen Entertainment events use a variety of accessories and prosthetics like wigs, makeup, high heels, bodysuits, butt pads, hip pads, and prosthetic breasts. *Id.* at ¶ 22. They also sometimes perform gestures or gesticulations that could arguably be interpreted as "sexual" by others, such as twerking, dancing, sitting on people's laps, or flirting with customers. *Id.* 360 Queen Entertainment also fears that SB 12 could lead its performers to be accused by government officials of "representation [of] . . . simulated . . . sexual acts," or "simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person." *Id.* When its performers use prosthetics or wear tight outfits, they also could be accused by government officials of the "exhibition or representation, actual or simulated, of male or female genitals in a lewd state," especially since these terms are vague and undefined. *Id.* And because the term "nude" is so broadly defined, 360 Queen

Entertainment worries that it could be targeted by SB 12 enforcement if one of its performers even partially or momentarily reveals part of a breast or buttocks, or has an accidental wardrobe malfunction. *Id.*

360 Queen Entertainment does not want to stop hosting performances due to the Drag Ban after September 1, which will effectively end their business, but it has made the difficult choice to do so because it does not want to expose itself, its performers, or the establishment where the event is held to the harsh civil and criminal penalties that SB 12 threatens to impose. *Id.* at ¶ 27.

### E. Brigitte Bandit

Brigitte Bandit is a non-binary drag artist who was assigned the sex of female at birth. Bandit Decl. ¶¶ 3–4. She uses she/they pronouns and lives in Travis County, Texas. *Id.* at ¶¶ 2–3. Brigitte performs, produces, and hosts drag shows and has worked as a drag artist for the past five years. *Id.* at ¶ 4. As part of her artistic expression, Brigitte uses a prosthetic breast plate to give her a larger chest and help exaggerate her female sexual characteristics, especially when she impersonates Dolly Parton. *Id.* at ¶¶ 5, 11. Brigitte also uses various accessories like wigs, eyelash extensions, makeup, rhinestones, cowboy boots, high heels, and clothing to impersonate other female stars like Amy Winehouse, Cher, Britney Spears, Lady Gaga, Cyndi Lauper, and Shania Twain. *Id.* at ¶¶ 10–11. Although Brigitte performs some shows in bars for adults ages 18 or 21 and up, she also performs, hosts, and

produces drag shows in public and in the presence of people under the age of 18. *Id.* at ¶¶ 25, 27.

If allowed to take effect, the Drag Ban will have a chilling effect on Brigitte's artistry and business. Brigitte reasonably fears that other people, including Defendants, will accuse her shows of "appeal[ing] to the prurient interest in sex," as she cannot predict how certain members of the public or government officials will react to her performances. *Id.* at ¶ 20. She also worries that her gestures or gesticulations could be interpreted as "sexual" by others, including when she dances, does the splits, or shakes her hips or chest. *Id.* Under SB 12, she also fears that her performances could be accused by government officials of "representation [of] . . . simulated . . .sexual acts," since she occasionally hugs, blows kisses, or dances in ways that could be considered "sexual." *Id.* at ¶ 21. She also reasonably fears that she will be accused of "simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person," since she sometimes dances closely with other performers, and they sometimes brush up against or touch each other. *Id.*

Brigitte also reasonably fears that she could be accused of "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals" because some of her routines involve her using a dildo as a pretend microphone. *Id.* at ¶ 23. She only performs these routines at venues where

the audience is 18 and up, but she does not know the age of everyone in the audience and cannot control who might be able to see the show from outside the venue. *Id.* Even when she performs at a bar where she believes everyone is 18 or 21 and up, she has no way to stop someone under the age of 18 from entering the premises with a fake ID or from looking through a window, from a balcony, or over a fence. *Id.* at ¶ 24.

Brigitte's drag artistry has already been chilled because of the fear, confusion, and uncertainty triggered by attempts to ban drag in Texas, and this harm will worsen if SB 12 takes effect. Drag shows that scheduled her for the summer have canceled gigs and contracts, and some venues that used to call or schedule her have stopped calling or scheduling events for this summer and fall. *Id.* at ¶ 23. She also tentatively has drag shows scheduled on September 2 and 3 that could be considered to be in the presence of someone under the age of 18 because both venues are outdoors and visible from the sidewalk and nearby buildings. *Id.* If SB 12 takes effect, she fears that these shows and the approximately fourteen drag shows that she tentatively has scheduled for the month of September could be canceled or impacted. *Id.* Brigitte also fears being subject to civil penalties for drag shows that she hosts and helps organize at commercial establishments, where she arguably "controls" parts of the premises. *Id.* at ¶ 27.

This law will be devastating for Brigitte because drag is her art and her full-time job. *Id.* at ¶ 30. Much of her business comes from restaurants where she performs drag shows and brunches, especially in Travis County. *Id.* There is no way that these commercial enterprises can fully stop people under the age of 18 from being present on the premises—or stop them from looking in the window or sneaking in with a fake ID—so SB 12 threatens to strip away all of her performances at local restaurants, coffee shops, and corporate offices. *Id.* These businesses have already stopped booking her for shows that they normally would, and SB 12 would irreparably harm Brigitte's free expression and livelihood if it takes effect. *Id.*

## **ARGUMENT**

This motion seeks a preliminary injunction under Federal Rule of Civil Procedure 65(a) and a temporary restraining order under Federal Rule of Civil Procedure 65(b) if a preliminary injunction order cannot be issued before SB 12 takes effect on September 1. The purpose of a temporary restraining order is to preserve the status quo and prevent irreparable harm until the court can hold an adversarial hearing for a preliminary injunction. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974). Plaintiffs are entitled to either a preliminary injunction or a temporary restraining order if they establish the same four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the

injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012) (citation omitted). Plaintiffs here satisfy each element.

## I.     Plaintiffs Have Standing to Challenge SB 12

Plaintiffs challenge SB 12 because they have already been concretely impacted by this law and intend to engage in constitutionally protected conduct that will arguably be proscribed once SB 12 takes effect on September 1. To establish Article III standing, a plaintiff must "(1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (citing *Lujan v. Def's. of Wildlife*, 504 U.S. 555, 560–61 (1992)). In the context of a pre-enforcement challenge, the Fifth Circuit "has repeatedly held that chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Ostrewich v. Tatum*, 72 F.4th 94, 102 (5th Cir. 2023) (citing *Speech First, Inc.*, 979 F.3d at 330–31 (collecting cases)).

A plaintiff has standing to bring a pre-enforcement challenge when the plaintiff "(1) has an 'intention to engage in a course of conduct arguably affected with a constitutional interest,' (2) [her] intended future conduct is 'arguably proscribed by the policy in question,' and (3) 'the threat of future enforcement of the

challenged policies is substantial.'" *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014)). When "dealing with pre-enforcement challenges to recently enacted . . . statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Speech First, Inc.*, 979 F.3d at 335 (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)).

Here, Plaintiffs bring a pre-enforcement challenge to SB 12, which threatens criminal and civil penalties targeting their expressive conduct. As described in Plaintiffs' declarations and this motion, Plaintiffs engage in expressive conduct shielded by the First Amendment through drag performances and artistry. Plaintiffs intend to keep engaging in expressive conduct arguably proscribed by SB 12, including during imminent performances in September and October, and there is no "compelling evidence" that Defendants will not enforce this law against them. If allowed to take effect, SB 12 threatens to continue inflicting irreparable harm on Plaintiffs, including by chilling their freedom of expression. These imminent and irreparable harms can be traced to Defendants' statutorily prescribed enforcement authority and are redressable by an order from this Court enjoining SB 12 and declaring it unconstitutional and void.

## II. Plaintiffs Are Substantially Likely to Prevail on the Merits

### A. The Drag Ban Impermissibly Discriminates Based on Content and Viewpoint

SB 12 unconstitutionally restricts Plaintiffs' expression based on its content and viewpoint. The First Amendment protects conduct that is inherently expressive. *Tex. v. Johnson*, 491 U.S. 397, 406 (1989). Like theatrical performances, ballet, or cinema, drag shows are "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974); *S. Utah Drag Stars v. City of St. George*, No. 4:23-CV-00044-DN-PK, 2023 WL 4053395, at *20 (D. Utah June 16, 2023) (finding that "drag shows . . . are indisputably protected speech").

Under the First Amendment, the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Gilbert*, 576 U.S. 155, 163 (2015). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* A law is content based if it "'on its face' draws distinctions based on the message a speaker conveys." *Id*. at 163 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011)). A content-based regulation is subject to strict scrutiny. *City of Austin, Tex. v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022).

### 1. SB 12 Is Content Based

Both the text and legislative history of SB 12 illustrate that the law targets the content of performances. The Drag Ban is content based on its face because it regulates constitutionally protected "sexually oriented performances" based on the content of those performances.

Sexual conduct that is not obscene is protected speech. "[I]n evaluating the free speech rights of adults, we have made it perfectly clear that '[s]exual expression which is indecent but not obscene is protected by the First Amendment.'" *Reno v. ACLU*, 521 U.S. 844, 874 (1997) (citing *Sable Communications of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)); *see also Carey v. Population Services, Intern.*, 431 U.S. 678, 701 (1977) ("At least where obscenity is not involved, we have consistently held that the fact that protected speech may be offensive to some does not justify its suppression."). Courts have consistently found regulations of expressive sexual conduct to be content-based regulations. *See, e.g., Texas Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 512 (5th Cir. 2021), *cert. denied,* 142 S. Ct. 2852 (2022) (finding that a state rule "is directed at the essential expressive nature of the latex clubs' business, and thus is a content[ ]based restriction' subject to strict scrutiny."); *Ass'n of Club Execs. of Dallas, Inc. v. City of Dallas, Tex.*, 604 F. Supp. 3d 414, 421 (N.D. Tex. 2022) ("[B]ecause the Ordinance regulates [sexually

oriented businesses], which are defined in the Dallas City Code by the content of the entertainment or services purveyed, the Ordinance is content based.").

Any regulation of a performance that meets the definition of a "sexually oriented performance," including those that fall into the  five-part definition of "sexual conduct," is explicitly content based and only targeted because of its content, including any possible "appeal[] to the prurient interest in sex."[40] Further, a fundamental indicator of a content-based restriction is that it was enacted due to "disagreement with the message [the performance] conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Here, the legislative history of SB 12 makes abundantly clear that it was enacted due to lawmakers' disagreement and discomfort with the content of drag performances. *See supra* Section II. Given SB 12's text and the legislative intent to target drag performances, the law cannot be "justified without reference to the content of the regulated speech." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *see Friends of Georges, Inc.*, 2023 WL 3790583, at *24 (finding a law content based and subject to heightened scrutiny based on its text and legislative history targeting drag performances).

### 2. SB 12 Is Also Viewpoint Based

The Drag Ban also targets Plaintiffs' speech based on viewpoint. Government discrimination among viewpoints—or the regulation of speech based on "the

---

[40]     S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(2)(A)(B)).

specific motivating ideology or the opinion or perspective of the speaker"—is a "more blatant" and "egregious form of content discrimination." *Reed*, 576 U.S. at 168–69 (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Regulations based on viewpoint are "particularly pernicious." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 430 (1992) (Stevens, J., concurring).

Here, the Drag Ban impermissibly discriminates based on viewpoint. It seeks to prohibit performers from "using accessories or prosthetics *that exaggerate* male or female sexual characteristics."[41] This language demonstrates that SB 12 aims to prohibit performers who "exaggerate male or female sexual characteristics" but not performers who already have such characteristics and merely exhibit them. This conveys a governmental preference for a specific viewpoint of artistic performance and the kinds of sexual characteristics that are permissible to convey or exaggerate. *See Friends of Georges, Inc.*, 2023 WL 3790583, at *21 (finding that a restriction on "male or female impersonators" discriminates against performers based on viewpoint).

### 3. SB 12 Fails Strict Scrutiny

Because content and viewpoint discrimination both trigger heightened scrutiny, the Drag Ban is "presumptively unconstitutional" and can only be salvaged if it is narrowly tailored to a compelling government interest. *Reed*, 576 U.S. at 163.

---

[41]     S.B. 12 § 3 (proposed Tex. Penal Code § 43.28(a)(1)(E)).

A regulation is narrowly tailored if it is the least restrictive means to serve a compelling governmental purpose. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (citing *Reno*, 521 U.S. at 874).

SB 12 fails this test because it is not narrowly tailored to any governmental purpose. Even assuming that the government has a compelling interest in protecting children from obscene or harmful performances, SB 12's restrictions reach far beyond that purpose. The Drag Ban chills entire genres of free expression, including many performances that are not obscene in any way. *See infra* Section II.B. To the extent that some obscene performances fall within SB 12's scope, Texas law already robustly restricts and prohibits such performances, particularly in the presence of minors.[42] And while governments may regulate or prohibit obscene material, SB 12 prohibits far more expressive conduct than what falls within the narrow and well-established definition of obscenity. *See infra* Section II.B. The Legislature could have taken steps to narrow SB 12's broad scope by adding a *mens rea* requirement and affirmative defenses, or an exception for performances with serious artistic or

---

[42]    Material and performances that are obscene or harmful to children were already regulated and proscribed by Texas law before SB 12 was enacted. *See, e.g.,* Tex. Penal Code § 43.22 (Obscene Display or Distribution); Tex. Penal Code § 43.23 (Obscenity); Tex. Penal Code § 43.24 (Sale, Distribution, or Display of Harmful Material to Minor); Tex. Penal Code § 43.25 (Sexual Performance by a Child); Tex. Penal Code § 43.251(Employment Harmful to a Child).

other value.[43] The "lack of a textual scienter requirement," the "breadth" of the law, and "lack of affirmative defenses" all demonstrate that SB 12 is not narrowly tailored. *Friends of Georges*, 2023 WL 3790583, at *23 (declaring a similar statute not narrowly tailored and unconstitutional).

SB 12 is also not narrowly tailored because it is both overinclusive and underinclusive. It is overinclusive because it prohibits huge swaths of constitutionally protected expression. It is underinclusive because it is not narrowly drawn to target performances that are actually obscene. For example, the law does not prohibit obscene "sexual gesticulations" even if they "appeal[] to the prurient interest in sex" as long as someone does not "exaggerate male or female sexual characteristics" while making such gesticulations.[44]

Further, even if the Court chooses to apply intermediate scrutiny, SB 12 would still not be sufficiently narrowly tailored. *See Ward*, 491 U.S. at 791 ("To survive intermediate scrutiny, a content-neutral law regulating expression must be 'narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information.'").

---

[43]    Failure to include such an important exception violates longstanding principles of First Amendment expression. *See Jacobellis v. State of Ohio*, 378 U.S. 184, 191 (1964) ("It follows that material dealing with sex in a manner that advocates ideas, . . . or that has literary or scientific or artistic value or any other form of social importance, may not be branded as obscenity and denied the constitutional protection") (citation omitted).

[44]    S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(E)).

## B. The Drag Ban Is Overbroad in Violation of the First Amendment

SB 12 is also facially unconstitutional due to its disproportionate overbreadth and chilling of entire genres of free expression. The "substantial overbreadth doctrine" requires courts to invalidate a statute based on overbreadth if a significant number of its applications are unconstitutional, considering the statute's intended scope. *United States v. Stevens*, 559 U.S. 460, 473 (2010). A "law imposing criminal penalties on protected speech is a stark example of speech suppression," *id.*, and the overbreadth doctrine permits courts to invalidate, before they are enacted, laws with civil or criminal penalties that might chill or dampen expressive activity of members of the public at large. Overbroad laws "may deter or 'chill' constitutionally protected speech," and if would-be speakers remain silent, society will lose their contributions to the "marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

SB 12 chills a new category of free expression that triggers civil and criminal penalties for any "visual performance that: (A) features: (i) a performer who is nude . . . or (ii) any other performer who engages in sexual conduct; and (B) appeals to the prurient interest in sex."[45] Based on these vague and open-ended terms, the Drag Ban implicates huge swaths of constitutionally protected and non-obscene expression. The law may apply to any type of "visual performance,"[46] including but

---

[45]  S.B. 12 § 3 (proposed Tex. Penal Code § 43.28).

[46]  *Id.* (proposed Tex. Penal Code §43.23(a)(2)).

not limited to theater, dancing, television, art, or sports. Because SB 12 fails to define the term "performer" and explicitly states that someone commits a violation "regardless of whether compensation for the performance is expected or received,"[47] it could apply to nearly everyone, including someone simply dancing at a Pride festival or public park. *See, e.g.,* Rocha Decl., Ex. 2 ¶ 8; Hardegree Decl., Ex. 3 ¶ 14.

The law's definition of "nude" is so broad that it sweeps within its ambit "any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks," and could apply to any momentary or accidental nudity, including a wardrobe malfunction.[48]

The five-part test for "sexual conduct" is particularly broad and problematic. *First*, since the phrase "the exhibition or representation, actual or simulated, of sexual acts" is open-ended and undefined,[49] it could apply to any type of hug, kiss, thrusting of the hips, or other suggestive movement. *Second*, the "exhibition or representation, actual or simulated, of male or female genitals in a lewd state, including a state of sexual stimulation or arousal"[50] could include non-obscene cartoons, putting condoms on bananas, or a showing of Michelangelo's *David* or Botticelli's *Birth of Venus*. Because "lewd" is not defined, any "representation" of

---

[47] S.B. 12 § 3 (proposed Tex. Penal Code §43.28(a)(2)(A)(i)-(ii)).
[48] *Id.* (proposed Tex. Penal Code § 43.28(a)(2)(A)(i)) (citing Tex. Bus. & Com. Code § 102.051).
[49] *Id.* (proposed Tex. Penal Code § 43.28(a)(1)(A)).
[50] *Id.* (proposed Tex. Penal Code § 43.28(a)(1)(B)).

genitalia might fall within SB 12's ambit, including an abstract painting that represents a vagina or an Elvis impersonator wearing very tight pants. *Third*, the provision prohibiting the "exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals"[51] is also so broad that it could chill the speech of a sexual education instructor who uses a sex toy as a prop or a comedian who holds one on stage for comedic effect. *Fourth*, the regulation of "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person"[52] sweeps so broadly that it could prohibit a performer from even giving a friendly front-facing hug to another person on stage. It severely limits most types of dancing, where performers often touch or simulate touching one other, or professional sports, where athletes might slap one another's butts. *Fifth*, the prohibition of any "exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics"[53] is so vastly broad that it could restrict someone from using a wig, earrings, fake eyelashes, or a pushup bra while doing anything that could be construed as "sexual" in any way.

SB 12 combines its egregiously broad definition of "sexual conduct" with an equally capacious requirement that the performance "appeal to the prurient interest

---

[51]   S.B. 12 § 3 (proposed Tex. Penal Code § 43.28(a)(1)(C)).
[52]   *Id.* (proposed Tex. Penal Code § 43.28(a)(1)(D)).
[53]   *Id.* (proposed Tex. Penal Code § 43.28(a)(1)(E)).

in sex."[54] Although this language comes from one part of the obscenity test established in *Miller v. California*, 413 U.S. 15, 24 (1973), it deviates from *Miller* in critical ways that demonstrate SB 12's overbreadth. The three-part *Miller* test for regulating obscenity asks: "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.* (citations omitted). Notably, SB 12 does not require that "appeal[ing] to the prurient interest in sex" be based on the sensibilities of an average person, nor contemporary community standards. Additionally, SB 12 does not require that the performance be "taken as a whole," which substantially broadens the impact of SB 12 because any minor component or mishap in a performance (such as a brief wardrobe malfunction or a single gesticulation) could trigger steep civil or criminal penalties. *See, e.g.*, *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 274 F.3d 377, 387 (6th Cir. 2001) (finding an ordinance overbroad where "any movie or video featuring a single shot of a person's nude or partially-covered buttocks or a woman's partially covered breast is a 'sexually oriented' film"). SB 12 also does not require that sexual conduct be patently

---

[54]     *Id.* (proposed Tex. Penal Code § 43.28(a)(2)(B)).

offensive. Perhaps most importantly, SB 12 omits the criterion that a work lacks serious artistic (or other) value. Without this exception, SB 12 lacks the critical guardrail that ensures the law does not substantially regulate First Amendment protected works.[55]

SB 12's radical departure from the long-established *Miller* standard demonstrates that the Drag Ban sweeps much more broadly than obscenity and prohibits too wide a range of constitutionally protected speech. *See Reno*, 521 U.S. at 872–76 (1997) (concluding that statute's attempt to regulate "indecent" communications was overly broad where statute lacked the limiting factors set forth in *Miller*); *see also Triplett Grille, Inc. v. City of Akron,* 40 F.3d 129, 136 (6th Cir. 1994) (finding public indecency ordinance overbroad where it prohibited all public nudity "including live performances with serious literary, artistic, or political value").

The Drag Ban chills constitutionally protected expression "of alarming breadth," *Stevens*, 559 U.S. at 474, disproportionate to any plainly legitimate sweep. The law's lack of *mens rea* further exacerbates this unconstitutional overbreadth, particularly since performers and artists will unintentionally and unknowingly be harmed by SB 12's broad application. *See Smith v. People of the State of California*, 361 U.S. 147, 152 (1959) (noting that eliminating a scienter requirement in the

---

[55]      *See supra* note 43.

context of the First Amendment "stifle[s] the flow of democratic expression and controversy"). Because of its significant overbreadth, SB 12 is unconstitutional and void.

## C. The Drag Ban Is Unconstitutionally Vague

SB 12 is unconstitutionally vague because it does not give adequate notice of the conduct it proscribes. A law is unconstitutionally vague when it (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" or (2) fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008). A "more stringent vagueness test applies where a law 'interferes with the right of free speech.'" *Nat'l Press Photographers Ass'n v. McCraw*, 594 F. Supp. 3d 789, 809 (W.D. Tex. 2022) (quoting *Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982)). Such laws may be constitutionally infirm where they "encourage arbitrary and discriminatory enforcement," *Kolender v. Lawson*, 461 U.S. 352, 357 (1983), or "have the capacity 'to chill constitutionally protected conduct, especially conduct protected by the First Amendment.'" *Roark*, 522 F.3d at 546 (quoting *United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir. 1988)). This test demands that statutes affecting speech explain precisely what conduct they are proscribing. *See Edwards v. South Carolina*, 372 U.S. 229, 236–37 (1963) (clarifying that the court is not examining a criminal verdict

arising from an offense due to a particular behavior, but one that is "not susceptible of exact definition").

SB 12 contains a litany of terms that are vague and open-ended, rendering the law "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Key terms of SB 12 are either undefined or so broadly defined that they reasonably extend to enormous swaths of non-obscene expressive activity. *See supra* Section II.B. Plaintiffs cannot be certain which aspects of their drag performances will potentially run afoul of SB 12. *See, e.g.,* Hardegree Decl. ¶¶ 9,17–18; Sieff Decl. ¶¶ 11–12; Rocha Decl. ¶¶ 11–14; Bandit Decl. ¶¶ 10, 20–24; Montez Decl. ¶¶ 21–22. Undefined terms like "accessory or prosthetic" and "sexual gesticulation" give Plaintiffs no guidance on what kind of expressive conduct is prohibited, or what might trigger sanctions under SB 12.[56] Hardegree Decl. ¶¶ 9–15; Sieff Decl. ¶¶ 14–19; Rocha Decl. ¶¶ 8–11, 29; Bandit Decl. ¶¶ 10, 20–24; Montez Decl. ¶¶ 21–22. Plaintiffs cannot reasonably conform their expression to the law— even while making good-faith attempts to do so—and some Plaintiffs have already made plans to stop their drag shows entirely if SB 12 takes effect. *See infra* Section III. Hardegree Decl. ¶¶ 7, 21; Sieff Decl. ¶¶ 8–10, 23–24; Rocha Decl. ¶¶ 21– 23; Bandit Decl. ¶¶ 18, 28–29; Montez Decl. ¶¶ 24–27.

---

[56]     S.B. 12 § 3 (proposed Tex. Penal Code § 43.28(a)(1)(E)).

The Drag Ban's prohibition of a performance that "appeals to the prurient interest in sex" also heightens the law's vagueness for similar reasons that it renders SB 12 overly broad.[57] As opposed to the *Miller* test, which requires that the prurient interest inquiry be based on a reasonable person standard and tethered to contemporary community standards, SB 12 contains no such guidance about how the prurient interest is to be judged or by whom; nor does it contain any exception for works of serious artistic (or other) value. *Cf. Reno*, 521 U.S. at 873 (finding that one *Miller* factor, divorced from two others, can be unconstitutionally vague).

The lack of *mens rea* also compounds the vagueness of SB 12. *United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020) (vagueness concerns are "heightened when the statute contains no *mens rea* requirement"); *Local 8027, AFT-N.H., AFL-CIO v. Edelblut*, No. 21-CV-1077-PB, 2023 WL 171392, at *12 (D.N.H. Jan. 12, 2023) ("Notably, greater clarity is required when a statute either restricts speech, imposes a particularly severe penalty, or lacks a scienter requirement."). Because the Drag Ban does not require anyone to know or intend that their performance is "sexually oriented," performers are seemingly subject to strict liability based on vague and confusing standards, which makes them unable to conform their behavior to the law or know how it might affect their free expression. Similarly, the law threatens to impose criminal and civil sanctions on performers and business owners

---

[57] S.B. 12 § 3 (proposed Tex. Penal Code § 43.28(a)(2)(B)).

if a minor is present at a show, even if no one knows that to be the case. While venues might try to restrict access to anyone under the age of 18, SB 12 could still trigger liability if any person enters the premises using a fake ID. The law's vagueness and reach make it virtually impossible to comply with, which will result in many performances being canceled and the widespread chilling of speech.

Additionally, the Drag Ban does not define a "commercial enterprise" or explain what it means to "control[] the premises of a commercial enterprise."[58] Under these vague provisions, any person who owns, rents, or temporarily occupies a place where a commercial transaction occurs could be accused of violating SB 12 and subject to Attorney General enforcement. Likewise, the law does not state what it means for a performance to occur "on public property" or "on the premises in the presence of" someone younger than 18.[59] Because of these undefined terms, SB 12 could potentially trigger criminal and civil sanctions even if a minor views a performance through a window or while briefly walking through a commercial establishment, as Plaintiffs reasonably fear. *See, e.g.,* Sieff Decl. ¶¶ 4, 20; Rocha Decl. ¶¶ 18–19; Bandit Decl. ¶¶ 30–31; Montez Decl. ¶¶ 13–14,17,19.

Because this law leaves "grave uncertainty" about how to understand its scope, it is unconstitutionally void for vagueness. *See Johnson* 576 U.S. at 597–98

---

[58]     S.B. 12 § 1 (proposed Tex. Health & Safety Code § 769.002).
[59]     S.B. 12 § 2 (proposed Tex. Loc. Gov't Code § 243.0031(c)).

(2015) (holding the residual clause of the Armed Career Criminal Act to be unconstitutionally vague because it is "imprecise" and "leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony").

## D. The Drag Ban Is an Impermissible Prior Restraint on Speech

A prior restraint is a prohibition on speech or expression that bears a "heavy presumption of unconstitutionality." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990). A law regulating speech imposes an unconstitutional prior restraint in violation of the First Amendment when it either prohibits certain communications before they occur or allows for "excessive discretion" in regulating speech. *Cath. Leadership Coal. of Texas v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citing *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988)). "[N]arrowly drawn, reasonable and definite standards" must be established in order to avoid "unbridled discretion" that might permit the official to "encourag[e] some views and discourag[e] others through the arbitrary application" of the law. *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992). Content-based prior restraints must contain adequate procedural protections, including: (1) being limited to a specified, brief period of time during which the status quo is maintained; (2) allowing for prompt judicial review; and (3) imposing on the censor the burdens of going to court and providing the basis to suppress the speech. *See N.W. Enters. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir. 2003).

SB 12 fails these standards and unconstitutionally authorizes municipalities and counties to impose prior restraints on free expression. By requiring municipalities and counties to prohibit all "sexually oriented performances" on public property or in the presence of an individual younger than 18 years of age— and granting municipalities and counties unbridled authority to "regulate" all other such performances[60]—the Drag Ban is an impermissible prior restraint on free expression. The law lacks any prior restraint safeguards required by the First Amendment because it (1) disrupts the status quo and allows for the censorship of free expression for a boundless amount of time; (2) lacks any provision for judicial review; and (3) places the burden on the performer, not the municipality or county, to seek judicial review. This prior restraint on free expression without adequate safeguards renders SB 12 unconstitutional and void.

### III. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

Without injunctive relief, Plaintiffs will suffer irreparable harm. As explained above, the Drag Ban violates Plaintiffs' First Amendment rights, which constitutes an irreparable injury in and of itself. *See Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))); *Opulent Life Church v. City of Holly Springs, Miss.*, 697

---

[60]    S.B. 12 § 2 (proposed Tex. Loc. Gov't Code § 243.0031(b)).

F.3d 279, 295 (5th Cir. 2012) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (quotations omitted).

Plaintiffs all engage in or facilitate drag performances that they reasonably fear would violate the Drag Ban, and they wish to continue these performances in the future. Hardegree Decl. ¶¶ 5–6, 9–16; Sieff Decl. ¶¶ 11–18, 25; Rocha Decl. ¶¶ 5, 8–14, 18; Bandit Decl. ¶¶ 4, 20–24, 28; Montez Decl. ¶¶ 7, 14, 20–22.

But these performances and acts of artistic expression would be severely hindered, if not completely halted, by the enforcement of the Drag Ban. If the Drag Ban is not enjoined, Plaintiffs will be forced to either cancel their performances or significantly limit their audiences and free expression by moving out of public spaces and adding age restrictions to their events. Montez Decl. ¶¶ 19–20; Sieff Decl. ¶¶ 24–25; Bandit Decl. ¶¶ 30–31. But even then, if Plaintiffs attempt to conform their expressive activity to the Drag Ban's vague and broad restrictions, they still cannot guarantee that they will not be subject to its sweeping and standardless provisions, or control whether a minor might be present on the premises during a performance. Montez Decl. ¶¶ 14, 18–19; Sieff Decl. ¶ 20; Bandit Decl. ¶ 31. Therefore, Plaintiffs reasonably fear that, even if they drastically change their expressive conduct and try to hide it from public view, they would still run afoul of this law. Hardegree Decl. ¶ 21; Sieff Decl. ¶¶ 12, 21, 24–25; Rocha Decl. ¶¶ 19, 25–

27; Bandit Decl. ¶¶ 24, 30–32; Montez Decl. ¶¶ 19, 21–23, 27. Plaintiffs are left with the choice to either completely cease their expressive activities or risk the Drag Ban's draconian civil and criminal penalties. *Id.*

The Drag Ban fundamentally injures Plaintiffs' ability to express their viewpoints to their intended audiences and further the goals of their organizations or businesses. For example, the Drag Ban will impair the ability of Abilene Pride Alliance and The Woodlands Pride to welcome, support, fundraise for, and celebrate the LGBTQIA+ communities in their geographic areas. Rocha Decl. ¶¶ 15, 22, 25; Hardegree Decl. ¶¶ 6, 18, 21. It will also curtail Brigitte Bandit's ability to earn a living and engage in charity work for nonprofits that support her community. Bandit Decl. ¶ 32. By targeting drag performances, SB 12 threatens to drive such constitutionally protected expressive activity into the shadows, thereby stigmatizing drag performers, as well as Texas's LGBTQIA+ community. *Id.* at ¶¶ 18–19; Sieff Decl. ¶ 12. This sends a message to Plaintiffs that their expressive conduct is unwelcome and unlawful and harms their reputation and standing in the community. Rocha Decl. ¶ 27; Hardegree Decl. ¶ 21.

The Drag Ban's chilling effect and looming enforcement is already causing Plaintiffs irreparable harm. Brigitte Bandit's and Extragrams' upcoming performances shortly after September 1 have been cast into doubt. Bandit Decl. ¶¶ 28–30; Sieff Decl. ¶¶ 21–25. Some events have been canceled or not booked, and

Plaintiffs reasonably believe the cancellations and decline in typical bookings are a result of the uncertainty surrounding the Drag Ban and its chilling effect. *Id.* Abilene Pride Alliance's and The Woodlands Pride's plans for their upcoming Pride events in September and October—where drag performances have been a staple—have been disrupted and cast into uncertainty. Hardegree Decl. ¶¶ 16–17, 19–21; Rocha Decl. ¶¶ 21–23, 25. 360 Queen Entertainment has already taken costly measures to modify its current performances and has had to cancel all of its shows starting September 1 due to SB 12's sweeping and vague provisions. Montez Decl. ¶¶ 16–20. Plaintiffs' freedom of expression, organizational missions, fundraising potential, and future business are all imperiled by SB 12, which threatens to irreparably harm them if it takes effect.

## IV. The Balance of the Equities and Public Interest Weigh in Favor of Granting Injunctive Relief

Both the balance of the equities and the public interest favor enjoining the Drag Ban because the First and Fourteenth Amendment rights of Plaintiffs and others will be infringed if the law is not enjoined. *See Opulent Life*, 697 F.3d at 298 ("Injunctions protecting First Amendment freedoms are always in the public interest."). By contrast, neither Defendants nor the public has a legitimate interest in the enforcement of an unconstitutional law, particularly where, as here, any obscene

performances to which the Drag Ban might apply are already proscribed by Texas law.[61]

## V.    No Bond Should Be Required

"[T]he amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court," and the court "may elect to require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). Because this case concerns constitutional freedoms and Defendants will not suffer any monetary harm from the Court's temporary restraining order or preliminary injunction, Plaintiffs respectfully request that the Court require no bond.

## CONCLUSION

Plaintiffs ask the Court to enjoin SB 12 before it goes into effect on September 1 by granting Plaintiffs' Motion for Preliminary Injunction; or, in the alternative, enter a Temporary Restraining Order until the Motion for Preliminary Injunction may be ruled on.

---

[61]    *See supra* note 42.

Respectfully submitted,

*/s/Brian Klosterboer*
Brian Klosterboer, *attorney-in-charge*
   TX Bar No. 24107833
   SDTX No. 3314357
Chloe Kempf
   TX Bar No. 24127325
   SDTX No. 3852674
Thomas Buser-Clancy
   TX Bar No. 24078344
   SDTX No. 1671940
Edgar Saldivar
   TX Bar No. 24038188
   SDTX No. 618958
Adriana Pinon
   TX Bar No. 24089768
   SDTX No. 1829959
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288
Tel. (713) 942-8146
Fax (713) 942-8966
bklosterboer@aclutx.org
ckempf@aclutx.org
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
apinon@aclutx.org

Derek McDonald
   TX Bar No. 00786101
   SDTX No. 18546
Maddy Dwertman*
   TX Bar No. 24092371
BAKER BOTTS L.L.P.
401 S. 1st Street, Suite 1300
Austin, TX 78704
Tel. (512) 322-2500
Fax (512) 322-2501
Derek.McDonald@BakerBotts.com
Maddy.Dwertman@BakerBotts.com

Brandt Thomas Roessler*
   TX Bar No. 24127923
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
Tel. (212) 408-2500
Fax (212) 408-2501
Brandt.Roessler@BakerBotts.com

Ali Andrews*
   TX Bar No. 24059381
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
Tel. (713) 229-1533
Fax (713) 229-2833
Ali.Andrews@BakerBotts.com

*Attorneys for Plaintiffs*           *\*SDTX Admission Application Pending*

## CERTIFICATE OF CONFERENCE

Plaintiffs notified Defendants of their intent to file this motion on August 3, 2023, and again on August 8, 2023, and asked for their position on the requested relief. Defendant Angela Colmenero is opposed to the requested relief and the other Defendants either did not respond or were unable to determine their position before the time of filing.

*/s/Brian Klosterboer*
Brian Klosterboer


## CERTIFICATE OF SERVICE

The undersigned certifies that on the 9th day of August 2023, a true and correct copy of the above document was served via the CM/ECF system to all counsel of record, via e-mail to all Defendants who have not yet appeared, and via service of process to all Defendants who have not yet appeared or agreed to accept service via e-mail.

*/s/Brian Klosterboer*
Brian Klosterboer