# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

THE WOODLSLANDS PRIDE, §
INC., *et al.*, §
    *Plaintiffs*, §
  §
**v.** §    C<small>IVIL</small> A<small>CTION</small> N<small>O.</small> 4:23-<small>CV</small>-2847
  §
**ANGELA COLMENERO, in her** §
**official capacity as Provisional** §
**Attorney General of Texas,** *et al.*, §
    *Defendants.* §

---

# DEFENDANT COLMENERO'S MOTION TO DISMISS UNDER RULES 12(b)(1) AND 12(b)(6) AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

## INTRODUCTION

Plaintiffs are challenging a proposed law that does not exist – there is no "drag ban" in Texas. Sexually oriented performances, once limited to consenting adults in bars and clubs where minors are not allowed, are increasingly being performed in public in front of minors. In response to this new problem, Texas has adopted a new statute, commonly known as Senate Bill 12 or SB 12. Although the historical record reveals that SB 12 was initially conceived in response to public outcry over highly sexualized, self-described "drag show" performances occurring in front of children,

SB 12 developed into a general prophylactic applying to *any* sexually oriented performance that appeals to the prurient interest in sex. It does not single out drag shows. It does not apply to *non-sexual* drag shows. It does not apply to *non-sexual* performances that use accessories or prosthetics that exaggerate male or female sexual characteristics—in other words, it does not apply to the mere act of a male dressing up as a female, the quintessential characteristic of drag performances. It does not apply to *non-sexual* displays of nudity. It does not apply to performances using *non-sexual* touching. And it does not apply to any performance—sexual or not—on private premises where minors are not present.

SB 12 does not violate the Constitution because it does not regulate constitutionally protected activity. And even if it did, it still would not violate the Constitution because the State may regulate constitutionally-protected activities which harm minors.

Moreover, SB 12 sets up specific enforcement mechanisms. Defendant Colmenero's enforcement authority cannot be used to harm any Plaintiff in any of the ways they claim to be harmed. Thus, Plaintiffs have no standing to sue Colemenro, and this Court lacks jurisdiction to adjudicate their claims.

## LEGAL BACKGROUND

SB 12 does three things.

*First*, it imposes a civil penalty on persons who control the premises of a commercial enterprise and allow a sexually oriented performance to be presented on the premises in the presence of a minor. The Attorney General may enforce this provision. SB 12 (to be codified as Tex. Health & Safety Code §§ 769.001, .002).

*Second*, it amends the Local Government Code regarding Sexually Oriented Businesses and authorizes municipalities to regulate sexually oriented performances as they can regulate sexually oriented businesses. It also prohibits municipalities from allowing sexually oriented performances on public property or in the presence of minors. *Id.* (to be codified as Tex. Loc. Gov. Code § 243.0031).

*Third*, it makes it a crime for a person to knowingly, intentionally, or recklessly engage in a sexually oriented performance on public property at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child, or in the presence of a minor. *Id.* (to be codified as Tex. Pen. Code § 43.28); *see also* Tex. Pen. Code § 6.02(c) (requiring a culpable mental state). A "sexually oriented performance" is defined as:

(1)   "Sexual conduct" means:

(A)   the exhibition or representation, actual or simulated, of sexual acts, including vaginal sex, anal sex, and masturbation;

(B)   the exhibition or representation, actual or simulated, of male or female genitals in a lewd state, including a state of sexual stimulation or arousal;

3

    (C)    the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals;

    (D)    actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person; or

    (E)    the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics.

(2)    "Sexually oriented performance" means a visual performance that:

    (A)    features:

        (i)    a performer who is nude, as defined by Section 102.051, Business & Commerce Code; or

        (ii)    any other performer who engages in sexual conduct; and

    (B)    appeals to the prurient interest in sex.

SB 12 becomes effective September 1, 2023.

## FACTS

Plaintiffs are four organizations and one individual who wish to put on drag shows in front of children. They argue that SB 12 prohibits them from doing so in violation of their First Amendment right to free speech.

## PROCEDURAL BACKGROUND

Plaintiffs filed this lawsuit on August 2, 2023. ECF 1. On August 9, Plaintiffs filed their Motion for Temporary Restraining Order and Preliminary Injunction seeking an order enjoining Defendants from enforcing SB 12, a declaration that SB

12 is facially unconstitutional, or in the alternative is unconstitutional as applied to Plaintiffs, and attorney's fees. ECF 10. On August 14, the Court issued an order that all parties appear for a consolidated preliminary injunction hearing and trial on the merits commencing on August 28. ECF 20. On August 18, the Court further ordered all Defendants to file responses to Plaintiffs' pending motion and any briefing the parties deem necessary for the consolidated trial on the merits by August 23. ECF 37. Due to the expedited nature of this consolidated trial, General Colmenero has not had sufficient time to develop all facts and evidence necessary to fully defend the merits of this lawsuit.

## STANDARD

### I.  Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). The party seeking to invoke jurisdiction bears the burden of demonstrating its existence. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "[A] court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction." *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009).

## II. Rule 12(b)(6)

A complaint must be dismissed if the plaintiff fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). To avoid dismissal, a plaintiff must plead sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While the Court must accept all factual allegations as true, the Court "do[es] not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005); *see also Iqbal*, 556 U.S. at 679.

In evaluating a motion to dismiss, a district court should employ a two-pronged approach. First, the court should identify and set aside "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Second, the court should assume the veracity of the plaintiff's "well-pleaded factual allegations . . . and then determine whether they plausibly give rise to an entitlement for relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing

*Twombly*, 550 U.S. at 556). If the factual allegations "do not permit the court to infer more than the mere possibility of misconduct," then the complaint fails to show a plausible claim for relief. *Id.* (citing Fed. R. Civ. P. 8(a)(2)).

The court should dismiss a complaint if the plaintiff has failed to "nudge[] [his] claims" of unlawful conduct "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. In other words, if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," then the complaint fails to "show[] that the pleader is entitled to relief" under Rule 8(a)(2) and must be dismissed. *Iqbal*, 556 U.S. at 679. Likewise, a court should dismiss when, based on the plaintiff's own allegations, he has no cognizable claims.

## III.   Preliminary Injunction and TRO

To obtain a preliminary injunction, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in the movant's favor; and (4) that issuance of a preliminary injunction will not disserve the public interest.  The last two factors merge when the government is the opposing party. A preliminary injunction is an "extraordinary remedy" and will only be granted if the movant carries its burden on all four requirements. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). The standard for deciding whether to issue a preliminary

injunction is the same standard used to issue a temporary restraining order. *Texas v. United States*, 524 F. Supp. 3d 598, 651 (S.D. Tex. 2021).

## MOTION TO DISMISS

### I. Plaintiffs' claims against Colmenero are barred by sovereign immunity.

"[F]or over a century now, [the Supreme Court has] made clear that the Constitution does not provide for federal jurisdiction over suits against nonconsenting States." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000). Generally, state sovereign immunity precludes suits against state officials in their official capacities. *See City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). The important case of *Ex parte Young*, 209 U.S. 123 (1908), is an exception to that baseline rule, but it permits only "suits for prospective ... relief against state officials acting in violation of federal law." *Texas Democratic Party v. Abbott*, 961 F.3d 389, 400 (5th Cir. 2020) (*quoting Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437, (2004).

In order for the *Ex parte Young* exception permitting suits for prospective relief against state officials acting in violation of federal law to apply, state officials must have some connection to the state law's enforcement to ensure that the suit is not effectively a suit against the state itself. *Texas Democratic Party v. Abbott*, 961 F.3d 389, 400–01 (5th Cir. 2020); *see also City of Austin v. Paxton*, 943 F.3d 993, 998 (holding that when "conducting [the] *Ex parte Young* analysis, [court] first consider[s] whether the plaintiff has named the proper defendant or defendants.

Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, [the] *Young* analysis ends."). It is not enough that the official have a "*general* duty to see that the laws of the state are implemented." *Id*. (*quoting Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (emphasis added)). If the official sued is not statutorily tasked with enforcing the challenged law, then the requisite connection is absent. *Id*. Moreover, a mere connection to a law's enforcement is not sufficient—the state officials must have taken some step to enforce. *Id*. The Fifth Circuit has noted that:

> One panel observed that '[e]nforcement typically involves compulsion or constraint.' *K.P. v. LaBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). Another defined it as 'a demonstrated willingness to exercise' one's enforcement duty. *Morris*, 739 F.3d at 746. But the bare minimum appears to be 'some scintilla' of affirmative action by the state official. *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019).

*Texas Democratic Party*, 961 F.3d at 401.

The Fifth Circuit recently provided additional clarity regarding *Ex parte Young's* requirement that a state official be tasked with enforcement of the allegedly unconstitutional law and the connection of that enforcement to the relief sought by the plaintiff. *See Mi Familia Vota v. Abbott*, 977 F.3d 461, 468 (5th Cir. 2020). In *Mi Familia Vota*, the Court analyzed the secretary of state's connection to the enforcement of the challenged voting provisions and concluded that "[d]irecting the Secretary not to enforce the electronic-voting-devices-only provision in section

9

43.007 would not afford the Plaintiffs the relief that they seek, and therefore, the Secretary of State 'is not a proper defendant.'" *Id.*; *see also Texas Democratic Party v. Hughs*, 997 F.3d 288, 291 (5th Cir. May 7, 2021) (holding that the Secretary of State was not sufficiently connected to enforcement of early-voting law, thereby precluding suit against Secretary to enjoin its enforcement); *Langan v. Abbott*, No. 1:20-CV-275-RP, 2021 WL 466124, at *4 (W.D. Tex. Feb. 8, 2021) (holding that Plaintiffs' claims against Attorney General Paxton were barred by Eleventh Amendment immunity because they did not demonstrate a sufficient connection to the enforcement of the challenged statute).

The attorney general is only tasked with the enforcement of section 1 of SB 12 related to sexually oriented performances on premises of commercial enterprises. Tex. Health & Safety Code § 769.002(c)-(f). Section 2 of SB 12 gives municipalities and counties the authority to regulate certain sexually oriented performances. Because General Colmenero is not authorized to enforce section 2 of SB 12 nor does she have any enforcement connection to that provision of the Act, the requisite connection to create an exception under *Ex parte Young* is absent and all related claims brought against General Colmenero should be dismissed. *See Texas Democratic Party*, 961 F.3d at 401 (holding that if the official sued is not statutorily tasked with enforcing the challenged law, then the requisite connection is absent).

## II. Plaintiffs' claims against Colmenero should be dismissed under Rule 12(b)(1) because Plaintiffs lack Article III standing.

Article III "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" U.S. Const. art. III, § 2). The "standing" doctrine "gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quotations omitted). The plaintiff bears the burden of establishing standing, *id*. at 158, and, even if the parties fail to raise standing, "the [C]ourt has an independent obligation to assure that standing exists," *Summers v. Earth Island Inst.,* 555 U.S. 488, 499 (2009).

To establish standing, the plaintiff must show "(1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1646 (2022).

When the claimed injury is a future violation of the right to free speech, a plaintiff has suffered an injury in fact if he (1) has an "intention to engage in a course of conduct arguably affected with a constitutional interest," (2) his intended future conduct is "arguably ... proscribed by [the policy in question]," and (3) "the threat of future enforcement of the [challenged policies] is substantial." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020).

An organization can establish the first standing element, injury-in-fact, under two theories: "associational standing" or "organizational standing." *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010). The Supreme Court has recognized that an association may have standing to assert the claims of its members even where the association itself has suffered no injury from the challenged activity. *Hunt v. Washington Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.*; *see also Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (noting that the first two components of associational standing are constitutional requirements, while the third is solely prudential).

An organization has standing to sue in its own right under an organizational theory if it satisfies the same well-known Article III requirements of injury-in-fact, causation, and redressability that apply to individuals. *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct; hence, the

defendant's conduct significantly and 'perceptibly impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources. . . .'" *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The injury-in-fact must be "concrete and demonstrable" and must constitute "far more than simply a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379.

None of the four organizational plaintiffs assert associational standing. None of them claim standing on behalf it their members. They only assert organization standing on their own behalf. *See* Plaintiffs' Motion at 32–33.

**A. Woodlands Pride lacks standing to sue Colmenero.**

Woodlands Pride alleges that it plans to have it 2023 Pride Festival on October 23, 2023, "held on public property owned by The Woodlands Township" at "Town Green Park, which is owned by The Woodlands Township." It further alleges that it "fears that its permit for the use of the park may not be approved by The Woodlands Township unless The Woodlands Pride guarantees that no drag performances would occur at the Festival. If The Woodlands Pride Festival is denied a permit or is forced to cancel its traditional—and extremely popular—drag performances, the organization would suffer irreparable harm to its First Amendment rights and its image and standing in the community." *Id.* at 25–26 (citations to declaration

omitted). "The Woodlands Pride also fears that, if this year's Festival incorporates drag, the organization and its performers[1] may incur SB 12's harsh civil or criminal penalties." *Id.* at 26. "Because of the uncertainty caused by the impending enforcement of the Drag Ban, The Woodlands Pride has already expended considerable resources planning two alternative Pride Festivals for this October—one that features drag performers and one that does not." *Id.*

As alleged, Colmenero has no enforcement authority concerning Woodlands Pride's 2023 Pride Festival. Town Green Park is not alleged to be "premises of a commercial enterprise," so even if the Woodlands Township allows Woodlands Pride to present a sexually oriented performance in front of children during the 2023 Pride Festival, Colmenero cannot seek any relief under § 769.001. Any alleged injury is not fairly traceable to Colmenero, and enjoining her from seeking such relief would not redress Woodlands Pride's alleged injury.

Moreover, Woodlands Pride's alleged injury—"irreparable harm to its First Amendment rights and its image and standing in the community"—is not an "injury-in-fact" that gives it standing. As argued elsewhere in this motion, it has no

---

[1] Despite this reference to "its performers," and a later reference to "[o]ne of its board members, who has traditionally emceed the Festival in drag, [who] has already decided to forego their drag performances this year, for fear of being subjected to a fine or jail time," *id.* at 26, Woodlands Pride is not asserting associational standing. "Censoring its drag shows would silence The Woodlands Pride's organizational viewpoint and directly contravene its mission of promoting equality for, and celebrating, the LGBTQIA+ community." *Id.* at 27.

absolute First Amendment right to perform drag shows because drag shows no not inherently express anything, has no First Amendment right to present sexually-oriented performances, and even if drag shows or sexually-oriented performances were protected by the First Amendment, states may nevertheless regulate or prohibit sexually-oriented performances in front of children. When the claimed injury is a future violation of the right to free speech, a plaintiff has suffered an injury in fact if he (1) has an "intention to engage in a course of conduct arguably affected with a constitutional interest." *Speech First*, 979 F.3d at 330.

Moreover, Woodlands Pride does not allege a substantial threat of future enforcement against it. *Id*. Enforcement would be against Woodlands Township, not Woodlands Pride, and Woodland Pride presents no evidence either that Colmenero will enforce Section 769.001 against Woodlands Township (or how such after-the-fact enforcement would harm Woodlands Pride) and no evidence that Woodlands Township has any intention of denying Woodlands Pride a permit for its Pride Festival.

Moreover, Woodlands Pride fails to explain how cancelling its 2023 Pride Festival could possible cause "irreparable harm to … its image and standing in the community," and such "harm" is certainly not self-evident. And there is no authority that such "harm" is "injury-in-fact"—and Woodlands Pride cites none.

Finally, Colmenero is not authorized to impose "harsh civil or criminal penalties" on Woodlands Pride. She is only authorized to seek relief against "[a] person who controls the premises of a commercial enterprise," which Woodlands Pride does not allege to be.

In sum, Woodlands Pride lacks standing to sue Colmenero.

## B. Abilene Pride lacks standing to sue Colmenero.

Abilene Pride alleges that it plans to have a Pride event on September 30, 2023, "which will feature drag performers during a parade through Abilene's public downtown streets and a festival at the Expo Center of Taylor County." Plaintiffs' Motion at 27. "The Expo Center of Taylor County is operated by a non-profit organization who rents the facility from Taylor County." *Id*. It further alleges that it "fears that, if SB 12 takes effect, its permit for the use of Abilene's city streets may be revoked by the City of Abilene" and "worries that the County will restrict or stop its drag performances if [SB 12] takes effect, particularly at its planned pride festival on county property." *Id*. at 29. Finally, it alleges that it also "fears that, if its 2023 pride event, or any of its upcoming fundraisers, incorporate drag, the organization and its performers[2] may incur SB 12's harsh civil or criminal penalties." *Id*.

---

[2] Despite this reference to "its performers," Abilene Pride is not asserting associational standing. "If SB 12 is not enjoined, its enforcement and chilling effect will force the Abilene Pride Alliance to cease or limit its planned drag performances, which will cause the organization irreparable harm." Plaintiffs' Motion at 29.

As alleged, Colmenero has no enforcement authority concerning Abilene Pride's 2023 Pride event. The streets of Abilene are not "premises of a commercial enterprise," so even if the City of Abilene allows Abilene Pride to present a sexually oriented performance in front of children during its parade on city streets, Colmenero cannot seek any relief under § 769.001. Likewise, the Expo Center in Taylor County is not "premises of a commercial enterprise," so even if Taylor County allows Abilene Pride to present a sexually oriented performance in front of children during its parade at its Expo Center, Colmenero cannot seek any relief under § 769.001. Enjoining her from seeking such relief would not redress Abilene Pride's alleged injury.

Moreover, Abilene Pride does not allege a substantial threat of future enforcement against it. *Speech First*, 979 F.3d at 330. Enforcement would be against the person who controls the premises of the commercial enterprise where the prohibited activity would occur, not Abilene Pride, and Abilene Pride presents no evidence either that Colmenero will enforce Section 769.001 against the City of Abilene or Taylor County (or how such after-the-fact enforcement would harm Woodlands Pride) and no evidence that the City of Abilene or Taylor County has any intention of denying Abilene Pride permits for its Pride event.

Finally, Colmenero is not authorized to impose "harsh civil or criminal penalties" on Abilene Pride. She is only authorized to seek civil penalties against "[a] person who controls the premises of a commercial enterprise," which Abilene Pride does not allege to be.

In sum, Abilene Pride lacks standing to sue Colmenero.

## C. Extragrams lacks standing to sue Colmenero.

Extragrams alleges that it "is a drag entertainment and delivery service based in Austin, Texas. Extragrams operates by connecting drag performers, who work as independent contractors, with customers seeking entertainment for birthday parties, corporate events, festivals, fundraisers, weddings, university orientations, bachelorette parties, and more. Extragrams has successfully coordinated approximately 1,000 drag performances, many of which occurred in public spaces and were open to all ages, with children and families often in attendance." Plaintiffs' Motion at 30 (citations to declaration omitted).

"Extragrams fears that, because of SB 12's vagueness and uncertainty, it will not be able to correctly advise Extragrams' drag performers about how to comply with the law, leaving them vulnerable to harsh criminal penalties if they are accused of giving a 'sexually oriented performance.' As a result, Extragrams also fears that it could be charged with aiding and abetting a prohibited performance and could be

held strictly liable for a performance in front of a minor even if Extragrams did not intentionally or knowingly facilitate such a performance." *Id.* at 31–32 (citations to declaration omitted). And "Extragrams also worries that private venues—such as hotels, restaurants, wedding venues, ballrooms, and corporate offices—which typically host Extragrams' drag performers, will no longer book or allow drag performances on their premises, for fear of incurring SB 12's civil penalties and Texas Attorney General enforcement action." *Id.* at 32. Moreover, "It also fears that Extragrams itself could be targeted for investigation and enforcement if it is considered to 'control' its shows and the spaces that its performers utilize. Extragrams also fears that municipalities will no longer authorize or grant permits for events featuring its drag performers on public property—such as parades and music festivals—after SB 12 takes effect." *Id.*

As alleged, Colmenero has no enforcement authority concerning any of Extragrams activities. Its complaint that it cannot advise its performers on how to avoid criminal penalties, about possibly being charged with aiding and abetting a criminal violation, and about what municipalities might do have nothing to do with Colmenero's enforcement authority and far exceed the plain language of the statute. Its alleged concern that it will be found to "control" spaces that its performers utilize is contradicted by its allegation that its business model is "connecting drag

performers, who work as independent contractors, with customers seeking entertainment." Someone who brokers independent contractor entertainer services does not "control" the spaces where those entertainers perform.

Its complaint that private venues—some of which are presumably "premises of a commercial enterprise"—"will no longer book or allow drag performances on their premises, for fear of incurring SB 12's civil penalties and Texas Attorney General enforcement action" rests on "a highly attenuated chain of possibilities" that does not give them standing to sue Colmenero. *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 410 (2013). They cannot show that enjoining Colmenero from enforcing section 769.001 would redress any of their alleged injuries.

Moreover, Extragrams does not allege a substantial threat of future enforcement against it. *Speech First* at 330. Enforcement would be against the persons controlling the premises of the commercial enterprises for which they broker entertainers, not Extragrams, and Extragrams presents no evidence that Colmenero will enforce Section 769.001 against those persons (or how such after-the-fact enforcement would harm Extragrams) and no evidence that any such person has any intention of not paying for Extragrams' services.

Extragrams alleged injuries are not fairly traceable to Colmenero, nor will enjoining Colmenero possibly redress any of its alleged injuries. In sum, Extragrams lacks standing to sue Colmenero.

### D. 360 Queen Entertainment lacks standing to sue Colmenero.

360 Queen Entertainment alleges that it is "a gay and Latinx-owned drag production company" which "brings globally renowned drag stars to San Antonio and hosts commercial drag shows on the back patio of a family-owned restaurant, which provides the space at an agreed-upon cost." Plaintiffs' Motion at 33. It "generally limits ticket sales to guests ages 18 and up," but "[o]n occasion, it has welcomed parents who individually requested to bring their teenagers to shows." *Id*. "The drag shows are partially visible from the parking lot and also through windows inside the restaurant," *id*. at 34, but "plans to start its upcoming August 25 show after the restaurant closes at 9 pm." But "[b]ecause 360 Queen Entertainment is unable to guarantee that no one under the age of 18 is present on the premises where its shows are currently held, the business has made the devastating decision to cancel all shows after September 1 because of SB 12. It was planning to hold a drag show dinner on either September 9 or September 23, but has not been able to schedule this show for fear of [SB 12's] civil and criminal penalties." *Id*. at 34–35 (citations to declaration omitted).

"360 Queen Entertainment fears that its shows will be targeted for enforcement." *Id*. at 35. It "does not want to expose itself, its performers,[3] or the establishment where the event is held to the harsh civil and criminal penalties that SB 12 threatens to impose." *Id*. at 36.

As alleged, Colmenero has no enforcement authority concerning any of 360 Queen Entertainment's activities. 360 Queen Entertainment does not "control the premises of a commercial enterprise." It leases space in a restaurant after hours. Thus, it is not subject to civil penalties enforced by Colmenero under section 769.001, Colmenero does not impose criminal penalties on 360 Queen Entertainment or anyone else.

Moreover, 360 Queen Entertainment does not allege a substantial threat of future enforcement against it. *Speech First*, 979 F.3d at 330. Enforcement would be against the restaurant from which it leases space, not 360 Queen Entertainment. It presents no evidence that Colmenero will enforce Section 769.001 against the people who own the restaurant (or how such after-the-fact enforcement would harm 360 Queen Entertainment). Nor does it present any evidence that its alleged injuries are traceable to Colmenero.

---

[3] Despite the reference to "its performers," 360 Queen entertainment does not assert associational standing.

In sum, 360 Queen Entertainment lacks standing to sue Colmenero.

### E.  Brigitte Bandit lacks standing to sue Colmenero.

Brigette Bandit alleges that she "is a non-binary drag artist" who "performs, produces, and hosts drag shows and has worked as a drag artist for the past five years," sometimes "in public and in the presence of people under the age of 18." Plaintiffs' Motion at 36–37. She alleges that she fears shows she has scheduled in September "could be canceled or impacted. Brigitte also fears being subject to civil penalties for drag shows that she hosts and helps organize at commercial establishments, where she arguably 'controls' parts of the premises." *Id.* at 38 (citation to declaration omitted).

As alleged, Colmenero has no enforcement authority concerning any of Brigitte Bandit's activities. Ms. Bandit does not "control the premises of a commercial enterprise" when she "hosts or helps organize [drag shows] at commercial establishments." Thus, she is not subject to civil penalties enforced by Colmenero under section 769.001.

Moreover, Brigitte Bandit does not allege a substantial threat of future enforcement against her. *Speech First*, 979 F.3d at 330. Enforcement would be against the people who control the commercial enterprises where she performs or hosts, not her. She presents no evidence that her injuries, if any, are fairly traceable

to Colmenero or that Colmenero will enforce Section 769.001 against any such people (or how such after-the-fact enforcement would harm Brigitte Bandit).

In sum, Ms. Bandit lacks standing to sue Colmenero.

## III.    Plaintiffs' claims should be dismissed under Rule 12(b)(6)

For the same reasons Plaintiffs do not have standing to bring a claims against Colmenero under the First Amendment and Fourteenth Amendments, and for the reasons that they are not substantially likely to succeed on the merits (articulated below in Colmenero's Response to Plaintiffs' Preliminary Injunction), Plaintiffs have pled no factual allegations that *their* First Amendment rights have been violated or that *they* have suffered any injury that could plausibly give rise to an entitlement to relief. *See Iqbal*, 556 U.S. at 679.

## RESPONSE TO PLAINTIFFS' REQUEST FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## I.  Plaintiffs are not substantially likely to succeed on the merits.

### A. Sexually oriented performances are not inherently expressive, so regulating them does not implicate the First Amendment.

#### 1.   The law of expressive conduct.

Plaintiffs claim that SB 12 violates their right to free speech, but never allege that the performances they want to put on in front of children contain "speech." They can only be arguing that the performances are "expressive conduct." Plaintiffs bear the burden of establishing that their conduct contains an expressive element. *See*

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive.").

Sometimes, "the expressive nature of the conduct … brings that conduct within the First Amendment's protection." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 65 (2006) ("*FAIR*"). To determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, [the Supreme Court] [has] asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

The Supreme Court elaborated on the meaning of "expressive conduct" in *FAIR*. There:

> When law schools began restricting the access of military recruiters to their students because of disagreement with the Government's policy on homosexuals in the military, Congress responded by enacting the Solomon Amendment [citation omitted]. That provision specifies that if any part of an institution of higher education denies military recruiters access equal to that provided other recruiters, the entire institution would lose certain federal funds. The law schools responded by suing, alleging that the Solomon Amendment infringed their First Amendment freedoms of speech and association.

547 U.S. at 51.

In determining whether restricting access of military recruiters law schools because of disagreement with the Government's policy on homosexuals in the military was expressive conduct protected by the First Amendment, the Supreme Court first reaffirmed its rejection of "the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." 547 U.S. at 65–66 (cleaned up) (citing *United States v. O'Brien*, 391 U.S. 367 (1968) (holding that burning a draft card in protest of the Vietnam War was not expressive conduct, and that even if the act included expressive conduct, the government could regulate and criminalize the nonexpressive conduct of burning a draft card)). "Instead, [courts] have extended First Amendment protection only to conduct that is inherently expressive." *Id*. at 66.

The *FAIR* court held that restricting access of military recruiters was not protected by the First Amendment because it was not inherently expressive, explaining:

> Prior to the adoption of the Solomon Amendment's equal access requirement, law schools "expressed" their disagreement with the military by treating military recruiters differently from other recruiters. But these actions were expressive only because the law schools accompanied their conduct with speech explaining it. For example, the point of requiring military interviews to be conducted on the undergraduate campus is not "overwhelmingly apparent" [citing Johnson, 491 U.S. at 406]. An observer who sees military recruiters interviewing away from the law school has no way of knowing

whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else.

The expressive component of a law school's actions is not created by the conduct itself but by the speech that accompanies it. The fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection under O'Brien. If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into "speech" simply by talking about it. For instance, if an individual announces that he intends to express his disapproval of the Internal Revenue Service by refusing to pay his income taxes, we would have to apply O'Brien to determine whether the Tax Code violates the First Amendment. Neither O'Brien nor its progeny supports such a result.

*FAIR*, 547 U.S. at 66.

### 2. Under *FAIR*, neither sexually oriented performances nor drag shows are inherently expressive conduct.

Plaintiffs never explain how the performances they wish to perform in front of children are inherently expressive conduct. They never explain how the performance "possess[] sufficient communicative elements to bring the First Amendment into play," never discuss "whether an intent to convey a particularized message was present," and never discuss "whether the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. at 404. If they ever do "explain" the supposed message of the performances they wish to perform in front of children, the explanation will prove that the performances themselves are not inherently express conduct under *FAIR*.

27

It is simply untrue that, as a matter of law, all sexually oriented performances— or all drag shows (the only kinds of performances Plaintiffs wish to put on)— inherently express points of view, let alone any points of view Plaintiffs may at some point claim they do.

For instance, many drag shows are pure entertainment. An observer watching a drag show has no way of knowing whether the performers are expressing anything unless the performance is accompanied by an explanation of the alleged message. But that means that drag shows are not inherently expressive and are not uniquely protected by the First Amendment. The supposed messages of drag shows cannot be understood without explanatory speech.

Plaintiffs' arguments would be just as unavailing if they were proposing to put on any other performative activity. If, for instance, Plaintiffs proposed to have a soccer game in a public space for some allegedly inherently expressive purpose, the soccer game would not be inherently expressive activity. And even if the soocer game had some stated message, *FAIR* says that would not transform the soccer game into inherently expressive activity protected by the First Amendment. Likewise for sexually oriented performances and drag shows.

**3. Even if plaintiffs' proposed performances were protected by the First Amendment, SB 12 would nevertheless not violate it.**

**a. States may constitutionally restrict access to sexual materials by minors.**

The Supreme Court has long recognized that States may restrict minors' access to sexual materials without violating the First Amendment, even where such materials are not legally obscene and where States cannot legally restrict access to the same materials by adults. *Ginsberg v. State of New York*, 390 U.S. 629, 637 (1968). "[T]here is a compelling interest in protecting the physical and psychological well-being of minors which extended to shielding them from indecent messages that are not obscene by adult standards." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 869 (1997). SB 12 is constitutional under this standard, even if the performances Plaintiffs wish to perform in front if children were protected by the First Amendment.

**b. If SB 12 regulates speech, it regulates marginal speech, and the regulation is constitutional.**

To the extent Plaintiffs are asserting a valid First Amendment challenge to SB 12, which they are not, the Court should apply the *O'Brien* standard because the conduct at issue (sexually oriented performance that appeals to the prurient interest in sex) is not inherently expressive, but at most has only "some expressive content." *Kleinman v. City of San Marcos*, 597 F.3d 323, 328 (5th Cir. 2010) (citing *United States*

*v. O'Brien*, 391 U.S. 376 (1968)). The alleged expressive conduct at issue in this case falls at the very margins of protected speech, at best. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (holding that "nude dancing of the type at issue here is expressive conduct, although we think that it falls within the outer ambit of the First Amendment's protection."); *Doe I v. Landry*, 909 F.3d 99, 116 (5th Cir. 2018) (noting the exotic dancer plaintiff had standing to raise a facial challenge to a statute raising the minimum age for exotic dancing from 18 to 21 because, inter alia, she expressed a desire to return to exotic dancing "both for monetary and expressive reasons.").

"Under *O'Brien*, a regulation is constitutional if it is within the constitutional power of the government; it furthers an important or substantial governmental interest; the government interest is unrelated to the suppression of free expression; and the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Kleinman*, 597 F.3d. at 328 (citing *O'Brien*, 391, U.S. 376).

SB 12 meets all those requirements.

Texas has a compelling state interest in protecting the physical and psychological well-being of minors. *Friends of Georges, Inc. v. Mulroy*, No. 223CV02163TLPTMP, 2023 WL 3790583, at *7 (W.D. Tenn. June 2, 2023).

While the government must "fairly support" its policy, it need not settle the matter beyond debate or produce an exhaustive evidentiary demonstration. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (plurality); see also *id.* at 451 (Kennedy, J., concurring in the judgment) ("[V]ery little evidence is required."). Moreover, its policy expertise is entitled to "deference," and it may demonstrate the efficacy of its method of reducing secondary effects "by appeal to common sense," rather than "empirical data." *Id.* at 439–40 (plurality); see also *id.* at 451–52 (Kennedy, J., concurring in the judgment).

Colmenero offers the expert opinion of Dr. Michael Arambula to show that minors can be harmed by viewing sexually oriented performances. Exhibit A. "The exposure of minors to sexually oriented performances can adversely affect them in different ways. Amidst the backdrop of their immature frontal lobe development and immature executive function, minors, and more so adolescents in puberty, remain vulnerable to copying / acting out the sexual behavior which they have been exposed to." *Id.* at 3. "Since clinical research has shown that sexual behavior is largely a learned behavior, it does not matter whether the exposure to sexual content was heterosexual, homosexual, or bisexual activity in nature." *Id.* Dr. Arambula goes on to say that it has been his "professional experience to observe that individuals who lacked healthy interpersonal relationships and who were exposed to explicit sexual

content and who experienced brief sexual/emotional pleasure engaging in these similar sexual activities (they were exposed to), were those individuals who struggled with personal worth, anxiety, depression, substance abuse and sexual deviance." *Id.*

There is no less restrictive way for the government to further its interest in protecting minors from viewing sexually oriented performances than to prohibit persons from performing them in front of minors.

Once the government makes this showing, the matter is at an end unless the plaintiff "produces clear and convincing evidence" to rebut it. *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 742 (4th Cir. 2010) (citations omitted).

### c. If SB 12 regulates speech, it is a constitutional content- and viewpoint-neutral regulation that passes intermediate scrutiny.

Intermediate scrutiny is proper if the statute is "justified without reference to the content of the regulated speech." *Hill v. Colorado*, 530 U.S. 703, 720 (2000). Plaintiffs do not demonstrate that SB 12 discriminates based on the content of the "speech" prohibited or the viewpoint of the speaker. They allege that SB 12 discriminates against drag shows. It does not. But even if it did, Plaintiffs fatally fail to allege that this alleged discrimination has anything to do with the content of the "speech" at drag shows or with the viewpoint of the "speakers" who perform at drag shows. This goes back to Plaintiffs' fatal failure to demonstrate or even allege

what "speech" or "inherently expressive conduct" is supposedly ontained in their proposed drag shows.

Assuming for the sake of argument that SB 12 regulates speech, as a content- and viewpoint-neutral regulation, it is subject to intermediate scrutiny, which applies to content-neutral restrictions that impose an incidental burden on speech. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994); *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 480 (5th Cir. 2022) ("a content-and viewpoint-neutral law [is] subject to intermediate scrutiny at most.").

Under an intermediate scrutiny standard, the government must show that its regulation materially advances its substantial interest in reducing negative secondary effects and that reasonable alternative avenues of communication remain available. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434, (2002) (plurality); see also *Ward v. Rock Against Racism*, 491 U.S. 781, 799, (1989) (government must show its interest "would be achieved less effectively absent the regulation.").

SB 12 advances Texas's interest in protecting the physical and psychological well-being of minors, and in prohibiting persons from performing sexually oriented performances that appeal to the prurient interest in sex in front of minors.

Texas has a compelling state interest in "protecting the physical and psychological well-being of minors, which extended to shielding them from indecent

messages that are not obscene by adult standards." *Reno*, 521 U.S. at 879. SB 12 survives intermediate scrutiny.

## B. SB 12 is neither overbroad nor unconstitutionally vague.

The "overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *New York v. Ferber*, 458 U.S. 747, 770 (1982) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 616 (1973)). For a court to invalidate a statute as overbroad, the statute's application to protected speech must be "substantial," both absolutely and in the context of the law's plainly legitimate applications. *Virginia v. Hicks*, 539 U.S. 113, 120 (2003). The overbreadth doctrine allows courts to "invalidate[] [a statute] as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 449 n.6 (2008)). Overbreadth invalidation is "strong medicine." Id. (quoting *Broadrick*, 413 U.S. at 613); see also *Williams*, 553 U.S. at 294 (narrowing the meanings of words "by the commonsense canon of noscitur a sociis—which counsels that a word is given more precise content by the neighboring words with which it is associated."); *Id*. at 301 (acknowledging the tendency of the Supreme Court's "overbreadth doctrine to summon forth an endless stream of fanciful hypotheticals."). "The

'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Id*. at 303 (quoting *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)).

Likewise, Courts apply the void-for-vagueness doctrine only to statutes that do not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

Plaintiffs characterize "drag shows" as an art, but it does not necessarily follow that art cannot also be indecent and inappropriate for minors. Indeed, Plaintiffs admits as much by acknowledging it distinguishes between "adults-only" and "family friendly" or "all-ages" performances. Woodlands Pride recognizes itself as a "family friendly group" (ECF 1 ¶ 77), and "Abilene Pride Alliance considers all of the drag performances at its events to be family friendly and does not view them as 'sexually oriented' or explicit in any way (Id. ¶85). Ms. Bandit "performs some shows in bars for adults ages 18 or 21 and up, she also performs, hosts, and produces drag shows in public and in the presence of people under the age of 18" and she "modifies and tailors her performances for the audience and age range that she is performing for." (*Id*. ¶ 120-121). It is disingenuous for Plaintiffs to argue on one hand

that they already tailor their performances to the age of their audience while simultaneously arguing that SB 12 is so overbroad and vague that they are unable to determine if their performances contain sexual conduct that appeals to the prurient interests and thus inappropriate for minors.

Plaintiffs contend that "SB 12 chills a new category of free expression." ECF 10 at 48. However, Plaintiffs nowhere demonstrate, "from the text of the law and from actual fact, that substantial overbreadth exists." *Hicks*, 539 U.S. at 122 (quotations omitted). Even assuming that some of Plaintiff's hyperbolic and fanciful hypotheticals violate the First Amendment, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Plaintiff must show "substantial overbreadth"— and fails to do so. *Hicks*, 539 U.S. at 122 (emphasis added).

Plaintiffs complain that various terms are undefined or overly broad. For example, the term "performer" is not defined. The Court can construe the term "performer" to mean one who give a performance or play. Perform, Merriam-Webster's Dictionary ("to give a performance: PLAY"), https://www.merriam-webster.com/dictionary/perform (last visited Aug. 22, 2023). Words that are not statutorily defined are to be given their common, ordinary, or usual meaning. See

36

*Martinez v. State*, 942 S.W.2d 693, 698 (Tex. Crim. App. 1996). "Words and phrases shall be read in context and construed according to the rules of grammar and common usage." Tex. Gov't Code § 311.011.

SB 12 defines "sexual conduct" to include "the exhibition or representation, actual or simulated, of male or female genitals in a lewd state...." Plaintiffs complain that the term "lewd" is "undefined and open-ended," such that "the display of an art piece like Michelangelo's David could be considered 'lewd' and be impacted by this law."

The term "lewd exhibition of the genitals: is included in both Texas Penal Code § 43.21(a)(1)(B)(ii), defining "obscene," and Texas Penal Code § 43.25(a)(2), defining "sexual conduct." However, the lack of a definition of "lewd" in Penal Code has not rendered that statute unconstitutional. That statute provides that "Obscene material means a performance that... depicts or describes... lewd exhibition of the genitals." The meaning of "lewd exhibition" is left undefined. However, the Court can apply the common meaning of "lewd," which is "obscene, vulgar; sexually unchaste or licentious." https://www.merriam-webster.com/dictionary/lewd (last visited Aug. 22, 2023).

Similarly, Texas Penal Code § 43.25(a)(2) defines "sexual conduct" to include "lewd exhibition of the genitals." The Texas Court of Criminal Appeals has held

that "[p]hrases such as… 'lewd exhibition' are terms that lay people are perfectly capable of understanding." *State v. Bolles*, 541 S.W.3d 128, 138 (Tex. Crim. App. 2017). "Jurors may freely read undefined statutory language to have any meaning which is acceptable in common parlance." Id. (cleaned up). "In determining the meaning of an undefined statutory term," Texas courts can "consult dictionary definitions, read words in context, and apply rules of grammar." Id. (cleaned up). The Bolles court turned to Black's Law Dictionary, which defines "lewd" as "[o]bscene or indecent; tending to moral impurity or wantonness," and defines "lewdness" as "a sexual act that the actor knows will likely be observed by someone who will be affronted or alarmed by it." *Id*. at 138-39 (citing BLACK'S LAW DICTIONARY (10th ed. 2014)).

In *Tovar v. State*, the court rejected the argument that the "failure to instruct the jury on the definition of 'lewdness' amounted to a violation of due process," holding that "because 'lewd' has a common meaning that jurors can be fairly presumed to know and apply, the trial court was not required to define 'lewd' in the jury charge." 165 S.W.3d 785, 790 (Tex. App.—San Antonio 2005 no pet.)

Plaintiffs also complain that "prurient interest in sex" is undefined under Texas law and that "[w]ithout a clear definition of this standard, SB 12 will lead to arbitrary and discriminatory enforcement… which will lead to censorship and a chilling

effect" on certain types of performances. Plaintiffs further complain that "[w]ithout any definition of 'prurient interest,' it is also impossible for an artist to know whether a visual performance might 'appeal[] to the prurient interest in sex.'" In *Red Bluff Drive-In, Inc. v. Vance*, the Fifth Circuit held that the "lack of a statutory definition of the term 'prurient interest'" did not render a Texas obscenity statute "constitutionally deficient." 648 F.2d 1020, 1026 (5th Cir. 1981). The challenge to the statute at issue in Red Bluff is strikingly similar to the challenge brought here: in 1979, "the Texas Legislature rewrote the state's penal code provisions defining and regulating obscene materials and performances." *Id.* at 1024. The Texas statute "define[d] obscenity with language drawn directly from the Supreme Court's landmark *Miller* decision." *Id.* at 1026.

While the Texas Legislature did not use the *Miller* definition of "obscenity" in SB 12, see *Miller v. California*, 413 U.S. 15, 24, (1973), there is sufficient discussion in both state and federal case law to give a person of ordinary intelligence a roadmap for navigating what is and is not a "prurient interest in sex." See e.g. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986); *California v. LaRue*, 409 U.S. 109, 127 (1972); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 251 (1990); *Vonderhaar v. Parish of St. Tammany*, 633 So.2d 217, 223 (1993).

Regardless, this Court must "construe the statute to avoid constitutional [overbreadth] problems." *Ferber*, 458 U.S. at 769 n.24). "[E]very reasonable construction must be resorted to in order to save a [legislative act] from unconstitutionality." *Hooper v. California*, 155 U.S. 648, 657 (1895).

### C. SB 12's criminal penalties contain a *mens rea* requirement.

Contrary to Plaintiffs' contention, SB 12 does contain a mens rea: intentionally, knowingly, or recklessly. A fundamental principle in criminal law is "that in order to constitute a crime, the act or actus reus must be accompanied by a criminal mind or mens rea." *Cook v. State*, 884 S.W.2d 485, 487 (Tex. Crim App. 1994); see also *Staples v. United States*, 511 U.S. 600, 606 (1994) (stating that "offenses that require no mens rea . . . are disfavored"). Absent an express mental state in the statute, Penal Code chapter 6 generally provides for culpability. See TEX. PENAL CODE §§ 6.01–.04; see also *id*. § 1.03(b) (providing for the application of the general provisions of the Penal Code "to offenses defined by other laws, unless the statute defining the offense provides otherwise"). Subsection 6.02(b) states that "[i]f the definition of an offense does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element." *Id*. § 6.02(b). Subsection 6.02(c) provides that "[i]f the definition of an offense does not prescribe a culpable mental state, but one is nevertheless required

..., intent, knowledge, or recklessness suffices to establish criminal responsibility." *Id*. § 6.02(c).

### D. Plaintiffs lack Article III standing to sue Colmenero.

As explained in Colmenero's motion to dismiss under Rule 12(b)(1), *supra*, Plaintiffs lack standing to sue Colmenero. Therefore, they do not have a substantial (or any) likelihood of success on the merits on their claims against her.

## II. Plaintiffs will not suffer irreparable harm.

Plaintiffs have not "clearly carried the burden of persuasion" to show imminent irreparable harm as "is required for injunctive relief." *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009); *Montient Corp. v. Dondero*, 529 F.3d 532, 538 (5th Cir. 2008); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (3d ed. 2013) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.").

To show irreparable harm here, Plaintiffs must demonstrate "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jackson*, 804 F.2d 1390, 1394 (5th Cir. 1986). Plaintiffs cannot make that showing.

A First Amendment injury, like any other, must be imminent and non-speculative. See *Google, Inc. v. Hood*, 822 F.3d 212, 227–28 (5th Cir. 2016) ("[I]nvocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury."); *Ark. Project v. Shaw*, 775 F.3d 641, 663-64 (5th Cir. 2014) ("Federal courts are not obligated to grant an injunction for every violation of law," and the "court's power to order injunctive relief depends" on "whether plaintiffs have established . . . a reasonably certain threat of imminent harm." (citation omitted)). Plaintiffs cannot satisfy these standards.

## III.   Balancing of Plaintiffs' alleged harms and the public interest

Generally, when a plaintiff seeks a preliminary injunction, the Court must conduct an analysis assessing the harm to the opposing party and weighing the public interest. But "[w]hen the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "The public interest standard is a hurdle which must be overcome before employing the drastic remedy of interim injunctive relief, not a clarion call for action before reaching final judgment." *Miss. Power & Light Co. v. United Gas Pipeline Co.*, 760 F.2d 618, 633 (5th Cir. 1985).

When the State is prevented from enforcing its laws, it suffers irreparable injury. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("any time a State is enjoined by

a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977) (citations omitted)); *see also Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) (recognizing that, if enforcement of duly enacted State law is enjoined, "the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws").

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Exercising caution is especially important where the defendant is itself a state actor because of the federalism concerns attendant to a federal court intervening to grant preliminary injunctive relief against a state agency. *See Gibson v. Leblanc*, No. 16-354, 2016 WL 5796897, at *2 (M.D. La. Sept. 30, 2016); *Parrott v. Livingston*, NO. 15-866, 2016 WL 4487918, at *1 (E.D. Tex. June 29, 2016); *see also Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015) (quoting *Eccles v. Peoples Bank*, 333 U.S. 426, 431 (1948)). That is particularly true here because the majority of Plaintiffs—and the apparent driving force behind this litigation—are foreign porn

websites who claim they can sue, but not be sued, in U.S. courts. *See* 2022 WL 982248 at *7.

The public interest is monumental. There is no more compelling interest than safeguarding the emotional, mental, and physical health of our kids. Their exposure to sexually explicit performances must stop. The balance of interest weighs heavily in favor of allowing the implementation of SB 12 to proceed as soon as possible.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' claims against Colmenero under Rule 12(b)(1), dismiss all their claims under Rule 12(b)(6), and deny Plaintiffs' motion for a temporary restraining order and a preliminary injunction.

Dated: August 23, 2023.   Respectfully submitted,

ANGELA COLMENERO
Provisional Attorney General

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

JAMES LLOYD
Acting Deputy Attorney General for Civil
Litigation

*/s/Taylor Gifford*
**TAYLOR GIFFORD**
Assistant Attorney General
Attorney-in-Charge
Texas Bar No.  24027262
Southern District ID No. 3624053

CHARLES K. ELDRED
Chief, Legal Strategy Division
Texas State Bar No. 00793681
Southern District No. 20772

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 • fax (512) 320-0067
taylor.gifford@oag.texas.gov
charles.eldred@oag.texas.gov

*ATTORNEYS FOR DEFENDANT ANGELA
COLMENERO, IN HER OFFICIAL CAPACITY
AS PROVISIONAL ATTORNEY GENERAL OF
TEXAS*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on August 23, 2023.

*/s/ Taylor Gifford*
Taylor Gifford