# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| The Woodlands Pride, Inc.; Abilene Pride Alliance; Extragrams, LLC; 360 Queen Entertainment LLC; Brigitte Bandit, | |
| *Plaintiffs,* | |
| v. | Civil Action No. 4:23-cv-02847 |
| Angela Colmenero, in an official capacity as Interim Attorney General of Texas; Montgomery County, Texas; Brett Ligon, in an official capacity as District Attorney of Montgomery County; City of Abilene, Texas; Taylor County, Texas; James Hicks, in an official capacity as District Attorney of Taylor County; Delia Garza, in an official capacity as County Attorney of Travis County; Joe D. Gonzales, in an official capacity as District Attorney of Bexar County, | |
| *Defendants.* | |

## PLAINTIFFS' FIRST AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# **TABLE OF CONTENTS**

I.  Factual Findings..............................................................................................2

    A.  S.B. 12 ................................................................................................2

    B.  Legislative History of S.B. 12 ............................................................6

    C.  Plaintiffs ..............................................................................................9

        1.  The Woodlands Pride....................................................................9

        2.  Abilene Pride Alliance ...............................................................16

        3.  Extragrams, LLC.........................................................................25

        4.  360 Queen Entertainment LLC....................................................29

        5.  Brigitte Bandit ............................................................................36

    D.  Defendants' Evidence ........................................................................41

II.  Conclusions of Law ......................................................................................41

    A.  Plaintiffs Have Standing against Defendants .....................................41

        1.  The Woodlands Pride..................................................................43

        2.  Abilene Pride Alliance ...............................................................45

        3.  Extragrams ..................................................................................48

        4.  360 Queen Entertainment ...........................................................50

        5.  Brigitte Bandit ............................................................................52

        6.  Defendants' Standing Arguments Are Unavailing ....................55

    B.  Plaintiffs' Claims Are Ripe ..............................................................58

    C.  Defendants Are Not Immune from Suit .............................................58

        1.  Attorney General.........................................................................59

        2.  District and County Attorneys ....................................................59

      3.      The County and City Defendants ..............................................64

D.     S.B. 12 Is Not Severable ....................................................................67

E.     S.B. 12 Is an Unconstitutional Content and Viewpoint-Based Restriction ..........................................................................................69

      1.      Plaintiffs' Performances Are Protected by the First Amendment ....................................................................................69

      2.      S.B. 12 Is Content and Viewpoint-Based and Subject to Strict Scrutiny ..........................................................................74

      3.      The Attorney General's Attempts to Avoid Strict Scrutiny Are Unavailing ..........................................................76

      4.      S.B. 12 Is Not Narrowly Tailored and Is Therefore Unconstitutional .......................................................................80

F.     S.B. 12 Is Unconstitutionally Overbroad ...........................................82

G.     S.B. 12 Is Unconstitutionally Vague...................................................88

H.     S.B. 12 Establishes an Unconstitutional Prior Restraint....................93

The Woodlands Pride, Inc., Abilene Pride Alliance, Extragrams, LLC, 360 Queen Entertainment LLC, and Brigitte Bandit (collectively, "Plaintiffs"), respectfully submit the following Proposed Findings of Fact and Conclusions of Law:

Senate Bill 12 ("S.B. 12") was signed into law on June 18, 2023, and was scheduled to take effect on September 1, 2023. On August 2, 2023, Plaintiffs sued Defendants Angela Colmenero, in an official capacity as Interim Attorney General of Texas; The Woodlands Township; Montgomery County, Texas; Brett Ligon, in an official capacity as District Attorney of Montgomery County; City of Abilene, Texas; Taylor County, Texas; James Hicks, in an official capacity as District Attorney of Taylor County; Delia Garza, in an official capacity as County Attorney of Travis County; Joe D. Gonzales, in an official capacity as District Attorney of Bexar County (collectively, "Defendants"[1]) for violations of Plaintiffs' constitutional rights pursuant to 42 U.S.C. § 1983. Dkt. 1. On August 9, 2023, Plaintiffs filed a motion for temporary restraining order and preliminary injunction, seeking to enjoin the enforcement of S.B. 12 before it went into effect on September 1, 2023. Dkt. 10.

---

[1]     On August 25, the Court granted Plaintiffs' unopposed motion to amend the caption and style, which altered the spelling of Gonzalez to Gonzales and removed The Woodlands Township as a party. Dkt. No. 65.

On August 28 and 29, 2023, the Court conducted a two-day trial on the merits in the above-captioned matter. During the proceeding, the Court received evidence and heard sworn testimony. After considering all evidence presented, the Court issued a temporary restraining order against Defendants. Dkt. 75. In that order, the Court found a substantial likelihood that "S.B. 12 as drafted violates the First Amendment of the United States Constitution under one or more of the legal theories put forward by the Plaintiffs" and "the impending infringement on the Plaintiffs constitutional rights [is] sufficient irreparable harm to warrant enjoining S.B. 12 while a final judgment is drafted." *Id.* at 3-4. This Court now declares S.B. 12 to be unconstitutional, permanently enjoins Defendants from enforcing it, and makes the following Findings of Fact and Conclusions of Law set forth herein.

## I.    FACTUAL FINDINGS

### A.    S.B. 12

1.    S.B. 12 was signed by Governor Abbott on June 18, 2023, and was scheduled to take effect on September 1, 2023.

2.    S.B. 12 purports to ban "sexually oriented performances" by (1) criminalizing many such performances; (2) creating civil penalties for commercial entities that host such performances; and (3) mandating that counties and

municipalities ban many "sexually oriented performances," and granting them authority to regulate other such performances.[2]

3.      S.B 12 defines a "sexually oriented performance" as a "visual performance" that (A) features (i) a performer who is nude or (ii) a performer who engages in "sexual conduct"; and (B) appeals to the prurient interest in sex.[3] "Visual performance" is not defined in S.B. 12 or elsewhere in Texas law.

4.      S.B. 12 borrows a definition of "nude" from the Texas Business and Commerce Code,[4] which includes anyone who is "entirely unclothed" or "clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks."[5]

5.      S.B. 12 establishes five categories of "sexual conduct": (1) "the exhibition or representation, actual or simulated, of sexual acts, including vaginal sex, anal sex, and masturbation;"[6] (2) the "exhibition or representation, actual or simulated, of male or female genitals in a lewd state, including a state of sexual stimulation or arousal;"[7] "the exhibition of a device designed and marketed as useful

---

[2]      S.B. 12 §§ 1–3 (proposed Tex. Health & Safety Code § 769.002; Tex. Local Gov. Code § 243.0031; Tex. Penal Code § 43.28).
[3]      *Id.* § 3 (proposed Tex. Penal Code § 43.28(a)(2)).
[4]      *Id.* (proposed Tex. Penal Code § 43.28(a)(2)(A)(1)).
[5]      Tex. Bus. & Com. Code § 102.051.
[6]      S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(A)).
[7]      *Id.* (proposed Tex. Penal Code § 43.28 (a)(1)(B)).

primarily for the sexual stimulation of male or female genitals;"[8] (4) "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person;"[9] and (5) "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics."[10]

6.   Any performer who is "nude" or "engages in sexual conduct" during a visual performance engages in a "sexually oriented performance" if their conduct "appeals to the prurient interest in sex."[11] "[P]rurient interest" is undefined under Texas law.

7.   Section 1 of S.B. 12 amends the Texas Health and Safety Code to prohibit anyone who "controls the premises of a commercial enterprise" from "allow[ing] a sexually oriented performance to be presented on the premises in the presence of an individual younger than 18 years of age."[12]

8.   The law does not specify that the individual must have knowledge that the minor is present or have allowed the minor to be present, nor does it define "commercial enterprise," what it means to "control" the premises, or what it means for a performance to be presented "on the premises in the presence of an individual

---

[8]   *Id.* (proposed Tex. Penal Code § 43.28 (a)(1)(C)).
[9]   *Id.* (proposed Tex. Penal Code § 43.28 (a)(1)(D)).
[10]   *Id.* (proposed Tex. Penal Code § 43.28 (a)(1)(E)).
[11]   *Id.* (proposed Tex. Penal Code § 43.28 (a)(2)(A)(B)).
[12]   S.B. 12 § 1 (proposed Tex. Health & Safety Code § 769.002).

younger than 18."[13] The penalty for violating this section of S.B. 12 is a $10,000 fine "for each violation."[14]

9.     The Attorney General is tasked with bringing actions to recover penalties, seeking temporary and permanent injunctions, and recovering attorney's fees, "investigative costs," and other expenses against businesses and anyone who violates Section 1.[15]

10.     Section 2 of S.B. 12 amends the Texas Local Government Code to prohibit municipalities and counties from "authoriz[ing]" a "sexually oriented performance" on public property, with no consideration for the age of the audience, or in the presence of anyone under the age of 18.[16]

11.     S.B. 12 allows municipalities and counties to "regulate sexually oriented performances as the municipality or county considers necessary to promote the public health, safety, or welfare," with no age requirement or standards or procedures for such regulations.[17]

12.     Section 3 of S.B. 12 amends the Texas Penal Code to create a new category of criminal offense "if, regardless of whether compensation for the performance is expected or received, the person engages in a sexually oriented

---

[13]     *Id.* (proposed Tex. Health & Safety Code § 769.002(b)).
[14]     *Id.* (proposed Tex. Health & Safety Code § 769.002(b)).
[15]     *Id.* (proposed Tex. Health & Safety Code §§ 769.002(b)-(f)).
[16]     S.B. 12 § 2 (proposed Tex. Loc. Gov't Code § 243.0031(c)).
[17]     *Id.* (proposed Tex. Loc. Gov't Code § 243.0031(b)).

performance: (1) on public property at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child; or (2) in the presence of an individual younger than 18 years of age."[18]

13.     This criminal offense is a Class A misdemeanor with penalties of up to a year in jail and a fine of up to $4,000.[19]

### B.     Legislative History of S.B. 12

14.     When S.B. 12 was first introduced on March 21, 2023, and enrolled on June 19, 2023, the Author's/Sponsor's Statement of Intent noted a concern about a "recent cultural trend" of "drag shows . . . performed in venues generally accessible to the public, including children."[20] The Statement of Intent explained, "While drag shows have received the most media attention, S.B. 12 is not limited to this type of sexually oriented performance. Drag shows today may be replaced by other types of harmful performances in the future. S.B. 12 applies to and will protect children from sexually oriented performances in general."[21]

15.     The Bill Analysis before the Texas House of Representatives State Affairs Committee cited a specific instance of a drag show being performed at a restaurant in Plano, Texas, on October 18, 2022, and referenced an article from the

---

[18]     S.B. 12 § 3 (proposed Tex. Penal Code § 43.28(b)).
[19]     Tex. Penal Code § 12.21.
[20]     Plaintiffs' Trial Exhibits 6 and 11.
[21]     *Id.*

*New York Post*.[22] The *New York Post* article is entitled "Video of drag queen gyrating in front of child has Texas pols pushing for legislative action."[23]

16.     On March 23, 2023, the author of S.B. 12 introduced it to the Senate State Affairs Committee and stated in a post online: "Children should not be exposed to sexually explicit performances like drag shows. I presented S.B. 12 and SB 1601 today to the State Affairs Committee to protect kids from these shows."[24]

17.     Governor Abbott signed S.B. 12 into law on June 18, 2023.[25]

18.     On June 24, 2023, Governor Abbott stated: "Texas Governor Signs Law Banning Drag Performances in Public. That's right."[26]

19.     At the start of this year's regular Texas legislative session, Lieutenant Governor Dan Patrick, the head of the Texas Senate, listed S.B. 12 as one of his top 30 priority bills and titled the law: "Banning Children's Exposure to Drag Shows."[27]

20.     After the Texas House of Representatives adopted the Conference Committee Report for S.B. 12 in its final form,[28] Lieutenant Governor Dan Patrick released the following statement: "I named S.B. 12 to be one of my top priorities this session because someone must push back against the radical left's disgusting

---

[22]     Plaintiffs' Trial Exhibit 9.
[23]     Plaintiffs' Trial Exhibit 21.
[24]     Plaintiffs' Trial Exhibit 25.
[25]     Plaintiffs' Trial Exhibit 2.
[26]     Plaintiffs' Trial Exhibit 23.
[27]     Plaintiffs' Trial Exhibit 24.
[28]     Plaintiffs' Trial Exhibit 10.

drag performances which harm Texas children. It is shocking to me that any parent would allow their young child to be sexualized by drag shows. Children, who cannot make decisions on their own, must be protected from this scourge facing our state."[29]

21.    On May 20, 2023, Representative Carrie Isaac, a joint sponsor of S.B. 12, stated: "Today we passed S.B. 12to protect our children from being groomed by restricting sexually oriented performances also know [sic] as 'drag shows' in the presence of children."[30]

22.    On May 22, 2023, Representative Caroline Harris, a joint sponsor of S.B. 12, stated: "Drag shows and sexually explicit performances have no business being around children. I am proud to joint author S.B. 12, which bans these performances and protects a child's innocence."[31]

23.    On June 8, 2023, Representative Matt Shaheen, the sponsor of S.B. 12 in the House, stated: "Working with @SenBryanHughes, I passed legislation in the TX House protecting children from explicit, hyper-sexualized drag performances in Texas. #SB12."[32]

---

[29]    Plaintiffs' Trial Exhibit 26.
[30]    Plaintiffs' Trial Exhibit 29.
[31]    Plaintiffs' Trial Exhibit 28.
[32]    Plaintiffs' Trial Exhibit 27.

### C.     Plaintiffs

#### 1.     The Woodlands Pride

24.     Jason Rocha testified at trial on behalf of The Woodlands Pride, Inc. ("The Woodlands Pride").[33] Mr. Rocha is a U.S. Army veteran and the Founder and President of The Woodlands Pride, a non-profit organization headquartered in The Woodlands Township in Montgomery County, Texas.[34]

25.     Mr. Rocha has been the President of The Woodlands Pride since it was founded in 2018.[35]

26.     Since 2018, The Woodlands Pride has held its annual pride festival ("The Woodlands Pride Festival" or the "Festival") for four years and plans to hold its fifth annual festival on October 21, 2023.[36]

27.     The inaugural Woodlands Pride Festival had over 5,000 attendees, and the fourth annual Woodlands Pride Festival had over 7,500 attendees.[37]

28.     Past Woodlands Pride Festivals have had several hundred exhibitors and sponsors, including ExxonMobil, HP, and HPE, as well as local sponsors that

---

[33]     Trial Tr. Vol. 1, 178:8-9.
[34]     *Id.* 177:20-178:18.
[35]     *Id.* 177:20-178:4
[36]     *Id*. 178:17-179:5.
[37]     *Id.* 178:17-20.

are headquartered in The Woodlands area, such as Huntsman and the Howard Hughes Corporation.[38]

29.     The Woodlands Pride Festival is one of the largest free pride festivals in the state and is open to everyone and all ages, including teenagers and children.[39]

30.     The Woodlands Pride's goal for its Festival is to highlight and celebrate the LGBTQ+ community and be a beacon of hope to everyone, including school-age students, college-age students, and those living in a senior facility. [40]

31.     The Woodlands Pride Festival and its other events prominently feature drag performers, and these drag performers are one of the most popular aspects of The Woodlands Pride Festival and one of the primary draws for attendees.[41]

32.     Drag performers and emcees at The Woodlands Pride Festival typically wear accessories or prosthetics, such as wigs, makeup, high heels, panty hose, earrings, and padded bras.[42]

33.     Drag performers at The Woodlands Pride Festival typically dance and lip-sync to popular music in costume.[43]

---

[38]     *Id.* 179:9-17.
[39]     *Id*. 179:24-180:2; 181:10-11.
[40]     *Id.* 181:6-9.
[41]     *Id*. 184:21-185:7; 198:3-5.
[42]     *Id*. 190:13-19; 194:16-21; 195:12-15.
[43]     *Id*. 190:13-19; 194:16-21; 195:16-23.

10

34.     In July 2023, weeks after S.B. 12 was signed into law, The Woodlands Pride marched in the South Montgomery County Fourth of July parade, which was sponsored by The Woodlands Township.[44] Following the parade, anti-LGBTQIA+ activists have attended Township board meetings to complain about The Woodlands Pride's participation in the parade and demand that various government entities pull their sponsorships from the South Montgomery County Fourth of July parade.[45]

35.     The Woodlands Pride Festival has a security plan in which approximately 15-20 off-duty law enforcement officers from Montgomery County attend the event for security purposes.[46]

36.     Although Mr. Rocha and The Woodlands Pride believe that the drag performances at The Woodlands Pride Festival are appropriate for The Woodlands Pride Festival's age-diverse audience, Mr. Rocha is fearful that common aspects of these drag performances could be criminalized or otherwise prohibited by S.B. 12.[47]

37.     The Woodlands Pride is concerned that the accessories and prosthetics that drag performers and emcees at The Woodlands Pride Festival typically use, such

---

44      *Id*. 198:12-24.
45      *Id*. 198:6-24.
46      *Id.* 184:15-20.
47      *Id*. 190:24-191:20; 197:17-19; 201:16-202:23; 217:17-218:1; 218:9-14; 222:24-25.

as wigs, makeup, high heels, panty hose, earrings, and padded bras, could be said to "exaggerate male or female sexual characteristics."[48]

38.     The Woodlands Pride is concerned that the dance routines of the drag performers and emcees at the Festival contain gestures or gesticulations that could be interpreted as "sexual" or "represent[ing] . . . simulated . . . sexual acts" by others.[49]

39.     Mr. Rocha and The Woodlands Pride cannot control or predict what public officials view as "sexual" and reasonably fear that The Woodlands Pride would be targeted by S.B. 12.[50]

40.     Drag performers and attendees at past The Woodlands Pride Festivals have sometimes danced with each other during performances and may have pretended to, or actually, touched each other's butts or hips in what could be characterized as "actual . . . or simulated contact occurring between one person and the buttocks . . . of another person."[51]

41.     The Woodlands Pride has previously allowed exhibitor participants—including at sexually transmitted infection screening booths—to hand out condoms and sexual lubricant to attendees.[52] Mr. Rocha is fearful that this activity could cause

---

48     *Id*. 190:13-19; 194:16-21; 195:12-14.
49     *Id*. 195:16-23; 217:17-218:1; 218:9-14.
50     *Id*. 190:24-191:20; 197:17-19; 202:18-23; 218:9-15; 222:24-25.
51     *Id*. 195:16-196:8.
52     *Id*. 200:13-201:4.

The Woodlands Pride to be accused of "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals."[53]

42.    Mr. Rocha is fearful that some, including state and local government officials, may accuse performers and attendees at The Woodlands Pride Festival of acting in ways that "appeal[] to the prurient interest in sex."[54]

43.    Although no performer at The Woodlands Pride events is "nude" under Mr. Rocha's personal view of the term, Mr. Rocha fears that because "nude" is defined so broadly, the law could trigger harsh penalties for anyone who shows even a part of their breast or buttocks, which has occurred at The Woodlands Pride Festival.[55]

44.    The 2023 Woodlands Pride Festival is scheduled for October 21, 2023, at Town Green Park, a public park in Montgomery County, Texas.[56]

45.    The Woodlands Pride has also featured drag performers at other events on both public and private property, such as a June 2023 Pride Summit on a college campus and a Pride party at a local hotel.[57]

---

53    *Id*. 200:13-201:8.
54    *Id*. 197:17-19; 202:18-23; 230:20-231:7.
55    *Id.* 229:6-230:19; s*ee also* Plaintiffs' Trial Exhibit 47.
56    *Id.* 178:23-179:1; 180:6-16.
57    *Id*. 182:3-10; 182:25-183:9.

46.     The Woodlands Pride has plans to hold a gala in early 2024 in the showroom of a local car dealership or at a corporate office and plans to feature drag performers at this event.[58]

47.     Mr. Rocha fears that The Woodlands Pride may have to cancel drag performances at future events, including a planned gala in early 2024, to ensure the organization does not incur S.B. 12's penalties.[59]

48.     Mr. Rocha is concerned that it will likely be too burdensome, if not impossible, to ensure that everyone who might catch a glimpse of the drag performers at The Woodlands Pride events would be 18 and older.[60] Mr. Rocha is worried about someone on the catering staff of the upcoming gala being 17 years old, a teenager sneaking into the event with a fake ID, or a family with kids simply walking past the gala and seeing the performers through the windows.[61] Mr. Rocha does not consider placing butcher paper on the windows as a viable alternative, because in his opinion it would signify putting the LGBTQ+ community "back in the closet" and "back into hiding" and would make people feel like they do not exist to the outside world, which is contrary to the message of The Woodlands Pride.[62]

---

58     *Id*. 182:25-183:9; 199:4-18.
59     *Id*. 182:25-183:9; 199:4-18; 201:16-202:10.
60     *Id*. 181:12-17; 199:19-200:11; 201:25-202:17.
61     *Id*. 181:12-17; 199:4-200:10.
62     *Id.* 226:4-6; 228:21-229:5.

49.     As a result of the law's vagueness and broadness, and uncertainty of how to comply with said law, The Woodlands Pride's future plans have been thrown into a state of doubt and disorder.[63] The Woodlands Pride has already expended time and resources to plan two alternative Pride Festivals for this October—one that features drag performers and one that does not.[64] The Woodlands Pride is also being forced to consider hiring an inflatable room, which could cost upwards of $5,000 to $10,000, that would block off the drag performances.[65]

50.     Mr. Rocha is fearful that because S.B. 12 grants specific enforcement power to Montgomery County to restrict and regulate any "sexually oriented performance," the County will restrict or stop drag performances hosted by The Woodlands Pride if S.B. 12 takes effect.[66]

51.     The Woodlands Pride is concerned that Montgomery County law enforcement officers would refuse to sign up to partner with them for security, which would harm the Festival because The Woodlands Pride has to submit a security plan to the township for the Festival.[67]

---

63      *Id*. 201:25-202:10.
64      *Id*. 201:25-202:10.
65      *Id*. 201:16-202:10.
66      *Id*. 202:18-203:6; 230:20-231:7.
67      *Id.* 202:24-203:6.

52.     Additionally, Mr. Rocha testified that the County Sheriff is required to approve The Woodlands Pride's temporary TABC license.[68]

53.     Mr. Rocha is concerned that S.B. 12 limits freedom of speech, democracy, and liberation, which he fought for abroad as a member of the U.S. military.[69]

54.     Stopping or age-limiting drag performances would chill The Woodlands Pride's ability to engage in speech and performances and place The Woodlands Pride at risk of financial hardship, since drag performances are some of the most popular aspects of The Woodlands Pride's Festivals and fundraisers.[70] Stopping or age-limiting these drag performances would risk a decline in attendees and in advertising, sponsorship, and sales revenue at The Woodlands Pride events.[71]

## 2.     Abilene Pride Alliance

55.     Gavyn Hardegree, resident of Abilene, Texas, since 1998,[72] testified on behalf of the Abilene Pride Alliance as the President of its board of directors.[73] In that capacity, Mx. Hardegree serves as a volunteer and is not compensated.[74]

---

68     *Id.* at 184:5-12.
69     *Id.* 203:7:-15.
70     *Id*. 198:3-5; 201:16-24.
71     *Id*. 201:16-202:10.
72     *Id.* 118:25, 119:1-2.
73     *Id.* 119:16-18.
74     *Id.* 119:3-11.

56.     The Abilene Pride Alliance is a non-profit organization focused on supporting Abilene's LGBTQIA+ community. It was founded in 2019 when a local group of community leaders came together and organized a Pride in the Park event and saw the desire and a need in the community for an organization like the Abilene Pride Alliance to exist.[75]

57.     The Abilene Pride Alliance's mission is to build, create and maintain safe spaces for the local LGBTQIA+ community in Abilene through community-based events, fundraising events, or a hybrid of the two.[76]

58.     The Abilene Pride Alliance hosts social support groups and meeting spaces in Abilene, with the goal of fostering a strong community, including monthly social support meetings for transgender and nonbinary individuals and a support group facilitated by a therapist.[77]

59.      In September 2022, Abilene Pride Alliance held Abilene's first full-scale Pride event, which included two components: a parade and a festival at Nelson Park.[78]

60.     The 2022 parade featured a drag float, and the festival included a drag show.[79] Both events required the Abilene Pride Alliance to secure a permit and did

---

75     *Id*. at 118:23, 120:5-6, 120:8-11.
76     *Id*. at 119:19-25.
77     *Id*. at 120:1-4.
78     *Id*. at 123:12-21, 146:20-147:3.
79     *Id*. at 124:12-15.

not include an age restriction for entry.[80] The parade was visible to the general public,[81] as was the festival, which was surrounded by a fence with metal bars that allowed anyone in the parking lot or outside the fence to very easily look in and see what was happening.[82] The festival included a large vendor fair with food trucks, local artisans, local crafters, local nonprofits sharing information about their organizations, and the public health department sharing information and handing out free condoms and lube, as well as a tented stage where some community leaders spoke.[83]

61.    The Abilene Pride Alliance has also hosted other events that feature drag performances. In June and July of 2022, it hosted two drag brunch fundraisers at a locally owned coffee shop that gave the Abilene Pride Alliance exclusive use of its space on Sundays, when the shop was normally closed.[84] The brunches involved drag performances and did not impose an age restriction, though the events were ticketed and charged admission.[85]

---

80    *Id.* 123:22-124:4, 20-24, 125:6-8.
81    *Id.* 124:5-6.
82    *Id.* 125:9-15.
83    *Id.* 124:7-14. 126:1-5.
84    *Id.* 122:9-13.
85    *Id.* 122:14-25.

62.     The Abeline Pride Alliance has also hosted drag bingo events and community cookouts.[86] These events each had drag as a component, included drag performers, and were open to all ages, with many children in attendance.[87]

63.     By having drag performers at these events, Abilene Pride Alliance seeks to convey a message of belonging for the Abilene community and provide a way for people in the community to see themselves represented on a larger scale.[88]

64.     Many of Abilene Pride Alliance's events have been targeted by anti-drag and anti-LGBTQIA+ protestors. For example, during one of the organization's coffee shop drag brunches, the coffee shop was targeted by anti-drag activists, who called the police to report the brunch.[89]

65.     Mx. Hardegree believes drag is an art form in which performers of any gender dress in ways that exaggerate traditional male or female characteristics. While anyone can participate in drag, it has been historically used as means of self-expression and celebration in the LGBTQIA+ community and as way to challenge cultural stereotypes of gender.[90]

66.     The Abilene Pride Alliance's past drag performances have featured a variety of performers (both drag queens and kings), content, and artistic styles. Many

---

86     *Id.* 120:17-21.
87     *Id*. 120:17-121:1, 122:23-25.
88     *Id.* 121:2-6.
89     *Id*. 136:24-137:11.
90     *Id*. 129:4-10.

of the drag performers dance or lip-sync while engaging the audience by hugging, kissing on the cheek, sitting on someone's lap, or sometimes bumping hips with audience members.[91]

67.    Mx. Hardegree is unable to provide guidance to drag performers participating in future Abilene Pride Alliance events because S.B. 12's standards for prohibited performances are confusing and vague.[92]

68.    The Abilene Pride Alliance does not know whether drag shows and performers, so often featured in the organization's events, comply with S.B. 12. In particular, the organization does not know how to assess whether a performance appeals to "the prurient interest in sex," since that term is open to interpretation and undefined by S.B. 12.[93] While Mx. Hardegree does not believe that any of their organization's drag shows should be categorized in that way, they are aware that others may hold a contrary view.[94]

69.    Drag performers at past events have used accessories and prosthetics that exaggerate male or female sexual characteristics like sequins, big hair, wigs, breastplates, hip pads, prosthetic facial hair, false eyelashes, body padding, and exaggerated jewelry.[95]

---

91    *Id.* 121:15-17; 138:21-24.
92    *Id*. 128:24-129:3.
93    *Id*. 128:13-16.
94    *Id*. 136:17-137:2.
95    *Id.* 121:7-14.

70.     Drag performers at Abilene Pride Alliance events occasionally give front-facing hugs and hip-bumps to audience members or even sit in their laps. Mx. Hardegree fears that public officials might consider this conduct "sexual gesticulations" or "representation[s] [of] . . . simulated . . . sexual acts" under S.B. 12, and "actual . . . or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person."[96]

71.     The organization occasionally employs "drag kings" who use devices called "packers," which are worn under pants to give the appearance of a masculine "bulge"—essentially simulating or exaggerating the presence of a penis.[97] Mx. Hardegree is concerned that people could accuse drag kings of "exhibition or representation, actual or simulated, of male or female genitals in a lewd state."[98]

72.     Some of the vendors at the Abilene Pride Alliance's 2022 Pride event distributed free condoms and sexual lubricant to attendees, but due to the fear of potentially violating S.B. 12, the Abilene Pride Alliance's 2023 Pride festival will not include condoms or sexual lubricant if S.B. 12 is not enjoined.[99]

---

96      *Id*. 138:15-21.
97      *Id*. 123:6-11.
98      *Id*.
99      *Id*. 129:11-15.

73.     Mx. Hardegree is concerned that S.B. 12's broad definition of "nude" could also subject individuals attending the organization's events to civil or criminal sanctions.[100]

74.     The Abilene Pride Alliance is currently planning its annual Pride event, which will take place later this year.[101]

75.     The current plan is for the Pride event to include a parade through Abilene's public downtown streets and a festival at the Expo Center of Taylor County, a coliseum owned by Taylor County.[102] The City of Abilene has issued the Abilene Pride Alliance a permit for the parade. The organization would like to include drag performers in the parade and the festival.[103]

76.     Prior to the enactment of S.B. 12, Abilene Pride Alliance's plan for the 2023 parade and festival was to once again have a dedicated float in the parade for the organization's drag performers as well as a big drag show to close out the festival.[104] With the possibility that S.B. 12 would not be enjoined, the Abilene Pride Alliance has had to create backup plans, does not intend to include a float dedicated to its drag performers in the parade, and has had to reserve a backup venue for the

---

100     *Id*. 140:16-23.
101     *Id*. 146:20-23.
102     *Id.* 126:11-17, 127:22-24.
103     *Id*. 126:18-127:7.
104     *Id.* 127:3-7.

drag show, which will limit the number of attendees as compared to the original plan to include the drag show at the festival itself.[105]

77.    As Mx. Hardegree testified, these changes to the parade and festival greatly hamper the Abilene Pride Alliance's ability as an organization to express itself and maintain the safe spaces it has created for the Abilene community.[106]

78.    Mx. Hardegree worries that Abilene Pride Alliance and its board members could be exposed to criminal penalties for organizing and employing drag performers at events, thereby "aiding and abetting" a prohibited performance.[107]

79.    Finally, because S.B. 12 gives the City of Abilene and Taylor County the power to restrict and regulate any "sexually oriented performance," Mx. Hardegree is worried that the City and County will stop or limit the organization's planned drag performances, especially because its upcoming festival will take place on County property and the parade takes place on City property.[108]

80.    If S.B. 12 is not enjoined, Mx. Hardegree reasonably fears the law will force Abilene Pride Alliance to end or limit planned drag performances.[109] Mx. Hardegree also fears the law would ultimately prevent the organization's drag artists

---

105    *Id.* 127:3-17.
106    *Id.* 127:18-21.
107    *Id*. 149:9-11.
108    *Id*. 127:3-24.
109    *Id*. 128:24-129:3, 149:9-24.

from being able to convey their art in the way that is necessary to represent their community, which gives Mx. Hardegree a great sense of grief.[110]

81.    This will cause the organization irreparable harm. The Abilene Pride Alliance considers drag to be the glue that holds the organization, and Abilene's greater LGBTQIA+ community, together. It is an art form that creates spaces for representations that do not otherwise exist, particularly for young people. It also sparks necessary and important political dialogue.[111]

82.    Censoring the Abilene Pride Alliance's drag performances would harm the organization's fundamental mission of building safe spaces for the LGBTQIA+ community in Abilene and would limit its fundraising potential.[112]

83.    Mx. Hardegree testified that they are a member of the LGBTQIA+ community and identify as queer, trans, and non-binary.[113] As a member of this community, Mx. Hardegree finds drag to be both revolutionary and healing.[114]

84.    Though Mx. Hardegree does not perceive the Abilene Pride Alliance's drag performances to be sexual in nature,[115] they fear that others may nonetheless take action against Abilene Pride Alliance based on S.B. 12.[116]

---

110    *Id.* 128:17-23.
111    *Id*. 129:4-10, 130:4-17.
112    *Id*. 131:11-17.
113    *Id.* 129:25-130:3.
114    *Id.* 130:4-14.
115    *Id.* 136:4-137:2.
116    *Id.* 149:9-11.

### 3.      Extragrams, LLC

85.      Extragrams, LLC ("Extragrams") is a drag entertainment and delivery service based in Austin, Texas.[117] Kerry Lynn Sieff, Extragrams' Founder and Creative Services Director, testified on its behalf.[118]

86.      Extragrams operates by connecting drag performers, who work as independent contractors, with customers seeking entertainment for birthday parties, retirement parties, corporate events, weddings, holiday events, and more.[119]

87.      Extragrams' drag performers use acting, dancing, and costuming to exaggerate masculine and feminine characteristics as a form of expression and to provide entertainment to audiences.[120]

88.      Extragrams retains a level of creative control over the performances of its drag artists and often approves their costumes and songs.[121]

89.      Extragrams' performers perform in publicly owned spaces like parks, public streets, and public universities, primarily in Travis County.[122]

---

117    *Id.* 44:8-12, 57:15.
118    *Id.* 43:17-44:18.
119    *Id.* 46:6-9, 54:21-55:5, 67:25-68:6.
120    *Id.* 44:24-45:3, 45:9-17, 46:6-9, 57:1-5.
121    *Id.* 55:4-15, 56:23-57:5.
122    *Id.* 54:16, 57:7-12.

90.     Extragrams' performers also perform in privately owned commercial venues such as hotels, restaurants, and corporate offices, primarily in Travis County.[123]

91.     Extragrams is sometimes hired to provide drag artists to host events, such as bingo nights.[124]

92.     At least one Extragrams employee attends each of its drag performances in the capacity of an on-site manager.[125] An on-site manager coordinates with the client and performer, provides security, and directs the audience.[126]

93.     Extragrams carries liability insurance for most performances, as required by venues and clients.[127]

94.     Extragrams does not typically set age limits for its audiences and its performers often perform in public spaces and for people under the age of 18.[128]

95.     Extragrams cannot guarantee or know the ages of its audience members or anyone who might catch a glimpse of its performers.[129]

---

123    *Id.* 57:8-10, 57:21-58:1.
124    *Id.* 46:6-16.
125    *Id.* 55:24-56:6.
126    *Id.* 56:11-22.
127    *Id.* 59:7-12.
128    *Id.* 58:2-5, 58:20-59:4.
129    *Id.* 58:16-59-4.

96.     Extragrams' drag performers wear clothing and accessories that "exaggerate male or female sexual characteristics," such as wigs, makeup, high heels, dresses, body padding, pantyhose, corsets, push-up bras, breast plates, and crotch packers, which simulate or enhance a "male" bulge.[130]

97.     Extragrams' drag performers also shimmy, shake, perform body waves, and do the splits during some of their performances,[131] which could be interpreted by government officials as "sexual gesticulations" or "representation[s] [of] . . . simulated . . . sexual acts" under S.B. 12.

98.     Extragrams' performers also dance with or hug other performers or audience members, or sit in audience member's laps, which sometimes results in a performer briefly touching or brushing up against another person's chest, butt, or lap.[132] These actions could constitute "actual . . . or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person."

99.     Extragrams' "drag kings" often wear prosthetic bulges, or "packers," which enhance or simulate the presence of a penis[133] and could be construed by

---

130     *Id.* 60:14-61:10, 61:15-20, 66:24-67:4.
131     *Id.* 59:23.
132     *Id.* 63:7-18.
133     *Id*. 61:1-10.

government officials as "the exhibition or representation, actual or simulated, of male or female genitals in a lewd state."

100.   Extragrams reasonably fears that one of its performers could accidentally reveal a portion of a breast or buttocks by having a momentary and accidental wardrobe malfunction.[134] Ms. Sieff testified that wardrobe malfunctions "happen[] often" and that performers accidently reveal portions of their cleavage and buttocks.[135]

101.   Extragrams reasonably fears that aspects of its performances could be accused of "appeal[ing] to the prurient interest in sex," especially because the term is undefined and open to subjective interpretation.[136]

102.   Extragrams reasonably fears its performances could trigger criminal penalties under S.B. 12.[137]

103.   Extragrams reasonably fears that, under S.B. 12, clients that typically host Extragrams' drag performers will be afraid of booking or allowing drag performances on their premises.[138]

---

134    *Id.* 62:14-24.
135    *Id.*
136    *Id.* 61:24-62:9.
137    *Id.* 63:23-64:3.
138    *Id.* 64:13-14.

104. Extragrams intends to continue providing drag performers and facilitating drag performances for its customers in Texas in the future, and has multiple public performances scheduled for September and October of this year.[139]

### 4.   360 Queen Entertainment LLC

105. Richard Montez Jr. and his partner are co-owners of 360 Queen Entertainment LLC ("360 Queen Entertainment"), which is a drag production company in San Antonio, Bexar County, Texas.[140] Mr. Montez testified on behalf of 360 Queen Entertainment.

106. Mr. Montez's father owns Tomatillo's Restaurant & Bar ("Tomatillo's), which is located in a shopping center in the outskirts of San Antonio.[141]

107. Tomatillo's has a back patio that 360 Queen Entertainment rents to host a monthly commercial drag show called the Bottoms Up Diva Dinner, which features drag performers from *RuPaul's Drag Race* as well as local performers.[142]

108. The Bottoms Up Diva Dinner is one of only a very few drag shows that are held outside the central part of San Antonio.[143]

---

139   *Id*. 65:9-22.
140   *Id.* 81:22-82:9; 82:18-21.
141   *Id.* 84:8-18.
142   *Id*. 83:7-9, 83:17-22, 84:8-22, 88:16-17.
143   *Id.* 88:15-23.

109.   360 Queen Entertainment's goal in exhibiting drag performances in the suburban area was to allow more people to be exposed to drag, be educated about drag, and understand that it is not always what people may believe it to be.[144]

110.   Audience members get a full dining experience. Giving patrons the opportunity to talk to each other, get to know each other, dine and break bread with one another is important to 360 Queen Entertainment because it helps express 360 Queen Entertainment's message of community.[145]

111.   360 Queen Entertainment does not host drag performances at any other venue.[146]

112.   When it hosts a drag performance at Tomatillo's, 360 Queen Entertainment sells tickets and controls who may enter or exit the patio.[147]

113.   360 Queen Entertainment and Tomatillo's have an agreement that provides that on days that 360 Queen Entertainment hosts a performance, 360 Queen Entertainment controls the patio from the morning until the performance ends.[148] Tomatillo's does not utilize the patio for its own purposes on the day of a performance.[149]

---

144   *Id.* 117:3-6.
145   *Id.* 114:8-15, 117:14-22.
146   *Id.* 84:14-15.
147   *Id.* 85:21-86:5.
148   *Id.* 85:17-23.
149   *Id.*

114.   360 Queen Entertainment limits its ticket sales to people 18 years of age and older.[150] They did not institute this restriction because they believe drag shows are inappropriate for minors but because, as fathers of five kids themselves, they wanted their audience to have a place away from children.[151]

115.   Although minors cannot currently buy tickets to the show, children have gotten out onto the patio during performances on a few occasions, such as when children ran through the patio to get to a nearby field and when a man walked through the patio to the dining room carrying a baby.[152]

116.   Minors can also see the performances from the restaurant's dining room, nearby businesses that do not have age restrictions, and the parking lot that Tomatillo's shares with these other businesses.[153]

117.   Some of the restaurant's staff members may also be under the age of 18.[154]

118.   On a couple of occasions, 360 Queen Entertainment has allowed minors to watch the show from the patio when the minor's parent, who had full knowledge of what the show entailed, requested they be allowed to do so.[155]

---

150   *Id.* 88:4.
151   *Id.* 87:20-88:7, 115:19-23.
152   *Id.* 86:6-15.
153   *Id.* 84:19-22,85:2-16, 89:16-22, 92:15-25, 96:2-8.
154   *Id.* 101:14-24.
155   *Id.* 110:1-19.

119.   360 Queen Entertainment has never intentionally allowed a child to view a drag performance from the patio without the consent of the minor's parent.[156]

120.   360 Queen Entertainment's shows are not only a product of its own expression, but they provide a vehicle for others' free speech and expressive conduct and are a platform for LGBTQIA+ rights.[157]

121.   360 Queen Entertainment's performers are diverse, and each expresses their own message, such as racial and social justice.[158]

122.   360 Queen Entertainment's drag performers engage in artistic expression that involves performers acting, dancing, or wearing outfits in ways that exaggerate masculine or feminine characteristics.[159]

123.   The performers often sing, lip-sync and do dance routines to entertain and connect with their audiences.[160]

124.   Some performers execute dance moves that some people may consider to be sexual gesticulations.[161]

125.   Some performers allow audience members to touch their breastplates or slap their butts.[162]

---

156   *Id.*
157   *Id.* 105:15-21.
158   *Id.* 101:25-102:13.
159   *Id.* 98:21-24.
160   *Id.* 99:9-21.
161   *Id.* 98:25-99:21, 111:2-14.
162   *Id.* 112:22-25.

126.   The performers enhance their characteristics and features to appear to be women though many of them are male.[163]

127.   Some performers and hosts wear wigs, breastplates, butt pads, and other prosthetics to accentuate female characteristics.[164]

128.   A breastplate has been inadvertently exposed during a Bottoms Up Diva Dinner and performers may wear short leotards or other clothing that is revealing around the buttocks.[165]

129.   At one show, a performer wore a breastplate that was revealing and pulsed her chest directly in front of audience members' faces.[166]

130.   Mr. Montez reasonably fears that if S.B. 12 becomes law, it will be enforced against 360 Queen Entertainment and its performers.[167]

131.   Mr. Montez fears that some performances might be seen as exhibiting sexual gesticulations while using accessories or prosthetics that exaggerate male or female sexual characteristics.[168]

---

163   *Id*. 104:4-9.
164   *Id.* 95:21-96:1, 98:22-24.
165   *Id.* 95:21-25, 100:2-5.
166   *Id.* 100:17-20.
167   *Id.* 102:14-24, 105:2-13.
168   *Id.* 103:25-104:24.

132.    Although the performers at the Bottoms Up Diva Dinner always wear clothing, Mr. Montez fears that some of the performers may be seen by others as performing "nude" as that term is defined in S.B. 12.[169]

133.    Even though 360 Queen Entertainment limits ticket sales to guests over the age of 18, they cannot guarantee that the drag shows will not be presented "on the premises in the presence of an individual younger than 18 years of age."[170]

134.    360 Queen Entertainment does not know how to determine whether its performances appeal to the prurient interest in sex and believes it may vary based on someone's individual beliefs.[171]

135.    360 Queen Entertainment does not host performances that are obscene but fears that some people may believe the performances to be sexualized.[172]

136.    One customer of the restaurant who was not a ticketed customer of 360 Queen Entertainment's performance called the police on 360 Queen Entertainment earlier this year because he believed they were engaging in illegal activity by hosting a drag show at a restaurant where families and kids were present.[173]

137.    360 Queen Entertainment changed its business operations in anticipation of S.B. 12 by moving the time of the shows to be later in the evening,

---

169    *Id.* 106:12-16.
170    *Id*. 106:24-107:1.
171    *Id.* 101:2-6.
172    *Id*.
173    *Id*. 101:2-13.

but there were still families and children in the restaurant who could view the show.[174]

138.   Moving the timing of the shows worsened the quality and experience for attendees, imposed costs on 360 Queen Entertainment, and prevented it from being able to fully express its message.[175]

139.   Even if moving the show to a bar, nightclub, or adult cabaret would guarantee that no minors would ever see the show, 360 Queen Entertainment would not do so because it would not be able to express its intended message in such a venue.[176]

140.   Because 360 Queen Entertainment cannot guarantee that minors will not be present on the premises of its current venue, it temporarily canceled all shows after September 1 for fear of prosecution or penalties under S.B. 12.[177]

141.   360 Queen Entertainment's performers are typically booked months in advance, can charge up to $6,000, and require deposits and flight and hotel arrangements.[178]

142.   360 Queen Entertainment would like to continue to host and organize the Bottoms Up Diva Dinner and to host a show where young people in the

---

174    *Id*. 106:23-108:1.
175    *Id.* 107:6-16.
176    *Id.* 116:25-118:22.
177    *Id.* 107:20-108:6.
178    *Id.* 106:3-5.

LGBTQIA+ community, including teenagers with parental permission, can see themselves in the performances and network with other people who are part of their community.[179]

143.   Demand for tickets to the Bottoms Up Diva Dinner has always been, and remains, strong.[180]

144.   360 Queen Entertainment intends to continue holding shows in the future if this law is enjoined.[181]

### 5.   Brigitte Bandit

145.   Brigitte Bandit testified as a Plaintiff.[182]

146.   Ms. Bandit lives and primarily performs in Travis County, Texas.[183]

147.   Ms. Bandit performs in, produces, and hosts drag shows as her full-time job and has worked as a drag artist for the past five years.[184]

148.   Hosting and producing drag shows requires Ms. Bandit to choose and hire drag performers, negotiate pay rates and budgets, direct the DJ to play certain music, act as an emcee, and interact with the audience.[185] As part of her host and

---

179   *Id.* 107:17-19, 115:24-116:4.
180   *Id.* 88:24-89:2.
181   *Id*. 107:17-25.
182   *Id.* 233:6. For reasons of personal safety and privacy, Plaintiff Brigitte Bandit is proceeding under a pseudonym, and the Court has granted her motion to do so. Dkt. 36.
183   *Id.* 232:18-19, 233:2, 233:14-19.
184   *Id.* 233:11-13, 235:3, 235:25.
185   *Id.* 236:2-9.

36

producer duties, Ms. Bandit specifically directs the audience on the rules of the show to maintain the safety and personal boundaries of the performers and the audience.[186]

149.   Ms. Bandit considers drag to be an artistic endeavor that allows her to express herself, explore her identity outside of traditional gender norms, share messages of kindness and acceptance, and convey political messages.[187]

150.   Ms. Bandit sometimes performs, hosts, and produces shows for audiences of all ages and sometimes performs, hosts, and produces shows in venues that are generally limited to people who are 18 or 21 and up.[188] Even at shows for adult audiences, Ms. Bandit cannot know or control the ages of every member of her audience or control who may be able to catch a glimpse of her show.[189] Sometimes, venues and Ms. Bandit will make an exception for parents to bring their minor children; other times, Ms. Bandit's performances can be viewed from a sidewalk or surrounding buildings.[190]

151.   Ms. Bandit performs and hosts performances on publicly owned property, such as parks.[191]

---

186   *Id.* 236:11-18.
187   *Id.* 234:1-235:1, 235:15-17.
188   *Id.* 236:25-237:24, 238:9-14.
189   *Id.* 239:23-241:10.
190   *Id.* 239:23-241:10, 248:25-249:4; Trial Tr. Vol. 2, 16:3-18.
191   Trial Tr. Vol. 1, 238:3-8.

152.   Ms. Bandit performs and hosts performances in private, commercial venues such as nightclubs and restaurants.[192]

153.   As part of her artistic expression, Ms. Bandit uses a prosthetic breast plate and various accessories like wigs, false eyelashes, high heels, corsets, jewelry, and clothing to perform drag and impersonate female stars like Dolly Parton.[193] Many of these accessories and prosthetics exaggerate her female sexual characteristics.[194]

154.   Ms. Bandit sometimes dances, shimmies, shakes and thrusts her hips, caresses a dildo, simulates kissing or "making out with somebody," blows kisses, and touches herself and others during her performances,[195] which could be interpreted by government officials as "sexual gesticulations" or the "representation [of] . . . simulated . . .sexual acts."

155.   Ms. Bandit sometimes dances closely with other performers.[196] Audience members also tip her by occasionally placing cash in her cleavage.[197]  Both of these activities can cause contact between Ms. Bandit and another person and can

---

192    *Id.* 237:7-9.
193    *Id*. 242:11-20.
194    *Id*. 243:1-3.
195    *Id*. 250:4-251:7.
196    *Id*. 246:17-247:9.
197    *Id*. 245:20-246:7.

sometimes constitute the "actual or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person."

156.   Ms. Bandit uses dildos in some of her performances, as a prop or a pretend microphone,[198] which could constitute the "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals," and the "exhibition or representation, actual or simulated, of male or female genitals in a lewd state." Ms. Bandit also reasonably fears that her prosthetic breast plate could be construed as the "exhibition or representation, actual or simulated, of male or female genitals in a lewd state."[199]

157.   Ms. Bandit wears revealing clothing during some performances, such as cleavage-bearing ensembles, thongs, and leotards.[200] She has also experienced accidental wardrobe malfunctions in the past, once revealing a nipple, and cannot guarantee that a wardrobe malfunction will never occur in the future.[201] Thus, government officials could consider her to be "nude," as defined by S.B. 12, during a future performance.

158.   Ms. Bandit reasonably fears that other people will accuse her shows of "appeal[ing] to the prurient interest in sex," because that term is "vague and open to

---

198   *Id*. 247:25-248:19.
199   *Id.* 249:17-250:3.
200   *Id.* 252:10-23.
201   *Id.* 252:24-253:9.

interpretation," because she is aware that government officials have claimed that S.B. 12 is a "drag ban," and because she reasonably fears that others view drag as inherently sexual.[202]

159.   Ms. Bandit reasonably fears that she will be vulnerable to S.B. 12's criminal penalties for her work of performing in, producing, and hosting drag shows.[203]

160.   Ms. Bandit reasonably fears that private and commercial venues that typically host her performances will no longer book or allow drag performances on their premises, for fear of incurring S.B. 12's penalties.[204]

161.   Ms. Bandit reasonably fears that she could also be fined because she hosts, organizes, and produces drag shows.[205]

162.   Ms. Bandit has performances scheduled after S.B. 12's effective date[206] and intends to continue her work as a drag performer, host, and producer in the future.[207]

---

[202]   *Id.* 251:12-252:9.
[203]   *Id*. 254:17-25.
[204]   *Id.* 254:10-16.
[205]   *Id.* 254:17-25.
[206]   *Id*. 253:13-25.
[207]   *Id.* 235:4-7, 236:19-23.

### D.   Defendants' Evidence

163.   Defendant Angela Colmenero called psychiatrist and pharmacologist, to testify as an expert on the harmful effects of exposure to explicitly sexual material on children, but he indicated that he had never seen someone suffer serious harm due to a drag show or other performances proscribed by S.B. 12. The Court therefore did not find his testimony relevant and sustained Plaintiffs' objection to his testimony.[208]

164.   None of the Defendants offered any other evidence.

***

165.   If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the following Conclusions of Law constitute Findings of Fact, they are adopted as such.

## II.   CONCLUSIONS OF LAW

### A.   Plaintiffs Have Standing against Defendants

166.   To demonstrate injury-in-fact in the pre-enforcement context, a plaintiff must show: "(1) that it intends to engage in a course of conduct arguably affected with a constitutional interest; (2) that the course of action is arguably proscribed by statute; and (3) that there exists a credible threat of prosecution under the statute." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 215–16 (5th Cir. 2023) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

---

[208]   *Id.* 165:21-166:6.

167.   In a pre-enforcement challenge, Plaintiffs need not show that their interpretation of the statute is the "best interpretation, the test doesn't require that." *Id.* at 218. Instead, "[t]he Supreme Court's opinion in [*Driehaus*] makes clear that courts are to consider whether the plaintiff's intended conduct is '*arguably proscribed*' by the challenged statute, not whether the intended conduct is *in fact* proscribed." *Id.* (quoting *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022)).

168.   Further, "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)).

169.   "In pre-enforcement cases alleging a violation of the First Amendment's Free Speech Clause, the Supreme Court has recognized that chilled speech or self-censorship is an injury sufficient to confer standing." *Barilla v. City of Houston, Texas*, 13 F.4th 427, 431 (5th Cir. 2021) (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988)); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979) ("[o]ne does not have to await the consummation of threatened injury to obtain preventive relief.").

170.   Applying these principles below, the Court finds that each Plaintiff has established Article III standing against the Defendants that each Plaintiff sued.

### 1.   The Woodlands Pride

171.   Plaintiff The Woodlands Pride has standing against Defendants Angela Colmenero, in her official capacity as Interim Attorney General of Texas; Montgomery County, Texas; and Brett Ligon, in an official capacity as District Attorney of Montgomery County.

172.   The Woodlands Pride hosts and organizes performances and events, including drag performances, which are inherently expressive and fall within the scope of First Amendment protections, as further discussed below.

173.   The Woodlands Pride intends to continue hosting and organizing drag performances at upcoming events, including its Pride Festival this October on public property in Montgomery County and at an upcoming gala, where it will arguably control the premises of a commercial enterprise because it will sell tickets for the event and have exclusive use of the space.

174.   The Woodlands Pride has demonstrated that some of the performances and events it has hosted in the past and intends to hold in the future are arguably proscribed by S.B. 12. The Woodlands Pride testified that is has hosted visual performances that are in the presence of individuals younger than 18 years of age, on the premises of a commercial enterprise and on public property, and include

dancing that arguably could exhibit or represent actual or simulated sexual acts. The Woodlands Pride also exhibits devices such as condoms or lubricants that are arguably designed and marketed as useful primarily for the sexual stimulation of male or female genitals. The Woodlands Pride also features dancing that arguably exhibits actual contact or simulated contact between one person and the buttocks of another person and arguably exhibits sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics. The Woodlands Pride also arguably features performers whose costumes can and have revealed portions of a buttocks or breast under the areola. All these activities could arguably appeal to the prurient interest in sex under S.B. 12, especially considering the phrase is so vague as to not reasonably constrain officials' discretion and the explicit targeting of drag shows in the legislative history.

175.   The Woodlands Pride has demonstrated a credible threat of prosecution under the statute, and Defendants Colmenero, Montgomery County, and Ligon have not presented any "compelling contrary evidence" that they will not enforce the statute that facially restricts expressive activity by The Woodlands Pride or that Montgomery County law enforcement who are at The Woodlands Pride Festival and other events will not enforce the statute.

176.   If S.B. 12 is not enjoined, The Woodlands Pride's speech will be chilled because The Woodlands Pride has already decided not to include drag performances

at its 2023 Festival, which is itself a constitutional harm adequate to satisfy the injury-in-fact requirement.

177. The Woodlands Pride's injuries are traceable to Defendants Colmenero, Montgomery County, and Ligon because they are statutorily tasked with enforcing S.B. 12 where The Woodlands Pride intends to hold upcoming events. The Woodlands Pride is subject to enforcement under all three sections of S.B. 12, including aiding and abetting liability for criminal penalties under the general aiding and abetting provision of Tex. Penal Code § 7.02, and the Woodlands Pride's injuries are redressable through injunctive and declaratory relief.

178. As further discussed below, Defendants Colmenero, Montgomery County, and Ligon are properly named and not immune.

### 2.    Abilene Pride Alliance

179. Plaintiff Abilene Pride Alliance has standing against Defendants Angela Colmenero, in her official capacity as Interim Attorney General of Texas; the City of Abilene, Texas; Taylor County, Texas; and James Hicks, in an official capacity as District Attorney of Taylor County.

180. The Abilene Pride Alliance hosts and organizes events and performances, including drag performances, which are inherently expressive and fall within the scope of First Amendment protections, as further discussed below.

181.   The Abilene Pride Alliance intends to continue hosting and organizing drag performances at upcoming events, including its Pride Festival this September, which will take place both on public property in the City of Abilene and Taylor County. Abilene Pride Alliance also intends to host drag events on the premises of commercial enterprises where it will arguably control the premises, as it has done in the past by hosting events at a coffee shop where it sells tickets and has exclusive use of the space.

182.   Abilene Pride Alliance has demonstrated that some of the events and performances it has hosted in the past and intends to host in the future are arguably proscribed by S.B. 12. Abilene Pride Alliance's drag performances arguably could be considered to appeal to the prurient interest in sex and feature performers engaging in "sexual conduct" under S.B. 12, including through "the exhibition or representation, actual or simulated, of sexual acts" such as dancing, hugging, and kissing people on the cheek; "the exhibition or representation, actual or simulated, of male or female genitals in a lewd state," including through the use of packers to simulate a male bulge; "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals," including by exhibiting condoms and sexual lubricant; "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person," including through hip bumps or performers sitting on people's laps;

and "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristic," including sequins, big hair, wigs, breastplates, hip pads, packers, and exaggerated jewelry while "dancing, lip syncing, [and] engaging with the audience by hugging, kissing on the cheek, sometimes bumping hips."[209]

183.   Abilene Pride Alliance has demonstrated a credible threat of prosecution under the statute, and Defendants Colmenero, the City of Abilene, Taylor County, and Hicks have not presented any "compelling contrary evidence" that they will not enforce the statute that facially restricts expressive activity by Abilene Pride Alliance.

184.   If S.B. 12 takes effect, Abilene Pride Alliance's speech will be chilled, since it has already had to change its upcoming plans and performances, which is itself a constitutional harm adequate to satisfy the injury-in-fact requirement.

185.   Abilene Pride Alliance's injuries are traceable to Defendants Colmenero, the City of Abilene, Taylor County, and Hicks because they are statutorily tasked with enforcing S.B. 12 where the Abilene Pride Alliance intends to hold upcoming performances. Abilene Pride Alliance is subject to enforcement under all three sections of S.B. 12, including aiding and abetting for criminal penalties under the general aiding and abetting provision of Tex. Penal Code § 7.02,

---

[209]   *Id*. 121:7-22.

47

and Abilene Pride Alliance's injuries are redressable through injunctive and declaratory relief.

186.   As further discussed below, Defendants Colmenero, the City of Abilene, Taylor County, and Hicks are properly named and not immune.

### 3.   Extragrams

187.   Plaintiff Extragrams has standing against Defendants Angela Colmenero, in her official capacity as Interim Attorney General of Texas and Delia Garza, in her official capacity as County Attorney of Travis County.

188.   Extragrams organizes and produces drag performances and events, which are inherently expressive and fall within the scope of First Amendment protections, as further discussed below.

189.   Extragrams intends to continue organizing and producing drag performances at upcoming events, including on public property in Travis County and at commercial establishments that it could arguably be said to control, since it hosts and directs performances and carries liability insurance for its performances.

190.   Extragrams has demonstrated that some of the events and performances it has hosted in the past and intends to host in the future are arguably proscribed by S.B. 12. Extragrams hosts visual performances that are in the presence of individuals younger than 18 years of age, on the premises of commercial enterprises, and on public property. Each of these performances involve drag artists wearing accessories

and prosthetics that exaggerate male or female sexual characteristics and that, in some cases, could arguably constitute the exhibition of simulated male or female genitals in a lewd state. The performances also feature dancing that arguably constitutes sexual gesticulations and representations of simulated sexual acts and often include actual or simulated contact between one person and the buttocks, breast, or any part of the genitals of another person. Further, Extragrams reasonably fears that common wardrobe malfunctions could result in a performer being considered "nude" under S.B. 12 and that its performances could be accused of appealing to the prurient interest in sex.

191.   Extragrams has demonstrated a credible threat of prosecution under the statute, and Defendants Colmenero and Garza have not presented any "compelling contrary evidence" that they will not enforce the statute that facially restricts expressive activity by Extragrams.

192.   If S.B. 12 takes effect, Extragrams' speech will be chilled, which is itself a constitutional harm adequate to satisfy the injury-in-fact requirement.

193.   Extragrams' injuries are traceable to Defendants Colmenero and Garza because they are statutorily tasked with enforcing S.B. 12 where Extragrams intends to hold performances in the future. Extragrams is subject to enforcement under all three sections of S.B. 12, including aiding and abetting for criminal penalties under

the general aiding and abetting provision of Tex. Penal Code § 7.02, and Extragrams'

injuries are redressable through injunctive and declaratory relief.

194. Defendants Colmenero and Garza are properly named and not immune,

as further discussed below.

### 4.    360 Queen Entertainment

195. Plaintiff 360 Queen Entertainment has standing against Defendants

Angela Colmenero, in her official capacity as Interim Attorney General of Texas and

Joe D. Gonzales, in his official capacity as District Attorney of Bexar County.

196. The drag performances 360 Queen Entertainment hosts and organizes

are inherently expressive and fall within the scope of First Amendment protections,

as further discussed below.

197. 360 Queen Entertainment controls the premises of a commercial

enterprise when it hosts a Bottoms Up Diva Dinner on the patio at Tomatillo's

Restaurant & Bar. Even though 360 Queen Entertainment does not currently sell

tickets to these events to minors, minors are still present on the premises and see 360

Queen Entertainment's performances from the restaurant dining room, the parking

lot, or nearby businesses in the same shopping center.

198. 360 Queen Entertainment has demonstrated that the events and

performances it has hosted in the past and hopes to host in the future are arguably

proscribed by S.B. 12. For example, 360 Queen Entertainment holds performances

that feature acting, dancing, and wearing outfits in ways that exaggerate masculine or feminine characteristics. Performers engage in dance moves that some people may consider to be sexual gesticulations and wear wigs, breastplates, butt pads and other prosthetics to accentuate female characteristics. A breastplate has been inadvertently exposed during a Bottoms Up Diva Dinner and performers sometimes wear short leotards or other clothing that is revealing around the buttocks. Performers have also invited audience members to touch their breastplates or slap their butts during performances.

199.   360 Queen Entertainment's performances are arguably proscribed by S.B. 12 because they could appeal to the prurient interest in sex and feature performers who are nude under the statute's broad definition of that term or engage in "sexual conduct," including "the exhibition or representation, actual or simulated, of sexual acts," "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person," or "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics."[210]

200.   360 Queen Entertainment has demonstrated a credible threat of prosecution under the statute and Defendants Colmenero and Gonzales have not

---

[210]   S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)).

presented any "compelling contrary evidence" that they will not enforce the statute that facially restricts expressive activity by 360 Queen Entertainment.

201.   360 Queen Entertainment's speech has already been chilled by the likelihood of S.B. 12 taking effect, since it has had to cancel upcoming performances. If S.B. 12 is not enjoined, 360 Queen Entertainment's speech will continue to be chilled, which is itself a constitutional harm adequate to satisfy the injury-in-fact requirement.

202.   360 Queen Entertainment's injuries are traceable to Defendants Colmenero and Gonzales because they are statutorily tasked with enforcing S.B. 12 where 360 Queen Entertainment intends to hold performances in the future. 360 Queen Entertainment is subject to enforcement under sections 1 and 3 of S.B. 12, including aiding and abetting for criminal penalties under the general aiding and abetting provision of Tex. Penal Code § 7.02, and 360 Queen Entertainment's injuries are redressable through injunctive and declaratory relief.

203.   Defendants Colmenero and Gonzales are properly named and not immune, as further discussed below.

### 5.   Brigitte Bandit

204.   Plaintiff Brigitte Bandit has standing against Defendants Angela Colmenero, in her official capacity as Interim Attorney General of Texas and Delia Garza, in her official capacity as County Attorney of Travis County.

205.   Ms. Bandit performs in, hosts, and organizes drag performances and events, which are inherently expressive and fall within the scope of First Amendment protections, as further discussed below.

206.   Ms. Bandit intends to continue performing in, hosting, and organizing drag performances at upcoming events, including on public property in Travis County and at commercial enterprises that she arguably controls because she hosts performances and lays the ground rules for the audience and performers.

207.   Ms. Bandit has demonstrated that some of her past and future events and performances are arguably proscribed by S.B. 12. Ms. Bandit testified that she has performed in, produced, and hosted visual performances that are in the presence of individuals younger than 18 years of age—who are either in the audience or who can easily view the performances from nearby buildings or sidewalks—on the premises of commercial enterprises and on public property. Each of these performances involve Ms. Bandit wearing accessories and prosthetics that exaggerate her female sexual characteristics and that, in the case of her prosthetic breast plate, could arguably constitute the exhibition of simulated female genitals in a lewd state. Her performances also feature dancing that arguably constitutes sexual gesticulations and representations of simulated sexual acts and often include actual or simulated contact between one person and the buttocks, breast, or any part of the genitals of another person. Ms. Bandit also uses dildos as a prop in some of her

53

performances, which could arguably constitute the "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals," or the "exhibition or representation, actual or simulated, of male or female genitals in a lewd state."  Further, Ms. Bandit reasonably fears that some of her costumes, which expose portions of her breast and buttocks, or a wardrobe malfunction could arguably cause her to be considered "nude" under S.B. 12 and that her performances could be accused of appealing to the prurient interest in sex.

208.   Ms. Bandit has demonstrated a credible threat of prosecution under the statute, and Defendants Colmenero and Garza have not presented any "compelling contrary evidence" that they will not enforce the statute against her.

209.   If S.B. 12 takes effect, Ms. Bandit's speech will be chilled, which is itself a constitutional harm adequate to satisfy the injury-in-fact requirement.

210.   Ms. Bandit's injuries are traceable to Defendants Colmenero and Garza because they are statutorily tasked with enforcing S.B. 12 where Ms. Bandit intends to perform. Ms. Bandit is subject to enforcement under all three sections of S.B. 12, including aiding and abetting for criminal penalties under the general aiding and abetting provision of Tex. Penal Code § 7.02, and her injuries are redressable through injunctive and declaratory relief.

211.   Defendants Colmenero and Garza are properly named and not immune, as further discussed below.

### 6.    Defendants' Standing Arguments Are Unavailing

212.   Defendants' arguments that Plaintiffs lack standing are unsupported by the trial record and binding case law.

213.   First, the Attorney General contests that Plaintiffs' performances are affected with a constitutional interest, Dkt. 52 at 27-28, but as explained below, this view misapplies Supreme Court precedent. No other Defendant contests that this standard is met.

214.   Second, the Attorney General contends that no Plaintiff can be said to "control" the premises of a commercial enterprise, *see, e.g.*, Dkt. 52 at 19-20, but this argument relies on an overly narrow interpretation of S.B. 12 and ignores Plaintiffs' standing against the Attorney General because of the chilling of speech.

215.   Because S.B. 12 does not define the word "control," the plain meaning of the term is not limited solely to owners of a property. *See* CONTROL, Black's Law Dictionary (11th ed. 2019) ("To exercise power or influence over."). Further, there are other contexts in which Texas law has defined "control" and found that the legal owner of a premises can delegate "control" to others, including a renter, lessee, or temporary occupant. *See, e.g.*, *Johnson Co. Sherriff's Posse Inc. v. Endsley*, 926 S.W.2d 284 (Tex. 1996) (finding, in premise liability context, that arena owner delegated control of the arena grounds to rodeo tenant, who had responsibility to maintain and prepare arena grounds for their particular event).

216.   As outlined above, every Plaintiff reasonably fears that they could be said to "control the premises of a commercial enterprise" and will arguably be subject to Attorney General enforcement. Because Plaintiffs' injuries are based on the suppression of speech and S.B. 12's chilling effect, Plaintiffs need not prove that their interpretation of the statute is the "best interpretation, the test doesn't require that." *Turtle Island Foods*, 65 F.4th at 218. Plaintiffs must only show that their activities are "arguably proscribed" by the statute, and here that test is met. *Id.*

217.   Moreover, Plaintiffs also all have injuries-in-fact traceable to the Attorney General because they all host or perform shows at commercial enterprises that will arguably be prohibited from allowing such shows to occur, under threat of civil enforcement from the Attorney General. This harm is does not stem from a "highly attenuated chain of possibilities." *See* Dkt. 52 at 20 (citing *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 410 (2013)). Unlike in *Clapper*, no speculation is needed to show how the Attorney General's enforcement power harms Plaintiffs in this scenario. If the Attorney General stops commercial enterprises from hosting drag performances, that enforcement authority directly injures Plaintiffs because it chills their expression and stops them from performing in these spaces.

218.   Under the Attorney General's cramped interpretation of standing, an artist could not sue a local government that shuts down all art galleries, a film producer could not sue a state that shuts down all movie theaters, and a speaker could

not challenge a law that bans all soapboxes. The Attorney General's enforcement authority to close off avenues of free expression directly harms all Plaintiffs in this case, even in the instances where Plaintiffs are found to not arguably "control the premises of a commercial enterprise" under S.B. 12.

219.   Plaintiffs also have standing against the remaining Defendants, who are each statutorily tasked with enforcing S.B. 12 against Plaintiffs. The District Attorneys and County Attorney do not dispute that they are responsible for enforcing the criminal penalties associated with S.B. 12. *See* Dkt. 49. The City of Abilene, Montgomery County, and Taylor County also do not dispute that they "may not authorize" certain "sexually oriented performances" and are tasked with "regulat[ing]" Plaintiffs' performances under S.B. 12. *See* Dkts. 42, 44, and 49.

220.   The County Defendants and the City of Abilene argue that Plaintiffs have failed to put forth any evidence of enforcement. Dkt. 49, at 13; Dkt. 42, at 7. But such evidence is not required to establish standing for a pre-enforcement challenge. The Fifth Circuit is clear that in the absence of compelling contrary evidence, "courts will assume a credible threat of prosecution." *Speech First, Inc.*, 979 F.3d at 335. No such contrary evidence exists here.

221.   As in other pre-enforcement free speech cases, the remaining two prongs for standing—causation and redressability—are satisfied. *See, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d at 338 ("[P]otential enforcement of the [challenged

policies] caused [] self-censorship, and the injury could be redressed by enjoining enforcement of [those policies].").

## B.  Plaintiffs' Claims Are Ripe

222.   Although some Defendants argue that Plaintiffs' claims challenging S.B. 12 are not yet ripe, *see* Dkt. 42 at 8-11 (City of Abilene); Dkt. 49 at 8-11 (County Defendants), the Court finds that Plaintiffs have stated a valid facial legal challenge to S.B. 12, and there is no further factual development that is necessary to aid the Court in determining the constitutionality of this statute. In a pre-enforcement challenge, Plaintiffs need not "await the consummation of threatened injury to obtain preventive relief." *See Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 581 (1985); *Ohio C.R. Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 626 n.1 (1986) ("[A] reasonable threat of prosecution for conduct allegedly protected by the Constitution gives rise to a sufficiently ripe controversy.").

## C.  Defendants Are Not Immune from Suit

223.   The Court finds that all Defendants are properly named and that they are not immune from suit. As the Fifth Circuit has recently stated, the correct defendant is "generally the individual tasked with enforcing the challenged act." *Tawakkol v. Vasquez*, No. 22-50434, --- F.4th ---, 2023 WL 5444329, at *2 (5th Cir. Aug. 24, 2023).  Here, Plaintiffs have sued those individuals.

### 1.  Attorney General

224.   Under the *Ex parte Young* exception to sovereign immunity, the Attorney General is a proper defendant if she has a sufficient enforcement connection to the challenged action. *Texas Democratic Party v. Abbott*, 978 F.3d 168, 179-80 (5th Cir. 2020). The Attorney General concedes that she is "tasked with the enforcement of section 1 of S.B. 12 related to sexually oriented performances on premises of commercial enterprises." Dkt. 52 at 10. At trial, she did not contest that *Ex parte Young* properly applies to her with respect to section 1.[211] Accordingly, the Attorney General is a proper defendant for Plaintiffs' challenges to section 1.

### 2.  District and County Attorneys

225.   Plaintiffs have named three district attorneys (for Montgomery County, Taylor County, and Bexar County) and one County Attorney (for Travis County) as Defendants. The Court holds that they are properly named Defendants who satisfy the *Ex parte Young* exception to sovereign immunity.[212]

226.   District and county attorneys act for the State when they enforce state law. The district and county attorney defendants do not dispute this point. *See* Dkt.

---

[211]   Trial Tr., Vol. 2, 79:6-10 (arguing only that the Attorney General had sovereign immunity with respect to sections 2 and 3).

[212]   The Montgomery County District Attorney suggested at trial that an *Ex parte Young* claim was not timely pled.  But *Ex parte Young* is not a claim or a cause of action.  *Ex parte Young* sets forth the standard for the exception to sovereign immunity as claimed by defendant here. Plaintiffs have pled adequate facts to invoke that exception.

49 at 4 n.4 (noting that role of district attorneys and county attorneys in representing the State is enshrined in the Texas Constitution).[213]

227.   S.B. 12 amends the Texas Penal Code to create a new criminal offense that the district and county attorneys have a specific duty to enforce on behalf of the state.[214] Recent precedent from the Texas Court of Criminal Appeals makes clear that district and county attorneys have the specific duty to enforce state criminal law. In *State v. Stephens*, 663 S.W.3d 45 (Tex. Crim. App. 2021), the Court of Criminal Appeals held that enforcing criminal law is "the specific duty of county and district attorneys." *Id.* at 52.

228.   Further, the newly enacted law House Bill 17 ("H.B. 17") emphasizes the duty of district attorneys to enforce criminal laws of Texas. H.B. 17, which went into effect on September 1, 2023, establishes that district attorneys may be removed from office if they adopt any policy that "prohibits or materially limits the enforcement of any criminal offense." H.B. 17 § 1. Both the district attorney for

---

[213]   *See also* Trial Tr., Vol. 1, 39:24-40:1 ("I think we have to distinguish the district attorney [for Montgomery County], because we believe he is a state official in this case.").

[214]   S.B. 12 § 3 (Proposed Tex. Penal Code § 43.28).

Bexar County and the Travis County Attorney confirmed that they cannot disavow prosecution of criminal offences like the one at issue here.[215]

229.   Thus, the Court concludes that the district and county attorney defendants have a specific duty to enforce section 3 of S.B. 12. *See Longoria v. Paxton*, No. 22-50110, 2022 WL 832239, at *2 (5th Cir. Mar. 21, 2022) (relying on *Stephens* to find that Attorney General was not proper party in a challenge to criminal provisions but allowing suit to go forward against district attorneys); *Ostrewich v. Tatum*, 72 F.4th 94, 102 (5th Cir. 2023) (similar). *Nat'l Press Photographers Ass'n v. McCraw,* 504 F. Supp. 3d 568, 583 (W.D. Tex. 2020) (district attorney's duty to enforce state law sufficient to satisfy *Ex parte Young*).

230.   Additionally, as Plaintiffs note in their briefing, Dkt. 70 at 18 n.11, the Travis County Attorney has a specific duty to enforce Section 2 of S.B. 12. Section 2 amends Local Government Code Chapter 243, which is entitled "Municipal and County Authority To Regulate Sexually Oriented Business." Section 243.010 of that Chapter authorizes municipalities and counties to bring suit in district court to enforce violations of regulations adopted under the chapter. In turn, the Travis County Municipal Code specifically grants that enforcement authority to the county

---

[215]   Trial Tr., Vol. 2, 111:21-112:1 ("He indisputably has the authority to prosecute violations of criminal laws that occur within Bexar County and the plaintiffs are absolutely correct that no district attorney or prosecutor in the state can basically disavow an intent to prosecute any criminal offense in the state."); *id.* 112:10 (Travis County Attorney agreeing with Bexar County district attorney).

attorney. *See* Travis County Municipal Code § 250.129(c) (authorizing the Travis County Attorney to bring suit seeking injunctive relief for violation of regulations concerning sexually oriented businesses). Accordingly, the Travis County Attorney has specific enforcement authority over Section 2 of S.B. 12.

231. The district and county attorneys argue that the *Ex parte Young* exception is not satisfied because Plaintiffs have not demonstrated any affirmative steps taken by them to enforce S.B. 12. The Court is not persuaded. This is a pre-enforcement facial challenge. Under recent Supreme Court precedent and this Circuit's precedent concerning pre-enforcement challenges, Plaintiffs need not show an affirmative step taken by defendants to enforce the law.

232. In *Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021), the Supreme Court held that, with respect to a pre-enforcement challenge, *Ex parte Young* requires nothing more than the defendant have a specific duty to enforce the challenged statute. There, "[e]ight Members of the Court h[e]ld that sovereign immunity does not bar a pre-enforcement challenge to [the challenged law] against" licensing officials who had a duty to enforce part of the challenged statutory scheme. *Whole Woman's Health*, 142 S. Ct. at 525. The Court explained that *Ex parte Young* applied because "[e]ach of these individuals is an executive licensing official who may or must take enforcement actions against the petitioners if they violate the terms of Texas's Health and Safety Code, including [the challenged law]." *Id.* at 535-36.

The Court reached this conclusion even though none of the licensing officials had taken an "affirmative action" towards enforcement, as County Defendants demand here. *See id.*; *see also id.* at 542. (Thomas, J., dissenting in part) (noting that the Court applied *Ex parte Young* even though "none of the licensing officials has threatened enforcement proceedings against petitioners").

233.    In rejecting the dissent's argument that more was required for *Ex parte Young* to apply, the Court concluded that:

> The petitioners have plausibly alleged that [the challenged law] has already had a direct effect on their day-to-day operations. And they have identified provisions of state law that appear to impose a duty on the licensing-official defendants to bring disciplinary actions against them if they violate [the challenged law]. In our judgment, this is enough . . . to suggest the petitioners will be the target of an enforcement action and thus allow this suit to proceed.

*Whole Woman's Health*, 142 S. Ct. at 536–37.

234.    The Supreme Court's holding is consistent with the Fifth Circuit's precedent regarding pre-enforcement challenges to newly enacted laws—which, as discussed above, do not require that the defendant has taken an affirmative step of enforcement. *Speech First*, 979 F.3d at 335; *Ostrewich*, 72 F.4th at 102.

235.    The cases cited by the district and county attorneys do not compel the Court to find otherwise. Most of the cases either do not concern a pre-enforcement challenge or they fail to grapple with the controlling *Whole Woman's Health* decision. Further, most of the authority merely stands for the proposition that a

properly named defendant is the one tasked with enforcing the law.[216] Here, Plaintiffs have sued those individuals.

236.    Therefore, the Court finds that, under the *Ex parte Young* exception to sovereign immunity, the district attorneys are properly named defendants with respect to Plaintiffs' challenge to Section 3 of S.B. 12 and the county attorney is a properly named defendant with respect to Section 2 and 3 of S.B. 12.

### 3.    The County and City Defendants

237.    Plaintiffs have also named two counties (Montgomery and Taylor) and one city, Abeline, as Defendants. Again, Plaintiffs have sued the actors charged with enforcement of S.B. 12. Section 2 of S.B. 12 specifically prohibits counties and cities

---

216    In *Air Evac EMS, Inc. v. Texas, Department of Insurance, Division of Workers' Compensation*, 851 F.3d 507 (5th Cir. 2017), the Fifth Circuit analyzed its Ex parte Young jurisprudence and observed that the cases, including *Ex parte Young* itself, often turn on whether the defendant had "authority to enforce the statute at issue" or a "specific means through which to apply" the challenged statute. *Id.* at 518-19. In *Texas Democratic Party*, 978 F.3d 168, the Court considered a challenge to Texas' vote by mail rules that limited no-excuse voting to only those over the age of 65. Ultimately, the Court concluded that the Secretary of State satisfied the Ex parte Young exception to sovereign immunity precisely because she was statutorily tasked with creating the application form that contained the challenged rule. *Id.* at 180 ("[T]he Secretary's specific duties regarding the application form under Section 31.002 are enough for us to conclude that the Secretary has at least a scintilla of enforcement authority for Section 82.003."). In contrast, in *Texas Alliance for Retired Americans v. Scott*, No. 20-40643, 2022 WL 795862, at *2 (5th Cir. 2022), the court held that the Secretary of State was not a proper defendant under *Ex parte Young* because local officials were instead tasked with enforcing the law at issue.

from authorizing sexually oriented performances on public property. This Court finds that the County and City Defendants are properly named.

238.   The Supreme Court has long held that counties and municipalities are not immune from suit, and that suit may be brought against "those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Further, it is clear that that counties and cities are properly named persons for § 1983 claims. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).

239.   This is a pre-enforcement challenge before a law has gone into effect. No county or city defendant has disavowed S.B. 12—much less put forth compelling evidence to show that they will not comply with it. As discussed above, in a pre-enforcement challenge to a new law, the absence of such a disavowal is sufficient to establish the inference that defendants will take unconstitutional enforcement action—which for the city and county defendants will occur through their relevant policy makers. *See Speech First*, 979 F.3d at 335. Under these unique circumstances—a pre-enforcement challenge to a law that specifically charges the municipal defendants with action—the Court finds that the county and city defendants are properly named.

240.   The Court is not persuaded by the cases cited by Defendants, which primarily concern actors in the judicial system who at times act for the state rather than the County. *See, e.g.*, *Arnone v. Cnty. of Dallas Cnty.*, 29 F.4th 262, 266 (5th Cir. 2022) (referring to the "dual-hat" problem); *Daves v. Dallas Cnty.*, 22 F.4th 522, 533 (5th Cir. 2022) (judges that set bail schedules were acting for the state); *McMillian v. Monroe Cnty.*, 520 U.S. 781, 784-85 (1997) (in suit regarding suppression of evidence, under Alabama law, sheriffs act for the state when executing their duties).

241.   The county and city defendants do not contend that they or their relevant policy makers—the city council or commissioners' courts—wear dual hats in the same way that a sheriff or judge might. Accordingly, when they enforce S.B. 12—as this Court is required to presume in a pre-enforcement challenge absent disavowal from the defendants—they will be acting for the county or city and violating Plaintiffs' constitutional rights. That is enough for them to be properly named defendants. *See, e.g.*, *Cooper v. Dillon*, 403 F.3d 1208, 1223 (11th Cir. 2005) (police chief's "decision to enforce an unconstitutional statute against Cooper constituted a 'deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy.'"); *Evers v. Custer Cnty.*, 745 F.2d 1196, 1203 (9th Cir. 1984) (rejecting

argument that because County was following state law it was immune from suit for its unconstitutional actions).

242.   This result is also consistent with the aim of *Monell* to discourage local officials from violating the U.S. Constitution: "The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights." *Owen v. City of Independence*, 445 U.S. 622, 651–52 (1980).[217]

243.   Accordingly, the Court finds that the County and City defendants are properly named and not immune from suit.

### D.   S.B. 12 Is Not Severable

244.   "Whether unconstitutional provisions of a state statute are severable 'is of course a matter of state law.'" *Nat'l Fed'n of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202, 210 (5th Cir. 2011) (citation omitted). The Texas Supreme Court has noted that when considering severability "[t]he point is not whether they are contained in the same section . . . but whether they are essentially and inseparably

---

217   If the municipal defendants are correct that they are not directly liable under *Monell* because they are acting for the state, they would still be subject to suit as officials of the state—a result contemplated by the Fifth Circuit. *See, Daves*, 22 F.4th at 542 (noting possibility that municipal parties acting as agent of the State could be sued under *Ex Parte* Young); *see also Dream Defs. v. DeSantis*, 553 F. Supp. 3d 1052, 1090 (N.D. Fla. 2021) (in pre-enforcement challenge finding that county sheriff was subject to suit as arm of the state).

connected in substance." *Rose v. Drs. Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990) (citing *Western Union Telegraph Co. v. State*, 62 Tex. 630 (1884)); *see also Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 538 (5th Cir. 2013) (citing *Rose* in determining that an ordinance was not severable).

245.    Under this test, it is clear that S.B. 12 is not severable, even though it contains a severability clause.[218] Each section of S.B. 12 is inseparably connected in substance to the creation of a new category of regulated expressive activity called "sexually oriented performances."[219] Although S.B. 12 places the definition of "sexually oriented performances," in Section 3, Sections 1 and 2 explicitly incorporate that definition in their proposed regulations of "sexually oriented performances."[220] As discussed below, it is the attempt to impermissibly target expressive activity through the vague and overbroad definition of "sexually oriented performances" that renders S.B. 12 unconstitutional. "When the unconstitutional portion [of S.B. 12] is stricken out"—namely, though not exclusively, Proposed Tex.

---

[218]    *See* S.B. 12 § 4.

[219]    *See* S.B. 12 § 3 (Proposed Tex. Penal Code § 43.28 (a) (defining "sexually oriented performances").

220    *See* S.B. 12 § 1 (Proposed Tex. Health & Safety Code § 769.001 (2) (incorporating Section 3's definition of "sexually oriented performances")); *id.* (Proposed Tex. Health & Safety Code § 769.002 (prohibiting commercial enterprises from allowing a sexually oriented performance to occur in the presence of someone under the age of 18); S.B. 12 § 2 (Proposed Local Gov't Code § 243.001(a) (incorporating Section 3's definition of "sexually oriented performances")); *id.* ((Proposed Local Gov't Code § 243.001(c)) (prohibiting counties and municipalities from allowing sexually oriented performances on public property).

Penal Code § 43.28—what remains is incomplete and incoherent. *Rose*, 801 S.W.2d at 844. Accordingly, the Court finds that S.B. 12 is not severable.

**E.     S.B. 12 Is an Unconstitutional Content and Viewpoint-Based Restriction**

246.   Only the Attorney General in this case seeks to defend S.B. 12 on the merits, but the Court finds that this law is unconstitutional.

### 1.     Plaintiffs' Performances Are Protected by the First Amendment

247.   The Plaintiffs in this case organize, host, and perform in drag shows that are affected with a constitutional interest and shielded by the First Amendment. The Attorney General's argument that Plaintiffs' performances fall outside the scope of First Amendment protections because they do not convey one single, particularized message is foreclosed by Supreme Court precedent.

248.   In *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, the Supreme Court explained that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' . . . would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." 515 U.S. 557, 569 (1995) (internal citation omitted).

249.   Even performances held primarily for entertainment have been found to be expressive conduct shielded by the First Amendment. *See, e.g.*, *D. Houston*

*Inc. v. United States Small Bus. Admin.*, 579 F. Supp. 3d 959, 966 (S.D. Tex. 2020) (Hittner, J.) ("Exotic dancing is within the range of speech that receives First Amendment protection."); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 499 (1952) (finding films and movies are protected by the First Amendment even if aimed primarily at commercial entertainment); *Schacht v. United States,* 398 U.S. 58, 61– 62 (1970) (holding an "amateurish and perhaps unappealing . . . street skit" to be protected First Amendment expression and noting that "[s]ince time immemorial, . . . theatrical performances, often performed by amateurs, have played an important part in the entertainment and the education of the people of the world"); *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 390 (4th Cir. 1993) (finding that a fraternity "ugly woman contest" is protected expressive conduct).

250.   As the Supreme Court recognized in *Southeast Promotions, Ltd. v. Conrad*, "live drama is [not] unprotected by the First Amendment—or subject to a totally different standard from that applied to other forms of expression." 420 U.S. 546, 557–58 (1975) (invalidating a prior restraint on the Broadway musical *Hair*). Even where performers are "acting," "singing," or "frequently mix[ing] speech with live action or conduct," they still find shelter under the First Amendment and it does not matter whether audiences come away from their shows with conflicting messages or no message at all. *Id.*

70

251.   Every federal court decision to consider this issue has also found that drag performances are protected by the First Amendment. *See, e.g.*, *Norma Kristie, Inc. v. City of Oklahoma City*, 572 F. Supp. 88, 91 (W.D. Okla. 1983) (rejecting the government's contention that a "'Miss Gay America Pageant' is not accorded Constitutional protection because it is a commercial enterprise and not a noteworthy artistic endeavor such as a play or musical"); *Friends of Georges, Inc. V. Mulroy*, 2023 WL 3790583 (W.D. Tenn. June 2, 2023) (permanently enjoining a law that sought to ban drag under the guise of "adult cabaret entertainment" and specifically incorporated every element of the *Miller* test); *HM Fla.-ORL, LLC v. Griffin*, No. 6:23-CV-950-GAP-LHP, 2023 WL 4157542, at *9 (M.D. Fla. June 23, 2023) (holding that Florida's law targeting drag performances under the guise of "adult live performances" likely violates the First Amendment and is vague and overbroad); *S. Utah Drag Stars v. City of St. George*, No. 4:23-CV-00044-DN-PK, 2023 WL 4053395, at *27 (D. Utah June 16, 2023) (finding "drag shows of a nature like the planned Allies Drag Show are indisputably protected speech and are a medium of expression" shielded by the First Amendment); *Imperial Sovereign Ct. of Montana v. Knudsen*, No. CV 23-50-BU-BMM, 2023 WL 4847007, at *7 (D. Mont. July 28, 2023) (granting a temporary restraining order to stop a state law prohibiting public drag performances under the label of "sexually oriented shows").

71

252.   The Attorney General relies on *Texas v. Johnson* to argue that Plaintiffs must establish that an "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." 491 U.S. 397, 404 (1989). That case involved an incident of flag burning, and the Supreme Court asked whether a pure act of conduct might be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Id.* (quoting *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974)).

253.   The Supreme Court has never applied this requirement of a "particularized message" to music, *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), movies, *Wilson*, 343 U.S. at 495, parades, *Hurley,* 515 U.S. at 557, or live performances, *Schacht,* 398 U.S. at 58, which are inherently expressive by their very nature. Indeed, even nude dancing is inherently expressive and shielded by the First Amendment. *D. Houston Inc.*, 579 F. Supp. 3d at 966. There is no reason why drag performances (or other types of performances impacted by S.B. 12) could be categorically excluded from First Amendment protections. This Court holds that Plaintiffs' drag performances are indisputably protected by the First Amendment.

254.   The Attorney General cites *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, to claim that drag performances might fall beyond First Amendment protections, but that case does not diminish the unbroken line of authority cited

above. 547 U.S. 47, 65 (2006) ("*FAIR*"). *FAIR* rejected a First Amendment challenge to the Solomon Amendment, which allows the Department of Defense to deny federal funds to law schools that prohibit or impede military representatives from participating in on-campus recruiting. 547 U.S. at 55. Because the Court found that no observer could possibly know why military recruiters were not present on campus absent accompanying speech, the law schools' decision to exclude them was considered pure conduct and not an inherently expressive activity. *Id.* A decision not to allow recruiters on campus is starkly different from Plaintiffs' performances here, which are filled with messages, meaning, and creative and expressive elements.

255.   To the extent that the Attorney General is correct that Plaintiffs' performances must convey a "particularized message" to find shelter within the protections of the First Amendment, the Court finds that Plaintiffs' performances convey particularized messages that likely would be understood by some people who view them. For example, the performances at The Woodlands Pride events convey messages of celebration, equality, and acceptance for attendees in suburban area; of strength and solidarity with the LGBTQ+ community; and of liberation.[221] The Abilene Pride Alliance testified that in their community, "our drag performers are kind of a nexus of belonging. It's a way for people in our community to see

---

[221]   *See* Trial Tr., Vol. 1 178:10-179:1; 185:8-187:1; 202:11-17.

themselves represented on a larger scale."[222] Extragrams' performances convey messages of celebration and express the "overdramatization of a character or a gender."[223] 360 Queen Entertainment testified that "every drag queen tries to articulate something different through their performance art," and cited how one performer conveys messages of race and social justice through music and dance.[224] Brigitte Bandit testified that "[d]rag is an art form in which somebody can express themselves in or outside gender norms and expectations."[225] She uses her drag performances to "share [a] message of kindness and respect and accepting of other people" and to convey political messages.[226] Plaintiffs' performances are inherently expressive and are protected by the First Amendment.

### 2.     S.B. 12 Is Content and Viewpoint-Based and Subject to Strict Scrutiny

256.   S.B. 12 is a content-based restriction that regulates Plaintiffs' drag performances and other kinds of performances based on the content of those performances. The statute on its face explicitly regulates the content of performances by defining five categories of "sexual conduct" and restricting and prohibiting performances that involve "sexual conduct" or a performer who is nude and

---

[222]     *Id.* 121:4-6.
[223]     *Id.* 44:24-45:3, 45:9-17, 54:21-23, 57:1-5.
[224]     *Id.* 102:4-10.
[225]     *Id.* 234:1-2. *See also id.* 235:12-22.
[226]     *Id.* 234:11-235:1.

"appeal[] to the prurient interest in sex." S.B. 12 § 3 (proposed Tex. Penal Code § 43.28(a)).

257.   The Attorney General appears to argue that S.B. 12 is content neutral because it does not treat drag shows any differently from other sexually oriented performances.[227] But this argument confuses viewpoint discrimination with content neutrality. S.B. 12 is content-based discrimination because it regulates all "sexually oriented performances" based on the content of those performances. Because S.B. 12 restricts and limits performances based on their content, its content-based nature is "obvious, defining regulated speech by particular subject matter." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163–64 (2015). The law is therefore "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Id.*

258.   Government discrimination among viewpoints—or the regulation of speech based on "the specific motivating ideology or the opinion or perspective of the speaker"—is a "more blatant" and "egregious form of content discrimination." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The Court further finds that part of S.B. 12 is viewpoint-based because it specifically prohibits "the exhibition of sexual gesticulations using accessories or prosthetics that

---

[227]   *See id.* 19:21-20:4.

*exaggerate* male or female sexual characteristics."[228] This provision of S.B. 12 goes beyond mere content discrimination because it prohibits individuals from "exaggerat[ing]" male or female sexual characteristics and not merely exhibiting them. This exemplifies a governmental preference on the viewpoint of how performers should express their gender and prohibits performers from exaggerating gender through certain performances. While this viewpoint discrimination is evident based on the text of the statute itself, it is also bolstered by the legislative history of S.B. 12, where the Statement of Intent and lawmaker statements evince an intent to target drag performances,[229] primarily through prohibiting "the exhibition of sexual gesticulations using accessories or prosthetics that *exaggerate* male or female sexual characteristics."[230]

### 3.   The Attorney General's Attempts to Avoid Strict Scrutiny Are Unavailing

259.   The Attorney General tries to avoid strict scrutiny by claiming that "States may restrict minors' access to sexual materials without violating the First Amendment." Dkt. 52 at 29. This assertion is unsupported by Supreme Court precedent, which requires all content and viewpoint-based laws to be subject to strict scrutiny, even where those laws are solely aimed at or limited to minors. *See Brown*

---

[228]   S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(E)).
[229]   *See, e.g.,* Plaintiffs' Trial Exhibits 6 and 11.
[230]   S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(E)).

*v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (applying strict scrutiny and invalidating a state law applying only to minors and prohibiting the sale of violent video games). While acknowledging the state's compelling interest in protecting children, the Supreme Court has consistently rejected attempts to sidestep First Amendment strict scrutiny. *See, e.g.*, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 811 (2000) (applying strict scrutiny even where "[t]he overriding justification for the regulation is concern for the effect of the subject matter on young viewers"); *Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 754 (1996) (applying strict scrutiny and invalidating a rule limiting "'patently offensive' sex-related material" based on the government's interest in "protecting the physical and psychological well-being of minors") (cleaned up); *Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 129 (1989) (applying strict scrutiny and invalidating a "ban on both obscene and indecent telephone communications" because there were "less restrictive means . . . to achieve the Government's interest in protecting minors").

260.   *Reno v. American Civil Liberties Union*, 521 U.S. 844, 874 (1997), relied on by the Attorney General, Dkt. 52 at 29, underscores the unconstitutionality of S.B. 12. There, the Supreme Court applied strict scrutiny and invalidated part of a statute prohibiting communications on the internet that were "obscene or indecent, knowing that the recipient of the communication is under 18 years of age." *Id.* at

859. "Notwithstanding the legitimacy and importance of the congressional goal of protecting children from harmful materials," the Court still found the law to violate the First Amendment and held that it was an impermissible content-based restriction on speech, facially overbroad, and unconstitutionally vague. *Id.* at 849. The government argued that it could prohibit materials for minors beyond the three-part obscenity test established in *Miller v. California*, 413 U.S. 15 (1973), and used one term from this test—"patently offensive"—in the statute at issue. But, as is the problem with S.B. 12 and its free-floating "prurient interest" requirement, the Supreme Court found that isolating one term from the *Miller* test and divorcing it from the other critical factors was constitutionally infirm. *Id.* at 873.

261.   The only other case cited by the Attorney General to claim sweeping authority for the state to restrict access to performances for minors is *Ginsberg v. State of New York*, 390 U.S. 629 (1968), Dkt. 52 at 29, but this case underscores the need for guardrails of the type missing from S.B. 12. *Ginsberg* upheld a New York law that prohibited the sale of magazines to people under the age of 17 that contained nude photos, were harmful to minors, and "(i) predominantly appeal[ed] to the prurient, shameful or morbid interest of minors, [] (ii) [were] patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and (iii) [were] utterly without redeeming social importance for minors." *Id.* at 632–33.

262.     Although *Ginsberg* predates *Miller*, it previewed important aspects of the three-part obscenity test and specifically found that the material targeted by this regulation was obscene for minors. The *Ginsberg* Court noted that "the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children," *id. at 639*, and the law contained an affirmative defense for any salesperson who made an "honest mistake" and a "reasonable bona fide attempt to ascertain the true age of such minor." S.B. 12 provides no such guardrails and goes far beyond *Ginsberg* to prohibit all performances where minors might be present, regardless of "social importance" or value, honest mistakes, or if parents choose to bring their teenagers to a show that they believe to be age-appropriate.

263.     The Attorney General urges the Court to apply intermediate scrutiny by trying to analogize to cases involving the secondary effects doctrine. *See* Dkt. 52 at 29-30. The secondary effects doctrine applies to zoning regulations on sexually oriented business that are enacted due to concerns about "the secondary effects of such [performances] on the surrounding community, namely, at crime rates, property values, and the quality of the city's neighborhoods." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002) (upholding an ordinance after "the city of Los Angeles conducted a comprehensive study of adult establishments and concluded

that concentrations of adult businesses are associated with higher rates of prostitution, robbery, assaults, and thefts in surrounding communities").

264.   The secondary effects doctrine does not apply here because the *primary effect* of S.B. 12 is to regulate the content of performances. As discussed above, the plain language of S.B. 12 constitutes a content and viewpoint-based restriction. The legislative history also confirms the statute's purpose and intent is to respond to a "recent cultural trend has been for drag shows to be performed in venues generally accessible to the public, including children."[231]

265.   Further, as the Court finds below, S.B. 12 fails to satisfy even intermediate scrutiny, so applying the secondary effects doctrine to this law, as the Attorney General urges, would still render it unconstitutional.

### 4.   S.B. 12 Is Not Narrowly Tailored and Is Therefore Unconstitutional

266.   The Court finds that S.B. 12 is not narrowly tailored and fails both strict and intermediate scrutiny.

267.   S.B. 12 could have been more narrowly drawn in multiple ways, including by creating an exception that allows for parental choice. S.B. 12 also could have incorporated more or all of the three-part obscenity test from *Miller v. California*, 413 U.S. 15, 24 (1973), contained affirmative defenses, or differentiated

---

[231]    *See, e.g.,* Plaintiffs' Trial Exhibit 11.

between minors who are 17 and those in pre-school. The Attorney General stated at trial that the law is "is still narrowly tailored, because to carve out exceptions like that would, I think, create a lot of mischief under this law."[232] But the Attorney General cites no support for this proposition, and—as further discussed below—the broad and vague reach of S.B. 12 goes far beyond any statute that the Attorney General can point to as having survived either strict or intermediate scrutiny. Because S.B. 12 could be more narrowly drawn in numerous ways, it is not narrowly tailored and is unconstitutional.

268. The testimony Michael Arambula, M.D. would have given is inadmissible under Federal Rule of Evidence 702 in that it is irrelevant and would not help the trier of fact decide a fact in issue. But to the extent that the Court could have taken Dr. Arambula's testimony into account, it would not show that S.B. 12 is narrowly tailored, even under intermediate scrutiny. S.B. 12 is therefore unconstitutional content and viewpoint-based discrimination.

---

[232]   Trial Tr., Vol. 2, 2-43:6-8.

### F.     S.B. 12 Is Unconstitutionally Overbroad

269.   S.B. 12 is facially unconstitutionally overbroad because a significant number of its applications are unconstitutional, considering the statute's intended scope.[233]

270.   To the extent that S.B. 12's intended scope is to prohibit obscene performances from being viewed by minors, the Court finds that such performances are already proscribed by Texas law. The Texas Penal Code already prohibits anyone from "produc[ing], present[ing], or direct[ing] an obscene performance or participate[ing] in a portion thereof that is obscene or that contributes to its obscenity" while "knowing its content and character." Tex. Penal Code § 43.23.

271.   The Texas Penal Code defines obscenity in accordance with the longstanding test from *Miller v. United States*, 413 U.S. 15 (1973), as "material or a performance that: (A) the average person, applying contemporary community standards, would find that taken as a whole appeals to the prurient interest in sex; (B) depicts or describes: (i) patently offensive representations or descriptions of ultimate sexual acts . . . and (C) taken as a whole, lacks serious literary, artistic, political, and scientific value." Tex. Penal Code § 43.21(a)(1).

---

[233]     The Attorney General suggests that Plaintiffs must show that S.B. 12 is unconstitutional in all of its applications, but that standard does not apply in the First Amendment context for a facial challenge. *United States v. Stevens*, 559 U.S. 460, 473 (2010).

272.    S.B. 12 departs from this well-established standard in critical ways that make it unconstitutionally overbroad. First, S.B. 12 cherry-picks the words "appeals to the prurient interest in sex" and divorces them from key components of the first factor of the *Miller* test. S.B. 12 does not specify who may determine what "appeals to the prurient interest in sex" or under what standard. Contrary to the *Miller* test and existing Texas law, S.B. 12 does not require that "the average person, applying contemporary community standards" must evaluate the work "taken as a whole."[234]

273.    S.B. 12 also contains no requirement that the work be "patently offensive" and has no exception for works of "serious literary, artistic, political, and scientific value."[235] As the Supreme Court has found, "[e]ach of *Miller*'s additional two prongs . . . critically limits the uncertain sweep of the obscenity definition." *Reno*, 521 U.S. at 873. Without these limitations, S.B. 12 sweeps within its orbit significant amounts of ordinary, non-obscene, and constitutionally protected performances.

274.    As explained above, Plaintiffs have established that their performances are affected with a constitutional interest and are arguably proscribed by S.B. 12. But the overbreadth doctrine also allows Plaintiffs to vindicate the rights of third parties whose performances would also be swept up and affected by this statute. *See*

---

[234]    Tex. Penal Code § 43.21(a)(1)(A).
[235]    Tex. Penal Code § 43.21(a)(1)(B)-(C).

*United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023) ("[T]he overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied.").

275.   Here, the Court finds that the applications of S.B. 12 that extend beyond already existing Texas laws are substantially and unconstitutionally overbroad.

276.   For example, S.B. 12 applies to any type of "visual performance,"[236] including but not limited to theater, dancing, television, art, or sports. Because S.B. 12 fails to define the term "performer" and explicitly states that someone commits a violation "regardless of whether compensation for the performance is expected or received,"[237] it could arguably apply to nearly everyone, including someone simply dancing at a Pride festival or public park.

277.   The five-part test for "sexual conduct" is particularly broad and problematic. *First*, since the phrase "the exhibition or representation, actual or simulated, of sexual acts"[238] is open-ended and undefined, it could apply to any type of hug, kiss, thrusting of the hips, or other suggestive movement.

---

[236]   S.B. 12 § 3 (proposed Tex. Penal Code § 43.28(a)(2)).
[237]   *Id.*
[238]   S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(A)).

278.   *Second*, the "exhibition or representation, actual or simulated, of male or female genitals in a lewd state, including a state of sexual stimulation or arousal"[239] could include non-obscene cartoons, putting condoms on bananas, or a showing of Michelangelo's *David* or Botticelli's *Birth of Venus.* And, as further explained below, the word "lewd" is vague and does not limit the overbroad sweep of this provision.

279.   *Third*, the provision prohibiting the "exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals"[240] is so broad that it could chill the speech of a sexual education instructor who uses a sex toy as a prop or a comedian who holds one on stage for comedic effect.

280.   *Fourth*, the regulation of "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person"[241] sweeps so broadly that it could prohibit a performer from even giving a friendly front-facing hug to another person on stage. It severely limits most types of dancing, where performers often touch or simulate touching one other, or professional sports, where athletes might slap one another's butts.

---

[239]   *Id.* (proposed Tex. Penal Code § 43.28 (a)(1)(B)).

[240]   *Id.* (proposed Tex. Penal Code § 43.28 (a)(1)(C)).

[241]   *Id.* (proposed Tex. Penal Code § 43.28 (a)(1)(D)).

281.   *Fifth*, the prohibition of any "exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics"[242] is so vastly broad that it could restrict someone from using a wig, earrings, fake eyelashes, or a pushup bra while doing anything that could be construed as "sexual" in any way.

282.   In isolation and taken together, each of these aspects of the definition of "sexual conduct" sweeps within its ambit significant constitutionally protected activities that are disproportionate to the statute's intended scope. Because the requirement that the performance "appeals to the prurient interest in sex" does not provide a constitutionally adequate guardrail, S.B. 12 is facially overbroad and unconstitutional.

283.   The statute's definition of "nude" is also overbroad and problematic. S.B. 12 borrows a definition of "nude" from the Business and Commerce Code that it incorporates into the Penal Code. This definition includes anyone who is "entirely unclothed" or "clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks."[243] That definition applies only to "sexually oriented businesses" in Texas that are "intended

---

242    *Id.* (proposed Tex. Penal Code § 43.28 (a)(1)(E)).
243    Tex. Bus. & Com. Code § 102.051.

to provide sexual stimulation or sexual gratification to the customer,"[244] and it does not prohibit all nudity in Texas. The Penal Code only prohibits indecent exposure if someone "exposes his anus or any part of his genitals with intent to arouse or gratify the sexual desire of any person, and he is reckless about whether another is present who will be offended or alarmed by his act."[245]

284.   S.B. 12 significantly broadens this definition and erases the intent requirement for indecent exposure. Section 1 of S.B. 12 threatens businesses with civil penalties and injunctions under a strict liability standard. With respect to Section 3, even if the Court applies the *mens rea* standard of recklessness, knowledge, or intent from the Texas Penal Code that could apply to the section on criminal penalties,[246] a recklessness standard is still a lower threshold than currently exists in Texas law for a performer who might have a wardrobe malfunction.

285.   The Attorney General insisted at trial that performers "need to be careful not to expose themselves, just like everyone else needs to be careful."[247] This provides little comfort to the strict liability imposed to anyone who controls a commercial enterprise or performers who still could be accused of being "reckless"

---

[244]   Tex. Loc. Gov't Code § 243.002.
[245]   Tex. Penal Code § 21.08(a).
[246]   *See* Tex. Penal Code § 6.02(c) ("If the definition of an offense does not prescribe a culpable mental state, but one is nevertheless required . . . intent, knowledge, or recklessness suffices to establish criminal responsibility.").
[247]   Trial Tr., Vol. 2, 80:21-25.

simply for a mishap that exposes "any portion" of their buttocks while wearing a swimsuit or leotard, or "any portion of the breasts below the top of the areola" if the person is female and wears a low-cut shirt that shows too much cleavage.[248]

286.   Because S.B. 12 seeks to ban all nudity that might appeal to the prurient interest in sex on all public property in Texas,[249] it would also apply to circumstances that are entirely adults-only, such as a nude beach where only adults are permitted. S.B. 12 therefore sweeps far beyond its permissible applications of preventing minors from seeing obscene performances and is unconstitutionally overbroad.

### G.   S.B. 12 Is Unconstitutionally Vague

287.   A law is unconstitutionally vague if it fails to provide "a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008).

288.   A more stringent vagueness test is required for S.B. 12 because it regulates free expression and imposes criminal penalties. *Nat'l Press Photographers Ass'n v. McCraw*, 594 F. Supp. 3d 789, 809 (W.D. Tex. 2022).

---

[248]   *See* Tex. Bus. & Com. Code § 102.051; *see also* Tr. Vol. 2 62:14-16 (testifying that a wardrobe malfunction "happens often").
[249]   S.B. 12 § 2 (proposed Tex. Loc. Gov't Code § 243.0031(b)-(c)).

289.   Plaintiffs testified at trial that they do not fully understand what all is prohibited by S.B. 12 because the statute is vague. For example, Kerry Lynn Sieff from Extragrams testified that the term "prurient interest in sex" is "vague. I don't know how to explain it really,"[250] and that she fears "that due to the vagueness of this law and with it being open to interpretation that I will not be able to clearly direct my performers on what exactly to do or not to do."[251] Other Plaintiffs similarly testified that they do not understand the term "prurient interest in sex" or other key aspects of S.B. 12, but they still reasonably fear that the law will be applied to them and they could face civil and criminal penalties.[252]

290.   Plaintiffs' understanding of the terms of this law comport with the Court's conclusion that a reasonable person would view S.B. 12 as vague, undefined, and so broadly defined that the law fails to provide constitutionally adequate notice of what it proscribes.

291.   For example, S.B. 12 fails to define the terms "performer" or "performance."[253] It is not clear whether the law could subject Plaintiffs and others to liability if someone attending a Pride event who starts dancing and has a wardrobe malfunction would be considered a "performer" at the event. Likewise, a medical

---

[250]   Trial Tr. Vol. 1, 62:4-5.

[251]   *Id.* 64:7-9.

[252]   Trial Tr. Vol. 1, 128:13-129:3; *id.* 251:12-18.

[253]   S.B. 12 § 3 (proposed Tex. Penal Code § 43.28(a)(2)).

school could be subject to civil penalties for a demonstration involving the exhibition of genitals that might appeal to someone's prurient interest in sex, even if the school itself does not consider the demonstration to be a "performance."

292.   The law's definition of "nude" also does not clarify whether someone could be accused of violating the law simply for showing prosthetic or fake breasts, or whether it must be someone's actual breasts.[254] This could arguably lead to Brigitte Bandit being convicted of violating the law when she is topless wearing her breast plate, even when her actual breasts are fully covered.[255]

293.   S.B. 12's definition of "sexual conduct" is also vague and problematic. *First*, the phrase "the exhibition or representation, actual or simulated, of sexual acts"[256] is so open-ended that it fails to give adequate notice of what it proscribes. The law does not specify whether dance moves that might be common at Plaintiffs' events, blowing a kiss, or giving a hug could be considered "representation[s] . . . or simulat[ions] of sexual acts."

---

[254]   Tex. Bus. & Com. Code § 102.051.

[255]   Trial Tr. Vol. 2, 12:16-22 ("Would my breastplate be considered nude? Because it's not my actual breasts. I do have actual breasts; but with my breastplate, it's something that I'm wearing that looks like breasts. But are those breasts? Could I do that in an all-ages show? You know, it's just not clear what nude is, especially when it comes to drag performers.").

[256]   S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(A)).

294.    *Second*, the "exhibition or representation, actual or simulated, of male or female genitals in a lewd state"[257] is also subject to significant discretion and interpretation. Although the Attorney General tries to assert that the term "lewd" narrows the statute's reach, the Texas Court of Criminal Appeals has held that when the term "lewd" is used on its own in a statute, "we are left with no assistance beyond the word itself, which alone is too vague." *Courtemanche v. State*, 507 S.W.2d 545, 547 (Tex. Crim. App. 1974) (finding that "[w]hen used to describe conduct, and as the sole description of the conduct, as in the instant statutory provision, 'lewd or vulgar' is simply so vague 'that men of common intelligence must guess as to its meaning and differ as to its application.'") (internal citation omitted); *see also Osborne v. Ohio*, 495 U.S. 103, 136 (1990) ("Not surprisingly, States with long experience in applying indecency laws have learned that the word 'lewd' is 'too indefinite and uncertain to be enforceable.'). As written, S.B. 12 fails to give adequate notice about what kinds of representations of simulations of genitals could be considered "lewd," including famous works of art featuring genitals or the "packers" that Plaintiffs use in their performances to simulate a male bulge.[258]

---

[257]    *Id.* (proposed Tex. Penal Code § 43.28 (a)(1)(B)).
[258]    *See* Trial Tr. Vol. 1, 61:1-10; *id.* 123:9-11.

295.   *Third*, the "exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals"[259] is so vague and undefined that it could arguably apply to condoms or sexual lubricant exhibited at The Woodlands Pride Festival and Abilene Pride Alliance events, as well as the dildo used by Brigitte Bandit on stage for comedic effect.

296.   *Fourth*, the regulation of "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person"[260] is so open-ended that it could apply to a butt slap or performers dancing closely together.

297.   *Fifth*, the prohibition of any "exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics"[261] is so undefined that it could apply to nearly any type of dance move, accessory, or prosthetic used by the Dallas Cowboys' Cheerleaders or the Plaintiffs at various drag performances.

298.   Finally, as discussed above, the decision to divorce the phrase "appeals to the prurient interest in sex" from the limiting factors set forth in *Miller* renders that phrase vague and ambiguous. *See Reno*, 521 U.S. at 874 (finding that one aspect

---

[259]   S.B. 12 § 3 (proposed Tex. Penal Code § 43.28 (a)(1)(C)).
[260]   *Id.* (proposed Tex. Penal Code § 43.28 (a)(1)(D)).
[261]   *Id.* (proposed Tex. Penal Code § 43.28 (a)(1)(E)).

of the *Miller* test, on its own, is unconstitutionally vague and "unquestionably silences some speakers whose messages would be entitled to constitutional protection").

299.   Individually and collectively, the regulations of S.B. 12 fail to give adequate notice of what the law proscribes and will lead to arbitrary and discriminatory enforcement if the law is not permanently enjoined.

### H.   S.B. 12 Establishes an Unconstitutional Prior Restraint

300.   Section 2 of S.B. 12 states that no municipality or county may authorize a "sexually oriented performance" on public property or in the presence of an individual younger than 18 years of age, and it also grants municipalities and counties sweeping authority to "regulate" all other such performances with no specified limitations on such regulations.[262]

301.   No Defendant has responded to Plaintiffs' contention that Section 2 is an unconstitutional prior restraint on free expression. The Court finds that this section of the law is a prior restraint on free expression that bears a "heavy presumption [of] unconstitutionality." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990). S.B. 12 imposes an unconstitutional prior restraint in violation of the First Amendment because it prohibits certain communications before they occur and allows for excessive discretion in regulating speech. *Cath. Leadership Coal. of Tex.*

---

262   S.B. 12 § 2 (proposed Tex. Loc. Gov't Code § 243.0031(b)).

*v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014). This section of the law prohibits municipalities and counties from allowing "sexually oriented performances" anywhere on public property, even when held solely among adults. It also grants seemingly limitless discretion to regulate all such performances, even in private or commercial spaces. Such sweeping discretion is a clear prior restraint on free expression.

302.   S.B. 12 also lacks constitutionally adequate safeguards for imposing a prior restraint on expression. The prior restraint in Section 2 does not: (1) limit itself to a specified, brief period of time during which the status quo is maintained; (2) allow for prompt judicial review; or (3) impose on the censor the burdens of providing the basis to suppress the speech. *See N.W. Enters. v. City of Houston*, 352 F.3d 162, 193–94 (5th Cir. 2003). Because Section 2 of S.B. 12 lacks these safeguards, it is unconstitutional as a prior restraint on free expression.

*** 

303.   If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the following Conclusions of Law constitute Findings of Fact, they are adopted as such.

## ORDER

Based on the above findings of fact and conclusions of law, this Court declares S.B. 12 to be facially unconstitutional, in violation of the First and Fourteenth Amendments.

Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them are hereby permanently enjoined from enforcing S.B. 12.

Plaintiffs are awarded reasonable costs and attorneys' fees to be determined at a later date.

***

Signed on this _____day of September, 2023.

_____

Judge David Hittner

Respectfully submitted,

*/s/ Brian Klosterboer*                        */s/ Emily Rohles*
Brian Klosterboer, *attorney-in-charge*         Ali Andrews
TX Bar No. 24107833                             TX Bar No. 24059381
SDTX No. 3314357                                SDTX No. 2247339
Chloe Kempf                                     Emily Rohles
TX Bar No. 24127325                             TX Bar No. 24125940
SDTX No. 3852674                                SDTX No. 3715273
Thomas Buser-Clancy                             BAKER BOTTS L.L.P.
TX Bar No. 24078344                             910 Louisiana Street
SDTX No. 1671940                                Houston, TX 77002
Edgar Saldivar                                  Tel. (713) 229-1234
TX Bar No. 24038188                             Fax (713) 229-1522
SDTX No. 618958                                 Ali.Andrews@BakerBotts.com
Adriana Pinon                                   Emily.Rohles@BakerBotts.com
TX Bar No. 24089768
SDTX No. 1829959                                Derek McDonald
ACLU FOUNDATION OF TEXAS, INC.                  TX Bar No. 00786101
P.O. Box 8306                                   SDTX No. 18546
Houston, TX 77288                               Maddy Dwertman
Tel. (713) 942-8146                             TX Bar No. 24092371
Fax (713) 942-8966                              SDTX No. 3853795
bklosterboer@aclutx.org                         BAKER BOTTS L.L.P.
ckempf@aclutx.org                               401 S. 1st Street, Suite 1300
tbuser-clancy@aclutx.org                        Austin, TX 78704
esaldivar@aclutx.org                            Tel. (512) 322-2500
apinon@aclutx.org                               Fax (512) 322-2501
                                                Derek.McDonald@BakerBotts.com
                                                Maddy.Dwertman@BakerBotts.com

                                                Brandt Thomas Roessler
                                                TX Bar No. 24127923
                                                SDTX No. 3853796
                                                BAKER BOTTS L.L.P.
                                                30 Rockefeller Plaza
                                                New York, NY 10112
                                                Tel. (212) 408-2500
                                                Fax (212) 408-2501
*Attorneys for Plaintiffs*                      Brandt.Roessler@BakerBotts.com

## **CERTIFICATE OF SERVICE**

I hereby certify that, on September 6, 2023, a true and correct copy of the foregoing was served via the CM/ECF system to all counsel of record.


*/s/ Emily Rohles*
Emily Rohles