## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| THE WOODLANDS PRIDE, INC et al., | § § § | |
| *Plaintiffs*, | § | |
| | § | CIVIL ACTION NO.  4:23-cv-02847 |
| v. | § | |
| | § | |
| ANGELA COLMENERO et al., | § | |
| *Defendants.* | | |

---

### DEFENDANT COLMENERO'S PROPOSED FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

---

TO THE HONORABLE DAVID HITTNER:

Angela Colmenero, in her official capacity as Provisional Attorney General of Texas, appears pursuant to Federal Rule of Civil Procedure 52 to submit the following Proposed Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

**1.**      Plaintiffs filed suit on August 2, 2023, challenging the constitutionality of Texas Senate Bill 12 and seeking a permanent injunction enjoining its enforcement state-wide.

**2.**      Angela Colmenero has been sued in her official capacity as provision Attorney General for the State of Texas.

**3.**      On August 28-29, 2023, the Court conducted a trial on the merits.

**4.** On August 31, 2023, the Court issued a temporary restraining order enjoining the Defendants from enforcing SB 12 for 14 days.

**Senate Bill 12**

**5.** SB 12 was signed by Governor Abbott on June 18, 2023, and became law on September 1, 2023.

**6.** SB 12 contains three sections.

**7.** Section 1 of SB amended the Health and Safety Code to impose a civil penalty on persons who control the premises of a commercial enterprise and allow a sexually oriented performance to be presented on the premises in the presence of a minor. The Attorney General may enforce this provision. *See* Tex. Health & Safety Code §§ 769.001, .002

**8.** Section 2 of SB 12 amended the Local Government Code regarding Sexually Oriented Businesses and authorizes municipalities to regulate sexually oriented performances as they can regulate sexually oriented businesses. It also prohibits municipalities from allowing sexually oriented performances on public property or in the presence of minors. *See* Tex. Loc. Gov. Code § 243.0031.

**9.** Section 3 of SB 12 makes it a crime for a person to knowingly, intentionally, or recklessly engage in a sexually oriented performance on public property at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child, or in

the presence of a minor. *See* Tex. Pen. Code § 43.28); *see also* Tex. Pen. Code § 6.02(c) (requiring a culpable mental state).

**10.**   A "sexually oriented performance" is defined as:

(1)   "Sexual conduct" means:

(A)   the exhibition or representation, actual or simulated, of sexual acts, including vaginal sex, anal sex, and masturbation;

(B)   the exhibition or representation, actual or simulated, of male or female genitals in a lewd state, including a state of sexual stimulation or arousal;

(C)   the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals;

(D)   actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person; or

(E)   the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics.

(2)   "Sexually oriented performance" means a visual performance that:

(3)   (A)   features:

(i)   a performer who is nude, as defined by Section 102.051, Business & Commerce Code; or

(ii)   any other performer who engages in sexual conduct; and

(B)   appeals to the prurient interest in sex.

11.     In sum, SB 12 restricts the access of minors to sexually oriented performances that appeal to the prurient interest in sex but does not restrict the access of adults to such performances.

12.     The attorney general is only tasked with the enforcement of section 1 of SB 12 related to sexually oriented performances on premises of commercial enterprises. Tex. Health & Safety Code § 769.002(c)-(f). Section 2 of SB 12 gives municipalities and counties the authority to regulate certain sexually oriented performances.

13.     The Court took judicial notice of all exhibits offered by Plaintiffs and conditionally admitted them into evidence. However, the Court stated that the exhibits had to be used "during the trial." RR1-47:20-22. The Court heard testimony regarding and admitted the following exhibits: P10, P30, P32, P36, P37, P38, P47, P51, P55, P56, and Defendant Colmenero's Exhibit 1.

14.     Defendant Colmenero adopts by reference the proposed findings of fact submitted by Defendant City of Abilene and Defendants Montgomery County and Brett Ligon.

### The Woodlands Pride, Inc.

15.     The Woodlands Pride, Inc., conducts an annual event called The Woodlands Pride festival at Town Green Pack in The Woodlands in Montgomery County. RR 1 178:23–179:8. 180:6–11. Town Green Park is a public park. RR 1 180:20–21. It plans to hold a festival in October of this year. RR 1 183:1–4.

16.     According to The Woodlands Pride, "the event looks like a traditional festival. You walk in. We have a stage where we have performances, mostly drag. And then we have the hundreds of exhibitors in their booths. And then we even have a kid zone that is sponsored by a local childcare business in the community." RR 1 179:18–22. The kid zone is away from the stage where the drag performances occur. RR 1 187:23.

17.     According to Woodlands Pride, a drag queen named Persephone talks to performers at the festival "about the does and don'ts" to ensure that the event is "a reflection of a family-oriented community." RR 1 187:6–11.

18.     According to Woodlands Pride, a drag performance "conveys a message of strength; that while we are a small organization, we are mighty" and "really amplifies that we are seen and that we are heard and that we are able to live freely in our hometown and, you know, not having to leave our hometown to experience joy." RR 1 185:12–20. Also, "it is like any other aspect of our society. It can be all of those things [comedic entertainment, serious entertainment, and an expression of a community] at the same time because that's what art is to me…. So it's everything plus more, but really a show of solidarity with -- for the LGBTQ+ community." RR 1 185:21–186:14.

19.     When asked if The Woodlands Pride gives "any consideration given to children or appropriateness or admission ability" when allowing drag shows at the Pride Festival, The Woodlands Pride answered, "Yes, sir. Like I stated, we have that conversation with our drag queens -- Persephone does rather. And I can tell you this much: We've never had an issue, we've never had a complaint." RR 1 188:3–9. Persephone tells the

performers something but The Woodlands Pride does not know what she tells them, and "everything is age-appropriate." RR 1 207:16–208:18.

**20.** According to The Woodlands Pride, "Our performances aren't specifically tailored to a family aspect, but they are tailored to mostly ensuring that there's no bad language in music and that it is a festival for everybody" and are "family-friendly." RR 1 191:4–8, 18–19. The Woodlands Pride hopes that "our drag queens and kings emulate the family-oriented community that we live in." RR 1 207:10–11. The Woodlands Pride performances at the Pride Festival are not "adult," and such performances are "carefully weeded out." RR 1 191:9–18.

**21.** Performers at The Woodlands Pride events occasionally touch each other while dancing in a non-sexual way. RR 1 217 11–16.

**22.** The Woodlands Pride does not allow and has never had nudity at any of its performances. RR 1 212:19–213:11 217:4–9, and is not challenging SB 12's regulation of nudity 220:3–7.

**23.** The Woodlands Pride does not allow performers to perform actual or simulated vaginal sex acts. RR 1 219:10–18.

**24.** The Woodlands Pride has also hosted a summit that included an education talk. Woodlands Pride does not describe the summit as an event regulated by SB 12. RR 1 182:3–10.

**25.** The Woodlands Pride has never hosted an event at a private commercial space. RR 1 182:20–23.

26.     The Woodlands Price has hosted "smaller events at local coffee shops and things like that." Woodlands Pride does not describe the summit as events regulated by SB 12 RR 1 182:23–24.

27.     The Woodlands Pride is considering holding a future event at a car dealership. RR 1 183:6–9. But it has not made any final arrangements. RR 1 214:4–11. And it will not let anyone under 21 into the event if it is held at the car dealership. RR 1 203:18–204:13.

28.     The Woodlands Pride allows "condoms and lubes and other sorts of things" to be distributed at the Woodlands Pride Festival. RR 1 201:3-4. The Woodlands Pride did not produce any evidence that "condoms and lubes and other sorts of things" are exhibited during performances.

29.     The Woodlands Price does not believe that performers "should be permitted to exhibit sexual toys for a sexual purpose at all-ages events" or "sexually gesticulate with an exaggerated prosthetic penis for a sexual purpose at all-age events." RR 1 221:6–9, 222:16–20.

30.     Drag performances at event put on by The Woodlands Pride sometimes contain "dances that contain gestures or gesticulations that could arguably be interpreted as sexual by others," but The Woodlands Pride believes the dances are not sexual. RR 214:24–215:13.

31.     The Woodlands Pride does not believe that "performers at Woodlands Pride events should be permitted to exhibit their genitals in a lewd state for a sexual purpose at all-age events." RR 1 220:23–221:5.

32.     The Woodlands Pride does not believe that "performers at Woodlands Pride events should be permitted to contact or simulate contact with another person's buttocks, breasts, or genitals for a sexual purpose at all-ages events." RR 1 221:10–13.

33.     Plaintiffs Exhibit 51 is a photograph of a drag performer, a parent, and a child, taken at the 2019 Woodlands Pride Festival.

34.     The Woodlands Pride did not establish that any inherently expressive conduct is present in the activity partially depicted in Plaintiffs Exhibit 51.

35.     The Woodlands Pride did not establish that the activity partially depicted in Plaintiffs Exhibit 51 occurred on the premises of a commercial establishment. To the contrary, it occurred at a public park.

36.     The Woodlands Pride did not establish that any of the activity partially depicted in Plaintiffs Exhibit 51 is regulated by SB 12.

37.     Plaintiffs Exhibit 47 is a picture of a drag queen and two men dancing on a stage at the 2022 Woodlands Pride Festival.

38.     The Woodlands Pride did not establish that any inherently expressive conduct is present in the activity partially depicted in Plaintiffs Exhibit 47.

**39.**    The Woodlands Pride did not establish that the activity partially depicted in Plaintiffs Exhibit 47 occurred on the premises of a commercial establishment. To the contrary, it occurred at a public park.

**40.**    The Woodlands Pride did not establish that any of the activity partially depicted in Plaintiffs Exhibit 51 is regulated by SB 47.

### Extragrams LLC

**41.**    Plaintiff Extragrams LLC is a "drag telegram service and full-scale drag entertainment company." RR1 44:8, 12.

**42.**    Extragrams also provides "drag entertainment for events, parties, weddings, corporate events." RR1 46: 6–8.

**43.**    According to Extragrams: "So drag is overall a performance art. I would explain it as the overdramatization of a character or a gender. It could be the opposite one in which you were born or the same. Drag is very theatrical. They tend to bring a lot of celebrity illusions, so many drag artists do celebrity lookalikes…. Many drag artists do celebrity lookalikes, impersonations like Dolly Parton, Lisa Minnelli, Beyoncé, Frank Sinatra." RR1, 44:24–45:3, 9–11.

**44.**    According to Extragrams, drag is "performance art is based on giving an illusion of something of a gender or a character." RR1 61: 18–19.

45.    "[A] drag telegram is inspired by the old singing telegram concept where people would send singing telegrams to people's houses to do a song and dance dressed in a costume for a birthday or for a celebration." RR1 45: 14–17.

46.    "[D]uring the pandemic when everyone was stuck in their houses, [Extragrams] decided to bring this concept back, but make it more elevated and high end. [Extragrams] go[es] to houses, places of work, companies." RR1 45:18–20, 25–46:1.

47.    Extragrams' performances include dance moves such as "[t]wisting, shaking, body waves, splits, shimmying." RR1 59:23. Extragrams is concerned that such dance moves might be considered by others as simulated sex acts. RR1 60:8–11.

48.    Extragrams' performers are independent contractors and are not employees of Extragrams. RR1 67:25–68:4.

49.    Extragrams' performers wear "[w]igs, pushup bras, corsets, [and] breastplates." RR1 60:17. "A breastplate is something you put over and wear to give you the illusion of having breasts. So if someone is doing a celebrity impersonator or giving the illusion of being a woman, then they are building up their chest." RR 1 60:19–22.

50.    They also wear "hip padding" and "sometimes put in a packer or like stuff the area of their front crotch to kind of give the illusion that they're male…. A packer is something you would place in your crotch area to kind of give the illusion -- like it

would look like a Speedo, a man wearing a Speedo kind of thing to give the illusion that they're a male character." RR 1 61:1–8.

51.     Extragrams does not describe its performances as sexual, but thinks that other people might find them sexual because Extragrams "can't help what other people are going to think and feel." RR1 62:8–9.

52.     Extragrams does not believe that "packers" are lewd, but fears that others might. RR1 62:25–63:6.

53.     Extragrams performers sometimes contact other people, but only during dancing. RR1 63:7–18.

54.     Extragrams describes its business as, "We get a request for someone who wants a drag telegram. They tell us about the celebration; whether they're retiring, it's a birthday, anniversary. We learn a little bit about what they like, what kind of music they like, if there's a favorite celebrity singer that they like. Then we work with a huge roster of performers. We pick out which one specializes in that. We connect with the performer and [ask], 'Hey, do you want to do this?' We create the concept, we choose the song, and then [Extragrams and the performer] go on location to perform it in a fun surprise element." RR1 54:21–55:5.

55.     Extragrams has final approval over costumes and has guidelines for performers, including "what type of people we think are going to be there." But sometimes performers wear costumes that Extragrams did not approve. RR 1 55:8–22.

56.     Extragrams takes steps to ensure that its performers are fully clothed, yet cannot ensure that a "wardrobe malfunction" will not happen, and in fact they happen "frequently" and "all the time." RR 1 62:10–24, 73:11–21.

57.     Sometimes these "wardrobe malfunctions" happen in front of minors. RR 1 78:12–24.

58.     Extragrams makes sure that its performers are wearing something and performing something that we think is appropriate for that environment and the crowd, depending on whether there's minors that might be present. RR 1 74:17–23.

59.     Extragrams has sometimes determined that a performer's outfit was inappropriate for an audience because of the age of the audience. RR 1 75:12–76:10.

60.     Extragrams tailors its shows to its audience. It "make[s] sure that the performers are dressed appropriately, professionally. We often, even if we think the majority of the crowd is going to be adults over 18, and there may be a chance that under 18 people might be present or kids, we make sure that the music that we pick and the costumes that we pick would be okay for that as well." RR1 58:6–15.

61.     Someone from Extragrams attends all performances as a "middle person between the client customer and the performer." They also "act[] a little bit as security making sure that the space is safe," "help[] the performer get adjusted, any zipping if needed, coordinating with the client, making sure everything is on track, on time," and co-ordinates with the audience, "especially with the drag telegram an announcer goes in with a megaphone with the drag performer and they conduct the people where to stand, get ready for a surprise. Get ready, we have a fun show. You can stand over here. And overall direct the crowd." RR1 56:11–22.

62.     Extragrams' "clients vary from young people to older people. We celebrate 80th birthdays. Then we have some of the largest corporations and entities in the state, corporations like Amazon, Google, Dell, University of Texas, San Antonio Zoo, music festivals, public spaces like parks. We do a lot of popup performances in parks for parties." RR1 57:7–12.

63.     Extragrams' performances happen in Austin, Texas. Travis County, San Antonio, Dallas, Houston, Fredericksburg, Round Rock, and Pflugerville. RR1 57:15–19.

64.     Extragrams sometimes performs in private commercial spaces such as the Fairmont Hotel. RR1 57:20–24.

65.     Extragrams describes the message of its shows, in total, as "curating memorable moments. So if it's someone's going away party, we might do Dolly Parton, I Will

Always Love You as a sendoff. So there very much is a message that we're trying to create with song and dance and entertainment."

66.     "[Extragrams does] bingos, full-scale drag shows for weddings, company parties, holiday events." Drag bingo is "a classic round of regular bingo, but [Extragrams' performers are dressed in a really fancy way. Drag performers wear big wigs, lots of makeup, accessories. And they play games and they do it and call numbers in a really comedic way." Extragrams' performers host the drag bingo events. RR1 46:6–16.

67.     Plaintiffs Exhibit 30 is a picture of an Extragrams performer in drag surrounded by several people at a park. It was taken during a "surprise performance for the neighborhood. They wanted to do like a neighborhood party to celebrate someone's birthday." RR1 52:3–5. Extragrams describes the performance as "So they all got together and we came in kind of like a surprise coordinated by one of the clients here. And we came in and we knew that there was going to be children there so we wanted -- … So the performance and song that we did, we chose Taylor Swift. We did the song Shake it Off and -- another one of Taylor Swift's songs. So we came in, did the performance. And then we played a little audience interaction participation game where the performer showed all the kids how to do a little Shake It Off little move dance movement, little twist of the hips and then they played the song and they all danced around together." RR1 52:6–9, 18–25.

14

**68.**     Extragrams has a video of the performance partially depicted in Plaintiffs'
Exhibit 30 but did not produce it. RR 1 71:16–18.

**69.**     Extragrams fears that the performance partially depicted in Exhibit 30 may be
prohibited by SB 12. RR 1 66:12–67:4, 68:7–69:3.

**70.**     Extragrams did not establish that any expressive conduct occurred at this event.

**71.**     Extragrams did not establish that the event was at the premises of a commercial
establishment.

**72.**     Extragrams did not establish that any activity regulated by SB 12 occurred at the
event.

**73.**     Plaintiffs Exhibit 32 is a picture of two adults in the foreground with a drag
performer in a neighborhood street in the background.

**74.**     According to Extragrams, Plaintiffs Exhibit 32 depicts "a performer dressed as
Dolly Parton. And this is someone was surprising them with -- their partner with a drag
telegram. They love country music and Dolly Parton so we came in and performed right
out in front of the street. [The performer is wearing] a ruffle dress with a high slit up to
the hip, big wig, heels, makeup. [The viewers were] the couple who is the recipients and
we're also on a public street here. So people who heard were looking out from their
windows or people walking by seeing what we were doing as well." RR 1 54:7–18.

**75.**     Extragrams fears that the performance partially depicted by Exhibit 32 may be prohibited by SB 12. RR 1 67: 5–15, 69:22–70:23.

**76.**     Extragrams did not establish that any expressive conduct occurred at this event.

**77.**     Extragrams did not establish that the event was at the premises of a commercial establishment.

**78.**     Extragrams did not establish that any activity regulated by SB 12 occurred at the event.

### 360 Queen Entertainment

**79.**     Richard Montez, Jr., testified in his capacity as owner of 360 Queen Entertainment ("360 Queen"). RR1, 82:17-23.

**80.**     360 Queen is a production company founded in 2022 to book drag queens to perform at the "Bottoms Up Diva Dinner" on the patio of Tomatillo's Restaurant and Bar in San Antonio, TX. *Id.* at 83:17-24, 88:15-19.

**81.**     Tomatillo's Restaurant and Bar ("Tomatillo") is owned and operated by Mr. Montez's father. *Id.*

**82.**     360 Entertainments purportedly has an agreement with the restaurant where they use the patio during their shows. *Id.* at 85:17-23.

83.     360 Entertainment sells tickets to its shows and controls who goes in and out of the entrance to the patio during their shows. *Id.*

84.     All 360 Entertainment shows are adults-only. *Id.* at 85:23-24, 88:4.

85.     Even the waitstaff who work on the patio of over 18 years old. Id. at 101:18-24.

86.     360 Entertainment has made exceptions in the past when families dining inside the restaurant asked to attend with their children. *Id.* at 87:1-6.

87.     Occasionally, children have run onto the patio during a show or dinner guest has accidentally wandered onto the patio. *Id.* at 86:1-15, 110:24-111:1.

88.     The adults-only performances on the Tomatillo's patio are visible to the public passing by on the street, in the parking lot, and to patrons dining inside the restaurant. *Id.* at 94:5-19.

89.     Mr. Montez testified that some of the drag performers have had wardrobe malfunctions that exposed a portion of their buttocks, genitals, or breasts below the areola. *Id.* at 99:23-100:5.

90.     Some 360 Entertainment drag performers wear thongs, sit on the laps of attendees, flirt with attendees, and allow attendees to slap their butts. *Id.* at 100:6-11.

91.     At a show the week before trial, one drag performer put her breasts in attendees faces and "pulsed" her breasts. *Id.* at 100:15-20.

92.     Attendees are also invited to fondle the drag performers breasts. *Id.* at 112:19-113:3.

93.     The performers also perform lap dances on attendees by dancing in their laps. *Id.* at 113:16-20.

94.     Customers inside the restaurant who witnessed the show have called the police on the drag performances, while others have told waitstaff that they will not be returning because they believed the performances were indecent. *Id.* at 101:7-13.

95.     360 Entertainment contend that the drag performances have political or artistic value because "every drag queen tries to articulate something different through their performances." *Id.* at 101:25-102:7.

96.     Mr. Montez testified that a black drag performer performance's "deal with race and social justice." *Id.* at 102:8-10.

97.     But Mr. Montez did not describe how the performances "deal" with race and social justice. *Id.*

98.     Mr. Montez, similarly, testified that another performer is "more of a comedic queen" and that she is "expressing herself" through her comedy. *Id.* at 102:11-13.

99.     Mr. Montez did not describe in any detail the artistic or political value of either performance. *Id.*

**100.** 360 Entertainment claims that it is expressing a message with its drag performances but did not identify what that message was during his testimony." *Id.* at 105: 15-21.

**101.** Mr. Montez testified that he "might" allow a minor attending on of the drag performances to touch the breasts of the drag performers. *Id.* at 113:4-15.

**102.** 360 Entertainment contend that they could put on their shows at a different venue that isn't visible to the minors. *Id.* at 113:21-25.

Exhibit 36

**103.** Exhibit 36, a still image of a drag performer holding four one-dollar bills, was admitted into evidence. *Id.* at 91:14-92:11; Ex. 36.

**104.** Mr. Montez testified that attendees at drag shows present performers with dollar bills to express their appreciation of their performances. RR1, 92:1-11.

**105.** Plaintiffs contend that the four one-dollar bills is evidence that the drag performance involved expressive conduct. *Id.* at 94:1-4.

**106.** 360 Entertainment, however, testified that they have anywhere from 100-175 attendees at their events, which undermines the claim that four one-dollar bills is indicia that the performance involved expressive conduct. *Id.* at 88:20-23.

**107.**   360 Entertainment had a video of the performance depicted in Ex. 36; but did not disclose the video to Defendants nor offer it into evidence to show the alleged expressive conduct. *Id.* at 109:4-6.

Exhibit 37

**108.**   Exhibit 37, a still image of a drag performer wearing a leotard, was admitted into evidence. *Id.* at 95:8-17; Ex. 37.

**109.**   Plaintiffs contend that the performance could be seen by a minor. RR1, 95:21-96:07.

**110.**   Plaintiffs falsely contend that a portion of the performers buttocks is visible in the photograph, but the image is a side-shot that merely shows the performers legs and thigh are visible. *Id.* at 97:19-98:2.

**111.**   360 Entertainment had a video of the performance depicted in Ex. 37; but did not disclose the video to Defendants nor offer it into evidence to show the alleged expressive conduct. *Id.* at 109:7-9.

Exhibit 38

**112.**   Exhibit 38, a still image of a drag performer wearing a leotard, was also admitted into evidence. *Id.* at 97:1-10; Ex. 38.

**113.**   360 Entertainment testified that the performer "twerked" during her performance, which is a dance move that involves the performer placing her hands on her knees and moving her buttocks up and down. *Id.* at 99:3-8.

**114.**   Miriam Webster's Dictionary defines "Twerking" as "sexually suggestive dancing characterized by rapid, repeated hip thrusts and shaking of the buttocks especially while squatting." "Twerking." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/twerking. Accessed 6 Sep. 2023.

**115.**   Mr. Montez testified that the performers twerk "in people's faces. They do it everywhere." *Id.* at 112:13-16.

**116.**   360 Entertainment had a video of the performance depicted in Ex. 36; but did not disclose the video to Defendants nor offer it into evidence to show the alleged expressive conduct. *Id.* at 109:10-15.

### Abilene Pride Alliance ("Abilene Pride")

**117.**   Gavyn Hardegree, a self-identifying non-binary person, testified in its capacity as President of the Board of Directors for Abilene Pride Alliance ("Abilene Pride"). RR1, 118:19-21, 119:16-18.

**118.**   Abilene Pride is a nonprofit organization founded in 2019 with the purported mission of building, creating, and maintaining a safe space for members of the local LGBT community.  *Id.* at 118:22-23, 119:19-21, 120:5-6.

Drag Performances

119.    Mx. Hardegree testified that in it's opinion, drag is "an art form that has existed for thousands of years. It's a way to create space that didn't otherwise exist. It is a way to spark necessary and important political dialogue. It is a way for, most importantly, young people to see themselves reflected back to them. It's vital to that sense of representation." *Id.* at 129:4-10.

120.    Mx. Hardegree did not testify about any drag performances occurring prior to Abilene Pride's creation in 2019. *Id.*

121.    Abilene Pride, ironically, has a Data Research and Intelligence position on its Board with the sole purpose of monitoring the speech and online activity of those who disagree with Abilene Pride. *Id.* at 133:14-134:5.

122.    Mx. Hardegree did not testify that Abilene Pride's drag performances are a form of protected speech.

123.    No videos or illustrations were entered into evidence during Mx. Hardegree's testimony depicting drag performers engaged in protected speech.

124.    Abilene Pride claims that *it* intends to convey an expressive message by having drag performances at its events, namely, that "drag performers are kind of a nexus of belonging." *Id.* at 121:2-6.

125.    Abilene Pride did not explain, nor give any examples, of how a "nexus of belonging" rises to the level of protected speech or expressive conduct.

126.    Mx. Hardegree, in its personal capacity, testified that it sees drag as "both revolutionary and healing" and gave as an example, a performer who "ministers" to the community by being "eloquent and articulate" when the performer speaks with the audience between performance numbers and, sometimes, while performing. *Id.* at 130:11-16.

127.    Mx. Hardegree did not explain, nor give any examples, of how drag is revolutionary, healing, nor how being "articulate and eloquent" when interacting with attendees could rise to the level of protected speech or expressive conduct.

128.    Mx. Hardegree admitted that it does not have any videos of drag performances that it contends are revolutionary, healing, or ministerial. *Id.* at 134:6-18.

129.    No videos or illustrations were entered into evidence during Mx. Hardegree's testimony depicting drag performers engaged in expressive conduct.

<u>Alleged Harm</u>

130.    Abilene Pride claimed that S.B. 12 "will greatly hamper [their] ability as an organization to maintain the safe spaces that [they] have already created." *Id.* at 127:10-21.

131.    Mx. Hardegree did not explain how S.B. 12's age-restrictions will hamper Abilene Pride's ability to "maintain safe spaces." *Id.*

132.    Mx. Hardegree also testified that S.B. 12 prevents "drag artists from being able to convey their art in a way that is necessary to represent the communities that they do." *Id.* at 128:17-21.

**133.**    Mx. Hardegree, however, did not explain how or why S.B. 12's age restrictions will prevent drag performers from "conveying their art in a way that is necessary to represent the communities that they do." *Id.*

<u>S.B. 12</u>

**134.**    Abilene Pride events have drag components at some of their events. *Id.* at 120:22-24.

**135.**    Abilene Pride hosts a parade and festival that is open to the public and includes a drag performance. *Id.* at 124:5-17.

**136.**    Abilene Pride controls who can enter and attend the festival's drag performance. *Id.* at 125:3-8.

**137.**    There are no age restrictions to attend the festival and it's drag performance. *Id.* at 125:6-7.

**138.**    The public health department is a vendor at the festival and distributes free condoms and lube to festival attendees. *Id.* at 125:25-126:5.

**139.**    The public health department will purportedly not hand out free condom and lube to festival attendees. *Id.* at 129:11-15.

**140.**    Abilene Pride also occasionally holds Drag Brunch event on Sundays at a local coffee shop that would otherwise be closed to the public.  *Id.* at 122:9-13.

**141.**    Abilene Pride sells tickets to the Drag Brunches to raise money for the organization. *Id.* at 122:14-22.

**142.**    There are no age restrictions at the Drag Brunch. *Id.* at 122:23-25.

**143.**    Abilene Pride intends to have similar drag performances at future events. *Id.* at 126:6-17.

**144.**    Mx. Hardegree testified that Abilene Pride will impose age-limitations going forward at its drag performances if S.B. 12 takes effect. RR1, 127:10-17.

**145.**    Three minutes later, Mx. Hardegree perjured itself by testifying that Abilene Pride will "no longer have drag components to [its] events" if S.B. 12 takes effect. *Id.* at 128:24-129:3.

**146.**    Abilene Pride will, apparently, either age-restrict its future drag performances or cancel them altogether if S.B. 12 takes effect. Id. at 127:10-17, 128:24-129:3.

<u>No Violative Conduct</u>

**147.**    Mx. Hardegree did not identify any intent by Abilene Pride to engage in conduct that is arguably proscribed by S.B. 12.

**148.**    Mx. Hardegree admitted that Abilene Pride already has verbal agreements with the drag performers that their performances must be age appropriate for children. *Id.* at 141:6-20.

**149.**    Mx. Hardegree admitted that there are no drag performers at Abilene Pride events who perform either unclothed or with their genitals, buttocks, or breasts below the top of their areola exposed or visible. *Id.* at 140:24-141:5.

**150.**    Ms. Hardegree admitted that Abilene Pride is not contending in this lawsuit that drag performers should be able to perform nude, either unclothed or with their genitals,

buttocks, or breasts below the top of their areola exposed or visible, at their all-ages events. *Id.* at 142:13-16.

**151.**   Mx. Hardegree testified that the only physical contact between the breasts, genitals, and buttocks of drag performers and attendees is incidental or accidental, such as giving attendees hugs or bumping into them while moving through the crowd. *Id.* at 121:18-22, 135:5-136:3.

**152.**   Mx. Hardegree was impeached as to whether drag performers sit in the laps of attendees, first testifying "that has never occurred at any of the events I have been at," *id.* at 138:8-14, and then later, after being shown it's declaration, admitting that this has occurred, *Id.* at 138:15-24.

**153.**   Mx. Hardegree admitted that Abilene Pride is not contending in this lawsuit that drag performers at its all-ages events should be permitted to contact or simulate contact with another person's buttocks, breasts, or genitals for a sexual purpose. *Id.* at 143:14-18.

**154.**   Mx. Hardegree testified that Abilene Pride does not permit drag performers to perform actual or simulated sex acts at their events. *Id.* at 142:4-16.

**155.**   Mx. Hardegree testified that Abilene Pride is not contending in this suit that drag performers at their events should be permitted to perform actual or simulated sex acts. *Id.*

**156.**   Ms. Hardegree testified that some of the drag performers wear "packers" to "give the appearance of a penis in their crotch area." *Id.* at 123:8-11.

**157.**   Mx. Hardegree, however, admitted that the packers are not intended to simulate an erection and are not worn outside of the performers clothing. *Id.* at 139:14-25.

**158.**   Mx. Hardegree admitted that the packers "just look like a normal bulge" and that they were not lewd. *Id.* at 139:5-7, 23-25.

**159.**   Mx. Hardegree testified that Abilene Pride is not contending in this suit that drag performers at their all-ages events should be permitted to exhibit their genitals in a lewd state for a sexual purpose. *Id.* at 142:21-25.

**160.**   Mx. Hardegree testified that Abilene Pride is not contending in this suit that drag performers at their all-ages events should be permitted to exhibit sexual toys for a sexual purpose. *Id.* at 143:5-8.

**161.**   Mx. Hardegree testified that it, and Abilene Pride, did not believe that any of the drag performers at Abilene Pride events had performed dance routings involving sexual gestures or gesticulations. *Id.* at 136:4-16.

**162.**   Mx. Hardegree testified that Abilene Pride is not contending in this suit that drag performers at their all-ages events should be permitted to sexually gesticulate with an exaggerated prosthetic penis for a sexual purpose. *Id.* at 143:19-23.

**163.**   Mx. Hardegree testified that his sole basis for believing an objective observer could conclude that the drag performances included sexual gestures and gesticulations were the police being called to one of their events by protesters. *Id.* at 136:20-137:18.

**164.**   This example, however, showed that an objective observer such as the police merely came, observed, asked Abilene Pride some questions, before leaving without

making any warnings, arrests or citations relating to the violation of any pre-existing law regulating public indecency. *Id.*

**Brigitte Bandit**

165.   Plaintiff Brigitte Bandit is a drag performer. "Brigitte Bandit" is a stage name. RR 1 232:16–23.

166.   Brigitte Bandit mostly performs in Travis County but also has performed or is scheduled to perform in Houston, San Marcos, San Antonio, Dallas, Denton, and Abilene. RR 1 233:14–19.

167.   According to Brigitte Bandit, "Drag is an art form in which somebody can express themselves in or outside gender norms and expectations or like a hyper-character that is highly exaggerated," and "Drag for me gives me a space where I can be my most authentic self and explore myself and how I present and what I want to say to other people about myself." RR 1 234:1–7.

168.   When asked "What is it that you're trying to say to other people [when you perform drag]," Brigitte Bandit responded, "Well, it depends on the day." RR 1 234:8–9. According to Brigitte Bandit, "I perform a lot as Dolly Parton and I really love to share her message of kindness and respect and accepting of other people." RR 1 234:11–1. While testifying against SB 12, Brigitte Bandit "wore a gown with the Texas flag on top and underneath it I wore the names of all of the victims from the Uvalde shooting," and was "trying to say that we're sitting here arguing about drag

performances and drag queens and under the concern of safety for kids while kids are being shot in our schools here in Texas." RR 1:234:18-235:1.

**169.** Brigitte Bandit typically performs at clubs where only people 21 years of age and older may enter. RR 1 236:24-23:9. She also performs at all-age brunches and other all-ages events. RR 1 237:8–238:21. Some brunches she performs at are also for 21-and-up. RR 1 238:11, 240:7–8.

**170.** According to Brigitte Bandit, all-ages events are different than 21-and-up events. RR 1 238:11–13. All-ages events should appeal to and be interesting to kids, so she might dress as Jessie from Toy Story, the little mermaid, or a big pink princess for an all-ages show. RR 1 239:10–18.

**171.** There are some things Brigitte Bandit will do at a 21-and-up show that she will not do in front of minors. RR 1 240:11–13.

**172.** Brigitte Bandit has performed at a 21-and-up club in Austin called Cheer Up Charlies. Her performances are visible to people outside the club on the sidewalk on in surrounding high-rises.

**173.** Brigitte Bandit sometimes touches others during performances. According to Brigitte Bandit, sometimes audience members tip her and "tuck it [the tip] in my own costume. They really love to tuck it in my cleavage sometimes in the 21 up spaces." RR 1 246:20–7. Sometimes she touches other performers while dancing with them. RR 1 246:17–247:9.

**174.**   Brigitte Bandit has used a dildo as a microphone at performances at Cheer Up Charlies. RR 1 247:23–249:4.

**175.**   Brigitte Bandit also hosts and produces drag shows, which means she books performers, advocates for their pay, gets music together, and sets rules for the audience.

**176.**   Plaintiffs Exhibit 55 is a picture of Brigitte Bandit in a Dolly Parton costume performing at Cher Up Charlies. RR 1 241:17–242:5.

**177.**   Brigitte Bandit says she would wear the same costume to all-ages shows. RR 1 242:6–8.

**178.**   In the photo, Brigitte Bandit is wearing a wig, a breastplate and a corset, but is not performing sexual gesticulations in a manner that appeals to the prurient interest in sex.

**179.**   Brigitte Bandit did not establish that any expressive conduct occurred at the performance partially depicted in Exhibit 55.

**180.**   Brigitte Bandit did not establish that any activity regulated by SB 12 occurred at the performance partially depicted in Exhibit 55.

## CONCLUSIONS OF LAW

### ARTICLE III STANDING

**181.**  As an initial matter, Plaintiffs cannot establish standing merely by invoking the First Amendment. *Abdullah v. Paxton*, 65 F.4th 204, 210 (5th Cir. 2023) (per curiam). Plaintiffs "must assert [their] own legal rights and interests, and cannot rest [their] claim to relief on the legal rights or interests of third parties." *Id.* (citation and emphasis omitted). Here, Plaintiffs have not established the necessary injury in fact.

**182.**  Plaintiffs have not shown an injury that is actual and imminent, nor one that is concrete and particularized. *See Clapper v. Amnesty Intern*, 568 U.S. 398, 409 (2013). Plaintiffs must establish standing as of "the time the action commences." *Stringer v. Whitley*, 942 F.3d 715, 724 (5th Cir. 2019). For prospective relief, Plaintiffs' injury "must be certainly impending to constitute injury in fact"—"[a]llegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409 (quotations omitted). Indeed "[a]llegations of only a 'possible' future injury . . . will not suffice." *Abdullah*, 65 F.4th at 208.

**183.**  "The causation element does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable' to the defendant." *LULAC v. City of Boerne*, 659 F.3d 421, 428 (5th Cir. 2011) (citing *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)). However, the injury cannot be "self-inflicted." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999); *see also Clapper v. Amnesty Intern*, 568

U.S. 398, 416 (2013) (holding that a party "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").

184.    Plaintiffs claim their speech is chilled because undefined "other people" may think their conduct violates SB 12 is insufficient to establish standing. There is no evidence that the Defendants will enforce SB 12 in an arbitrary way or contrary to the statute. Plaintiffs cannot manufacture standing by self-censoring based on fears of what third parties with no enforcement authority (passersby) might think, say, or do. *See Glass v. Paxton*, 900 F.3d 233, 242 (5th Cir. 2018) (holding that a plaintiff "cannot manufacture standing by self-censoring her speech based on what she alleges to be a reasonable probability that concealed-carry license holders will intimidate professors and students in the classroom").

185.    Plaintiffs did not establish that they or their performers ever intentionally, knowingly, or recklessly perform any of the sexual conduct proscribed by SB 12 that appeals to the prurient interest in sex at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child or in the presence of an individual younger than 18 years of age.

186.    Furthermore, Plaintiffs did not establish that they control the premises of a commercial enterprise.

187.    Additionally, to satisfy the second prong of the standing requirement, Plaintiffs' alleged injury must be fairly traceable to the *conduct* of the Defendants, not the existence

of SB 12. *See California v. Texas*, 141 S.Ct. 2104, 2113 (2021) ("A plaintiff has standing only if he can 'allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)); *see also Collins v. Yellen*, 141 S.Ct. 1761, 1779 (2021) (holding that "[f]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, *not to the provision of law that is challenged*." (emphasis added)).

188.   Plaintiffs failed to prove an Article III injury that is "fairly traceable" to the allegedly unlawful conduct of Defendants and they failed to prove by a preponderance of the evidence that Defendants are injuring Plaintiffs' by interpreting SB 12 in a manner that would outlaw their performances. Additionally, Plaintiffs failed to prove by a preponderance of the evidence that Defendants intend to enforce SB 12 against any of the Plaintiffs in this case. Plaintiffs did not prove that Defendants are inflicting Article III injury by threatening to prosecute Plaintiffs, and Plaintiffs do not carry their burden by tracing their Article III injuries to the mere *existence* of SB 12.

189.   Furthermore, Plaintiffs have not presented evidence that their future shows or performances intend to violate SB 12. As such, Plaintiffs cannot establish an intention to engage in conduct that is even arguably proscribed by SB 12.

190.   Because the attorney general does not have enforcement authority over the product proscribed by sections 2 and 3 of SB 12, enjoining Attorney General Colmenero will provide no relief to Plaintiffs. *see Inclusive Communities Project, Inc. v. Dep't*

*of Treasury*, 946 F.3d 649, 657–58 (5th Cir. 2019) (finding lack of redressability when enjoining government agency would not result in the relief sought). Plaintiffs have no injury that is redressable by Attorney General Colmenero.

191.    Neither Plaintiffs Woodlands Pride nor Abilene Pride established organizational standing. An organization has standing to sue in its own right under an organizational theory if it satisfies the same well-known Article III requirements of injury-in-fact, causation, and redressability that apply to individuals. *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources. . . .'" *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The injury-in-fact must be "concrete and demonstrable" and must constitute "far more than simply a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379.

## ELEVENTH AMENDMENT IMMUNITY

192.    The attorney general retains immunity to Plaintiffs' First Amendment claims related to sections 2 and 3 of SB 12 and alleged under Section 1983. Although "*Ex parte Young* allows injunctive or declaratory relief against a state official in her official capacity," it applies only when "the official has a sufficient 'connection' with the

enforcement of the allegedly unconstitutional law." *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467 (5th Cir. 2020).

193.    Attorney General Colmenero has no connection, statutory or otherwise, to the enforcement of sections 2 and 3 of SB 12. Therefore, any exception under *Ex parte Young* is inapplicable and she is entitled to immunity for all claims regarding sections 2 and 3 of SB 12. *See Texas Democratic Party v. Hughs*, 997 F.3d 288, 291 (5th Cir. May 7, 2021) (holding that the Secretary of State was not sufficiently connected to enforcement of early-voting law, thereby precluding suit against Secretary to enjoin its enforcement); *Langan v. Abbott*, No. 1:20-CV-275-RP, 2021 WL 466124, at *4 (W.D. Tex. Feb. 8, 2021) (holding that Plaintiffs' claims against Attorney General Paxton were barred by Eleventh Amendment immunity because they did not demonstrate a sufficient connection to the enforcement of the challenged statute).

FIRST AMENDMENT CLAIM

**Plaintiffs' claims are not expressive protected by the First Amendment.**

194.    Plaintiffs failed to meet their burden of establishing that their conduct contains an expressive element. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive.").

195.   Plaintiffs failed to prove by a preponderance of the evidence that drag shows are inherently expressive conduct and failed to explain how drag performances as a whole "possess[] sufficient communicative elements to bring the First Amendment into play." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (holding that to determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, [the Supreme Court] [has] asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it."). While Plaintiffs testified about particular messages at particular shows, they failed to present evidence that "the likelihood was great that the message would be understood by those who viewed it." *Id.*; *see also Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 65 (2006) ("*FAIR*") (holding that courts "have extended First Amendment protection only to conduct that is inherently expressive").

**Strict scrutiny does not apply to SB 12.**

196.   The conduct at issue (sexually oriented performance that appeals to the prurient interest in sex) is not inherently expressive, but at most has only "some expressive content." *Kleinman v. City of San Marcos*, 597 F.3d 323, 328 (5th Cir. 2010) (citing *United States v. O'Brien*, 391 U.S. 376 (1968)). The conduct at issue in this case falls at the very margins of protected speech, at best. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (holding that "nude dancing of the type at issue here is expressive conduct, although

we think that it falls within the outer ambit of the First Amendment's protection."); *Doe I v. Landry*, 909 F.3d 99, 116 (5th Cir. 2018) (noting the exotic dancer plaintiff had standing to raise a facial challenge to a statute raising the minimum age for exotic dancing from 18 to 21 because, inter alia, she expressed a desire to return to exotic dancing "both for monetary and expressive reasons"). "Under *O'Brien*, a regulation is constitutional if it is within the constitutional power of the government; it furthers an important or substantial governmental interest; the government interest is unrelated to the suppression of free expression; and the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Kleinman*, 597 F.3d. at 328 (citing *O'Brien*, 391, U.S. 376). SB 12 meets all of the *O'Brien* requirements.

197.    The parties agree that Texas has a compelling state interest in protecting the physical and psychological well-being of minors. RR2-35:1-5; *see also Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 869 (1997) ("[T]here is a compelling interest in protecting the physical and psychological well-being of minors which extended to shielding them from indecent messages that are not obscene by adult standards."). furthermore, this compelling state interest in protecting the physical and psychological well-being of minors protecting the physical and psychological well-being of minors is unrelated to the suppression of any free expression.

198.    The incidental restriction on the First Amendment freedom placed on sexually oriented performances that appeal to the prurient interest in sex in front of minors is

no greater than essential to the furtherance of the governmental interest because "[t]he statutory prohibition is not a means to some greater end, but an end in itself," *See Barnes v. Glen Theater*, 501 U.S. 560, 571-72 (1991).

**199.**   SB 12 is narrowly tailored because it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (internal quotation marks and citation omitted); *see also Barnes*, 501 U.S. at 572 (holding that the public indecency statute was narrowly tailored because "Indiana's requirement that the dancers wear pasties and G-strings is modest, and the *bare minimum necessary to achieve the State's purpose.*"). A law is *not* narrowly tailored when the regulation burdens "substantially more speech than is necessary to further the government's legitimate interests." *Id.* In other words, "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* SB 12 does not unreasonably limit alternative avenues of communication. *See Dept. of Alcoholic Beverage Control,* 99 Cal.App.4th at 895, 121 Cal.Rptr.2d 729 (noting that "[t]he State ... has not prohibited dancers from performing with the utmost level of erotic expression. They are simply forbidden to do so in establishments which serve alcohol, and the Constitution is thereby not offended").

**200.**   Under SB 12, Plaintiffs are given more than "a 'reasonable opportunity' to disseminate the speech at issue." *See Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 52 (1986).

201.   "[T]he challenged regulation must be upheld not because it survives some lower level of First Amendment scrutiny, but because, as a general law regulating conduct and not specifically directed at expression, it is not subject to First Amendment scrutiny at all." *Barnes*, 501 U.S. at 572 (Justice Scalia concurring).

202.   This Court finds that SB 12 is not regulating the message or the expressive conduct that Plaintiffs allege they are intending to convey because their message is not connected to the prurient interest in sex. SB 12 is simply making the message less graphic.

203.   Plaintiffs failed to prove by a preponderance of the evidence that SB 12 discriminates against drag shows or that SB 12 discriminates based on the content of the "speech" prohibited or the viewpoint of the speaker.

**Facial challenges are disfavored.**

204.   Facial challenges are disfavored for several reasons. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449–51, (2008). Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." *Sabri v. United States,* 541 U.S. 600, 609 (2004) (internal quotation marks and brackets omitted). Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "'anticipate a question of constitutional law in advance of the necessity of deciding it'" nor "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Ashwander v. TVA,* 297 U.S. 288 (1936)

(Brandeis, J., concurring) (quoting *Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration,* 113 U.S. 33, 39 (1885)). Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. *Washington State Grange*, 552 U.S. at 451 (noting that "[w]e must keep in mind that '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" (quoting *Ayotte v. Planned Parenthood of Northern New Eng.,* 546 U.S. 320, 329 (2006)).

### SB 12 is viewpoint neutral.

**205.** SB 12 is viewpoint neutral regarding drag performances, both facially and as-applied. The language of SB 12 neither distinguishes between nor treats differently "performers who 'exaggerate male or female sexual characteristics'" and "performers who have such characteristics and merely exhibit them." *See* ECF 10 at 37; Tex. Pen. Code § 43.28(a). "Sexual Conduct," as defined in SB 12, applies equally to any performance of a sexual nature.

**206.** Moreover, the "use of accessories or prosthetics that exaggerate male or female sexual characteristics" is not unique or limited to drag performances. Performers of all types often don false lashes, lavish wigs, and dramatic makeup. And anyone desiring to appear more well-endowed than they naturally are could enhance themselves with accessories or prosthetics.

207.     "[S]peaker distinctions . . . are not presumed invalid under the First Amendment"
or subjected to "strict scrutiny" unless "they reflect the Government's preference for[,]
. . . or aversion to[,] what the disfavored speakers have to say." *Turner Broad. Sys. v. FCC*,
512 U.S. 622, 645, 658 (1994).

208.     This Court does not conclude that the Texas Legislature passed SB 12 to target
drag shows.

209.     The text of the Act—"the best indicator of intent," *Nixon v. United States*, 506
U.S. 224, 232 (1993)—undermines the contention that the Texas Legislature targeted
family-friendly drag shows. The statute prohibits only sexually oriented performances
that appeal to the prurient interest in sex in front of minors. It imposes the same
restrictions on drag performers that it imposes on other entertainers who may provide
sexually-explicit performances.

210.     Unlike the challenged act in Tennessee, the definition of sexual conduct in SB
12 does not single out, even by way of example, any particular viewpoint. *Friends of
Georges, Inc. v. Mulroy*, No. 2:23-cv-02163, 2023 WL 3790583, *20-21 (W.D. Tenn. June
2, 2023) (holing the Tennessee AEA targets the viewpoint of gender identity by
including "male or female impersonators").

211.     "[T]he fact that a statute *refers* to the content of expression does not necessarily
make it content-based if it was enacted for a valid purpose *other* than suppressing the
expression due to a disagreement with the message conveyed or a concern over the
message's direct effect on those who are exposed to it." *Ranch House, Inc. v. Amerson*, 238

F.3d 1273, 1278 (11th Cir.2001). "The Court need only ensure that the government not use a class of speech—like sexual speech that is not obscene but potentially harmful to minors—as a 'vehicle for content discrimination unrelated to [its] distinctively proscribable content.'" *Friends of George's*, 2023 WL 3790583 *20 (citing *R.A.V.*, 505 U.S. at 383–84). SB 12 encompasses *all* sexually oriented performances that appeal to the prurient interest in sex regardless of the performer's gender identity or their message regarding gender identity.

## SB 12 Is Not Overbroad

**212.**   Plaintiffs challenge SB 12 as facially overbroad.

**213.**   The legitimate sweep of SB 12 is protecting the physical and psychological well-being of minors which includes to shielding them from sexually oriented performances that appeal to the prurient interest in sex.

**214.**   "To judge whether a statute is overbroad, we must first determine what it covers." *United States v. Hansen*, 143 S. Ct. 1932, 1940 (2023). The Supreme Court's most recent pronouncement on the overbreadth doctrine requires litigants to prove a "lopsided ratio" when comparing a law's "unconstitutional applications" to the statute's "lawful sweep":

> Because it destroys some good along with the bad, invalidation for overbreadth is strong medicine that is not to be casually employed. To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep. *In the absence of a lopsided ratio,*

courts must handle un- constitutional applications as they usually do—case-by-case.

*United States v. Hansen*, 143 S. Ct. 1932, 1939–40 (2023) (emphasis added) (citations and internal quotation marks omitted); *see also id.* at 1948 ("[T]he ratio of unlawful-to-lawful applications is *not lopsided enough* to justify the 'strong medicine' of facial invalidation for overbreadth." (emphasis added)). Plaintiffs' failed to demonstrate a "lopsided ratio" when comparing the supposedly unconstitutional applications of SB 12 with its legitimate sweep.

215.    Plaintiffs have not challenged a "substantial" number of the applications of SB 12, nor have they shown that SB12 is "unconstitutional in all of its applications." *See Washington State Grange*, 552 U.S. at 449.

216.    SB 12's requirement that performers not perform in a sexually explicit manner in front of children leaves ample capacity for the performers to convey their messages.

217.    Based on the evidence in this case, Plaintiffs have not demonstrated a "lopsided ratio."

## SB 12 IS NOT VOID FOR VAGUENESS

218.    Plaintiffs challenge SB 12 as void for vagueness.

219.    Courts apply the void-for-vagueness doctrine only to statutes that do not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

220.    And just because a statutory phrase may need interpretation or construction does not mean that it is unconstitutionally vague.  *Skilling v. United States*, 561 U.S. 358, 405 (2010) ("It has long been our practice, . . . before striking a . . . statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction.").

221.    The lack of a statutory definition for the term "prurient interest in sex" does not render the statute constitutionally deficient. *Fletcher v. State,* 633 S.W.2d 895 (Tex.Cr.App.1982); *Red Bluff Drive-In, Inc. v. Vance,* 648 F.2d 1020, 1029 (5th Cir. 1981), cert. denied, 455 U.S. 913. The term has been interpreted by courts and the legislature as meaning "a shameful or morbid interest in nudity, sex or excretion that goes substantially beyond customary limits of candor in description or representation of such matters." *Cf. Fletcher v. State, supra; Andrews v. State,* 639 S.W.2d 4 (Tex.App.—Houston [1st Dist.] 1982).

222.    While the Texas Legislature did not use the *Miller* definition of "obscenity" in SB 12, *see Miller v. California*, 413 U.S. 15, 24, (1973), there is sufficient discussion in both state and federal case law to give a person of ordinary intelligence a roadmap for navigating what is and is not a "prurient interest in sex." *See e.g. City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986); *California v. LaRue*, 409 U.S. 109, 127 (1972); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 251 (1990); *Vonderhaar v. Parish of St. Tammany*, 633 So.2d 217, 223 (1993).

223.    The Court holds that section 3 of SB 12 contains a *mens rea* requirement: intentionally, knowingly, or recklessly. Absent an express mental state in the statute,

Penal Code chapter 6 generally provides for culpability. *See* TEX. PENAL CODE §§ 6.01–.04; see also *id.* § 1.03(b) (providing for the application of the general provisions of the Penal Code "to offenses defined by other laws, unless the statute defining the offense provides otherwise"). Subsection 6.02(b) states that "[i]f the definition of an offense does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element." *Id.* § 6.02(b). Subsection 6.02(c) provides that "[i]f the definition of an offense does not prescribe a culpable mental state, but one is nevertheless required …, intent, knowledge, or recklessness suffices to establish criminal responsibility." *Id.* § 6.02(c).

## STRICT SCRUTINY

**224.** Even under strict scrutiny, SB 12 passes constitutional review.

**225.** In cases where a legislative act restricts indecent speech, which is not obscene to adults, the Supreme Court has been clear that those circumstances must be "relatively narrow and well-defined[.]" *Erznoznik v. Jacksonville*, 422 U.S. 205, 212, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011) ("No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed.").

**226.** The parties agree that Texas has a compelling state interest in protecting the physical and psychological well-being of minors. RR2-35:1-5.

**227.**   SB 12 is narrowly tailored to address Texas's compelling interest in shielding minors from exposure to sexually explicit performances. SB 12 applies only to "a narrow slice of speech." *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 452 (2015). And SB 12 does not ban that speech; it merely requires the performances to occur in places where children cannot permissibly view the performance. SB 12 thus "tightly fits the State's compelling interest" by "limiting children's exposure," while "still allow[ing] adults to" view the performances. *Crawford v. Lungren*, 96 F.3d 380, 387 (9th Cir. 1996) (compiling Supreme Court precedent). It "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy": exposure of children to sexually explicit speech. *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

**228.**   "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000).

**229.**   The only argument in Plaintiff's briefing that could even be construed as a less restrictive alternative contention is its challenge to the lack of parental consent exception.

**230.**   That argument fails.  The State is not required to provide a parental-consent exception for every restriction related to minors.  When it comes to regulating minors' access to sexually explicit materials, the State has its own "independent interest in the well-being of its youth." *Ginsberg*, 390 U.S. at 640 (emphasis added).  That interest does

not disappear because of parental consent. And a restriction with a parental consent exception would not further the State's interest. This is why, for example, children are not allowed in adult-oriented establishments—like strip clubs—even with their parents' consent. And it is why children cannot participate in pornography, even if their parents would allow it. *Connection Distrib. V. Holder*, 557 F.3d 321, 328-29 (6th Cir.) ("Congress may suppress child pornography in its entirety due to its scarring impact on the children."). Plaintiffs err in suggesting that laws without parental consent exceptions categorically fail strict scrutiny.

## SB 12 IS NOT A PRIOR RESTRAINT

**231.** "The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550. SB 12 does not prohibit communication of any kind.

## PROPOSED JUDGMENT

**232.** The Court denies all relief requested by Plaintiffs. Plaintiffs do not have Article III standing to challenge SB 12. Furthermore, Plaintiffs have presented no evidence that their future shows or performances intend to violate SB 12. As such, Plaintiffs cannot establish an intention to engage in conduct that is even arguably proscribed by SB 12.

**233.** Moreover, even if plaintiffs had standing, their facial challenges fail. The requirement that performers not perform in a sexually explicit manner in front of children leaves ample capacity for them to convey their messages.

### Alternatively, the Court should limit any relief to as-applied.

**234.** Courts should not issue overbreadth remedies when as-applied relief can fully redress the plaintiff's alleged injuries. The Supreme Court so held in *Board of Trustees v. Fox*, 492 U.S. 469 (1989):

> It is not the usual judicial practice, however, nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied   [F]or reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first.

*Id.* at 485–86. Where a plaintiff asserts an overbreadth claim and insists that its speech or conduct is *protected* by the First Amendment, then the Court should award as-applied relief that shields the plaintiff's constitutionally protected activities rather than invalidating the statute's enforcement across the board. *See Gonzales v. Carhart*, 550 U.S. 124, 168 (2007) ("[A]s-applied challenges are the basic building blocks of constitutional adjudication." (citation and internal quotation marks omitted)). Overbreadth remedies should be considered *only* when a litigant's conduct is *unprotected* by the First Amendment, because as-applied relief cannot be used to restrain government officials from enforcing a statute against constitutionally unprotected conduct. *See United States*

*v. Hansen*, 143 S. Ct. 1932, 1939 (2023) (considering overbreadth claim raised by litigant who conceded that his speech was constitutionally unprotected); *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980) (overbreadth doctrine allows "a litigant whose own activities are unprotected" to "nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court.").

Respectfully submitted,

**ANGELA COLMENERO**
Provisional Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**JAMES LLOYD**
Acting Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Deputy Chief, General Litigation Division

**RYAN KERCHER**
Deputy Chief, General Litigation Division

*/s/ Taylor Gifford*
**TAYLOR GIFFORD**
Assistant Attorney General
Attorney-in-Charge
Texas Bar No.  24027262
Southern District ID No. 3624053

**CHARLES K. ELDRED**
Chief, Legal Strategy Division
Texas Bar No. 00793681
Southern District ID No. 20772

**JOHNATHAN STONE**
Assistant Attorney General
Texas Bar No. 24071779
Southern Dist. No. 1635446

General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 | FAX: (512) 320-0667
Taylor.Gifford@oag.texas.gov
Charles.Eldred@oag.texas.gov
Johnathan.Stone@oag.texas.gov
***ATTORNEYS FOR DEFENDANT***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 5, 2023, a true and correct copy of the foregoing document was served via the Court's electronic filing manager system to all counsel of record.

*/s/ Taylor Gifford*
**TAYLOR GIFFORD**
Assistant Attorney General