IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SPECTRUM WT, *et al.*,

      Plaintiffs,

v.                                                            2:23-CV-048-Z

WALTER WENDLER, *et al.*,

      Defendants.

## MEMORANDUM OPINION
## AND ORDER

Before the Court are Defendant Wendler's Motion to Dismiss Under Rules 12(b)(1) and 12(b)(6) ("Wendler's Motion") (ECF No. 34), Defendants' Motion to Dismiss ("Defendants' Motion") (ECF No. 38), and Plaintiffs' Amended Motion for Preliminary Injunction ("Amended Motion") (ECF No. 30). Having considered the motions, briefing, and relevant law, the Court **GRANTS IN PART** Wendler's Motion and Defendants' Motion, and **DENIES** Plaintiffs' Amended Motion.

### BACKGROUND

Plaintiffs are a recognized student organization ("Spectrum WT") at West Texas A&M University ("WT") and two of Spectrum WT's officers. ECF No. 28 at 5–6. Plaintiff Spectrum WT strives to "provide a safe space for LGBT+ students and allies to come together," to "raise awareness of the LGBT+ community," and to "promote diversity, support, and acceptance on campus and in the surrounding community." *Id.* at 4. In furtherance of that mission, Spectrum WT hosts events such as "Lavender Prom, Queer History Night, and Queer Movie Night." *Id.* at 5. Plaintiffs also planned a March 2023 fundraiser at a WT "campus event hall" to raise funds for LGBT+ suicide prevention. *Id.* at 1. In papers filed with this Court, Plaintiffs describe the proposed event as a "drag show" open to children accompanied by a parent or guardian. *Id.* at 18.

The proposed event was tentatively scheduled for April 1 and branded "A Fool's Drag Race." *Id.* at 15. Due to a scheduling conflict, Spectrum WT agreed to hold the show one day earlier. *Id.* But before WT confirmed the event, Defendant Walter Wendler ("President Wendler") stated his opposition in a letter dated March 21, 2023: "[WT] will not host a drag show on campus." ECF No. 28-1 at 2–3. In the letter, President Wendler analogized to another type of "theatrical performance" — "blackface" minstrelsy[1] — to explain his opposition to *any* event exaggerating, stereotyping, mocking, or objectifying a person "based on appearance, bias or predisposition":

> As a performance exaggerating aspects of womanhood (sexuality, femininity, gender), drag shows stereotype women in cartoon-like extremes for the amusement of others and discriminate against womanhood. Any event which diminishes an individual or group through such representation is wrong . . . . Should I let rest misogynistic behavior portraying women as objects?
>
> *     *     *
>
> Drag shows are derisive, divisive and demoralizing misogyny, no matter the stated intent. Such conduct runs counter to the purpose of WT. A person or group should not attempt to elevate itself or a cause by mocking another person or group.
>
> As a university president, I would not support "blackface" performances on our campus, even if told the performance is a form of free speech or intended as humor. It is wrong. I do not support any show, performance or artistic expression which denigrates others — in this case, women — for any reason . . . .
>
> Mocking or objectifying in any way members of any group based on appearance, bias or predisposition is unacceptable . . . . No one should claim a right to contribute to women's suffering via a slapstick sideshow that erodes the worth of women. When humor becomes harassment, it has gone too far.

*Id.*

---

[1] "What we call blackface minstrelsy is a specific performance genre that developed in early 19th-century America, with the earliest performance documented in 1830. Featuring characters with names like Jim Crow, Zip Coon and Mammy, these performances comprised skits, monologues, songs and dances that supposedly imitated those of enslaved people or of the recently freed. Blackface is used 'to mock or ridicule Black people'; it is considered deeply offensive." *Smith v. Salvation Army*, 2023 WL 2252380, at *6 (N.D. Ala. Feb. 27, 2023) (citations omitted).

President Wendler averred that "harassment" was inconsistent with WT's vision statement, the Texas Education Code, and federal workplace rules enforced by the U.S. Equal Employment Opportunity Commission, linking relevant websites. *Id.* at 3–4. Throughout the letter, President Wendler expressed support for the underlying mission and message of the proposed event — *i.e.*, preventing suicide in the LGBT+ community by raising money for The Trevor Project. *See id.* at 4 ("Supporting the Trevor Project is a good idea."). In closing, President Wendler offered a simple recommendation: "[S]kip the show and send the dough." *Id.*

Plaintiffs filed and then withdrew their motion for a temporary restraining order after electing to host the event off campus. ECF No. 16. But Plaintiffs still seek injunctive and declaratory relief in addition to damages under 42 U.S.C. § 1983 because their future events are allegedly "in imminent peril due to President Wendler's edict." ECF No. 31 at 15. These include "Queer Movie Night," "Queer History Night," and a second drag show tentatively set for March 2024. ECF No. 28 at 26.

### OVERVIEW

Free Speech jurisprudence only intermittently invokes the *historical* analysis applied to other Amendments and Clauses. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2161 (2022) (applying a Second Amendment "text, history, and tradition" test); *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2087 (2019) (explaining that Establishment Clause jurisprudence "looks to history for guidance"). Said historical analysis reveals a Free Speech ecosystem drastically different from the "expressive conduct" absolutism of Plaintiffs' briefing: (1) the Founders focused on "prior restraints" of publication — specifically, political pamphlets, (2) draft Free Speech Clauses focused on protecting the "right to speak, to write, or to publish their sentiments," (3) Blackstone treatises extolled "freedom of thought" *and* recognized a police power "to censure licentiousness," (4) the Comstock Act of 1873 prohibited the mailing of "obscene, lewd or

3

lascivious" materials, and (5) Joseph Story's *Commentaries* defined the Free Speech Clause as protecting the "right to speak, write, and print . . . opinions upon any subject whatsoever, without any prior restraint," but *not* the right to "injure any other person in his rights, person, property, or reputation" or "to disturb the public peace."[2]

As written, ratified, and adjudicated for 150 years, the Free Speech Clause harmonized disparate and competing interests using "text, history, and tradition" as guideposts, sometimes a sliding scale: political speech *versus* commercial speech;[3] pornography *versus* obscenity;[4] viewpoint *versus* content;[5] traditional *versus* designated *versus* limited public forums;[6] thought *versus* speech *versus* conduct,[7] etc. Many Free Speech categories were subject to "reasonable time, place, and manner" restrictions.[8] Beginning in the late 20th Century, Free Speech jurisprudence absorbed "expressive individualism" as the new *sine qua non* of First Amendment analysis. *See* Jeffrey A. Kaplan, *The Republic of Choice: Law, Authority, and Culture*. 27 HARV. J. ON LEGIS. 613 (1990) ("Expressive individualism" emphasizes "self-expression, that is, cultivating the inner human being, expanding the self, developing the special qualities and uniqueness of each person.") (citations omitted); *see also* Carl R. Trueman, *The Rise and Triumph of the Modern Self: Cultural Amnesia, Expressive Individualism, and the Road to Sexual Revolution* 26–80 (2022).

---

[2] *See generally* 1 Annals of Cong. 434 (1789); St. George Tucker, *Blackstone's Commentaries*, 1:App. 298–99, 2:App. 12–25, 27–30; Comstock Act of 1873, THE FIRST AMENDMENT ENCYCLOPEDIA, 2009; 3 Joseph Story, *Commentaries on the Constitution of the United States*, § 1874, at 732 (Boston & Co. 1833).

[3] *Compare W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) *with Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 758 (1976).

[4] *Compare Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 57 (1973) *with Miller v. California,* 413 U.S. 15, 24 (1973).

[5] *Compare Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015) *with Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 572 (1995).

[6] *Compare Hague v. Committee for Industrial Organization*, 307 U.S. 496, 515 (1939) *with Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 680 (2010).

[7] *Compare Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) *with City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984).

[8] *See, e.g., Hill v. Colorado*, 530 U.S. 703 (2000); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983); *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994).

But the newer cases retained older rules relevant to protests, forums, time, place, and manner — plus an important outer limit on "expressive conduct," especially *sexualized* "expressive conduct": When children are involved, the calculation changes.[9] Here, Plaintiffs expressly contemplate and even advertise the involvement of children. ECF No. 28 at 18.

### APPLICATION

Plaintiffs neither plead a "clearly established right" to host a sexualized drag show on campus, nor that President Wendler's response was "objectively unreasonable." And although Plaintiffs recite and repeat "expressive conduct" boilerplate from landmark cases, they elide the constitutional and statutory taxonomies necessary to decide a Free Speech campus case — at least at this MTD Phase. Specifically, Plaintiffs failed to plead adequate facts and arguments in four categories of First Amendment law necessary to overcome qualified immunity protections:

First, if the "fundraiser" features cross-dressing like other theatrical performances, but not an "overtly political" message, does it convey the "intentional and overwhelmingly apparent" message required in the "campus protest" cases applicable to school settings? *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 504 (1969); *Texas v. Johnson*, 491 U.S. 397, 406 (1989); *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974) (the Court must "determine whether his activity was sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments"). Notably, the landmark cases cited by Plaintiffs include a warning to this Court: "We cannot accept the view that an apparently limitless variety of conduct

---

[9] *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245–46 (2002) ("The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children."); *Ginsberg v. State of N.Y.*, 390 U.S. 629, 639 (1968) (the state may ban the sale of indecent magazines to minors); *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 134 (1989) ("To be sure, the Government has a strong interest in protecting children against exposure to pornographic material that might be harmful to them.") (Breyer, J., concurring in part); *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 214 (2003) (upholding requirement that library computers filter out content harmful to minors).

can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). As pled, Plaintiff's proposed event does not obviously convey or communicate a discernable, protectable message.

Second, using "textbook" as an adjective is no substitute for the forum analysis required in a Free Speech campus case — *i.e.*, the analysis that determines whether the alleged discrimination is "content" or "viewpoint" specific. *See* ECF Nos. 31 at 21 ("That is *textbook* content discrimination."); 28 at 2 ("Wendler's edict is *textbook* viewpoint discrimination . . . .") (emphasis added). Similarly, that Texas Education Code § 51.9315 protects "traditional public forums" in "common outdoor areas" is not necessarily determinative of the question here: Is the relevant WT facility a "traditional public forum," "designated public forum," "limited public forum," or "non-public forum" for purposes of First Amendment analysis? *See* ECF No. 28-3 at 3 ("Examples of traditional public forums include public streets, sidewalks, plazas, lawns, and parks."). Thus far, Plaintiffs' forum analysis falls flat.

Third, Plaintiffs acknowledge and attach WT policies stating that "expressive activity" is subject to "reasonable time, place, and manner restrictions," consistent with First Amendment requirements, but consign the issue and their analysis to a single footnote. ECF No. 28-3 at 2–5; ECF No. 31 at 20 n.3 ("Since [WT] is prohibiting drag shows outright . . . the time, place, or manner test is inapplicable."). But this Court cannot so easily ignore binding Supreme Court precedent holding that *sexualized conduct* is more regulable under various First Amendment doctrines — especially when children are in the audience. *See, e.g.*, *City of Erie v. Pap's A.M.*, 529 U.S. 277, 295 (2000) (holding public nudity ban "may place incidental burdens on some protected speech"); *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 732 (1978) (finding FCC may regulate monologue referencing "sexual activities" because "children are in the audience"). Thus, even if

6

Plaintiffs' proposed event is lawful, WT could arguably regulate the "time, place, and manner" of the show to protect children.

Fourth, President Wendler's letter expressly or impliedly invoked countervailing federal, state, and WT policies relevant to harassment of other protected classes — specifically, women. ECF No. 28-1 at 2–3. Yet Plaintiffs never explain how or if Defendants must reconcile these competing, conflicting legal obligations. *See, e.g.*, 20 U.S.C. § 1681(a); 34 C.F.R. § 106.8(c); *see also* Texas H.B. No. 900, S.B. No. 12. At this MTD Phase, Plaintiffs have not addressed or analyzed President Wendler's arguably reasonable efforts to reconcile binding harassment laws, regulations, and policies with applicable Free Speech standards.

### LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), the Court evaluates the pleadings by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Barnett v. Perfect Search Corp.*, No. 3:14-CV-2840-D, 2014 WL 6805529, at *1 (N.D. Tex. Dec. 3, 2014) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). To survive a motion to dismiss, a complaint must allege enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) "when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). And "a defendant's entitlement to qualified immunity should be determined at the earliest possible stage of the litigation." *Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021) (per curiam), *cert. denied*, 142 S. Ct. 2571 (2022).

To be entitled to a preliminary injunction, an applicant must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is

not granted; (3) the threatened injury outweighs the threatened harm to the party whom he seeks

to enjoin; and (4) the granted injunction will not disserve the public interest. *See Bluefield Water

Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 252–53 (5th Cir. 2009). A plaintiff bears the burden

on all four factors, and failure on any one of them warrants denial. *Id.* at 253.

ANALYSIS

A. President Wendler Is Entitled to Qualified Immunity

Qualified immunity protects government officials acting within their authority from

individual liability "when their actions could reasonably have been believed to be legal." *Morgan

v. Swanson*, 659 F.3d 359, 412 (5th Cir. 2011) ("*Morgan I*"). And "[w]here there are no allegations

of malice, there exists a 'presumption in favor of qualified immunity' for officials in general, and

for educators in particular." *Morgan v. Swanson*, 755 F.3d 757, 760 (5th Cir. 2014) (internal marks

omitted). This is especially true "where the area of law is as 'abstruse' and 'complicated' as First

Amendment jurisprudence." *Id.* at 761 (internal marks omitted).[10] Indeed, because "the nearly

universal prohibition against viewpoint discrimination does not inform an official as to what,

precisely, constitutes viewpoint discrimination," "sweeping statements" about the First

Amendment "are not sufficient to deprive a teacher of qualified immunity." *Id.* Thus, "educators

are rarely denied immunity from liability arising out of First-Amendment disputes." *Id.* at 760.

To defeat the presumption in favor of qualified immunity, Plaintiffs must show: (1) the

official "violated a statutory or constitutional right"; and (2) the right was "clearly established at

the time." *Bevill v. Fletcher*, 26 F.4th 270, 275 (5th Cir. 2022). However, judges "are free to decide

which prong of the qualified immunity analysis to address first." *Taylor v. LeBlanc*, 68 F.4th 223,

---

[10] *See also Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 288 (4th Cir. 2021) (in "gray areas" where the law is "unsettled or murky," qualified immunity protects actions that are "not clearly forbidden"); *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 308 (3d Cir. 2013) (courts "must take into account" that school officials must often act "suddenly and unexpectedly" based on their experience).

227 (5th Cir. 2023). Substantively, a clearly established right is one "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). And it is the plaintiff's burden "to find a case in his favor that does not define the law at a high level of generality." *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019). That said, there is no requirement that a case be "directly on point for a right to be clearly established," but existing precedent must "squarely govern[]" the specific facts at issue to place "the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018); *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 337 (5th Cir. 2020).[11]

Lastly, "[e]ven if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable." *Wallace v. Cnty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Kisela*, 138 S. Ct. at 1152 (citing *White v. Pauly*, 580 U.S. 73, 79 (2017)).

### 1. Plaintiffs have not alleged facts sufficient to prove President Wendler violated a "clearly established right" or that his conduct was "objectively unreasonable."

Here, there is no dispute that President Wendler's action was within the scope of his discretionary authority. Thus, Plaintiffs must demonstrate President Wendler violated their "clearly established rights" to overcome the presumption in favor of qualified immunity. At this MTD Phase, Plaintiffs fall short.

---

[11] The Supreme Court has held that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). But "*Hope*'s holding historically has been applied to only the 'rare obvious case,' involving 'extreme circumstances,' or 'particularly egregious' misconduct." *Frasier v. Evans*, 992 F.3d 1003, 1021 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 427 (2021); *see also Morgan I*, 659 F.3d at 373 (*Hope* is limited to "a certain category of 'obvious' cases"). This is not the sort of "obvious" case that implicates *Hope* and its progeny. *See, e.g., Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (denying qualified immunity to correctional officers where inmate "was left to sleep naked in sewage" for six full days).

Plaintiffs' best case is a non-binding, forty-year-old opinion concerning a male beauty pageant from the Western District of Oklahoma. *See Norma Kristie, Inc. v. City of Okla. City*, 572 F. Supp. 88, 91 (W.D. Okla. 1983). But *Norma Kristie* is distinguishable for at least three reasons. First, it is not a campus case and therefore cannot clearly establish the rights of students on campus beyond debate. *See, e.g.*, *Doe v. Silsbee Indep. Sch. Dist.*, 440 Fed. Appx. 421, 427 (5th Cir. 2011) (per curiam) ("It is also well settled that students' First Amendment rights are curtailed while in school."). Second, the defendants in *Norma Kristie* did not produce "a shred of evidence that the pageant includes depictions of sexual conduct" to support their conclusion that the event was "obscene." *Norma Kristie*, 572 F. Supp at 92. Third, *Norma Kristie*'s holding that the pageant constituted protected "expression" is questionable when applied to the facts of this case. *Id.* at 91.

    *a.  As presented to President Wendler, the proposed event does not necessarily survive the First Amendment taxonomies that apply in campus settings, where children are in the audience — at least not at this MTD Phase.*

The First Amendment "protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023). Historically, First Amendment jurisprudence countenanced reasonable limits on Free Speech as the alleged expression moved from "thought" to "speech" to "conduct."[12] Today, First Amendment protection for the latter extends "only to conduct that is inherently expressive." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006).[13]

---

[12] *See, e.g.*, Jud Campbell, *Natural Rights and the First Amendment*, 127 YALE L. J. 246, 256 (2017) ("There is no evidence, for instance, that the Founders denied legislative authority to regulate expressive conduct in promotion of the public good — a principle that runs contrary to countless *modern* decisions.") (emphasis added); *id.* at 286 n.188; *see also O'Brien*, 391 U.S. at 376 (articulating and applying a four-part test for judging the validity of content-neutral regulations that incidentally impact expression); *Doe v. City of Lafayette, Ind.*, 377 F.3d 757, 765 (7th Cir. 2004) ("[R]egulations aimed at conduct which have only an incidental effect on thought do not violate the First Amendment's freedom of mind mandate.").

[13] *See, e.g.*, *Schultz v. City of Cumberland*, 228 F.3d 831, 841 (7th Cir. 2000) ("In most cases, the government may regulate conduct without regard to the First Amendment because most conduct carries no expressive meaning of First Amendment significance.").

"In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," this Court must ascertain whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404. Courts have "considered the context in which it occurred," and whether "[t]he expressive, overtly political nature of th[e] conduct was both intentional and overwhelmingly apparent." *Id.* at 405–06. And while "[i]t is possible to find some kernel of expression in almost every activity a person undertakes . . . such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). Accordingly, a party must advance more than a mere "plausible contention" that its conduct is expressive. *Church of Am. Knights of the KKK v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) (holding that white masks worn by Klan members have no independent expressive value).[14]

Though apparel and attire "are certainly a way in which people express themselves, clothing as such is not — not normally at any rate — constitutionally protected expression." *Brandt v. Bd. of Educ. of City of Chi.*, 480 F.3d 460, 465 (7th Cir. 2007) (Posner, J.).[15]

---

[14] Notably, the Supreme Court "did not alter these standards" in subsequent cases. *Kerik*, 356 F.3d at 205 n.6 ("While we are mindful of *Hurley*'s caution against demanding a narrow and specific message before applying the First Amendment, we have interpreted *Hurley* to leave intact the Supreme Court's test for expressive conduct in *Texas v. Johnson*.") (citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995)). Importantly, *Hurley* only "disallowed compelled, participatory speech," and does not extend to circumstances "where a speaker in a public forum seeks only to be heard, not to have his speech included or possibly confused with another's, and has not violated a valid statute or ordinance." *Startzell v. City of Phila., Pa.*, 533 F.3d 183, 194 (3d Cir. 2008); *Gathright v. City of Portland, Or.*, 439 F.3d 573, 578 (9th Cir. 2006); *see also Kleinman v. City of San Marcos*, 597 F.3d 323, 327 (5th Cir. 2010) (sharing the Second Circuit's post-*Hurley* "skepticism that the heavy machinery of the First Amendment is to be deployed in every case involving visual non-speech expression"). It is therefore not the case that "[b]allet, orchestra, paintings, sculptures, saluting, kneeling in prayer, kneeling in protest, photography, and even opera would lack First Amendment protection" if "President Wendler had his way." ECF No. 45 at 20. Axiomatically, these actions either "convey a particularized message" or are "works of fine art." *Johnson*, 491 U.S. at 404; *Kleinman*, 597 F.3d at 327.

[15] *See also Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 390 (6th Cir. 2005) (the First Amendment does not protect "vague and attenuated" notions of self-expression); *Zalewska v. Cnty. of Sullivan, N.Y.*, 316 F.3d 314, 320 (2d Cir. 2003) ("[A] person's choice of dress or appearance in an ordinary context does not possess the communicative elements necessary to be considered speech-like conduct entitled to First Amendment protection."); *Canady v. Bossier*

Instead, courts have applied Free Speech protection to manners of dress only when and where the context "establish[es] that an unmistakable communication is being made." *Edge v. City of Everett*, 929 F.3d 657, 668 (9th Cir. 2019) ("Because wearing pasties and g-strings while working at Quick-Service Facilities is not 'expressive conduct' within the meaning of the First Amendment, the Dress Code Ordinance does not burden protected expression."); *Edge v. City of Everett*, 291 F. Supp. 3d 1201, 1204 (W.D. Wash. 2017). Thus, the Ninth Circuit rejected the argument that scantily clad baristas conveyed a Free Speech-protected message of "fearless body acceptance and freedom from judgment." *Edge*, 291 F. Supp. 3d at 1204. And consequently, at this point in Free Speech jurisprudence, it is not clearly established that all "drag shows" are categorically "expressive conduct." *See Edge*, 929 F.3d at 669.

Furthermore, as Plaintiffs admit, some drag shows "are intentionally risqué, some comedic, some outlandish, and some would not give a moment's pause to a Motion Picture Association reviewer." ECF No. 28 at 18. Accordingly, an objective viewer observing biological men "performing" while dressed in attire stereotypically associated with women — without accompanying political speech or dialogue — would not necessarily discern an "unmistakable" or "overwhelmingly apparent" communication of "LGBTQ+ rights." *Id.* at 17.[16] For example, persons viewing "male football players posing in cheerleader skirts" or the drag scene from the 1943 film "This is the Army" are unlikely to discern a political message. *Id.* And even if

---

*Par. Sch. Bd.*, 240 F.3d 437, 440 (5th Cir. 2001) ("[A] male student's choice of hair length [does] not convey sufficient communicative content to warrant First Amendment coverage."); *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1307 n.4 (8th Cir. 1997) (upholding school's ban on students displaying gang tattoos because the tattoos were "nothing more than 'self-expression'"); *Star v. Gramley*, 815 F. Supp. 276, 279 (C.D. Ill. 1993) ("[T]he plaintiff has no 'clearly established' right to cross-dress . . . ."); *but see A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 701 F. Supp. 2d 863, 882 (S.D. Tex. 2009), *aff'd*, 611 F.3d 248 (5th Cir. 2010) ("A.A.'s braids convey a particularized message of his Native American heritage and *religion*.") (emphasis added).

[16] *See Rumsfeld*, 547 U.S. at 66 ("The fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection . . . ."); *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) ("Conduct does not become speech for First Amendment purposes merely because the person engaging in the conduct intends to express an idea.").

12

explanatory speech could aid Plaintiffs, the context of this show does not help. That is because an observer may not discern that the performers' conduct communicates "advocacy in favor of LGBTQ+ rights." *See Tagami v. City of Chi.*, 875 F.3d 375, 378 (7th Cir. 2017) (Sykes, J.) (rejecting argument that a woman's public nudity in the context of "GoTopless Day" communicated a message of political protest against gender-specific standards of public decency because such message was not "overwhelmingly apparent" to onlookers).

Plaintiffs cite *Schacht v. United States* to argue the First Amendment affords protection whenever "people get on stage and perform." 398 U.S. 58, 63 (1970). But *Schacht*'s holding turned on core political speech — specifically, the "right openly to criticize the Government during a dramatic performance." *Id.* There, the "preparation and repeated presentation by amateur actors of a short play designed to create in the audience an understanding of and opposition to our participation in the Vietnam War." *Id.* at 61. Thus, core *political* speech was at issue — not mere expressive conduct and certainly not *sexualized* expressive conduct. Similar facts have not been alleged in this case.

Additionally, the Supreme Court's decision in *Schad v. Borough of Mount Ephraim* is unavailing. 452 U.S. 61, 76 (1981). There, the Court held unconstitutionally overbroad an ordinance banning "*all* live entertainment, including nonobscene nude dancing . . . otherwise protected by the First Amendment." *Id.* at 76 (emphasis added); *see also Fowler v. Bd. of Educ. of Lincoln Cnty., Ky.*, 819 F.2d 657, 664 n.8 (6th Cir. 1987) ("[I]n determining whether a given type of entertainment is protected by the First Amendment, [courts] look to the kind of entertainment involved and the appropriateness of the entertainment under the circumstances such as the time and place where offered."); *Jones v. Schneiderman*, 974 F. Supp. 2d 322, 334 n.4 (S.D.N.Y. 2013) (*Schad* "did not categorically hold that all 'live entertainment' qualifies for First Amendment

protection."). Unlike *Schad*, *Fowler*, or *Schneiderman*, there are no overbreadth issues or arguments in this case.

Furthermore, Plaintiffs miscite and misread *Se. Promotions, Ltd. v. Conrad*. 420 U.S. 554 (1975). Like *Norma Kristie*, *Conrad* concerned a controversial show on municipal property — not a university campus. *Id.* at 556. And the show was a "rock musical" rather than a "drag show," or what the Supreme Court characterized as "live drama." *Id.* at 557. Specifically, the performance entailed "the acting out — or singing out — of the written word," and "mixe[d] speech with live action or conduct." *Id.* at 557–58. Lastly, *Conrad* "predate[s] the Supreme Court's delineation of limited public fora as a distinct type of government property." *Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.*, 660 Fed. Appx. 600, 604 (10th Cir. 2016).[17] Thus, *Conrad* cannot establish Plaintiffs' asserted right "beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

Because men dressed in attire stereotypically associated with women is not "overtly political" in a category of performative conduct that runs the gamut of transvestitism — *e.g.*, *onnagata* in kabuki, Sigma Chi fraternity brothers in a distasteful "ugly woman" contest, *jogappa* priests worshiping Yellamma, and Matt Damon depicting a Yale University thespian in *The Good Shepherd* — it is not clearly established that all drag shows are inherently expressive as defined in *Johnson*. 491 U.S. at 406.[18]

---

[17] *See also Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010) (discussing "traditional and designated public forums," "limited public forums," and "nonpublic forums"). "Regulation of speech in traditional or designated public forums must pass strict scrutiny with a compelling state interest and narrow tailoring." *Id.* But the government may restrict speech in *limited* public forums if the regulation "(1) does not discriminate against speech on the basis of viewpoint and (2) is reasonable in light of the purpose served by the forum." *Id.*

[18] *Norma Kristie* also undermines Plaintiffs' argument. To the extent the pageant in *Norma Kristie* can be equated with present-day drag shows, the court noted female impersonations by males "may not be necessarily equated with homosexuality." 572 F. Supp. at 92. Thus, at this MTD Phase, it is unclear how drag shows unmistakably communicate advocacy for LGBT+ rights. *See, e.g.*, GAYS AGAINST GROOMERS, https://www.gaysagainstgroomers.com/about ("The overwhelming majority of gay people . . . directly oppose[] the sexualization and indoctrination of children. This includes drag queen story hours [and] drag shows involving children.").

*b. President Wendler's conduct was not "objectively unreasonable."*

But even if the First Amendment is implicated, President Wendler knew of potential lewdness, which is prohibited under school policy. ECF No. 37 at 7 (prohibiting "[p]ublic behavior that is disruptive, lewd, or indecent") (alteration in original).[19] And the First Amendment does not prevent school officials from restricting "vulgar and lewd" conduct that would "undermine the school's basic educational mission" — particularly in settings where children are physically present. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986); *Sasser v. Bd. of Regents of Univ. Sys. of Ga.*, No. 21-14433, 2023 WL 2446720, at *5 (11th Cir. Mar. 10, 2023).[20] Here, Plaintiffs advised President Wendler the event would be open to children. ECF No. 28 at 18. Although Plaintiffs attest the show was rated "PG-13" — a term undefined by Plaintiffs but presumably based on the familiar Motion Picture Association ("MPA") ratings[21] — contemporaneous media accounts of similarly advertised events reflect a range of highly sexualized content.[22]

---

[19] Sex-specific conduct is often subject to lesser protections under the First Amendment. *See, e.g.*, *City of Erie v. Pap's A.M.*, 529 U.S. 277, 295 (2000) ("[T]here is nothing objectionable about a city passing a general ordinance to ban public nudity even though such a ban may place incidental burdens on some protected speech") (internal marks omitted); *Miller v. California*, 413 U.S. 15, 26 (1973) ("At a minimum, prurient, patently offensive depiction or description of sexual conduct must have serious literary, artistic, political, or scientific value to merit First Amendment protection."); *Schultz*, 228 F.3d at 841 ("[A] general prohibition on all public nudity receives intermediate scrutiny, rather than strict scrutiny, when the government offers as its legislative justification the suppression of public nudity's negative secondary effects.")

[20] "While the Court 'made clear that students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,' the Court also held in *Bethel* that 'the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings.'" *Sasser*, WL 2446720, at *5 (cleaned up). This makes it "all the more obvious that the law in this area is not so clearly established to put [President Wendler] on notice so as to defeat qualified immunity." *Sasser*, WL 2446720, at *5.

[21] The Classification and Ratings Administration brochure published by the predecessor MPAA defines "PG" to include "violence or brief nudity" and the stronger "PG-13" label communicates a "stronger caution for parents" that the content includes "stronger language, extended violence or sexual situations and drug-use." Kendra Moyses, *What do Movie Ratings Mean?*, MICH. STATE UNIV. EXTENSION (Sept. 27, 2017), https://www.canr.msu.edu/news/what_do _movie_ratings_mean. Today, MPA states that "[a] PG-13 motion picture may go beyond the PG rating in theme, violence, nudity, sensuality, language, adult activities or other elements . . . ." *Classification and Rating Rules*, MOTION PICTURE ASS'N INC. 6–7 (July 24, 2020), https://www.filmratings.com/content/downloads/rating_rules.pdf.

[22] *See, e.g.*, Christopher F. Rufo, *The Real Story Behind Drag Queen Story Hour*, CITY J. (Oct. 2022) https://www.city-journal.org/the-real-story-behind-drag-queen-story-hour (collecting stories).

Although the Court infers in Plaintiffs' favor that the show would not have been lewd, Plaintiffs do not allege President Wendler was *aware* of their efforts to purge lewdness. *See* ECF No. 28 at 18; *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) ("A qualified immunity defense alters the usual summary judgment burden of proof."). Additionally, Plaintiffs selected an emcee whose past performances were arguably inappropriate for children of any age: Myss Myka's performance involved "stimulated stripping (and accepting money from audience members as if he were a stripper), simulated masturbation, bouncing feminine breasts (possibly prosthetic, possibly not), and frequent presentation of his barely covered crotch." ECF No. 37 at 6.[23]

"[T]here is a compelling interest in protecting the physical and psychological well-being of minors." *Sable Commc'ns of Ca., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989); *see also New York v. Ferber*, 458 U.S. 747, 757 (1982) ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance."). Thus, even if clearly established rights were violated, President Wendler's decision was still "objectively reasonable." *Wallace*, 400 F.3d at 289.

    *c.   Plaintiffs misstate and misapply the remaining First Amendment cases.*

Plaintiffs cite *Papish v. Bd. of Curators of Univ. of Mo.*, which involved a campus newspaper and a political cartoon "depicting policemen raping the Statue of Liberty and the Goddess of Justice." 410 U.S. 667, 667 (1973). There, the Supreme Court held that "the mere dissemination of ideas — no matter how offensive to good taste — on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Id.* at 670. But *Papish* cannot clearly establish Plaintiffs' asserted right because "[t]he government generally has a freer hand in restricting expressive *conduct* than it has in restricting the written or spoken word." *Johnson*, 491

---

[23] *See* Elies Baltimore, *Myss Myka Performing 2-24-23*, YouTube (Feb. 27, 2023), https://www.youtube.com/watch?v=QR9BjFpPeK0.

U.S. at 406. (emphasis added). That a school newspaper cannot censor political cartoons does not "clearly establish" a right to parade Myss Myka's "barely covered crotch" before an audience that includes children arrayed in a limited public forum. ECF No. 37 at 6. And it was offensive conduct that President Wendler's email purported to restrict — not offensive ideas or political messages. In fact, President Wendler expressly supported the "noble cause" of raising funds for LGBT+ suicide prevention. *See* ECF No. 28-1 at 2, 4 ("Supporting The Trevor Project is a good idea. My recommendation is to skip the show and send the dough.").[24]

Next, Plaintiffs cite *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386 (4th Cir. 1993). But this too did not concern a "drag show." *Sigma Chi* involved a male fraternity's "ugly woman contest" — "an exercise of teenage campus excess" with an "obvious sophomoric nature." *Id.* at 389. In the university's view, the problem was not the conduct itself. Rather, "the message conveyed" by the contest "ran counter to the views" the university promoted: "racial integration and gender neutrality." *Id.* at 392–93. Accordingly, the court applied *Johnson* and found a message "likely to be understood" by the audience — "that racial and sexual themes should be treated lightly." *Id.* at 391–92. Additionally, the school issued sanctions that "included suspension from all activities for the rest of the 1991 spring semester," "a two-year prohibition on all social activities," and "required Sigma Chi to plan and implement an educational program addressing cultural differences, diversity, and the concerns of women." *Id.* at 388. Thus, the question was not whether Sigma Chi had an unqualified constitutional right to dress members in outlandish and stereotypically female attire. *Id.* The question was whether the school could punish

---

[24] For similar reasons, President Wendler's action does not constitute "viewpoint discrimination" because it does not discriminate based on "the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see also Robertson*, 989 F.3d at 290 (rejecting argument that school principal's refusal to include a student's LGBT-themed essay in a class essay booklet was viewpoint discrimination).

the fraternity "because its boorish *message* had interfered with the described University mission." *Id.* at 392. But here, Plaintiffs have not been sanctioned by President Wendler. And it is the conduct contained in the fundraiser that President Wendler identified as the problem — not the message. ECF No. 28-1 at 3.

Plaintiffs next turn to the Fourth Circuit case, *Berger v. Battaglia*, 779 F.2d 992 (4th Cir. 1985). There, the issue was whether "the Baltimore Police Department could condition the continued employment of one of its police officers upon his cessation of off-duty public entertainment performances in blackface that members of Baltimore's black community found offensive." *Id.* at 993. Hence, *Berger* involved neither drag shows nor campuses, but instead the heavily regulated public employee sector.[25] And indeed, *Berger*'s only real similarity to this case is that it broadly concerned a form of entertainment some members of the community found offensive. But it cannot clearly establish Plaintiffs' asserted right when it otherwise involved different facts and a different body of First Amendment case law.

Finally, Plaintiffs cite the Supreme Court's decision in *Widmar v. Vincent*, 454 U.S. 263 (1981). This too misses the mark. *Widmar* only addressed content-based exclusions of religious speech in an "open forum" on campus. *Id.* at 265. It does not clearly establish a right to conduct a drag show on campus in a yet-to-be-determined forum — though First Amendment practitioners rarely miss an opportunity to drop a *Widmar* quote out of context.

Plaintiffs thus fail to clearly establish a First Amendment right to conduct a "PG-13" drag show with performers like Myss Myka at a designated or limited public forum on a university campus in front of children. None of these cases involved drag shows of the type that have become increasingly controversial. And, except for *Conrad*, none involved potentially lewd conduct.

---

[25] *See Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022) ("[T]he school is not the workplace.").

Nor are they especially helpful in addressing the limits of reasonable "time, place, and manner" restrictions on indecent conduct or ways school officials might justify restrictions on protected forms of expression.[26] Critically, even if the lower court cases were directly on point, it would be "insufficient to create a robust consensus" that would clearly establish the asserted constitutional right beyond debate. *Morrow v. Meachum*, 917 F.3d 870, 879–80 (5th Cir. 2019) (recognition of a doctrine in *six circuits* is insufficient).[27]

Plaintiffs lament that President Wendler's email states he will not allow the drag show "even when the law of the land appears to require it." *See* ECF No. 28-1 at 4. But for reasons explained, that law is not "clearly established" — if it is indeed the law at all. To the extent President Wendler's statement conveys a belief that there is a clearly established right and is not an expression of "confusion typical of many Americans" on what the Constitution requires, his statement is incorrect and therefore irrelevant. *See* ECF No. 52 at 8; *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (the inquiry "generally turns on the objective legal reasonableness of the action") (internal marks omitted).

---

[26] *See, e.g., Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 286 (5th Cir. 2001) (assuming without deciding that a school uniform policy restricted "expressive conduct" but finding "little difficulty" in deeming it constitutional).

[27] For the same reasons, two district court cases cannot clearly establish a constitutional right to defeat qualified immunity. And even if they could, these cases established the law *after* President Wendler denied Plaintiffs' application. *See Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) (the defendant's actions must be objectively unreasonable "at the time of the violation"). Plaintiffs first cite a district court's holding that a Tennessee statute "criminaliz[es] the performance of 'adult cabaret entertainment' in 'any location where the adult cabaret entertainment could be viewed by a person who is not an adult'" is unconstitutional. *Friends of Georges, Inc. v. Mulroy*, No. 2:23-CV-02163-TLP-TMP, 2023 WL 3790583, at *1 (W.D. Tenn. June 2, 2023). The court mentioned *Johnson* but otherwise provided no analysis on why restrictions on drag shows necessarily restrict "expressive conduct." *Id.* at *18. Additionally, *Mulroy* is distinguishable because it: (1) involved restrictions on "indecent but not obscene" conduct (*i.e.*, erotic dancing), whereas Plaintiffs' show was purportedly non-lewd; (2) is not a school campus case; and (3) was decided on vagueness and overbreadth grounds. *Id.* at *19. Likewise, *S. Utah Drag Stars v. City of St. George* is distinguishable for similar reasons. No. 4:23-CV-00044-DN-PK, 2023 WL 4053395, at *2 (D. Utah June 16, 2023). There, the court held that drag shows are "indisputably protected speech" but did not explain why. *Id.* at *20. Instead, the court boldly declared contrary arguments "do not merit discussion." *Id.*

19

For the foregoing reasons, President Wendler did not violate Plaintiffs' clearly established rights and is therefore entitled to qualified immunity.[28] Accordingly, Plaintiffs' damages claim against President Wendler in his individual capacity must be dismissed.

### B. Sovereign Immunity Does Not Bar Plaintiffs' Claims for Prospective Relief Against President Wendler in His Official Capacity

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). Still, the defense is not available "where injunctive relief is sought instead of or in addition to damages." *Id.* at 242. However, the Eleventh Amendment generally bars federal courts from telling state officials "'how to conform their conduct to state law' — for one can hardly imagine 'a greater intrusion on state sovereignty.'" *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 450 (5th Cir. 2022) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)).

One exception to sovereign immunity is where a lawsuit against a state official in his official capacity "seeks prospective relief to redress an ongoing violation of federal law." *Id.* at 451 (citing *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020)). For *Ex parte Young* to apply, three criteria must be satisfied: (1) a plaintiff must name individual state officials as defendants in their official capacities; (2) the plaintiff must allege an ongoing violation of federal law; and (3) the relief sought must be properly characterized as prospective. *Id.*

"[A] complaint must allege that the defendant *is violating* federal law, not simply that the defendant has done so." *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015). "This requirement is similar but not identical to the Article III minimum for standing to request an

---

[28] *See Radwan v. Manuel*, 55 F.4th 101, 122 (2d Cir. 2022) ("In light of the absence of a decision by the Supreme Court or this Court on the application of the First Amendment . . . as well as the lack of any consensus among other courts on this issue, we conclude that the defendants are entitled to qualified immunity."); *Abbott v. Pastides*, 900 F.3d 160, 175 (4th Cir. 2018) ("At a minimum, the University defendants were not on clear notice . . . .").

injunction, which requires ongoing harm or a threat of imminent harm." *Id.* at 394 n.5 (citing *City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983)); *see also Air Evac EMS, Inc. v. Tex. Dep't of Ins. Div. of Workers' Comp.*, 851 F.3d 507, 513–14 (5th Cir. 2017) ("[T]here is significant overlap between standing and *Ex parte Young*'s applicability."). Accordingly, "when there is no ongoing or impending violation of federal law, a federal court may not issue declaratory or 'notice' relief, even though that relief would be 'prospective' and would not require payments from the state treasury." *Watkins v. Blinzinger*, 789 F.2d 474, 484 (7th Cir. 1986) (Easterbrook, J.). Lastly, in determining whether *Ex parte Young* applies, a court need only conduct a "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Phillips*, 24 F.4th at 451 (cleaned up).

The Court need not accept allegations of ongoing harm at face value; the allegations must be plausible.[29] Here, a plausible reading of the facts might suggest Plaintiffs' only evidence of harm is a single letter distributed via email. And because Plaintiffs' other requests have been approved since President Wendler's denial — including drag show practice — there are arguably no "ongoing consequences of past violations of federal rights." *Rep. of Paraguay v. Allen*, 134 F.3d 622, 628 (4th Cir. 1998); ECF No. 39-1 at 4. However, the Court at this stage must view the facts in a light most favorable to Plaintiffs. And President Wendler's email unequivocally declares the university "will not" host a drag show because a harmless drag show is "[n]ot possible." ECF

---

[29] *See, e.g.*, *Allen v. Cooper*, 895 F.3d 337, 354 (4th Cir. 2018), *aff'd*, 140 S. Ct. 994 (2020) (suggesting *the possibility* of future infringement "does not plausibly allege the existence of an ongoing violation of federal law"); *Cantu Servs., Inc. v. Roberie*, 535 Fed. Appx. 342, 345 (5th Cir. 2013) ("Despite its facial pleading, the question remains whether Cantu alleged an ongoing federal law violation."); *DeBauche v. Trani*, 191 F.3d 499, 505 (4th Cir. 1999) (Allegations that the plaintiff "will be excluded from future debates do not, as a matter of law, allege an ongoing violation of federally-protected rights. Instead, they amount to conjecture regarding discrete future events. Mere conjecture is insufficient to transform a one-time event into a continuing governmental practice or an ongoing violation."); *Stanley v. Gallegos*, No. CV 11-1108 GBW/JHR, 2018 WL 3801247, at *6 (D.N.M. Aug. 9, 2018) ("The so-called 'straightforward inquiry' into whether Plaintiff has alleged an ongoing violation of federal law is in fact quite a thorny question in practice . . . .").

No. 28-1 at 2, 4. Thus, Plaintiffs' allegations are sufficient to satisfy the "ongoing violation" prong of the *Ex parte Young* inquiry. *See Freedom from Religion Found. v. Abbott*. 955 F.3d 417, 424–25 (5th Cir. 2020) (holding the plaintiff alleged an "ongoing violation" of federal law where defendants sent a letter to plaintiffs stating any future applications will be denied). Therefore, Plaintiffs' claims for injunctive relief against President Wendler in his official capacity are not barred by sovereign immunity. Accordingly, the Court **DENIES** Wendler's Motion **IN PART** and turns to Defendants' Motion.

### C.  Plaintiffs Lack Standing Against the Board of Regent Defendants

The judicial power of federal courts is limited to certain "Cases" and "Controversies." U.S. CONST. art. III, § 2. This case-or-controversy requirement requires a plaintiff to establish he has standing to sue. *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013). To have standing, the party invoking federal jurisdiction must show: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Courts should assess whether the alleged injury to the plaintiff has a "close relationship" to harm "traditionally" recognized as providing a basis for a lawsuit in American courts. *Id.* at 2204. "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Id.* at 2208. And because vicarious liability is inapplicable to § 1983 suits, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Aside from President Wendler, Plaintiffs also sued Vice President of Student Affairs Christopher Thomas ("Dr. Thomas"), Chancellor John Sharp, and each member of the Board of Regents ("Board Defendants") (collectively, "WT Defendants"). ECF No. 28 at 6–8. Here, parties quarrel over whether WT Defendants: (1) had any part in President Wendler's decision; (2) have any authority — individually or collectively — to overrule that decision; and (3) are imminently likely to prevent a second drag show. The Court finds that Plaintiffs have standing against Dr. Thomas and Chancellor Sharp but not against the Board Defendants.

To begin, Plaintiffs allege Dr. Thomas enforced President Wendler's directive and is likely to enforce any future directives. *See* ECF No. 28 at 32; *Speech First, Inc. v. Fenves*, 979 F.3d 319, 336 (5th Cir. 2020) ("Past enforcement of speech-related policies can assure standing . . . ."). Likewise, President Wendler is "[s]ubject to, and under the general authority of" Chancellor Sharp. TEX. A&M UNIV. SYS., SYS. POL'Y 02.05. Chancellor Sharp is responsible for "supervis[ing] the implementation" of "basic policies," making recommendations for policies to the Board, and has been "delegated authority to do all things necessary to fulfill such responsibility." TEX. A&M UNIV. SYS., SYS. POL'Y 02.02. Chancellor Sharp has a "history of involving himself in university free speech matters," ECF No. 45 at 36, but as Plaintiffs note, he did not override or "even denounce[]" President Wendler's letter. ECF No. 45 at 35. Thus, Plaintiffs persuasively plead an apparent disconnect in university policy: under Chancellor Sharp's leadership, the Texas A&M University System is a national leader in LGBT advocacy, with the College Station flagship hosting "Lavender Graduation," "Coming Out Monologues," and "Draggieland" events at its LGBTQ+ Pride Center; yet affiliate WT charts a different course — at least in this case.[30]

---

[30] *See generally* Student Life, *LGBTQ+ Pride Center*, TEX. A&M UNIV., https://studentlife.tamu.edu/lgbtq; draggieland (@draggieland), INSTAGRAM, www.instagram.com/draggieland/ (last viewed on Sept. 15, 2023).

23

"At earlier stages of litigation," the "manner and degree of evidence required to show standing is less than at later stages." *Fenves*, 979 F.3d at 329. It does not "appear[] certain" at this MTD Phase that Plaintiffs "cannot prove any set of facts" in support of their claim that would entitle them to relief. *Home Builders Ass'n*, 143 F.3d at 1010. In other words, "it is plausible" that Chancellor Sharp and Dr. Thomas have some connection to President Wendler's edict. *Haverkamp v. Linthicum*, 6 F.4th 662, 671 (5th Cir. 2021).[31] While the Court understands Chancellor Sharp's contention that he did not make the decision to cancel the previously scheduled drag show, he does hold the authority to permit or deny future ones. And because neither side has adequately shown that Chancellor Sharp and Dr. Thomas have no role in this case, the Court declines to exclude them at this point. The Court therefore **DENIES** Defendants' Motion **IN PART**.

The analysis changes for the Board Defendants. Plaintiffs rely exclusively on the fact that the government of the university is "vested" in the Board, which has the power to "make bylaws, rules, and regulations it deems necessary and proper for the government of the university system and its institutions, agencies, and services." TEX. EDUC. CODE ANN. §§ 85.11, 85.21. But "absent any allegations tying" the Board "to the specific decisions at issue, it cannot be plausibly inferred that" the Board "played any role in the decisions" Plaintiffs challenge as unconstitutional. *Haverkamp*, 6 F.4th at 671.[32] Therefore, Plaintiffs lack standing against the Board Defendants. The Court **GRANTS** Defendants' Motion **IN PART**.

---

[31] For the same reasons, Chancellor Sharp and Dr. Thomas are not shielded by sovereign immunity from Plaintiffs' claims for prospective relief. *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) ("[A] finding of standing tends toward a finding that the *Young* exception applies to the state official(s) in question.").

[32] *See also Schwarzer v. Wainwright*, No. 6:18-CV-00034, 2023 WL 2950639, at *19 (S.D. Tex. Jan. 17, 2023), *report and recommendation adopted*, No. 6:18-CV-00034, 2023 WL 2645538 (S.D. Tex. Mar. 27, 2023) ("Plaintiff does not allege that any of the Board member defendants participated personally in the decision . . . .").

### D.  Plaintiffs' Request for Injunctive Relief Should Be Denied

To be entitled to a preliminary injunction, Plaintiffs must show "a substantial likelihood of success on the merits," which is one of the "most significant factors." *Sells v. Livingston*, 561 Fed. Appx. 342, 343 (5th Cir. 2014); *Louisiana v. Becerra*, 20 F.4th at 262 (5th Cir. 2021). And Plaintiffs must also demonstrate irreparable harm, which is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948.1 (3d ed.).

Here, Plaintiffs have not demonstrated they are substantially likely to succeed for the same reasons that President Wendler is entitled to qualified immunity. *See Pearson*, 555 U.S. at 236 ("In some cases, a discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all."). Even if the denial of the drag show does implicate the First Amendment, Plaintiffs have not demonstrated that the university's *policy* on drag shows is incapable of surviving intermediate or strict scrutiny. And because Plaintiffs' irreparable harm argument is predicated on a "clearly established" First Amendment violation, their argument for that factor must fail as well. In any case, Plaintiffs' second show is not scheduled until March 2024. It is therefore doubtful that Plaintiffs will suffer irreparable harm in the coming months while this issue is litigated.

At this stage of litigation, Plaintiffs cannot prevail by invoking the word "expression," as if the Free Speech Clause obliterated all logical distinctions separating (1) thought, speech, and conduct, (2) "time, place, and manner," and (3) children from sexualized conduct. It does not. Of course, Plaintiffs may still ultimately prevail on their request for declaratory relief, but that is a matter for another day. And because these factors are not satisfied, the Court need not reach the other factors requisite for injunctive relief. *See Bluefield*, 577 F.3d at 252–53.

CONCLUSION

For the foregoing reasons, the Court **GRANTS** Wendler's Motion and Defendants' Motion

**IN PART** and **DENIES** Plaintiffs' Amended Motion.

**SO ORDERED**.

September 21, 2023

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

26