United States District Court
Southern District of Texas
**ENTERED**
September 26, 2023
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

THE WOODLANDS PRIDE, INC.,    §
ABILENE PRIDE ALLIANCE,    §
EXTRAGRAMS LLC., 360 QUEEN    §
ENTERTAINMENT LLC.,    §
BRIGITTE BANDIT,    §
   §
   §
     Plaintiffs,    §
   §
   §
v.    §    Civil Action No. H-23-2847
   §
WARREN KENNETH PAXTON, in    §
an official capacity as Attorney    §
General of Texas, MONTGOMERY    §
COUNTY, BRETT LIGON, in an    §
official capacity, CITY OF    §
ABILENE, TAYLOR COUNTY,    §
JAMES HICKS, in an official    §
capacity, DELIA GARZA, in an    §
official capacity, JOE D.    §
GONZALES, in an official capacity,    §
   §
     Defendants.    §
   §

### FINDINGS OF FACT & CONCLUSIONS OF LAW
### & ORDER OF PERMANENT INJUNCTION

Pending before the Court is Plaintiffs' Motion for Temporary Restraining

Order and Preliminary Injunction (Document No. 10). On August 14, 2023, the

Court ordered that the preliminary injunction hearing would be consolidated into a

final trial on the merits. Commencing on August 28, 2023, the Court conducted a

two-day hearing, with witness testimony, as to the request for a TRO and permanent

injunction (final trial on the merits) (the "Hearing"). Having considered the motion, evidence, and oral argument presented at the Hearing, and applicable law, the Court now enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Any conclusion of law that should be construed as a finding of fact is hereby adopted as such. Any finding of fact that should be construed as a conclusion of law is hereby adopted as such.

## I. BACKGROUND

This case arises out of a challenge to the constitutionality of a recent law promulgated by the State of Texas. On June 18, 2023, Texas Governor Greg Abbott signed into law Senate Bill 12 ("S.B. 12")—which was touted as a "Drag Ban" from its inception—and is set to take effect on September 1, 2023. Indeed, the same day he signed S.B. 12 into law, Governor Abbott tweeted the following: "Texas Governor Signs Law Banning Drag Performances in Public. That's Right."[1] S.B. 12 purports to ban "sexually oriented performances" through both civil penalties for commercial entities who host such performances and criminal penalties for

---

[1] *Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction*, Document No. 10 at 10, n. 3.

performers, as well as granting counties and municipalities the ability to ban and regulate such performances.[2]

Based on the foregoing, on August 2, 2023, Plaintiff The Woodlands Pride, Inc. ("Woodlands Pride"), Plaintiff Abilene Pride Alliance ("Abilene Pride"), Plaintiff Extragrams, LLC ("Extragrams"), Plaintiff 360 Queen Entertainment ("360 Queen Entertainment"), and Plaintiff Brigitte Bandit[3] ("Brigitte Bandit") (collectively, "Plaintiffs") brought this suit against Defendant Warren Kenneth Paxton, in an official capacity as the Attorney General of Texas ("Paxton" or the "Attorney General")[4]; Defendant Montgomery County, Texas ("Montgomery"); Defendant Brett Ligon, in an official capacity as District Attorney of Montgomery County ("Ligon"); Defendant City of Abilene, Texas ("Abilene"); Defendant Taylor County, Texas ("Taylor"); Defendant James Hicks, in an official capacity as District Attorney of Taylor County ("Hicks"); Defendant Delia Garza, in an official capacity as County Attorney of Travis County ("Garza"); and Defendant Joe D. Gonzales, in an official capacity as District Attorney of Bexar County ("Gonzalez") (collectively,

---

[2] *Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction*, Document No. 10, Exhibit 1 (*S.B. 12*).

[3] "Brigitte Bandit" is a pseudonym.

[4] This matter was originally filed against Angela Colmenero in her official capacity as Interim Attorney General of Texas. However, the parties agreed to change the case style and caption upon Paxton's reinstatement as Attorney General of Texas.

the "Defendants") seeking to enjoin the enforcement of S.B. 12 on numerous constitutional grounds, including impermissible content and viewpoint restrictions, vagueness, overbreadth, and impermissible prior restraint of speech. On August 9, 2023, the Plaintiffs moved for a temporary restraining order and preliminary injunction. On August 14, 2023, the Court set the Hearing for August 28, 2023, and further ordered the preliminary injunction hearing to be consolidated with a trial on the merits. On August 31, 2023, the Court issued a temporary restraining order ("TRO"), finding the Plaintiffs had carried their initial burden.[5]

## II. **FINDINGS OF FACT**

The following facts have been established by a preponderance of the evidence:[6]

### A. *S.B. 12*

1.  S.B. 12 bans "sexually oriented performances" by: (1) creating civil penalties for commercial entities that host such performances ("Section One"); (2) mandating that counties and municipalities ban many "sexually oriented performances," and granting them authority to regulate other such

---

[5] *Temporary Restraining Order*, Document No. 75 at 1–5.

[6] At the Hearing the Court granted Plaintiffs' motion for judicial notice of Plaintiffs Exhibits 1–21 and 23–29. *See Plaintiffs' Requests for Judicial Notice*, Document No. 47 at 1–6.

performances ("Section Two"); and (3) establishing criminal penalties for performers ("Section Three").[7]

2.  S.B. 12 accomplishes its purported intent by amending multiple areas of Texas law and establishing different enforcement mechanisms assigned to various officials and government entities. Section One gives the Attorney General authority to enforce civil penalties against a person who "controls the premises" where a "sexual oriented performance" occurs with a minor present. Section Two gives local municipalities to regulate "sexual oriented performances." Section Three creates a criminal punishment for "sexual oriented performances," punishable as a class A misdemeanor with penalties of up to a year in jail and a fine of up to $4,000.00.[8]

3.  While S.B. 12 has a severability provision[9], the law relies on the definitions and framework provided in Section Three throughout S.B. 12.[10]

4.  S.B 12 defines a "sexually oriented performance" as a "visual performance" that (A) features (i) a performer who is nude or (ii) a performer who engages in

---

[7] *Plaintiffs' Requests for Judicial* Notice, Document No. 47, Exhibit 1 at 1–5 (*Senate Bill 12, Enrolled Version*) (proposed Tex. Health & Safety Code § 769.002; Tex. Local Gov. Code § 243.0031; Tex. Penal Code § 43.28) [hereinafter *S.B. 12*].

[8] *S.B. 12*, *supra* note 7, at 1–5.

[9] *S.B. 12*, *supra* note 7, at 1–5.

[10] *S.B. 12*, *supra* note 7, at 3–4.

"sexual conduct"; and (B) appeals to the prurient interest in sex. "Visual performance" is not defined in S.B. 12 or elsewhere in Texas law.

5.      Section Three of S.B. 12 establishes five categories of "sexual conduct": (1) "the exhibition or representation, actual or simulated, of sexual acts, including vaginal sex, anal sex, and masturbation;"[11] (2) the "exhibition or representation, actual or simulated, of male or female genitals in a lewd state, including a state of sexual stimulation or arousal;"[12] "the exhibition of a device designed and marketed as useful primarily for the sexual stimulation of male or female genitals;" (4) "actual contact or simulated contact occurring between one person and the buttocks, breast, or any part of the genitals of another person;" and (5) "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics."[13]

6.      Any performer who is "nude" or "engages in sexual conduct" during a visual performance engages in a "sexually oriented performance" if their conduct

---

[11] *S.B. 12*, *supra* note 7, at 3–4.

[12] *S.B. 12*, *supra* note 7, at 3–4.

[13] *S.B. 12*, *supra* note 7, at 3.

6

"appeals to the prurient interest in sex."[14] "[P]rurient interest" is undefined under Texas law.[15]

7.    S.B. 12 uses the definition of "nude" provided for in the Texas Business and Commerce Code,[16] which includes anyone who is "entirely unclothed" or "clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks."[17]

---

[14] *S.B. 12, supra* note 7, at 3.

[15] The Court notes the term is borrowed from the Supreme Court's *Miller* test for obscenity, however none of the accompanied language is present in S.B. 12. The *Miller* test for obscenity includes the following criteria: (1) whether "the average person, applying contemporary community standards" would find that the work, "taken as a whole," appeals to "prurient interest" (2) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (3) whether the work, "taken as a whole," lacks serious literary, artistic, political, or scientific value. *Miller v. California,* 413 U.S. 15, 21, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973) [hereinafter *Miller Test*].

[16] *S.B. 12, supra* note 7, at 4.

[17] Tex. Bus. & Com. Code § 102.051.

**B.    S.B. 12 Legislative History[18]**

8.    When S.B. 12 was first introduced on March 21, 2023, and enrolled on June 19, 2023, the Author's/Sponsor's Statement of Intent noted a concern about a "recent cultural trend" of "drag shows . . . performed in venues generally accessible to the public, including children."[19]

9.    The Statement of Intent explained, "While drag shows have received the most media attention, S.B. 12 is not limited to this type of sexually oriented performance. Drag shows today may be replaced by other types of harmful performances in the future. S.B. 12 applies to and will protect children from sexually oriented performances in general."[20]

10.    The Bill Analysis before the Texas House of Representatives State Affairs Committee cited a specific instance of a drag show being performed at a restaurant in Plano, Texas, on October 18, 2022, and referenced an article from

---

[18] The Court note that the use of legislative history is not the preferred method of determining a purpose or intent of a law. *See Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 549 (2005) (holding that statutory text and not legislative history is the preferred evidence of legislative intent.). However, the Supreme Court has repeatedly held that after examining a law on the face a court may turn to the legislative history to determine purpose and intent. *Reed v. Town of Gilbert*, 576 U.S. 155, 166(2015) (listing cases where legislative history was used.).

[19] *Plaintiffs' Request for Judicial Notice*, Document No. 47, exhibit 6 at 1–3 (*Bill Analysis*).

[20] *Plaintiffs' Request for Judicial Notice*, Document No. 47, exhibit 6 at 1–3 (*Bill Analysis*).

the *New York Post*.[21] The *New York Post* article is entitled "Video of drag queen gyrating in front of child has Texas pols pushing for legislative action."[22]

11. Multiple public statements from officials and legislature explicitly state or strongly suggest that S.B. 12 is meant to be a ban on drag shows. Lieutenant Governor Dan Patrick said, "it is shocking parents would allow their young children to be sexualized by drag shows" in his official adoption of the Committee report for S.B. 12.[23]

12. A Texas state representative made comments expressing his work to "protect[] children from explicit, hyper-sexual drag performances in Texas."[24] Other statements by legislators referred to the ban as targeting drag shows in particular.[25]

---

[21] *Plaintiffs' Request for Judicial Notice*, Document No. 47, exhibit 6 at 1–3 (*Bill Analysis*).

[22] Plaintiffs' Trial *Plaintiffs' Request for Judicial Notice*, Document No. 47, exhibit 21 at 1–9 (*New York Post Article*).

[23] *Plaintiffs' Request for Judicial Notice*, Document No. 47, exhibit 26 at 1 (*Statement of Adoption*).

[24] *Plaintiffs' Request for Judicial Notice*, Document No. 47, exhibit 27 at 1 (*Matt Shaheen post on X (formerly Twitter)*).

[25] *Plaintiffs' Request for Judicial Notice*, Document No. 47, exhibit 29 at 1 (*legislator's posts on X (formerly Twitter)*).

### C.  *Woodlands Pride*

13.   Woodlands Pride is a non-profit organization headquartered in The Woodlands Township in Montgomery County, Texas.

14.   Jason Rocha ("Rocha")[26] is the president and a founder of Woodlands Pride. Rocha testified Woodlands Pride has held an annual pride festival (the "Festival") since its founding in 2018. The festival for this year is scheduled for October 21, 2023.[27]

15.   Rocha testified the Festival is meant to highlight and celebrate the LBGTQIA+ community.[28] A vital part of this celebration is various performances including drag performances. Woodlands Pride performers utilize all types of accessories, including wigs, make-up, padded bras, and other prosthetics.[29]

16.   The festival is one of the largest free pride festivals in the state and is open to all ages and is tailored to be an event for all ages.[30]

---

[26] Rocha is an U.S. Army veteran, who grew up in the Spring, Texas area and is a founding member of Woodlands Pride. *See Hearing Transcript Day 1*, Document No. 77 at 177:20–178:11.

[27] *Hearing Transcript Day 1*, Document No. 77 at 17:17–20.

[28] *Hearing Transcript Day 1*, Document No. 77 at 182:12–16.

[29] *Hearing Transcript Day 1*, Document No. 77 at 190:13–195:15.

[30] *Hearing Transcript Day 1*, Document No. 77 at 1177:1–179:25.

17.   The festival has a security plan that includes fifteen to twenty off-duty police officers.[31]

18.   The Woodlands Pride has also featured drag performers at other events on both public and private property, such as a June 2023 Pride Summit on a college campus and a pride party at a local hotel.[32]

19.   Rocha testified it was likely impossible to ensure that no one under the age of eighteen would observe a drag performance at the Festival.[33]

20.   Rocha also testified to multiple ways minors might be able to observe the performances put on by Woodlands Pride. Rocha expressed concerns someone on the catering staff of the upcoming gala could be a minor. He also described other possible occurrences, such as a teenager sneaking into an event with a fake ID, or a family with children simply walking past the gala and seeing the drag performers through the windows. [34]

21.   At the Hearing it was suggested to Rocha that Woodlands Pride could place "butcher paper" over the windows of its venues to prevent minors from

---

[31] *Hearing Transcript Day 1*, Document No. 77 at 184:15–20.

[32] *Hearing Transcript Day 1*, Document No. 77 at 182:3-10; 182:25-183:9.

[33] *Hearing Transcript Day 1*, Document No. 77 at 199:19–202:17.

[34]*Hearing Transcript Day 1*, Document No. 77 at 199–200:10.

inadvertently observing the performances. In response, Rocha stated "we're not

going back in the closet . . . [y]ou can't hide who we are with butcher paper."[35]

22.    Rocha also expressed concern about terms found in S.B. 12, such as the terms

"nude" and "lewd."[36] Rocha explained how he was unclear about how the terms

are defined as related to S.B. 12 and how to know when Woodlands Pride

performers would be in violation of S.B. 12.

23.    Rocha testified that he is concerned that by the plain text of S.B. 12 the

performers could be said to be "exaggerating male or female characteristics."[37]

Further, Woodlands Pride fears that a public official will deem the

performances "sexual" as it pertains to S.B. 12.[38]

24.    Mr. Rocha is fearful state and local government officials may accuse

performers and attendees at The Woodlands Pride Festival of acting in ways

that "appeal[s] to the prurient interest in sex."[39]

---

[35] *Hearing Transcript Day 1*, Document No. 77 at 226:1–6.

[36] *Hearing Transcript Day 1*, Document No. 77 at 229:6–230:19.

[37] *Hearing Transcript Day 1*, Document No. 77 at 190:13–195:13.

[38] *Hearing Transcript Day 1*, Document No. 77 at 202:18–222:25.

[39] *Hearing Transcript Day 1*, Document No. 77 at 197:17-19; 202:18-23; 230:20-231:7.

### D.   *Abilene Pride*

25.   Abilene Pride is a non-profit organization, founded in 2019, focused on supporting Abilene's LGBTQIA+ community. Gavyn Hardegree ("Hardegree"), Abilene Pride's president testified on its behalf.

26.   The Abilene Pride's mission is to build, create, and maintain safe spaces for the local LGBTQIA+ community in Abilene through community-based events, fundraising events, or a hybrid of the two.[40]

27.   On September 23, 2022, Abilene Pride held its first full-scale parade in the City of Abilene.[41] The parade was open to the public and had attendees of all ages.[42] The parade featured a drag float and had vendors handing out items such as free condoms.

28.   Abilene Pride has also hosted other events featuring drag performances. In June and July of 2022, Abilene Pride hosted two drag brunch fundraisers at a locally owned coffee shop, which gave Abilene Pride exclusive use of its premises on Sundays, when the shop was normally closed.[43] The brunches involved drag

---

[40] *Hearing Transcript Day 1*, Document No. 77, at 119:19-25.

[41] *Hearing Transcript Day 1*, Document No. 77 at 123:1–20.

[42] *Hearing Transcript Day 1*, Document No. 77 at 123:15–125:5.

[43] *Hearing Transcript Day 1*, Document No. 77, at. 121:23–122:25.

performances and did not impose an age restriction, though the events were ticketed and charged admission.

29. Hardegree testified drag shows such as the ones discussed above and others the organization holds are meant to promote "belongingness" and let people see themselves better represented in the community.[44] Hardegree also explained how drag shows are meant to be a form of art that strives for expression and challenging gender stereotypes.

30. Abilene Pride shows also feature drag kings, which often utilize a device called a "packer" to simulate the presence of male genitalia in one's pants.[45] Hardegree believes, based on the broad language of S.B. 12, this could be seen as "exhibition or representation, actual or simulated, of male or female genitals in a lewd state."[46]

31. Hardegree testified that Abilene Pride cannot give performers guidance because S.B. 12 is vague and confusing.[47]

32. Abilene Pride does not know whether drag shows and performers, so often featured in the organization's events, comply with S.B. 12. In particular, the

---

[44] *Hearing Transcript Day 1*, Document No. 77, at. 121:2–9.

[45] *Hearing Transcript Day 1*, Document No. 77 at 123:6-15.

[46] *Hearing Transcript Day 1*, Document No. 77 at 123:6–11.

[47] *Hearing Transcript Day 1*, Document No. 77 at 120:5–25.

organization does not know how to assess whether a performance appeals to "the prurient interest in sex," since that term is open to interpretation and undefined by S.B. 12.[48]

33.   While Hardegree does not believe that any of Abilene Pride's drag shows should be categorized as "sexually oriented," Hardegree is aware that others may hold a contrary view.[49]

34.   In preparation for S.B. 12's enactment, Abilene Pride has made contingency plans for its parade, including a backup venue and eliminating the drag float. The changes have hampered Abilene Pride in its mission to express itself and maintain safe places in the community for its members.[50]

### E.   *Extragrams*

35.   Extragrams is a drag entertainment and delivery service based in Austin, Texas.[51] Kerry Lynn Sieff ("Sieff"), Extragrams' Founder and Creative Services Director, testified on its behalf.[52]

---

[48] *Hearing Transcript Day 1*, Document No. 77, at 128:13-16.

[49] *Hearing Transcript Day 1*, Document No. 77, at 136:17-137:2.

[50] *Hearing Transcript Day 1*, Document No. 77 at 126:15–127:21.

[51] *Hearing Transcript Day 1*, Document No. 77, at. 44:8-12, 57:15.

[52] *Hearing Transcript Day 1*, Document No. 77, at 43:17-44:18.

36.   Extragrams utilizes independent contractors, who do drag performances for a variety of events including birthday parties, retirement parties, and corporate events. The Independent contractors use costuming to exaggerate masculine or feminine characteristics and often perform in open and public areas.[53] Costumes include wigs, makeup, high heels, dresses, body padding, pantyhose, corsets, push-up bras, breastplates, and packers.

37.   Performances also occur in privately owned commercial properties.

38.   Performances include a variety of dancing, shaking, and splits, along with other theatrics such as singing, hugging, and comedy.

39.   At least one Extragrams employee attends each of its drag performances in the capacity of an on-site manager.[54] The on-site manager coordinates with the clients and performers, provides security, and directs the audience.[55] Generally, there are no age limits at Extragrams shows and events.

40.   Extragrams fears its performances could come into violation with S.B. 12 triggering both criminal liability for its performers and civil liability for the venues it often uses.

---

[53] *Hearing Transcript Day 1*, Document No. 77 at 60:1–67:15.

[54] *Hearing Transcript Day 1*, Document No. 77, at 55:24-56:6.

[55] *Hearing Transcript Day 1*, Document No. 77, at 56:11-22.

41.   Specifically, Extragram believes some aspects of its performances could be accused of "appeal[ing] to the prurient interest in sex."[56]

42.   Extragram also believes S.B.12 will cause clients to avoid its services in fear of running afoul of S.B.12.[57]

### F.   *360 Queen Entertainment*

43.   360 Queen Entertainment is a drag production company operating in the San Antonio, Texas area. Richard Montez Jr. ("Montez") is a co-owner of 360 Queen Entertainment and testified on its behalf.[58] 360 Queen Entertainment hosts drag shows at Montez's father's restaurant.[59]

44.   The main event is Bottom-Up Diva Dinners where guests get dinner and watch a show from famous Drag Queens.[60]

45.   360 Queen Entertainment does not admit minors to the actual show, which is performed on its outdoor patio. There are ways for minors to potentially see a

---

[56] *Hearing Transcript Day 1*, Document No. 77, at 61:24–62:9.

[57] *Hearing Transcript Day 1*, Document No. 77, at 64:13-22.

[58] *Hearing Transcript Day 1*, Document No. 77, at 81:20–82:25.

[59] *Hearing Transcript Day 1*, Document No. 77, at 84:8–18.

[60] 360 Queen Entertainment hires drag performers who appear on RuPaul's Drag Race (a television series about drag performers).

glimpse of the performances from other parts of the restaurant.[61] Additionally, Montez testified that occasionally, parents ask for an exception to allow their children to watch the performances.[62] Montez also testified that he had, on occasion, observed families stopping at a distance on the outside sidewalk to catch a view of the drag performances.

46. The performances include multiple elements which Montez fears could come into contention with S.B. 12. Such as executing dance moves that some could consider "sexual gesticulations." Additionally, some performers wear prosthetics such as breastplates and wigs.

47. Montez testified that each performer conveys their own expressive message spanning from pure entertainment to messages of social justice.[63]

48. Montez fears the S.B. 12 will be enforced against 360 Queen Entertainment and its performers. This uncertainty has caused 360 Queen Entertainment to refrain from booking drag performers.

## G. *Brigitte Bandit*

49. Brigitte Bandit is a drag performer who also produces and hosts drag shows, mainly in the Travis County area.

---

[61] *Hearing Transcript Day 1*, Document No. 77, at 92:15–101:12.

[62] *Hearing Transcript Day 1*, Document No. 77, at 110:1–19.

[63] *Hearing Transcript Day 1*, Document No. 77, at 101:25–15:21.

50. Brigitte Bandit considers drag to be an artistic endeavor that allows her to express herself, explore her identity outside of traditional gender norms, share messages of kindness and acceptance, and convey political messages.[64]

51. Brigitte Bandit demonstrated a political message when she wore a dress with the names of the Uvalde school shooting victims on the dress, to testify before a Texas senate committee. When asked what the message was, she stated, "I was trying to say that we're sitting here arguing about drag performances and drag queens [ ] under the concern of safety for kids while kids are being shot in our schools here in Texas."[65]

52. Brigitte Bandit sometimes performs, hosts, and produces shows for audiences of all ages and sometimes performs, hosts, and produces shows in venues that are generally limited to people who are 18 or 21 and up.[66] Even at shows for adult audiences, Brigitte Bandit cannot know or control the ages of every member of her audience or control who may be able to catch a glimpse of her show.[67]

---

[64] *Hearing Transcript Day 1*, Document No. 77, at. 234:1-235:1, 235:15-17.

[65] *Hearing Transcript Day 1*, Document No. 77, at. 234:14–235:1.

[66] *Hearing Transcript Day 1*, Document No. 77, at. 236:25-237:24, 238:9-14.

[67] *Hearing Transcript Day 1*, Document No. 77, at 239:23-241:10.

53. As part of her artistic expression, Brigitte Bandit uses a prosthetic breastplate and various accessories like wigs, false eyelashes, high heels, corsets, jewelry, and clothing to perform drag and impersonate female stars like Dolly Parton.[68] Many of these accessories and prosthetics exaggerate her female sexual characteristics.[69]

54. Brigitte Bandit sometimes dances, shimmies, shakes, and thrusts her hips, simulates kissing or "making out with somebody," blows kisses, and touches herself and others during her performances.[70] She fears multiple parts of her performances can be interpreted as "sexual gesticulations" or "imitating sexual acts."[71]

55. Brigitte Bandit believes parts of her performances and the props she uses could be seen under S.B. 12 as being in a "lewd state" or "nude."

56. Brigitte Bandit discussed her use of a breastplate to simulate larger breasts, which she sometimes exposes at adult-only shows.[72] However, even at all ages

---

[68] *Hearing Transcript Day 1*, Document No. 77, at 242:11-20.

[69] *Hearing Transcript Day 1*, Document No. 77, at 243:1-3.

[70] *Hearing Transcript Day 1*, Document No. 77, at 250:4-251:7.

[71] *Hearing Transcript Day 1*, Document No. 77, at 250:16–22.

[72] *Hearing Transcript Day 2*, Document No. 78, at 6:1–25.

shows the breastplate can slip and it is not clear that the exposure of fake breasts

would come into the definition of nude under S.B. 12.

57.    As a result of S.B. 12, Brigitte Bandit will be at risk of criminal prosecution,

and as such, she will likely have to limit or modify her performances.

## III. **CONCLUSIONS OF LAW**

### A.    *General Statements of Law*

58.    The Court has federal question jurisdiction over this case pursuant to 28 U.S.C.

§ 1331.

59.    Venue is proper pursuant to 28 U.S.C. § 1391(b).

### B.    *Permanent Injunction*[73]

60.    The elements of a permanent injunction are nearly identical to those of a

preliminary injunction, except that a "plaintiff must show actual success on the

merits rather than a mere likelihood of success." *Amoco Prod. Co. v. Village of

Gambell*, 480 U.S. 531, 546 n.12 (1987). Thus, to establish it is entitled to a

permanent injunction, a plaintiff must demonstrate: (1) an actual success on the

merits; (2) a substantial threat of immediate and irreparable harm for which it

---

[73] Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. Fed. R. Civ. P. 65(a)(2). Parties must have adequate notice that a preliminary injunction hearing will be consolidated with a trial on the merits. *Warehouse Groceries Mgmt. v. Sav-U-Warehouse Groceries*, 624 F.2d 655, 657 (citing *Puerto Rican Farm Workers v. Eatmon*, 427 F.2d 210 (5th Cir. 1970)).

has no adequate remedy at law; (3) that greater injury will result from denying the [injunction] than from its being granted; and (4) that an injunction will not disserve the public interest. *Clark v. Prichard*, 812 F.3d 991, 993 (5th Cir. 1985); *Amoco Prod.*, 480 U.S. at 546 n.12.

## C. Proper Defendants

61.   The Plaintiffs contend their claims are ripe and proper against all the Defendants. Additionally, the Plaintiffs contend the Defendants are not immune from suit because they are the individuals or entities tasked with enforcement of S.B. 12.

62.   Defendants contend they are not proper parties for a litany of reasons. Abilene contends the claims are not yet ripe.[74] The county Defendants argue they have not yet implemented any ordinance, so there is no harm as of yet. The Attorney General incorporates all of the Defendants' positions and contends the Plaintiffs have not shown they are in "control of premises" needed to come under the Attorney General's enforcement authority.[75]

---

[74] *Defendant City of Abilene's Motion to Dismiss for Lack of Subject-Matter Jurisdiction or, Alternatively, For Failure to State a Claim*, Document No. 42 at 8.

[75] *Defendant Colmenero's Motion to Dismiss Under Rules 12(b)(1) and 12(b)(6) and Response in Opposition to Plaintiffs' Motion for Temporary Injunction Order and Preliminary Injunction*, Document No. 52 at 9–12.

63.    In a pre-enforcement challenge, [p]laintiffs need not "await the consummation

of threatened injury to obtain preventive relief." *See Thomas v. Union Carbide*

*Agr. Prod. Co.*, 473 U.S. 568, 581 (1985).

64.    The Fifth Circuit has recently stated, that the correct defendant is "generally the

individual tasked with enforcing the challenged act." *Tawakkol v. Vasquez*, No.

22-50434, --- F.4th ---, 2023 WL 5444329, at *2 (5th Cir. Aug. 24, 2023).

Recent precedent from the Texas Court of Criminal Appeals makes clear that

district and county attorneys have the specific duty to enforce state criminal

law. *State v. Stephens*, 663 S.W.3d 45 (Tex. Crim. App. 2021). Under the *Ex*

*parte Young*[76] exception to sovereign immunity, the Attorney General is a

proper defendant if he has a sufficient enforcement connection to the challenged

action. *Texas Democratic Party v. Abbott*, 978 F.3d 168, 179-80 (5th Cir. 2020).

The Supreme Court held that, with respect to a pre-enforcement challenge, the

*Ex Parte Young* exception to immunity requires nothing more than the

defendant to have a specific duty to enforce the challenged statute. *Whole*

*Woman's Health v. Jackson*, 142 S. Ct. 522 (2021).

---

[76] The Supreme Court decision in *Ex Parte Young* created a carve out to sovereign immunity when a state actor enforces an unconstitutional law. *Ex parte Young*, 209 U.S. 123, 159-60, 28 S. Ct. 441, 52 L. Ed. 714 (1908).

65.   The Supreme Court has long held that counties and municipalities are not immune from suit, and that suit may be brought against "those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Further, it is clear that counties and cities are properly named persons for § 1983 claims. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).

66.   S.B. 12 has a complex enforcement mechanism, spreading the responsibility to enforce amongst different officials and levels of government. Section One of S.B. 12 empowers the attorney general to enforce civil penalties against one who "controls premises" where an unauthorized performance occurs in front of a minor. While counties and cities have the ability to regulate under Section Two of S.B. 12, the district and county attorneys have criminal enforcement duties under Section Three.[77] Additionally, as discussed above, all of S.B. 12's definitions and enforcement guidance are bound up in Section Three of S.B. 12.[78] Paxton, Hicks, Gonzalez, Garza, and Ligon all have specific enforcement

---

[77] *S.B. 12, supra* note 7, at 1–6.

[78] *S.B. 12, supra* note 7, at 4–6

responsibilities under S.B. 12. *Nat'l Press Photographers Ass'n v. McCraw,* 504 F. Supp. 3d 568, 583 (W.D. Tex. 2020) (Pittman, J.) (district attorney's duty to enforce state law sufficient to satisfy *Ex parte Young*). Further, cities and counties do not get immunity and are generally proper parties in constitutional challenges.[79] Accordingly, the Defendants all have some role to play in enforcing S.B. 12.

67. The Court further notes none of the Defendants have stipulated they will not enforce S.B. 12. This is of consequence because the newly enacted House Bill 17 ("H.B. 17"). H.B. 17, which went into effect on September 1, 2023, establishes that district attorneys may be removed from office if they adopt any policy that "prohibits or materially limits the enforcement of any criminal offense." Therefore, the Defendants are proper parties.[80]

---

[79] The Court is unpersuaded by the Counties and City Defendants' argument that because they have not enacted an ordinance or taken an affirmative step to enforce S.B. 12 there is no claim yet. This is a pre-enforcement challenge and the text of S.B. 12 unambiguously grants municipalities the authority to restrict the performances in question.

[80] The Court notes that a final judgment finding S.B. 12 unconstitutional and enjoining the Texas Attorney General from enforcing it binds all state and local governmental actors commanded or authorized to act under it. *Harris County v. Carmax Auto Superstores Inc.*, 177 F.3d 306, 318 (5th Cir. 1999) (recognizing that "a local law enforcement official is bound when his interests are represented by the state attorney general") (citing cases). Therefore, while the Defendants are proper parties, Plaintiffs's claims may become moot as to all Defendants except for Paxton.

68.   Accordingly, the Defendants are proper parties and are not immune to the claims brought by the Plaintiffs. The Court now addresses the Plaintiffs's standing.

### D.   Standing

69.   Plaintiffs contend they have standing to challenge S.B. 12 because they have already been impacted by it and fully intend to conduct activities which, though they contend to be constitutional, are arguably prohibited by S.B. 12. Further, the Plaintiffs contend they have standing amongst the different Defendants due to the various enforcement responsibilities assigned by S.B. 12.

70.   The Attorney General contends: (1) the Plaintiffs have not shown an injury that is actual or imminent; (2) there is no evidence that S.B. 12 will be enforced in an arbitrary way; and (3) the Plaintiffs have failed to show that their conduct is or would be in violation of S.B. 12.

71.   To establish Article III standing, a plaintiff must "(1) have suffered an injury in fact (2) that is fairly traceable to the challenged action of one of the . . . defendants and (3) that will likely be redressed by a favorable decision." *Ostrewich v. Tatum*, 72 F.4th 94, 102 (5th Cir. 2023) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). However, in pre-enforcement actions such as this case, the Fifth Circuit "has repeatedly held that chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact

requirement." *Id.* (citing *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330–31 (5th Cir. 2020)). Therefore, plaintiffs sufficiently plead an injury in fact when they "(1) [have] an 'intention to engage in a course of conduct arguably affected with a constitutional interest[;]' (2) [their] intended future conduct is 'arguably proscribed by the policy in question[;]' and (3) 'the threat to future enforcement of the challenged policies is substantial.' " *Speech First*, 979 F.3d at 330 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–64 (2014)). Because the Plaintiffs' injuries are based on the suppression of speech and S.B. 12's chilling effect, the Plaintiffs need not prove that their interpretation of the statute is the "best interpretation, the test doesn't require that." *Turtle Island Foods*, 65 F.4th at 218. Plaintiffs must only show that their activities are "arguably proscribed" by the statute, and here that test is met. *Id.*

72.   "[S]tanding is not dispensed in gross," *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017), "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

73.   All the Plaintiffs testified to being involved in drag shows at some level, such as performing, hosting, or producing shows. As a result, the Court generally finds that all Plaintiffs partake in conduct arguably proscribed by S.B. 12. The Court now examines standing as it specifically pertains to each Plaintiff.

### i.    *Woodlands Pride*

74.    Woodlands Pride contends it has standing against the Attorney General, Montgomery, and Ligon because of the authority those parties have as it relates to S.B. 12.

75.    As established above, Woodlands Pride hosts pride festivals and other events. Those events consist of drag shows both in public areas (the Festival) and in commercial premises. As described by the testimony of Rocha, some of those performances are arguably proscribed by S.B. 12.

76.    Woodlands Pride has demonstrated a credible threat of prosecution under the statute, and the Attorney General, Montgomery, and Ligon have not presented any "compelling contrary evidence" that they will not enforce the statute that facially restricts expressive activity by Woodlands Pride or that Montgomery law enforcement who are at the Festival and other events will not enforce the statute.

77.    If S.B. 12 is not enjoined, Woodlands Pride's speech and expression will be chilled because The Woodlands Pride has already planned to not include drag performances at its 2023 Festival (if S.B. 12 goes into effect), which is itself a constitutional harm adequate to satisfy the injury-in-fact requirement.

78.    Woodlands Pride's injuries are traceable to S.B. 12. S.B. 12 Section One and Section Two may be used to enforce penalties or restrict their events.

Woodlands Pride is also at risk of prosecution under Section Three through, at a minimum, aiding and abetting liability. These traceable injuries are redressable through injunctive and declaratory relief.

79.    Accordingly, Woodlands Pride has adequate standing to bring its First Amendment Challenge.

### ii. Abilene Pride

80.    Abilene Pride contends it has standing against the Attorney General, Abilene, Taylor, and Hicks to seek the enjoinment of S.B. 12.

81.    Abilene Pride has demonstrated that some of the events and performances it has hosted in the past and intends to host in the future are arguably proscribed by S.B. 12. Abilene Pride's drag performances arguably could be considered to appeal to the prurient interest in sex and feature performers engaging in "sexual conduct" under S.B. 12, including through "the exhibition or representation, actual or simulated, of sexual acts" such as dancing, hugging, and kissing people on the cheek; "the exhibition or representation, actual or simulated, of male or female genitals in a lewd state," including through the use of packers to simulate a male bulge and breastplates to simulate female breasts.

82.    Abilene Pride has demonstrated a credible threat of prosecution under the statute, and Defendants the Attorney General, the City of Abilene, Taylor County, and Hicks have not presented any "compelling contrary evidence" that

they will not enforce the statute that facially restricts expressive activity by Abilene Pride.

83.   As previously discussed, the harm Abilene Pride alleges is traceable to S.B. 12 and is redressable by this Court.

84.   Accordingly, Abilene Pride does have standing.

### iii. 360 Queen Entertainment

85.   360 Queen Entertainment contends it has standing against the Attorney General and Gonzalez in its pre-enforcement challenge of S.B. 12.

86.   Similar to the other Plaintiffs, 360 Queen Entertainment has adequately shown that it conducts performances that can arguably violate S.B. 12. However, here the Attorney General alleges that because 360 Queen Entertainment does not own the restaurant where the shows occur, it has "no control over the premises."[81]

87.   The fact that 360 Queen Entertainment hosts shows and utilizes a restaurant to host shows that fit the description in S.B. 12 means they can arguably be seen to have "control over the premises."[82] Montez testified that 360 Queen

---

[81] *Hearing Transcript Day 1*, Document No. 77, at 108:14–109:2.

[82] The Court notes that S.B. 12 does not define the word "control." The plain meaning of the term is not limited solely to owners of a property. See CONTROL, Black's Law Dictionary (11th ed. 2019) ("To exercise power or influence over.").

Entertainment takes control of the restaurant's outside patio during the drag shows. Additionally, there is a reasonable belief by 360 Queen Entertainment the performances it hosts will be in violation of the criminal provision of S.B. 12, exposing 360 Queen Entertainment and the performers it hosts to criminal liability. Therefore, 360 Queen Entertainment has adequately shown an injury which is traceable to S.B. 12 and redressable by this Court.

88.    Accordingly, 360 Queen Entertainment has established standing for its pre-enforcement claims against S.B. 12

### iv. Extragrams

89.    Extragrams contends it has standing against the Attorney General and Garza in its challenge of S.B. 12.

90.    Extragrams engages with independent contractors to put on a variety of drag performances. These shows include drag performers using prosthetics and dancing in ways that are arguably proscribed by S.B. 12.

91.    Extragram provides drag performances at a variety of events, including birthday parties and corporate events. These performances occur at various locations including public places and private commercial premises.

92.    Extragram testified that while they use independent contractors, an employee is always present to coordinate the show and ensure the customers' wishes are fulfilled. As such, Extragram employees have some control over the locations

31

where they host and direct the drag performances. The Court finds Extragram could likely be in violation of S.B. 12, either under Section One or Section Three, through aiding and abetting liability.

93.     Further, there is no doubt that the independent contractors could be found to be in violation of Section Three, which would virtually put Extragram out of business.

94.     Accordingly, the Court finds Extragram has sufficiently shown an injury in fact that is traceable to S.B. 12 and is redressable by this Court.

### v. *Brigitte Bandit*

95.     Brigitte Bandit contends she has standing against the Attorney General and Garza. Brigitte Bandit is a drag performer who also hosts and produces shows.

96.     As stated above, Brigitte Bandit testified to the conduct she partakes in during performances both at adult-only events and at family-oriented performances. Brigitte Bandit raised concerns about not having full control over some premises where she performs and being fearful of a costume malfunction or other mishap. Brigitte Bandit performs and produces shows that can arguably meet the definition of behavior which would violate S.B. 12.

97.     Thus, Brigitte Bandit has adequately shown that she has suffered an injury-in-fact that is traceable to S.B. 12 and redressable by this court.

98.    Therefore, the Court finds all the Plaintiffs have standing to bring this action. The Court now turns to whether S.B. 12 is severable.

## E.    *Severability*

99.    The Plaintiffs contend S.B. 12's dependence on the definitions in Section Three of the bill makes it un-severable under Texas law. Defendants contend the severability provision is valid and will save parts of the S.B. 12 not found to be unconstitutional.

100.   "Whether unconstitutional provisions of a state statute are severable 'is of course a matter of state law.' " *Nat'l Fed'n of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202, 210 (5th Cir. 2011) (citation omitted). The Texas Supreme Court has noted that when considering severability "[t]he point is not whether they are contained in the same section . . . but whether they are essentially and inseparably connected in substance." *Rose v. Drs. Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990) (citing *Western Union Telegraph Co. v. State*, 62 Tex. 630 (1884)); *see also Villas at Parkside Partners v. City of Farmers Branch*, Tex., 726 F.3d 524, 538 (5th Cir. 2013) (citing *Rose* in determining that an ordinance was not severable).

33

101.  As established above S.B. 12 relies on the definitions and terms in Section Three throughout the bill.[83] While Section One and Section Two regard civil regulations, it is based on the new definitions of "sexual oriented performances," which are provided for in Section Three of S.B. 12. If Section Three is unconstitutional, then the remaining provisions will be "incomplete and incoherent." *Rose*, 801 S.W.2d at 844. Accordingly, the Court finds that S.B. 12 is not severable as to Section Three.

102.  The Court now turns to the merits of each of the Plaintiffs' challenges to S.B. 12.

**F.    *Actual Success on the Merits***

103.  Plaintiffs contend S.B. 12 is: (1) an unconstitutional content-based restriction; (2) an unconstitutional restriction based on viewpoint; (3) unconstitutionally overbroad; (4) unconstitutionally vague; and (5) an unconstitutional prior restraint on their speech.

---

[83] *S.B. 12, supra* note 7, at 1–6.

104. The Attorney General contends the Plaintiff's performances are not expressive conduct that warrants First Amendment protection.[84] Additionally, the Attorney General contends S.B. 12 is content neutral and warrants intermediate scrutiny.

105. The Court first addresses if the Plaintiffs' conduct is expressive and therefore afforded some measure of First Amendment protection.

### i.    *Plaintiff's Conduct is Expressive*

106. Plaintiffs contend there are multiple messages and expressive purposes to drag performances, including messages of celebration, equality, and acceptance.[85] Further, Brigitte Bandit testified to messages of a political and social justice nature.[86]

107. The Attorney General contends the Plaintiffs failed to show that drag shows are inherently expressive or show a sufficient communitive element.[87]

108. Court precedent supports the Plaintiffs' assertion that a single articulable message is not necessary to be afforded First Amendment Protection. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569 (1995) (holding

---

[84] The Court notes that while the other Defendants argued different procedural grounds for dismissal, only the Attorney General defended S.B. 12 as it relates to the merits of the law.

[85] *Hearing Transcript Day 2*, Document No. 78, at 36:5–23.

[86] *Hearing Transcript Day 1*, Document No. 77, at 101:25–15:21.

[87] *Hearing Transcript Day 2*, Document No. 78, at 89:20–90:25.

that requiring a particular message would result in First Amendment protection.). Indeed, First Amendment protection has been extended to all types of activities, even some that seem untasteful to society. *See, e.g., D. Houston Inc. v. United States Small Bus. Admin.*, 579 F. Supp. 3d 959, 966 (S.D. Tex. 2020) (Hittner, J.) ("Exotic dancing is within the range of speech that receives First Amendment protection."); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 499 (1952) (finding films and movies are protected by the First Amendment even if aimed primarily at commercial entertainment).

109.   Further, a survey of court decisions related to the issue of drag shows reveals little divergence from the opinion that drag performances are expressive content that is afforded First Amendment protection. *See, e.g., Norma Kristie, Inc. v. City of Oklahoma City*, 572 F. Supp. 88, 91 (W.D. Okla. 1983) (Russel, J.) (holding that a "Miss Gay America Pageant" while not rising to the level of intelligent artistic expression, it still warranted constitutional protection because it was not obscene.)*; Friends of Georges, Inc. V. Mulroy*, 2023 WL 3790583 (W.D. Tenn. June 2, 2023)(Parker, J.) (permanently enjoining a law that sought to ban drag under the definition of "adult cabaret entertainment."); *HM Fla.-ORL, LLC v. Griffin*, No. 6:23-CV-950-GAP-LHP, 2023 WL 4157542, at *9 (M.D. Fla. June 23, 2023) (Presnell, J.) (holding that Florida's law targeting drag performances under the guise of "adult live performances"

likely violates the First Amendment and is vague and overbroad.); *S. Utah Drag Stars v. City of St. George*, No. 4:23-CV-00044-DN-PK, 2023 WL 4053395, at *27 (D. Utah June 16, 2023) (Nuffer, J.) (finding "drag shows of a nature like the planned Allies Drag Show are indisputably protected speech and are a medium of expression" shielded by the First Amendment.); *Imperial Sovereign Ct. of Montana v. Knudsen*, No. CV 23-50-BU-BMM, 2023 WL 4847007, at *7 (D. Mont. July 28, 2023) (Molloy, J.) (granting a temporary restraining order to stop a state law prohibiting public drag performances under the label of "sexually oriented shows.").

110.   Here, the Plaintiffs have in detail discussed their various performances and the various meanings the performances have.[88] Drag shows express a litany of emotions and purposes, from humor and pure entertainment to social commentary on gender roles. There is no doubt that at the bare minimum these performances are meant to be a form of art that is meant to entertain, alone this would warrant some level of First Amendment protection.

111.   The Attorney General contends a neutral person of ordinary intelligence would not understand the message and hence is not expressive conduct.[89] The Attorney

---

[88] *Hearing Transcript Day 2*, Document No. 78, at 178:10–179:1; 185:5–187:1; 202:11–17; 234:1-235:1, 235:15-17.

[89] *Hearing Transcript Day 2*, Document No. 78, at 92:1–93:25.

General relies on *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,* where the Supreme Court found law schools prohibiting military recruiters from campuses not expressive conduct. 547 U.S. 47, 65 (2006) (holding that an observer would not know why military recruiters were absent from campus without accompanying speech.). However, this is distinguishable from drag shows, which are performances that express conduct with no need for extra explanation.   The Court finds it is evident drag shows express either pure entertainment or, like most types of expressive art, an underlying deeper message. (Such as music, theater, and poetry).

112.   In one of the only federal cases where drag shows did not receive First Amendment protection, the president of West Texas A&M University banned a drag show from campus. *Spectrum WT v. Wendler*, 2023 U.S. Dist. WL 6166779, *1 (N.D. Tex. September 21, 2023) (Kacsmaryk, J.)(denying a preliminary injunction to stop a college president from barring a drag show on a campus.).While the case is distinguishable from the instant case, one issue of note is the president's reasoning for banning the show. In a letter to the campus population the president compared drag shows to "blackface" and a "slapstick sideshow " *Id at 1*. The President further opinionized in the letter that "drag shows stereotype women in cartoon-like extremes for the amusement of others and discriminates against womanhood . . . [d]rag shows are derisive, divisive

38

and demoralizing misogyny, no matter the stated intent." *Id* at 1. The president's sentiment reinforces this Court's opinion that while some people may find a performance offensive or morally objectionable, it does not mean the performance is not expressive or given First Amendment protection.

113. Not all people will like or condone certain performances. This is no different than a person's opinion on certain comedy or genres of music, but that alone does not strip First Amendment protection. However, in addition to the pure entertainment value there are often political, social, and cultural messages involved in drag performances which strengthen the Plaintiff's position.[90]

114. Accordingly, the Court finds the drag performances described by the Plaintiffs are expressive conduct that warrants First Amendment protection. The Court now turns to whether S.B. 12 is a content-based restriction.

### ii. *Discrimination Based on Content*

115. The Plaintiffs contend S.B. 12 is a content-based restriction by expressly regulating expression with content that is "sexual," and S.B. 12 is not narrowly tailored to promote a compelling state interest.

---

[90] *Hearing Transcript Day 1*, Document No. 77, at 101:25–15:21.

116. The Attorney General contends S.B. 12 is content neutral and should only be held to the intermediate scrutiny standard. However, the Attorney General further contends that S.B. 12 also passes strict scrutiny.

117. The First Amendment prohibits the enactment of laws "abridging the freedom of speech." U.S. Const., Amend. I, § 2.

118. Under this clause, a government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting *Police Dept. of Chi. V. Mosley*, 408 U.S. 92, 95 (1972)). Thus, all "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves they are narrowly tailored to serve compelling state interests." *Id.* (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991)). A regulation of speech is content based if "a law applies to a particular speech because of the topic discussed or the idea or message expressed," and "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163 (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563–64). Content-based regulations must satisfy strict scrutiny. *Reed*, 576 U.S. at 163.

40

119. To survive strict scrutiny, the government must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (5th Cir. 2011) (citing *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 340 (2010)). "If a less restrictive alternative would serve the [g]overnment's purpose, the legislature must use that alternative." *U.S. v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).

120. Here, S.B. 12 restricts "sexual oriented performances." The statute does this by laying out five broad categories of "sexual conduct."[91] The law targets conduct deemed to be "sexual oriented." That alone suggests a content-based restriction.

121. While obscenity is not protected by the First Amendment the Supreme Court has distinguished between material that is "obscene" in the vernacular, and material that is "obscene" under the law. *Friends of Georges, Inc. V. Mulroy*, 2023 WL 3790583 (W.D. Tenn. June 2, 2023) (Parker, J.) citing *Miller v. California,* 413 U.S. 15, 21, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973) (setting out a three-prong standard for obscenity)[92]. While some conduct might be offensive or concern subjects affecting some people's sensibility it is not

---

[91] *S.B. 12*, *supra* note 7, at 3–4.

[92] *Miller Test*, *supra* note 15 (defining the three prongs of the *Miller* test.).

stripped of First Amendment protection. *Ashcroft v. A.C.L.U..*, 535 U.S. 234, 245 (2002); *also see, Reno v. A.C.L.U.*, 521 U.S. 844, 874 (1997) (reaffirming that the First Amendment protects sexual expression, which is indecent but not obscene).

122.   Therefore, S.B. 12 targets the content of speech, i.e., "sexual oriented performances," some of which do not rise to the definition of obscenity. Accordingly, S.B. 12 is a content-based restriction and is subject to strict scrutiny.

123.   The Plaintiffs concede Texas has a compelling interest in protecting children. Although there is little debate that the issue of what content children are allowed to see is of the utmost importance, it does not alone negate strict scrutiny. *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (applying strict scrutiny and invalidating a state law applying only to minors and prohibiting the sale of violent video games). Therefore, the pertinent question is whether S.B. 12 as written, is narrowly tailored to promote the state's compelling interest of protecting children. The answer is no for a multitude of reasons.

124.   The Attorney General contends the law is narrowly tailored mainly because of the second element of S.B. 12 requiring "[an] appeal to the prurient interest in

42

sex." While this term is borrowed from the *Miller* obscenity test, it excludes the other relevant prongs of the *Miller* analysis.[93]

125. Further, S.B. 12 does not distinguish children by the age of a child. S.B. 12 treats an older teenager the same as a much younger child, which is problematic considering that the "appeal to a prurient interest in sex" is not defined or supported by the rest of the *Miller* test. S.B. 12 also fails to provide any affirmative defenses, such as consent by a parent or a mistake on the part of the performer. The Attorney General contends allowing for "carve out exceptions like that would . . . create a lot of mischief under this law."[94]  The Court is not persuaded by this argument as explained above, First Amendment precedent requires laws like S.B. 12 to be narrowly tailored.

126. For example, S.B. 12 is completely silent on the role of a parent or the parent's ability to consent to and control their child seeing a performance that—while it may offend some—does not rise to the definition of obscenity as contemplated by *Miller*.

127. Further, the Attorney General contends the state need not provide a parental consent exception in every restriction. While this is true, allowing an

---

[93] *Miller Test*, *supra* note 15 (defining the three prongs of the *Miller* test.).

[94] *Hearing Transcript Day 2*, Document No. 78 at 43:6-8.

affirmative defense for parental consent is one of many ways S.B. 12 could be more narrowly tailored. The Court also keeps in mind that parental rights, while not absolute, are rights that should not be taken for granted. The Attorney General offers the example of the legislature banning child pornography as the reason parental consent may not be warranted. *Connection Distrib. V. Holder*, 557 F.3d 321, 328-29 (6th Cir. 2009). However, Texas has indecent exposure laws and other laws to stop heinous behavior contemplated by the state. S.B. 12 was written to go beyond that to behavior that was not proscribed already, i.e., behavior that did not rise to the obscenity standard set by case precedent. Parents have the right to consent to their children seeing some material that another parent might find inappropriate, such as "R" rated movies. As stated above, the legislative history included a question of why any parent would take a child to a sexual oriented performance.[95] If the state's compelling concern is to protect children independent of their parents, a narrowly tailored statute would possibly include punishments for a parent who takes their child to a "sexual oriented performance."

---

[95] *Plaintiffs' Request for Judicial Notice*, Document No. 47, exhibit 26 at 1 (*Statement of Adoption*).

128.   Therefore, S.B. 12 is not narrowly tailored in its purpose to protect children. Accordingly, S.B. 12 is not narrowly tailored to promote a compelling state interest.

129.   However, even if S.B. 12 were not an impermissible content-based regulation, it would still fail as an impermissible viewpoint restriction as described below.

### iii.    Discrimination Based on Viewpoint

130.   The Plaintiffs contend the fact that S.B. 12 targets performers who use prosthetics to simulate a gender other than the one they are assigned constitutes viewpoint discrimination.

131.   The Attorney General contends the law does not single out drag shows in any way and therefore is not a viewpoint discrimination.

132.   "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (citing *R.A.V.*, 505 U.S. at 391). "Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. When "the legislature's suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended." *First. Nat. Bank of Boston v. Bellotti*,

435 U.S. 765, 785–86 (1978). Viewpoint restrictions, like content-based restrictions, must also satisfy strict scrutiny.

133. While the term "drag show" is not mentioned anywhere in the text of S.B. 12, there is language to suggest targeting of drag shows. In addition, the legislative history shows legislative intent to target drag shows. S.B. 12 specifically targets "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics."[96] This language goes beyond mere content-based discrimination because it is now directed at the specific act of impersonating or exaggerating a sex other than the one a performer is assigned. Additionally, the court cannot ignore the legislative history and public statements by legislators purporting that S.B. 12 is at least in part a ban on drag shows.[97]

134. Accordingly, the court finds S.B. 12 to be viewpoint discrimination and, based on the above analysis, fails strict scrutiny.[98]

---

[96] *S.B. 12*, *supra* note 7, at 3–4.

[97] *See Plaintiffs' Request for Judicial Notice*, Document No. 47, Exhibit 6 at 1–3 (*Bill Analysis*).

[98] The Court finds that the secondary effect doctrine is not applicable in this case. The secondary effects doctrine applies to zoning regulations on sexually oriented businesses that are enacted due to concerns about "the secondary effects of such [performances] on the surrounding community." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002). However, here the plain language of S.B. 12 and the legislative history shows the primary purpose of the law is to

135. But even if S.B. 12 were not an impermissible viewpoint restriction, it would still fail due to its overbreadth.

### iv.  *Unconstitutionally Overbroad*

136. Plaintiffs contend S.B. 12 broadens the established obscenity test in a manner that defines "sexual conduct" to sweep within its ambit significant constitutionally protected activities that are disproportionate to the statute's intended scope.

137. The Attorney General contends that S.B. 12 is not overbroad and its legitimate sweep is only to protect minors' physical and psychological well-being, including shielding them from sexually oriented performances that appeal to the prurient interest in sex.

138. The substantial overbreadth doctrine requires a court to invalidate a law as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)). Showing a law punishes a substantial amount of protected free speech, judged in relation to the

---

regulate based on the content and viewpoint of performances. Alternatively, if a court is to disagree with the need to apply strict scrutiny, S.B. 12 also fails intermediate scrutiny. For the aforementioned reasons S.B. 12 is not narrowly drawn, and it substantially burdens more speech than necessary.

statute's plainly legitimate sweep, suffices to invalidate all enforcement of that law. *Virginia v. Hicks*, 539 U.S. 113, 115 (2003). The overbreadth doctrine also allows Plaintiffs to vindicate the rights of third parties whose performances would also be swept up and affected by this statute. *See United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023) ("[T]he overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications.").

139.   The Texas Penal Code defines obscenity in accordance with the longstanding test from *Miller v. United States*, 413 U.S. 15 (1973), as "material or a performance that: (A) the average person, applying contemporary community standards, would find that taken as a whole appeals to the prurient interest in sex; (B) depicts or describes: (i) patently offensive representations or descriptions of ultimate sexual acts . . . and (C) taken as a whole, lacks serious literary, artistic, political, and scientific value." Tex. Penal Code § 43.21(a)(1).

140.   However, while S.B. 12 borrows some language from the *Miller* test, it excludes language that gives the test limitations such as requiring "the average person, applying contemporary community standards" must evaluate the work "taken as a whole."[99] This is problematic because S.B. 12 does not distinguish between a child's age. As a result, it is hard identify how "appealing to a prurient sexual

---

[99] Tex. Penal Code § 43.21(a)(1)(A).

interest" will be determined. Additionally, S.B. 12 has no requirement that the work be patently offensive or a carve out for work that is comical or has serious literary, artistic, political, and scientific value.

141. Beyond the substantially modified and broad "obscenity" standard, S.B. 12 also lacks many key definitions that allow the law to be wide sweeping in many ways. S.B. 12 applies to any type of "visual performance" and explicitly extends criminal liability to any performer (which is also not defined) who "regardless of whether compensation for the performance is expected or received,"[100] violates the law. The Court sees no way to read the provisions of S.B. 12 without concluding that a large amount of constitutionally protected conduct can and will be wrapped up in the enforcement of S.B. 12. It is not unreasonable to read S.B. 12 and conclude that activities such as cheerleading, dancing, live theater, and other common public occurrences could possibly become a civil or criminal violation of S.B. 12.

142. Further, the scope of S.B. 12 is broad, stating that it applies "on public property at a time, in a place, and in a manner that could reasonably be expected to be viewed by a child" **OR** "in the presence of an individual younger than eighteen

---

[100] *S.B. 12, supra* note 7, at 3–4.

years of age." The plain reading of this could virtually ban any performance in public that is deemed to violate S.B. 12, including drag shows.

143.   Additionally, the author of S.B.12, in the statement of intent, said "[w]hile drag shows have received the most attention, S.B. 12 is not limited to this . . . drag shows today may be replaced by other types of harmful performances in the future."[101] To meet this intent, S.B. 12 is extremely broad, and the five categories of "sexual conduct" are written to go far beyond the established standards provided for by the United States Supreme Court's *Miller* test and Texas' statute for indecent exposure.[102]

144.   Accordingly, the Court finds S.B. 12 to be substantially overbroad as written based on the plain text of S.B. 12. But even if S.B. 12 were not overbroad, it would still fail due to it being unconstitutionally vague.

---

[101] *Plaintiffs' Request for Judicial Notice*, Document No. 47, exhibit 6 at 1–3 (*Bill Analysis*).

[102] The Court notes the Texas Penal Code already prohibits anyone from "produc[ing], present[ing], or direct[ing] an obscene performance or participate[ing] in a portion thereof that is obscene or that contributes to its obscenity" while "knowing its content and character." Tex. Penal Code § 43.23.

### v.    *Unconstitutionally Vague*

145.    The Plaintiffs contend S.B. 12 is unconstitutionally vague because the plaintiffs cannot fully understand the scope of S.B. 12 due to the lack of defined terms and the incomplete obscenity standard.

146.    The Attorney General contends that the mere need to interpret a term does not make S.B.12 unconstitutionally vague.

147.    A law is unconstitutionally vague when it (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" or (2) fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008). When a law regards free expression and imposes criminal penalties, a more stringent test is used. Just because a statutory phrase may need interpretation or construction does not mean it is unconstitutionally vague. *Skilling v. United States*, 561 U.S. 358, 405 (2010) ("It has long been our practice, . . . before striking a . . . statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction.").

148.    The majority of the Plaintiffs testified to vague and confusing language in S.B. 12. The main issue of concern relates to the term "prurient interest in sex." The Attorney General argues that just because S.B.12 omits the rest of the *Miller*

standard, there is copious case law and definition for a "reasonable prudent person" to understand what the term means.[103] The Court disagrees. The express omission of the other prongs of the *Miller* test suggests that S.B. 12 is a wider interpretation of "prurient sexual interest." Accordingly, it is not readily known to someone of "ordinary intelligence" how S.B. 12 will be enforced.

149. Without a clear understanding of "prurient sexual interest," other terms such as "lewd" and "Performer" (which is undefined in S.B. 12) become problematic. While the Court notes there are ordinary definitions of the words, where the line is drawn as it relates to S.B. 12 is unclear. For example, any use of a "packer" to simulate male genitalia could be seen as lewd by some demographic. While it can be argued that there is an objective standard for what is lewd or even inappropriate, S.B. 12 does not provide any guidance or standard in determining what is lewd or barred by S.B. 12.

150. Some of the Plaintiffs testified that protestors frequent their events and apparently find the performances lewd and inappropriate for themselves and/or children.[104] While the Court notes there is not a citizen or third-party enforcement mechanism in S.B. 12, it is still obvious opinions on what is lewd

---

[103] *Hearing Transcript Day 2*, Document No. 78, at 102:1–25.

[104] *Hearing Transcript Day 1*, Document No. 77 at 136:21–25 and 198:6–20.

and inappropriate is a matter of great divergence amongst the population. Thus, the vague language and seeming omission of clear guidance makes S.B. 12 vague.

151.  Accordingly, the Court finds S.B. 12 to be unconstitutionally vague. But even if S.B. 12 were not unconstitutionally vague, it would still fail due to it being an impermissible prior restraint on speech.

### vi.  *Impermissible Prior Restraint on Speech*

152.  Plaintiffs contend that Section Two of S.B. 12 establishes a prior restraint on speech. None of the Defendants expressly address whether S.B. 12 is an impermissible prior restraint on speech.

153.  A prior restraint is a prohibition on speech or expression that bears a "heavy presumption of unconstitutionality." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990). A law regulating speech imposes an unconstitutional prior restraint in violation of the First Amendment when it either prohibits certain communications before they occur or allows for "excessive discretion" in regulating speech. *Cath. Leadership Coal. of Texas v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (citing *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988)).

154.  Here Section Two of S.B. 12 provides local government the authority to pass ordinances in order to regulate "sexually oriented performances" on public

property or in front of children under the age of eighteen. This ability to pass ordinances to stop conduct that as discussed above is protected by the First Amendment is a prior restraint on speech.

155. Accordingly, section two of S.B. 12 is an impermissible prior restraint on speech.

156. Therefore, the Plaintiffs have shown actual success on the merits as to their facial challenges to S.B. 12. The Court now turns to the remaining elements needed for the issuance of a permanent injunction.

## G. *Substantial Threat of Injury*

157. Courts deem the loss of a First Amendment right to be sufficient to show irreparable harm. *See Roman Catholic Diocese v. Cuomo, 141 S. Ct. 63, 67 (2020) ("*The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)))*.

158. Based on the foregoing, the Court finds that S.B. 12 impermissibly infringes on the First Amendment and chills free speech.

159. Accordingly, the impending chilling effect S.B. 12 will have is an irreparable injury which favors enjoining S.B. 12.

## H.    *Balance of Harms*

160.   Determining if the balance of the hardship favors the party seeking the injunction requires a court to consider "the competing claims of injury and . . . the effect on each party of the granting or withholding of the requested relief." *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 336 (5th Cir. 2013) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

161.   Here the infringement of the Plaintiffs' First Amendment rights and the impending chilling effect S.B. 12 will have on speech in general outweighs any hardship on the State of Texas.

162.   Accordingly, the Plaintiffs have shown the Balance of harm weights in their favor.

## I.    *Public Interest*

163.   "Injunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs*, Miss., 697 F.3d 279, 288 (5th Cir. 2012).

164.   Accordingly, the Court finds the Plaintiffs have met all requirements to relieve injunctive relief.

## IV. CONCLUSION

Based on the foregoing, the Court hereby

**DECLARES** that S.B. 12 is an **UNCONSTITUTIONAL** restriction on speech. The Court concludes that S.B. 12 violates the First Amendment as incorporated to Texas by the Fourteenth Amendment of the United States Constitution. The Court further

**ORDERS** that Defendant Warren Kenneth Paxton, Defendant Montgomery County, Texas, Defendant Brett Ligon, Defendant City of Abilene, Texas, Defendant Taylor County, Texas, Defendant James Hicks, Defendant Delia Garza, Defendant Joe D. Gonzalez are immediately enjoined from enforcing S.B. 12.[105]

SIGNED at Houston, Texas, on this **26** day of September, 2023.

DAVID HITTNER
United States District Judge

---

[105] The Court will issue a separate order disposing of all remaining ministerial matters in this case.