United States District Court
Southern District of Texas
ENTERED
August 25, 2026
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EXTRAGRAMS LLC, 360 QUEEN ENTERTAINMENT LLC, & BRIGITTE BANDIT,<br><br>Plaintiffs,<br><br>v.<br><br>WARREN KENNETH PAXTON, in an official capacity as Attorney General of Texas,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. H-23-2847 |

SUPPLEMENTAL FINDINGS OF FACT & CONCLUSIONS OF LAW
& AMENDED ORDER OF PERMANENT INJUNCTION

Pending before the Court is Plaintiffs' Amended Motion for Injunctive Relief (Document No. 129). Having considered the motion, evidence, oral argument presented at the Court's trial on the merits, supplemental briefing offered after the Fifth Circuit's remand by Plaintiffs and Defendants, amicus briefs offered by interested parties,[1] and applicable law, the Court now enters the following supplemental findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) and the United States Court of Appeals for the Fifth Circuit's

[1] The Court notes receipt of Amicus Briefs filed by Actors' Equity Association and the Dramatists' Legal Defense Fund. *See Brief of Amicus Curiae Actors' Equity Association*, Document No. 160 at 1–37; *see also Brief of Amicus Curiae Actors' Equity Association*, Document No. 161 at 1–26.

instructions. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such. Any finding of fact that should be construed as a conclusion of law is hereby adopted as such.

## I. BACKGROUND

This case arises out of a challenge to the constitutionality of a law promulgated by the State of Texas. On June 18, 2023, Texas Governor Greg Abbott signed into law Texas Senate Bill 12 ("S.B. 12")—which was touted as a "Drag Ban" from its inception. Indeed, the same day he signed S.B. 12 into law, Governor Abbott tweeted the following: "Texas Governor Signs Law Banning Drag Performances in Public. That's Right."[2] S.B. 12 purports to prohibit "sexually oriented performances" by imposing civil penalties on businesses that host them and criminal penalties on performers.[3] It also gives counties and municipalities the authority to ban and regulate such performances.[4]

On August 2, 2023, The Woodlands Pride, Inc. ("Woodlands Pride"), Abilene Pride Alliance ("Abilene Pride"), Extragrams, LLC ("Extragrams"), Plaintiff 360 Queen Entertainment LLC ("360 Queen Entertainment"), and Plaintiff Brigitte

---

[2] *Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction*, Document No. 10 at 10, n. 3 (hereinafter *Governor Abbott's Statement*).

[3] *Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction*, Document No. 10, Exhibit 1 (S.B. 12).

[4] *Id.*

Bandit,[5] (collectively, the "Original Plaintiffs") brought suit against Warren Kenneth Paxton, in his official capacity as the Attorney General of Texas ("Ken Paxton" or the "Attorney General");[6] Montgomery County, Texas; Brett Ligon, in his official capacity as District Attorney of Montgomery County; City of Abilene, Texas; Taylor County, Texas; James Hicks, in his official capacity as District Attorney of Taylor County; Delia Garza, in her official capacity as County Attorney of Travis County; and Joe D. Gonzales, in his official capacity as District Attorney of Bexar County (collectively, the "Original Defendants"), seeking to enjoin the enforcement of S.B. 12 on numerous constitutional grounds, including impermissible content and viewpoint restrictions, vagueness, overbreadth, and impermissible prior restraint of speech.[7] On August 9, 2023, the Original Plaintiffs moved for a temporary restraining order and preliminary injunction.[8] On August 14, 2023, the Court set a preliminary injunction hearing and further ordered the preliminary injunction hearing be consolidated with a trial on the merits pursuant to Federal Rule of Civil

---

[5] "Brigitte Bandit" is a pseudonym.

[6] The Court notes that this matter was originally filed against Angela Colmenero in her official capacity as Interim Attorney General of Texas. However, the parties agreed to change the case style and caption upon Paxton's reinstatement as Attorney General of Texas after the conclusion of his Texas Senate impeachment trial.

[7] *See Plaintiffs' Original Complaint*, Document No. 1 at 1–43.

[8] *See Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction*, Document No. 10 at 1–64.

Procedure 65(a)(2).[9] Commencing on August 28, 2024, the Court conducted a two-day final trial on the merits (hereinafter "the Hearing").[10] On August 31, 2023, the Court issued a temporary restraining order ("TRO"), finding the Original Plaintiffs had carried their initial burden.[11] On September 26, 2023, the Court issued its findings of fact, conclusions of law, and permanent injunction declaring S.B. 12 an unconstitutional restriction on the First Amendment of the U.S. Constitution.[12] Therein, the Court found S.B. 12 to be unconstitutional under five independent grounds and permanently enjoined eight Defendants from enforcing S.B. 12. *Id.* On September 29, 2023, six of the eight Defendants appealed this Court's decision, with Delia Garza, as County Attorney of Travis County, and Joe D. Gonzales, as District Attorney of Bexar County, declining to appeal. *Woodlands Pride v. Paxton*, 168 F.4th 293, 296 n. 4 (5th Cir. 2026).

---

[9] *See Court Order Declaring a Trial on the Merits*, Document No. 21 at 1–2.

[10] *See Minute Entry for Trial on the Merits Day 1*, Document No. 72 at 1; *see also Minute Entry for Trial on the Merits Day 2*, Document No. 74 at 1.

[11] *Temporary Restraining Order*, Document No. 75 at 1–5.

[12] *See Court's Findings of Fact & Conclusions of Law & Order of Permanent Injunction*, Document No. 94 at 1–56.

Twenty-nine months later, on February 25, 2026, a Fifth Circuit panel, comprised of two judges,[13] vacated the Court's permanent injunction and remanded the case to this Court with instructions to: "(1) dismiss the claims against Brett Ligon, James Hicks, Montgomery County, Taylor County, and the City of Abilene; (2) reconsider the plaintiffs' facial First Amendment challenges to Section One of S.B. 12 under the *Moody* framework; and (3) reconsider the plaintiffs' facial vagueness challenge to Section One of S.B. 12 in light of *Roy*."[14] *Woodlands Pride*, 168 F.4th at 308. The Fifth Circuit also concluded that two of the Original Plaintiffs, Woodlands Pride and Abilene Pride, lacked standing because their intended conduct was not proscribed by S.B. 12. Consistent with the first instruction of the mandate, the Court has already dismissed Plaintiffs Woodlands Pride and Abilene Pride, and dismissed all claims against Defendants Brett Ligon, James Hicks, Montgomery County, Taylor County, and the City of Abilene.[15] Thus, pursuant to the Fifth Circuit's mandate, the sole remaining Plaintiffs in this matter are Extragrams, 360 Queen Entertainment, and Bridgette Bandit (hereinafter "Plaintiffs"), leaving the

---

[13] Fifth Circuit Judge James Dennis was a member of the original panel but took inactive status on February 23, 2026. Therefore, Judge Dennis did not participate in the Fifth Circuit's decision, causing the case to be decided by a quorum under 28 U.S.C. § 46(d).

[14] *See Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024); *Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020).

[15] *See Court Order Granting Motion to Dismiss Claims by the Woodlands Pride, Inc., and Abilene Pride Alliance*, Document No. 133 at 1–2.

Attorney General of Texas, Ken Paxton as the sole remaining defendant in this matter.

Beyond this specific mandate, the Fifth Circuit did not disturb this Court's other findings of fact and conclusions of law that remain the law of the case at this time. *See F.D.I.C. v. McFarland*, 243 F.3d 876, 884 (5th Cir. 2001) ("[u]nder the 'law of the case' doctrine, 'a decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation.'") (quoting *Roboserve, Inc. v. Kato Kagaku Co.*, 121 F.3d 1027, 1031 (7th Cir. 1997)).

This Court now affirms its previous, undisturbed findings as the law of the case. The Court holds that Plaintiffs' facial overbreadth challenge to Section One of S.B. 12 succeeds under the *Moody* framework and that Plaintiffs continue to prevail on their facial vagueness challenge to Section One of S.B. 12 under *Roy*. As such, the Court permanently enjoins Defendants from enforcing S.B. 12 against Plaintiffs. The Court hereby reincorporates its prior findings of fact and conclusions of law by reference and issues supplemental findings of fact and conclusions of law, solely with respect to the issues the Court must consider as instructed by the Fifth Circuit. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such. Any finding of fact that should be construed as a conclusion of law is hereby adopted as such.

## II. FINDINGS OF FACT

The following facts have been established by a preponderance of the evidence:[16]

### A. Texas Senate Bill 12[17]

1. S.B. 12 was signed by Governor Abbott on June 18, 2023, and was scheduled to take effect on September 1, 2023. Since the Fifth Circuit suspended the Court's permanent injunction, the law is now in effect.

2. S.B. 12 bans "sexually oriented performances" by: (1) creating civil penalties for commercial entities that host such performances ("Section One"); (2) mandating that counties and municipalities ban many "sexually oriented performances," and granting them authority to regulate other such

---

[16] At the Hearing, the Court granted Plaintiffs' Motion for Judicial Notice of Plaintiffs' Exhibits 1–21 and 23–29 (Document No. 47). *See Plaintiffs' Requests for Judicial Notice*, Document No. 47 at 1–6.

[17] The Court is aware of the Eleventh Circuit's recent opinion vacating the District Court's preliminary injunction regarding Florida Senate Bill 1438. *See HM Florida-ORL, LLC v. Governor of Florida*, No. 23-12160, 2026 WL 2235960 (11th Cir. Aug. 4, 2026); *see also* Fla. Stat. § 827.11. This Court notes the fundamental differences between Florida's law and Texas Senate Bill 12. While Florida's law operates as a restriction on who can be admitted to an "adult performance[,]" Texas Senate Bill 12 restricts the performances themselves, making Texas's law potentially much broader, at least in application. *See* Fla. Stat. § 827.11 ("A person may not knowingly admit a child to an adult live performance.").

performances ("Section Two"); and (3) establishing criminal penalties for performers ("Section Three").[18]

3. S.B. 12 accomplishes its purported intent by amending multiple areas of Texas law and establishing different enforcement mechanisms assigned to various officials and government entities. Section One gives the Attorney General authority to enforce civil penalties against a person who "controls the premises" where a "sexual oriented performance" occurs with a minor present. Section Two gives local municipalities the ability to regulate "sexual oriented performances." Section Three creates a criminal punishment for "sexual oriented performances," punishable as a class A misdemeanor with penalties of up to a year in jail and a fine of up to $4,000.00.[19] The Court has considered the specific instructions of the Fifth Circuit's remand and now proceeds to consider Section One of S.B. 12 as instructed.

4. S.B 12 defines a "sexually oriented performance" as a "visual performance" that features a performer who is nude or a performer who engages in "sexual

---

[18] *Plaintiffs' Requests for Judicial* Notice, Document No. 47, Exhibit 1 at 1–5 (*Senate Bill 12, Enrolled Version)* (proposed Tex. Health & Safety Code § 769.002; Tex. Local Gov. Code § 243.0031; Tex. Penal Code § 43.28) [hereinafter *S.B. 12*].

[19] *S.B. 12*, *supra* note 15, at 1–5.

conduct" and appeals to the prurient interest in sex.[20] "Visual performance" is not defined in S.B. 12 or elsewhere in Texas law.

5. Any performer who is "nude" or "engages in sexual conduct" during a visual performance engages in a "sexually oriented performance" if their conduct "appeals to the prurient interest in sex."[21] "[P]rurient interest" is undefined under Texas law.[22]

6. S.B. 12 uses the definition of "nude" provided for in the Texas Business and Commerce Code,[23] which includes anyone who is "entirely unclothed" or "clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks."[24]

---

[20] *S.B. 12*, *supra* note 15, at 1–5.

[21] *S.B. 12*, *supra* note 15, at 3.

[22] The Court notes the term is borrowed from the Supreme Court's *Miller* test for obscenity, however none of the accompanied language is present in S.B. 12. The *Miller* test for obscenity includes the following criteria: (1) whether "the average person, applying contemporary community standards" would find that the work, "taken as a whole," appeals to "prurient interest" (2) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (3) whether the work, "taken as a whole," lacks serious literary, artistic, political, or scientific value. *Miller v. California,* 413 U.S. 15, 21 (1973) [hereinafter *Miller Test*].

[23] *S.B. 12*, *supra* note 15, at 4.

[24] Tex. Bus. & Com. Code § 102.051.

7. S.B. 12 allows municipalities and counties to "regulate sexually oriented performances as the municipality or county considers necessary to promote the public health, safety, or welfare," with no age requirement or standards or procedures for such regulations.[25]

8. Section One of S.B. 12, the provision of S.B. 12 at issue in the present Order, amends the Texas Health and Safety Code to prohibit anyone who "controls the premises of a commercial enterprise" from "allow[ing] a sexually oriented performance to be presented on the premises in the presence of an individual younger than 18 years of age."[26]

### B. S.B. 12 LEGISLATIVE HISTORY[27]

9. When S.B. 12 was first introduced on March 21, 2023, and enrolled on June 19, 2023, the Author's/Sponsor's Statement of Intent noted a concern about a

---

[25] Tex. Loc. Gov't Code § 243.0031(b).

[26] S.B. 12 § 1 (Tex. Health & Safety Code § 769.002(a)).

[27] The Court notes that the use of legislative history is not the preferred method of determining a purpose or intent of a law. *See Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 549 (2005) (holding that statutory text and not legislative history is the preferred evidence of legislative intent). However, the Supreme Court has repeatedly held that after examining a law on its face, a court may turn to the legislative history to determine purpose and intent. *Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015) (listing cases where legislative history was used).

"recent cultural trend" of "drag shows . . . performed in venues generally accessible to the public, including children."[28]

10. The Statement of Intent explained, "While drag shows have received the most media attention, S.B. 12 is not limited to this type of sexually oriented performance. Drag shows today may be replaced by other types of harmful performances in the future. S.B. 12 applies to and will protect children from sexually oriented performances in general."[29]

11. The Bill Analysis before the Texas House of Representatives State Affairs Committee cited a specific instance of a drag show being performed at a restaurant in Plano, Texas, on October 18, 2022, and referenced an article from the *New York Post*.[30] The *New York Post* article is entitled "Video of drag queen gyrating in front of child has Texas pols pushing for legislative action."[31]

---

[28] *Plaintiffs' Request for Judicial Notice*, Document No. 47, Exhibit 6 at 1–3 (*Bill Analysis*).

[29] *Id.*

[30] *Plaintiffs' Requests for Judicial Notice*, Document No. 47, Exhibit 6 at 1–3 (*Bill Analysis*).

[31] *Plaintiffs' Requests for Judicial Notice*, Document No. 47, Exhibit 21 at 1–9 (*New York Post Article*).

12. Governor Abbott signed S.B. 12 into law on June 18, 2023.[32] On June 24, 2023, Governor Abbott stated: "Texas Governor Signs Law Banning Drag Performances in Public. That's right."[33]

13. In the aftermath of S.B. 12's passage, multiple public statements from state officials and members of the Texas legislature explicitly state or strongly suggest that S.B. 12 is meant to be a ban on drag shows. After the Texas House of Representatives adopted the Conference Committee Report for S.B. 12 in its final form,[34] Lieutenant Governor Dan Patrick released the following statement: "I named SB 12 to be one of my top priorities this session because someone must push back against the radical left's disgusting drag performances which harm Texas children. It is shocking to me that any parent would allow their young child to be sexualized by drag shows. Children, who cannot make decisions on their own, must be protected from this scourge facing our state."[35]

14. On May 20, 2023, Texas State Representative Carrie Isaac, a joint sponsor of S.B. 12, stated: "Today we passed SB 12 to protect our children from being

---

[32] *See Plaintiffs' Requests for Judicial Notice*, Document No. 47, Exhibit 2.

[33] *See Plaintiffs' Requests for Judicial Notice*, Document No. 47, Exhibit 23 (*Governor Greg Abbot S.B. 12 Statement*).

[34] *See Plaintiffs' Requests for Judicial Notice*, Document No. 47, Exhibit 10 (*Adoption of S.B. 12*).

[35] *See Plaintiffs' Requests for Judicial Notice*, Document No. 47, Exhibit 26 (*Lieutenant Governor Dan Patrick's S.B. 12 Statement*).

groomed by restricting sexually oriented performances also know [sic] as 'drag shows' in the presence of children."[36]

15. On June 8, 2023, Texas State Representative Matt Shaheen, the sponsor of S.B. 12 in the Texas State House, stated: "Working with @SenBryanHughes, I passed legislation in the TX House protecting children from explicit, hyper-sexualized drag performances in Texas. #SB12."[37]

## C. PLAINTIFF EXTRAGRAMS

16. Extragrams is a drag entertainment and delivery service based in Austin, Texas.[38]

17. Extragrams utilizes independent contractors, who do drag performances for a variety of events including birthday parties, retirement parties, and corporate events. The Independent contractors use costuming to exaggerate masculine or feminine characteristics and often perform in open and public areas.[39] Costumes

[36] *See Plaintiffs' Requests for Judicial Notice*, Document No. 47, Exhibit 29 (*Texas State Representative Carrie Issaac's S.B. 12 Statement*); *cf. Governor Abbott's Statement*, *supra* note 2.

[37] See Plaintiffs' Requests for Judicial Notice, Document No. 47, Exhibit 27 (*Texas State Representative Matt Shaheen's S.B. 12 Statement*); *cf. Governor Abbott's Statement*, *supra* note 2.

[38] *Hearing Transcript Day 1*, Document No. 77 at 44:8-12, 57:15.

[39] *Hearing Transcript Day 1*, Document No. 77 at 60:1–67:15.

include wigs, makeup, high heels, dresses, body padding, pantyhose, corsets, push-up bras, breastplates, and crotch packers.

18. Performances also occur in privately owned commercial properties.

19. Performances include a variety of dancing, shaking, and splits, along with other theatrics such as singing, hugging, and comedy.

20. At least one Extragrams employee attends each of its drag performances in the capacity of an on-site manager.[40] The on-site manager coordinates with the clients and performers, provides security, and directs the audience.[41] Generally, there are no age limits at Extragrams shows and events.

21. Extragrams fears its performances could come into violation with S.B. 12 triggering both criminal liability for its performers and civil liability for the venues it often uses.

22. Specifically, Extragrams believes some aspects of its performances could be accused of "appeal[ing] to the prurient interest in sex."[42]

23. Extragrams also believes S.B.12 will cause clients to avoid its services in fear of running afoul of S.B.12.[43]

---

[40] *Hearing Transcript Day 1*, Document No. 77 at 55:24–56:6.

[41] *Hearing Transcript Day 1*, Document No. 77 at 56:11–22.

[42] *Hearing Transcript Day 1*, Document No. 77, at 61:24–62:9.

[43] *Hearing Transcript Day 1*, Document No. 77 at 64:13–22.

### D. PLAINTIFF 360 QUEEN ENTERTAINMENT

24. 360 Queen Entertainment is a drag production company operating in the San Antonio, Texas area. Richard Montez Jr. ("Montez") is a co-owner of 360 Queen Entertainment and testified on its behalf.[44] 360 Queen Entertainment hosts drag shows at Montez's father's restaurant.[45]

25. The main event produced by 360 Queen Entertainment is known as "Bottom-Up Diva Dinners" where guests get dinner and watch a show from famous Drag Queens.[46]

26. 360 Queen Entertainment does not admit minors to the actual show, which is performed on its outdoor patio. There are ways for minors to potentially see a glimpse of the performances, such as by looking around a corner or peaking through a fence.[47] Additionally, Montez testified that occasionally, parents ask for an exception to allow their children to watch the performances.[48] Montez also testified that he had, on occasion, observed families stopping at a distance on the outside sidewalk to catch a view of the drag performances.

[44] *Hearing Transcript Day 1*, Document No. 77 at 81:20–82:25.

[45] *Hearing Transcript Day 1*, Document No. 77 at 84:8–18.

[46] 360 Queen Entertainment hires drag performers who appear on RuPaul's Drag Race (a television series about drag performers).

[47] *Hearing Transcript Day 1*, Document No. 77 at 92:15–101:12.

[48] *Hearing Transcript Day 1*, Document No. 77 at 110:1–19.

27. The performances include multiple elements which Montez fears could come into contention with S.B. 12. Such as executing dance moves that some could consider "sexual gesticulations." Additionally, some performers wear prosthetics such as breastplates and wigs.

28. Montez testified that each performer conveys their own expressive message spanning from pure entertainment to messages of social justice.[49]

29. Montez fears the S.B. 12 will be enforced against 360 Queen Entertainment and its performers. This uncertainty has caused 360 Queen Entertainment to refrain from booking drag performers.

### E. PLAINTIFF BRIGITTE BANDIT

30. Brigitte Bandit is a drag performer who also produces and hosts drag shows, mainly in the Travis County area.

31. Brigitte Bandit considers drag to be an artistic endeavor that allows her to express herself, explore her identity outside of traditional gender norms, share messages of kindness and acceptance, and convey political messages.[50]

32. Brigitte Bandit demonstrated a political message when she wore a dress with the names of the Uvalde school shooting victims on the dress, when she testified before a Texas Senate Committee. When asked what the message was, she

---

[49] *Hearing Transcript Day 1*, Document No. 77 at 101:25–15:21.

[50] *Hearing Transcript Day 1*, Document No. 77 at 234:1–235:1, 235:15–17.

stated: "I was trying to say that we are sitting here arguing about drag performances and drag queens [] under the concern of safety for kids while kids are being shot in our schools here in Texas."[51]

33. Brigitte Bandit sometimes performs, hosts, and produces shows for audiences of all ages and sometimes performs, hosts, and produces shows in venues that are generally limited to people who are at least eighteen years of age.[52] Even at shows for adult audiences, Brigitte Bandit cannot know or control the ages of every member of her audience or control who may be able to catch a glimpse of her show.[53] Rather, this control lies predominately with the parents of the children who may, at times, be allowed to view the shows with parental consent.[54] In addition, the Court notes a related sentiment regarding parental supervision expressed by Lieutenant Governor Dan Patrick.[55]

34. As part of her artistic expression, Brigitte Bandit uses a prosthetic breastplate and various accessories like wigs, false eyelashes, high heels, corsets, jewelry,

---

[51] *Hearing Transcript Day 1*, Document No. 77 at 234:14–235:1.

[52] *Hearing Transcript Day 1*, Document No. 77 at 236:25–237:24, 238:9–14.

[53] *Hearing Transcript Day 1*, Document No. 77 at 239:23–240:16.

[54] *See Hearing Transcript Day 1*, Document No. 77 at 239:23–241:10.

[55] *See Lieutenant Governor Dan Patrick's S.B. 12 Statement*, *supra* note 35 (relating to parental responsibility).

and clothing to perform drag and impersonate female stars like Dolly Parton.[56] Many of these accessories and prosthetics exaggerate her female sexual characteristics.[57]

35. Brigitte Bandit sometimes dances, shimmies, shakes, and thrusts her hips, simulates kissing or "making out with somebody," blows kisses, and touches herself and others during her performances.[58] She fears multiple parts of her performances can be interpreted as "sexual gesticulations" or "imitating sexual acts."[59]

36. Brigitte Bandit believes parts of her performances and the props she uses could be seen under S.B. 12 as being in a "lewd state" or "nude."

37. Brigitte Bandit discussed her use of a breastplate to simulate larger breasts, which she sometimes exposes at adult-only shows.[60] However, even at general admission all-age shows the breastplate can slip, and it is not clear that the exposure of fake breasts would come into the definition of "nude" under S.B. 12.

---

[56] *Hearing Transcript Day 1*, Document No. 77 at 242:11–20.

[57] *Hearing Transcript Day 1*, Document No. 77 at 243:1–3.

[58] *Hearing Transcript Day 1*, Document No. 77 at 250:4–251:7.

[59] *Hearing Transcript Day 1*, Document No. 77 at 250:16–22.

[60] *Hearing Transcript Day 2*, Document No. 78 at 6:1–25.

38. As a result of S.B. 12, Brigitte Bandit will be at risk of both civil penalties and criminal prosecution, and as such, she will likely have to limit or modify her performances.

### F. DEFENDANT KEN PAXTON'S EVIDENCE PRESENTED AT TRIAL

39. Defendant Paxton called a psychiatrist and pharmacologist to testify as an expert on the allegedly harmful effects of exposure to explicit sexual material on children. At trial, the expert indicated that he had never seen someone suffer serious harm due to a drag show or other performances proscribed by S.B. 12.[61]

40. None of the other six Original Defendants offered any other evidence at trial.

## III. CONCLUSIONS OF LAW

### A. GENERAL STATEMENTS OF LAW

41. The Court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331.

42. Venue is proper pursuant to 28 U.S.C. § 1391(b).

### B. PLAINTIFFS' STANDING AGAINST DEFENDANT PAXTON

43. This Court previously held that all Plaintiffs have standing against the Defendants. *Woodlands Pride*, 694 F. Supp. 3d at 841.

44. On appeal, the Fifth Circuit affirmed that "360 Queen [] has standing to seek an injunction against the Attorney General." *Woodlands Pride*, 168 F.4th at 305-

---

[61] *Hearing Transcript Day 1*, Document No. 77 at 165:21–166:6.

06. The Fifth Circuit did not evaluate Extragrams and Bridgitte Bandit's standing, nor challenge this Court's findings that they have standing. *Id.* at 306 ("Because one plaintiff with standing for a given defendant is sufficient, we need not determine whether the remaining two plaintiffs [Extragrams and Bandit] have standing to seek an injunction against the Attorney General.").

45. At this stage of litigation, Ken Paxton agrees that "standing is present" and has not sought dismissal on remand based on standing grounds.

46. Accordingly, the Court finds that Plaintiffs Extragrams, 360 Queen Entertainment, and Brigitte Bandit have standing to bring the present challenge against Ken Paxton. The Court now turns to consider the specific issues presented to the Court upon remand.

### C. RECONSIDERING THE PLAINTIFFS' FACIAL FIRST AMENDMENT CHALLENGES TO SECTION ONE OF S.B. 12 UNDER THE *MOODY* FRAMEWORK

47. The Fifth Circuit has instructed this Court to "reconsider the Plaintiffs' facial First Amendment challenges to Section One of S.B. 12 under the Supreme Court's framework in *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024).[62]

48. Under Moody, a court's analysis proceeds in two steps. "The first step in the proper facial analysis is to assess the state laws' scope. What activities, by what

---

[62] *Woodlands Pride*, 168 F.4th at 308.

actors, do the laws prohibit or otherwise regulate?" *Moody*, 603 U.S. at 724. "The next order of business is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Id.* at 725.

49. In conducting the first step, the Court "must evaluate the full scope of the law's coverage" and conduct an "inquiry into how a law works in all of its applications." *Id.* at 744. In "explor[ing] the laws' full range of applications," the Court should go beyond the "heartland" of what the law is aimed at to consider "the sphere of other applications." *Id.* at 726. Once the law's scope and breadth are determined, the Court must decide where applications "fall on different sides of the constitutional line." *Id.*

50. Importantly, while *Moody* requires a two-part analysis, it does not change the substantive legal standard that this Court previously relied on in declaring S.B. 12 facially overbroad. *Woodlands Pride*, 694 F. Supp. 3d at 847 ("[t]he substantial overbreadth doctrine requires a court to invalidate a law as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'") (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). The Court now turns to consider each step of the *Moody* framework.

## STEP ONE OF THE *MOODY* FRAMEWORK: ASSESSING S.B. 12'S SCOPE

51. Construing S.B. 12 under *Moody* reveals the statute's broad scope. All three sections of S.B. 12 are centered around the term "sexually oriented performances." *See Woodlands Pride*, 168 F.4th at 298. S.B. 12 defines "sexually oriented performance" as "a visual performance" that (1) features a performer who is either (a) "nude" or (b) "engages in sexual conduct" and (2) "appeals to the prurient interest in sex." Tex. Penal Code § 43.28 (a)(2). As this Court previously found, "S.B. 12 is extremely broad, and the five categories of 'sexual conduct' are written to go far beyond the established standards provided for by the United States Supreme Court's *Miller* test and Texas' statute for indecent exposure." *Woodlands Pride*, 694 F. Supp. 3d at 848–49.

### 1. <u>S.B. 12's Broad Definition of "Performances"</u>

52. S.B. 12 only applies to "visual performances." This means that any conduct or expressive activity that is not part of a "performance" is not reached by the statute. While not defined in S.B. 12, the word "performance" is defined in the Texas Penal Code as "a play, motion picture, dance, or other exhibition performed before an audience." Tex. Penal Code § 43.21(a)(3) (emphasis added).

53. On its face, S.B. 12 only applies to visual performances, which are generally shielded by the First Amendment unless obscene or obscene for minors. *See,*

*e.g.*, *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981) ("By excluding live entertainment . . . [the] ordinance prohibits a wide range of expression that has long been held to be within the protections of the First and Fourteenth Amendments. Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee"); *see also id.* at 66 ("Nor may an entertainment program be prohibited solely because it displays the nude human figure. '[N]udity alone' does not place otherwise protected material outside the mantle of the First Amendment") (citing *Jenkins v. Georgia*, 418 U.S. 153, 161 (1974); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 211–212 (1975)).

54. Some performances that contain no "visual" component at all are excluded from the statute's reach—such as a book, audiobook, song, or radio program. However, even shows that rely primarily on singing or the spoken word, such as stand-up comedy, slam poetry (a relatively new competitive and energetic form of performance poetry), or the opera still contain "visual" elements and fall within S.B. 12's scope. This makes the law potentially apply to countless exhibitions and events with an audience, including sports matches, cheerleading and dance contests, karaoke, musicals, art exhibitions, dressing in potentially provocative costumes at comic book conventions, ballet, and more. *See*

*Merriott v. City of Bossier City*, No. 25-30325, 2026 WL 1830752, at *5–6 (5th Cir. June 25, 2026) (noting that when terms are "so unbounded . . . [t]he possible applications are unquantifiable").

### 2. S.B. 12's Broad Definition of "Nude"

55. In addition to S.B. 12's broad definition of performances, S.B. 12 similarly carries a broad definition of "nude" from the Texas Business & Commerce Code. "Nude" is defined as "(A) entirely unclothed; or (B) clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks." Tex. Bus & Comm. Code § 102.051 (emphases added).

56. Plaintiffs note for the Court by way of example just how broad the definition of "Nude" appears to be under S.B. 12. For example, swimmers or divers in the Olympics would run afoul of S.B. 12 if their swimsuits show even a minimal portion of their buttocks. Plaintiffs further contend that celebrity singers like Lady Gaga, Jennifer Lopez, or Dolly Parton could be accused of being "nude" for wearing low-cut tops that show cleavage below the areola. Accordingly, based on the plain language of S.B. 12, the definition of "nude" potentially applies to performances that are not obscene or obscene for minors.

### 3. S.B. 12's Broad Definition of "Prurient Interest in Sex"

57. For standing purposes, the Fifth Circuit noted that "prurient" material "at a minimum, must be 'in some sense erotic.'" *Woodlands Pride*, 168 F.4th at 299.

58. The word "erotic" can be defined by Merriam-Webster dictionary as "strongly marked or affected by sexual desire" or "of, devoted to, or tending to arouse sexual love or desire."[63] For instance, a scene of two people kissing in a PG rated movie or a pop star wearing a revealing dress could be viewed as "erotic" depending on people's subjective interpretation.

59. Because S.B. 12 does not specify who determines whether a performance "appeals to the prurient interest," or require that the work be taken as a whole, a single moment of eroticism could condemn an entire performance to criminal or civil penalties. Just as many people criticized Elvis's signature hip gyrations and were offended by his display of male sexuality, chastised Dolly Parton as a voluptuous sex symbol because of her big hair, flamboyant clothes and breast exposure, and shamed Miley Cyrus for "twerking" on stage during a live performance at the 2013 MTV Video Music Awards, there are "erotic" elements in countless popular performances that could be subject to both civil and criminal penalties under S.B. 12.

---

[63] *Erotic*, Merriam-Webster, https://www.merriam-webster.com/dictionary/erotic (last visited July 24, 2026).

60. Based on the Court's analysis above under step one of *Moody*, the plain language of S.B. 12 creates a significant potential for broader applications. As this Court previously concluded, "[i]t is not unreasonable to read S.B. 12 and conclude that activities such as cheerleading, dancing, live theater, and other common public occurrences could possibly become a civil or criminal violation of S.B. 12." *Woodlands Pride*, 694 F. Supp. 3d at 848. Because S.B. 12's terms are so "unbounded," it is impossible for this Court to list all "possible applications" of the statute, which are "unquantifiable." *See Merriott*, 2026 WL 1830752, at *5.

61. Having considered the potential scope of S.B. 12 in compliance with the first step of the *Moody* framework, the Court now turns to consider the second step of the *Moody* framework: how S.B. 12's potential applications violate the First Amendment.

## **STEP TWO OF THE *MOODY* FRAMEWORK: HOW S.B. 12'S APPLICATIONS VIOLATE THE FIRST AMENDMENT**

62. The Court is now instructed to conduct an "inquiry into how [S.B. 12] works in all of its applications." *Moody*, 603 at 744

63. This Court has already determined that S.B. 12 imposes content and viewpoint-based restrictions on protected speech and does not satisfy strict or even intermediate scrutiny. *Woodlands Pride*, 694 F. Supp. 3d at 844-47. Although these claims of content and viewpoint discrimination are distinct from facial

overbreadth, *see Merriott*, 2026 WL 1830752, at *10, they also underscore how nearly all of S.B. 12's potential applications are unconstitutional at step two of the *Moody* analysis.

64. Even if S.B. 12 were somehow content-neutral (an argument the Attorney General has never advanced), it still prohibits huge swaths of constitutionally protected performances. Because the term "prurient interest in sex" is open-ended, S.B. 12 can be used to cherry-pick particular aspects of performances that might be "in some sense erotic."

65. S.B. 12 applies to countless protected performances that might contain elements that are "in some sense erotic" and meet either the law's definition of "nude" or "sexual conduct" but are not obscene or obscene for minors and are thus constitutionally protected. These examples, or any combination of them, could all potentially trigger liability under S.B. 12 while still being constitutionally protected performances. These examples are as follows.

   a. Nudity: (1) A gymnast performing a floor routine wearing a leotard or other garment that rides up and reveals a small part of their buttocks; (2) a vocalist wearing a low-cut dress that reveals a small part of the breast; or (3) a ballet dancer who experiences a wardrobe malfunction and reveals a portion of their buttocks or breasts;

b. Sex Acts: (1) a comedian who uses gestures to suggest sexual acts; or (2) a theater group performing a musical with a simulated sex scene on stage;

c. Genitals in a Lewd State: (1) a drag king who uses a crotch packer to simulate having a penis; (2) an art exhibition with abstract paintings that look like female genitals; or (3) a comedian using a dildo as a prop in a comedic routine;

d. Gesticulations Using Accessories or Prosthetics: (1) a Dolly Parton impersonator who uses a breast plate while dancing and making gestures; or (2) an Elvis impersonator who uses a packer while shaking and shimmying their hips.

66. Much like the "possible applications" that the Fifth Circuit found "unquantifiable" in *Merriott*, these are just a handful of traditionally constitutionally protected performances that S.B. 12 would prohibit. *See* 2026 WL 1830752, at *5. This Court need not list additional hypotheticals to which S.B. 12 would apply because "the potential applications are limitless." *Id.* at *7.

## SUMMARY OF *MOODY* DISCUSSION

67. In sum, S.B. 12 is facially overbroad under the *Moody* analysis. In the first *Moody* step, an analysis of the law's sweeping and often undefined terms, and expansive application to numerous types of property, audiences, and performers reveals S.B. 12's broad scope. In other words, S.B. 12 "prohibit[s] or otherwise

regulate[s]" a wide array of "activities" by a myriad of "actors." *Moody*, 603 U.S. at 724. 250.

68. The next step of *Moody* requires courts to "decide which of the laws' applications violate the First Amendment." *Id.* at 725. As evidenced above, the vast majority of the law's numerous applications violate the First Amendment because all the performances that it has an actual impact on are constitutionally protected and are targeted for prohibition based on content and viewpoint. Under *Moody*, S.B. 12 has no "legitimate sweep." *Id.* at 725.

69. The final stage of the *Moody* analysis involves comparing the unconstitutional applications of the law with its constitutional applications. In the case of S.B. 12, the unconstitutional applications (i.e. applications affecting non-obscene dance, theatrical, comedic, and other performances) far outweigh any constitutional applications, which are virtually non-existent and are already prohibited by other laws. Thus, S.B. 12 is "facially invalid" because its "unconstitutional applications substantially outweigh its constitutional ones." *Id.*

70. Accordingly, the Court has complied with the Fifth Circuit's instructions to consider S.B. 12 in light of *Moody* and finds S.B. 12 to be unconstitutional under the *Moody* framework. The Court now turns to comply with the Fifth Circuit's instructions by considering S.B. 12 in light of *Roy*.

### C. RECONSIDERING PLAINTIFFS' FACIAL VAGUENESS CHALLENGE TO SECTION ONE OF S.B. 12 IN LIGHT OF *ROY*.

71. The Fifth Circuit has instructed this Court to "reconsider the plaintiffs' facial vagueness challenge to Section One of S.B. 12 in light of the Fifth Circuit's opinion in *Roy v. City of Monroe,* 950 F.3d 245, 252 (5th Cir. 2020)."[64]

72. The Court notes that *Roy* applied the same standard that this Court did in its prior findings of fact and conclusions of law. However, the Fifth Circuit refers this Court to additional rule language in *Roy* that courts "will not hold that the ordinance is unconstitutionally vague on its face if 'it is clear what the ordinance as a whole prohibits' or if the ordinance 'is surely valid [i.e. not vague] in the vast majority of its intended applications.'" *Woodlands Pride*, 168 F.4th at 308 (quoting *Roy*, 950 F.3d at 252). Even under this additional rule language, S.B. 12 remains unconstitutionally vague on its face.

73. A law is unconstitutionally vague if it fails to provide "a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008).

---

[64] *See Woodlands Pride*, 168 F.4th at 308.

74. S.B. 12 is unconstitutionally vague because it fails to give a reasonable person notice of what is prohibited. Even though multiple aspects of the law render it vague, the most glaring issue "relates to the term 'prurient interest in sex.'" *Woodlands Pride*, 694 F. Supp. 3d at 849. Because this term is undefined in Texas law, lacks a readily ascertainable ordinary meaning, and applies to all performances targeted by the statute, it renders S.B. 12 irredeemably vague.

75. As this Court previously noted, "[w]ithout a clear understanding of 'prurient sexual interest,' other terms such as 'lewd' and 'Performer' (which is undefined in S.B. 12) become problematic." *Woodlands Pride*, 694 F. Supp. 3d at 849. "While the Court notes there are ordinary definitions of the words, where the line is drawn as it relates to S.B. 12 is unclear." *Id.* These terms fail the test from *Roy* because they do not provide "a reasonable opportunity to understand what conduct [the law] prohibits" and "authorize[] . . . arbitrary and discriminatory enforcement." *Roy*, 950 F.3d at 252.

76. For example, unlike other laws that use the term "lewd," "S.B. 12 does not provide any guidance or standard in determining what is lewd or barred by S.B. 12." *Woodlands Pride*, 694 F. Supp. 3d at 849. At trial, the Attorney General argued that crotch packers, which simulate a male bulge, are not "lewd" because they merely "simulate[] the normal male bulge that every male has,"[65] and this

[65] *Hearing Transcript Day* 2, Document No. 78 at 23:11–24.

Court found that "any use of a 'packer' to simulate male genitalia could be seen as lewd by some demographic." *Woodlands Pride*, 694 F. Supp. 3d at 849.

77. Another example of statutory vagueness presents itself with the term "control." Although this term has an ordinary meaning that the Fifth Circuit identified in its standing analysis, this term still fails to give sufficient notice of what S.B. 12 precludes. *See Woodlands Pride*, 168 F.4th at 305 (quoting Control, Black's Law Dictionary (11th ed. 2019) (defining "Control" as, *inter alia*, "[t]o exercise power or influence over")). Individuals operating a business, hosting an event, performing a routine, or even providing services for such an event (such as security, lighting, music, etc.) potentially qualify as a person who controls the premises of a commercial enterprise, thus subjecting these individuals to civil and criminal liability under S.B. 12. Thus, the law's broad use of the term "control" fails to give adequate guidance to a reasonably prudent person about whether they exercise enough "control" to be held liable.

78. Accordingly, after reconsidering its prior vagueness analysis under *Roy* based on the Fifth Circuit's remand instructions, the Court finds S.B. 12 to be facially vague in violation of the Fourteenth Amendment's Due Process Clause.

## D. DEFENDANT PAXTON'S OPPOSED MOTION FOR NEW TRIAL AND FOR ADDITIONAL DISCOVERY

79. Also pending before the Court is Paxton's Opposed Motion for New or Supplemental Trial and for Discovery (Document No. 146). Therein, Paxton

contends that this Court cannot properly perform the *Moody* analysis directed by the Fifth Circuit without a new or supplemental trial at which additional facts relevant to that analysis can be heard.

80. The Court notes that the Fifth Circuit did not specify precisely what "further proceedings" are necessary in this case on remand, but did state that "[t]he district court did not conduct this [Moody] analysis, nor did the parties brief the proper standard or adequately develop the record." *Woodlands Pride*, 168 F.4th at 308.

81. On June 23, 2026, this Court ordered extensive supplemental briefing to both adequately develop the record and for purposes of complying with the Fifth Circuit's instructions. In response to the Court's order, the parties filed over 230 pages of briefing specifically responsive to the Fifth Circuit's instructions to consider the *Moody* framework.

82. Accordingly, the Court determines that the record has been adequately developed in this matter and determines that Paxton's pending motion for a new trial should be denied.

83. Finally, for those who find such activities as described in this case offensive, the solution is relatively simple… just don't go.

## IV. CONCLUSION

Based on the foregoing, the Court hereby

**ORDERS** that Plaintiffs' Amended Motion for Injunctive Relief (Document No. 129) is **GRANTED**. The Court further

**DECLARES** that Texas Senate Bill 12 is an **UNCONSTITUTIONAL** restriction on speech. The Court concludes that Texas Senate Bill 12 violates the First Amendment as incorporated to Texas by the Fourteenth Amendment of the United States Constitution. The Court further

**ORDERS** that Defendant Warren Kenneth Paxton, is immediately and permanently enjoined from enforcing Texas Senate Bill 12. The Court further

**ORDERS** that Defendant Paxton's Opposed Motion for New or Supplemental Trial and for Discovery (Document No. 146) is **DENIED**.

SIGNED at Houston, Texas, on this 25 day of August, 2026.

DAVID HITTNER
United States District Judge